**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

STATE OF CONNECTICUT,                    :
    *Plaintiff*,                              :
                              :
      v.                                        :
                              :
UNITED STATES DEPARTMENT                  :
OF THE INTERIOR, DOUG BURGUM,             :
BRYAN MERCIER, BUREAU OF                   :
INDIAN AFFAIRS, KIMBERLY                    :
BOUCHARD,                                    :
    *Defendants*.                          :                    APRIL 11, 2025

**COMPLAINT FOR DECLARATORY**
**AND INJUNCTIVE RELIEF**

    1.    The State of Connecticut ("the State) brings this action to overturn an unlawful and unconstitutional decision ("Decision") by the Secretary of the Interior ("Secretary"), and those acting under his delegated authority (collectively "Defendants"), to acquire more than 80 acres of land in trust for the benefit of the Mashantucket Pequot Tribe a/k/a the Mashantucket Pequot Tribal Nation ("Tribe"). Defendants reached that Decision even though: (a) they knew the State had not received notice of the Tribe's applications for the trust acquisitions as required, (b) they failed to consider the Comments the State submitted once it heard about the applications even though Defendants were required to do so; (c) their written decisions granting the applications identified purported statutory authority allowing them to take the land that they have otherwise disclaimed reliance on; and (d) they—in fact—had no statutory authority to take the land. The consequences of Defendants' actions are significant—if the Courts allow the Decision to go into effect and stand, it will permanently strip the State of its sovereign territory at issue here and set a precedent that Defendants have said would allow them to take all of southeastern Connecticut out of the State's

jurisdiction and place it under the jurisdiction of Defendants and the Tribe. Declaratory and injunctive relief is necessary to prevent these improper acquisitions.

## Introduction

2.     The Secretary has no statutory authority to take land into trust for the Tribe.

3.     The Secretary has delegated aspects of his authority relating to trust land acquisitions to employees of the Bureau of Indian Affairs ("the BIA") or other officials of the Department of the Interior ("the Department").

4.     This Complaint will refer generally to Defendants except when addressing specific actions of individual officers or employees will make the allegations more clear.

5.     The process of taking land into trust begins with a tribe filing an application.

6.     Once a tribe files an application, the regulations require the BIA to send notice of the application to the state and local governments with jurisdiction over the land that is the subject of the application. Such notices offer the impacted governments the opportunity to comment on the application and express any concerns they may have.

7.     This case arises out of two separate trust land applications the Tribe submitted to Defendants, covering a total of more than 80 acres of land located in the State.

8.     Defendants designated one application as Case No. 53179 and the other as 53199. This Complaint will refer to the two applications collectively as "the Applications."

9.     Defendants may only act on an application as permitted by their statutory authority and within the bounds of that authority.

10.     Consistent with that, the applicable regulations require Defendants to identify statutory authority for all trust land acquisitions and to operate within the limits of that authority.

11.    In the Applications, the Tribe asserted that the Mashantucket Pequot Indian Claims Settlement Act, Public Law 98-134, 97 Stat. 851 (Oct. 18, 1983) ("the Settlement Act") granted Defendants the necessary statutory authority for the acquisitions.

12.    The initial administrative decision-maker on the Applications was Defendant Kimberly Bouchard, the Regional Director for the Eastern Regional Office of the BIA ("the Regional Director").

13.    The Regional Director granted the Applications in two separate Decisions (collectively "the Decisions," unless otherwise provided).

14.    In the Decisions, the Regional Director did not cite the Settlement Act even though the Tribe relied on it in its Applications. Instead, the Regional Director relied solely on § 5 of the Indian Reorganization Act, 48 Stat. 985, 25 U.S.C. § 5108 ("IRA"), as the statutory authority for the acquisitions. The Decisions simply cited the IRA with no analysis even though Defendants' procedures explicitly required analysis.

15.    The United States Supreme Court has held that the IRA only authorizes the Secretary to acquire lands in trust for tribes that were federally recognized and under federal jurisdiction in 1934.

16.    The Tribe was not federally recognized until the Settlement Act in 1983.

17.    The Tribe was not under federal jurisdiction in 1934. For example, in § 2(f) of the Settlement Act, Congress found that "[t]he United States has provided few, if any, special services to the" Tribe "and has denied that it had jurisdiction over or responsibility for said Tribe." That finding by Congress was consistent with public statements by the Tribe and state and federal officials at the time the Settlement Act became law.

18.    The State timely administratively appealed the Decisions to the Interior Board of Indian Appeals ("the IBIA"), which consolidated the State's appeals.

19.    The then-Assistant Secretary of Indian Affairs ("the ASIA") took jurisdiction over the State's administrative appeals.

20.    In briefing before the ASIA, the Regional Director abandoned the IRA as the statutory basis for the acquisitions and instead argued that Congress had permitted her to acquire the land under the Settlement Act.

21.    The Regional Director did not cite the Settlement Act in the Decisions.

22.    The United States Supreme Court has held that agency decisions must be assessed based on the reasoning the agency sets forth in its decision.

23.    Even if the Regional Director could properly rely on the Settlement Act as the basis for her statutory authority despite having failed to cite it in the Decisions, the Settlement Act did not grant her the authority for the acquisitions.

24.    In the numerous instances where Congress extended § 5 of the IRA to tribes, it did so expressly.

25.    In contrast to these laws that expressly extend the IRA to a given tribe, the Settlement Act does not mention the IRA.

26.    The IRA is not discussed even once in the Settlement Act's voluminous legislative history.

27.    Apart from failing to identify valid statutory authority for the acquisition, Defendants also failed to give the State proper notice or hearing.

28.    Although the regulations required Defendants to notify the State of the Applications, Defendants attempted to send notice using plainly deficient procedures.

4

29.     As a result, the State did not receive actual notice of the proposed acquisitions until the State learned of them from a third party months after Defendants had purportedly sent the notices.

30.     The notices Defendants sent stated that the recipient could submit comments on the applications within 30 days of the day the recipient received the notice.

31.     The State contacted Defendants 13 days after it received the notices from a third party.

32.     The State informed Defendants that it had just received notice and requested the extension of time offered in the notices.

33.     Defendants denied the request, in direct violation of binding agency precedent.

34.     Defendants failed to acknowledge substantial evidence the State submitted that showed it had not, in fact, received the notices sent by Defendants.

35.     Defendants also improperly withheld key documents that would have given the State information about the Applications.

36.     Despite all that, the ASIA affirmed the Regional Director's Decisions. In so doing, the ASIA explicitly refused to consider the State's argument that Defendants lacked statutory authority to acquire the land at issue.

37.     The State respectfully seeks relief from this Court. The Court should declare that the Secretary lacks statutory authority to take land into trust for the Tribe and permanently enjoin the Secretary from acquiring the lands at issue in this case.

38.     Alternatively, this Court should vacate and remand the ASIA and Regional Director Decisions because Defendants violated the State's procedural rights, and because those Decisions are otherwise arbitrary, capricious, and not in accordance with law. *See* 5 U.S.C. § 706(2).

## Parties

39.    Plaintiff the State of Connecticut is a sovereign state, with a compelling interest in maintaining its jurisdiction over land that, while owned by federally recognized tribes in the State, is not tribal land. Rather, it is fee land subject to full state and local jurisdiction. In addition, the State represents the interests and defends the rights of its citizens.

40.    Defendant the Department of the Interior is an agency of the United States and is charged with primary supervision of Indian Affairs for the federal government.

41.    Defendant Doug Burgum is the United States Secretary of the Interior, whose office is located at 1849 C Street, N.W., Washington D.C., 20240. Congress has delegated responsibilities to the Secretary to carry out federal administration of tribal land acquisition. The Secretary has delegated his authority to take lands into trust to the Assistant Secretary for Indian Affairs through Part 209, Chapter 8 of the Departmental Manual. *See also* 25 C.F.R. §§ 151.2(a) and 151.12(c). The Secretary is sued in his official capacity only.

42.    Defendant Bryan Mercier is the ASIA, whose office is located at 1849 C Street, N.W., Washington D.C., 20240. The ASIA exercises authority delegated to him by the Secretary, including over requests to acquire land in trust for tribes, and has direct authority over the Bureau of Indian Affairs Regional Offices, including the Eastern Region. The ASIA is sued in his official capacity only.

43.    Defendant the Bureau of Indian Affairs is an office within the Department with delegated responsibilities for the administration and management of certain federal authorities related to Indian tribes.

44.    Defendant Kimberly Bouchard is the Regional Director for the Eastern Regional Office of the BIA, whose office is located at 545 Marriott Drive, Suite 700, Nashville, Tennessee,

37214. Director Bouchard oversees the transfer of title for lands to be taken into trust by the Secretary and has been directed to "immediately" take the lands into trust upon completion of ministerial tasks. She is sued in her official capacity only.

## Jurisdiction and Venue

45.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331. This action challenges a final agency action and is brought under the Administrative Procedure Act, 5 U.S.C. §§ 701–06 ("the APA").

46.     The Declaratory Judgment Act, 28 U.S.C. §§ 2201–02, authorizes the requested declaratory and injunctive relief.

47.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(1). The State brings this action against the United States and federal officers acting in their official capacities, the parcels of land at issue are located in Connecticut, and a substantial part of the events giving rise to these claims occurred in Connecticut.

48.     The United States has waived its sovereign immunity from suit under 5 U.S.C. § 702; *see Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 216–17 (2012).

49.     The State challenges a final agency action under § 704 of the APA. *See* 25 C.F.R. § 151.12(c).[1]

_____

[1] To assist the Court, the State has included its exhibits to this Complaint in a bates-numbered Appendix. The operative version of the regulations—those in effect when the Tribe filed these Applications on August 25, 2023—is attached hereto at A-020. Thereafter, the regulations were revised on January 11, 2024. 88 Fed. Reg. 86,222 (Dec. 12, 2023). All parties proceeded under the pre-2024 regulations below.

## Allegations

### I.   Neither the IRA Nor the Settlement Act Confers Authority on the Secretary to Acquire Lands into Trust for the Tribe

50.    Because "[a]dministrative agencies are creatures of statute" they "possess only the authority that Congress has provided." *National Fed'n of Independent Business (NFIB) v. DOL, OSHA*, 595 U.S. 109, 117 (2022). Therefore, land "may only be acquired for an individual Indian or a tribe in trust status when such acquisition is authorized by an act of Congress." 25 C.F.R. § 151.3.

51.    In the Decisions, Defendants stated that they were authorized to acquire land for the Tribe under the IRA.

52.    That was error.

53.    In 1934, Congress passed the IRA, which authorizes the Secretary to acquire land and hold it in trust "for the purpose of providing land for Indians." IRA § 5 (codified at 25 U.S.C. § 5108). "Indian" means "all persons of Indian descent who are members of any recognized Indian tribe *now under Federal jurisdiction*." IRA § 19 (codified at 25 U.S.C. § 5129) (emphasis added). Section 5 only authorizes trust acquisitions for those tribes that were federally recognized and under federal jurisdiction in 1934. *Carcieri v. Salazar*, 555 U.S. 379, 395 (2009).

54.    The Tribe satisfies neither requirement. It was not federally recognized until Congress passed the Settlement Act in 1983. 97 Stat. 851 (A-027). And Congress found in the Settlement Act that "[t]he United States has provided few, if any, special services to the Western Pequot Tribe [the predecessor to the Tribe] and has denied that it had jurisdiction over or responsibility for said Tribe." Settlement Act § 2(f). Other relevant parties—such as the Tribe itself, along with the State, the Department, and the President—universally agreed that the Tribe had no relationship with the federal government as of 1934.

8

55.     Section 5 of the IRA therefore does not provide the Secretary with authority to take land into trust for the Tribe.

56.     The Decisions below cited only the IRA to support their conclusion that Defendants had statutory authority for the acquisitions.

57.     In administrative appeal proceedings before the agency, the Regional Director abandoned the IRA as the source of statutory authority for the acquisitions. Instead, she argued for the first time on appeal that the Secretary was permitted to acquire the land under the Settlement Act.

58.     The United States Supreme Court has held that agency decisions must be reviewed based on the reasoning the agency expresses in the decision. Therefore, agencies may not properly defend their decisions based on post-hoc reasoning. As a result, the Regional Director's reliance on the Settlement Act to defend her Decisions was improper.

59.     Even if the Regional Director could properly rely on statutory authority that she failed to cite in her Decisions, the Settlement Act does not confer trust authority on the Secretary.

60.     The Settlement Act resolved a 1976 lawsuit filed by the Tribe. *Conn. ex rel. Blumenthal v. United States DOI*, 228 F.3d 82, 86 (2d Cir. 2000), *cert. denied,* 532 U.S. 1007 (2001). The Tribe claimed that in 1855, Connecticut illegally transferred nearly 800 acres of the Tribe's land out of tribal hands without congressional approval. *Id.* The Tribe asserted title to the land, and the lawsuit clouded title for hundreds of acres of privately and publicly owned parcels. *Id.* The State, the Tribe, and affected landowners negotiated a settlement that included federal recognition of the Tribe and permitted a portion of the lands at issue in the suit to be taken into trust by the Secretary. *Id.*

61.    Congress passed the Settlement Act to effectuate the settlement, *id.*, and to "remove all clouds on titles resulting from [the Tribe's] land claims[.]" Settlement Act § 2(c). The Settlement Act therefore "extinguished the Tribe's claims to hundreds of acres of land." *Conn. ex rel. Blumenthal*, 228 F.3d at 86 (*citing* Settlement Act § 4).

62.    Congress did not intend the Settlement Act to extend § 5 of the IRA to the Tribe.

63.    The Settlement Act does not say that the Secretary's trust authority under § 5 of the IRA extends to the Tribe, or even mention the IRA.

64.    That is because the Settlement Act was not a "comprehensive statute intended to settle once-and-for-all" the Tribe's land issues. *Conn. ex rel. Blumenthal*, 228 F.3d at 90. Rather, "[t]he purpose of the Act" was to resolve a "parochial" dispute. *Id.* Congress merely "saw the Settlement Act as providing the necessary federal implementation of the private agreement negotiated between [the parties]." *Id.*; *see also id.* at 91 n.3 (noting that the Settlement Act "appears, in some ways, more like a private agreement between two parties than like a typical federal statute").

65.    When Congress intends to extend the IRA to a given tribe in a settlement act, *it does so explicitly*, mentioning the IRA by name. *Carcieri*, 555 U.S. at 392 n.6 (citing examples); *see also*, *e.g.*, Coquille Restoration Act, Pub. L. No 101-42, § (e), 103 Stat. 91 (June 28, 1989); Catawba Indian Tribe Settlement Act, Pub. L. No. 103-116, 107 Stat. 1118, § 9(a) (Oct. 27, 1993); Payson Community of Yavapai Apache Indians, Ariz., Village Site Selection, Pub. L. No. 92-470, ¶ (b), 86 Stat. 783 (Oct. 6, 1972); Pascua Yaqui Indians, Ariz., Extension of Federal Benefits, Pub. L. No. 95-375, § 1(b), 92 Stat. 712 (Sept. 18, 1978); Ysleta del Sur Pueblo Restoration Act, Pub. L. No. 100-89, § 103(a), 101 Stat. 667 (Aug. 18, 1987); Coushatta Tribe of Louisiana Settlement Act, Pub. L. No. 100-411, § 4(a), 102 Stat. 1098 (Aug. 22, 1988).

66.     The absence of analogous express language in the Settlement Act establishes that Congress did not intend to extend § 5 to the Tribe.

67.     Congress's decision not to expressly extend the IRA to the Tribe is dispositive. Under the major questions doctrine, Congress cannot implicitly do so.

68.     Even if Congress could theoretically extend the IRA to the Tribe under the Settlement Act without using express language doing so, other provisions of the Settlement Act, the legislative history of the Settlement Act, and Congress's approach to similar statutes clearly demonstrate that Congress did not intend to do so.

69.     Defendants' own recent actions further suggest that Defendants lack statutory authority for the acquisitions here.

70.     On February 29, 2025, Gregory Zerzan, Senior Advisor exercising the delegated authority of the Solicitor of the DOI, issued a Memorandum on the subject of M-Opinion Review. A-172.

71.     The Memorandum referenced in the paragraph immediately above placed "each M-opinion issued between January 20, 2021, and January 20, 2025 (M-opinions numbered M-37065 through M-37084) . . . under a 'Suspension Review.'" The Memorandum further provided that "[d]uring the Suspension Review period, no unit of the Department of the Interior should rely on those M-opinions as authoritative and binding without first consulting with the Office of the Solicitor for guidance."

72.     On information and belief, the Regional Director's positions below were based either directly or indirectly on M-Opinions that are currently under a Suspension Review. Those M-Opinions are not currently operative, and may never go back into operation.

## II.    The Flawed Administrative Proceedings

### A.    The Tribe's Applications

73.    In August 2023, the Tribe submitted two applications to the BIA to take parcels of land in trust on the Tribe's behalf ("the Applications"). The Applications concerned a 76.74-acre parcel at 119 Indiantown Road (Case No. 53179), and a 4.790-acre parcel at 159 Indiantown Road (Case No. 53199), both in Ledyard, Connecticut. True and accurate excerpted copies of the Applications are attached hereto at A-001–19.

74.    Defendants' guidance documents required the Tribe to identify the statutory authority the Tribe claimed allowed the trust acquisition.

75.    The Tribe incorrectly claimed that the Secretary had authority to take the lands into trust for the benefit of the Tribe because § 9(a) of the Settlement Act extended § 5 of the IRA to the Tribe. (A-004, 014).

76.    The Tribe represented that the land is comprised of undeveloped wetlands and forest and is used only for riding All-Terrain Vehicles ("ATVs") and hiking. (A-007, 016).

77.    The Tribe represented that it "does not anticipate a change in the use of the" parcels, and "there are no current plans to develop" them. (A-007, 016).

### B.    Defendants attempt to provide notice to state and local governments using outdated and incomplete practices.

78.    Upon receiving an application to take land into trust, Defendants must notify the state and local governments with regulatory authority over the land and give them an opportunity to comment. 25 C.F.R. § 151.10.

79.    This action concerns two deficiencies in how Defendants attempted to comply with these requirements. The first concerns the method by which Defendants chose to provide notice; the second concerns the particular state office(s) Defendants elected to notify.

80.     Despite realizing the inherent flaws, Defendants' continued use of inadequate notice procedures strongly suggests that Defendants are not genuinely desirous of providing actual notice. Instead, Defendants view notice of fee-to-trust applications as a box-checking exercise and show little care for whether the affected state is actually aware that its sovereign territory is at risk of being taken.

81.     First, Defendants' method of providing notice is problematic. Without explanation, Defendants refuse to provide digital notice and instead persist in providing notice only by paper mail. 88 Fed. Reg. 86222, 86244 (Dec. 12, 2023) ("The Department believes that digital publication on the BIA website is unnecessary given that written notice will be provided.").

82.     Defendants know this method of notice causes problems. In the most recent update of the governing regulations, Defendants acknowledged "concern over how notice is afforded to States and local governments" expressed by the State and several other state and local governments. *Id.* at 86238.

83.      Defendants declined to address those concerns in the rule, stating that "[t]he specific manner for providing notice and seeking comment from third parties is better suited to internal guidance documents such as the Fee-To-Trust Handbook." *Id. at* 86242.

84.     On information and belief, the *Fee-to-Trust Acquisitions and Reservation Proclamations Handbook* ("the *FTT Handbook*") is the primary internal guidance document for land into trust issues. Although Defendants refer to it as internal, it is available to—and used by—tribes as well as Defendants. (A-220).

85.     At the time the Regional Director and the ASIA ruled, the most recent revision of the *FTT Handbook* was in 2016 and that was the operative *FTT Handbook* at the time Defendants were required to provide the State notice of the Tribe's applications at issue.

86.     In the 2016 *FTT Handbook*, the BIA represented that it would "review the content of this handbook periodically to determine the need for revisions." Despite that, the BIA did not revise the Handbook to address notice issues or any other issue from May 2016 through January 2025, over eight years.

87.     The State's concerns about notice were not merely theoretical and are not limited to the Applications at issue. In recent years alone, Defendants have failed to provide the State timely notice of at least four acquisitions.

88.     In 2023, the Secretary acquired a 7.76-acre parcel in Ledyard, Connecticut for the benefit of the Tribe without notifying either the State or the affected local government.

89.     Similarly, earlier this year, the Secretary approved an application to acquire a parcel in Montville, Connecticut for the benefit of a different Connecticut tribe, again with no notice to the State or locality.

90.     And here, as described further below, Defendants failed to provide adequate notice to the State regarding the two Applications at issue in this action.

91.     On information and belief, there are other such examples.

92.     Defendants have traditionally acknowledged the reality that mail will not always reach its intended recipient. So, as a check on their use of notice by mail, they have long and consistently held that a valid mailing only creates a rebuttable presumption that the mailing has, in fact, been received. *See, e.g.*, *Estate of Beverly M. Howard*, 55 IBIA 300, 303 (Sept. 24, 2012) (citing *Estate of Rose Hyson Hardick Sparlin*, 19 IBIA 153, 155 (Jan. 11, 1991)). That is consistent with Supreme Court precedent and precedent in other federal courts. *See, e.g.*, *Rosenthal v. Walker*, 111 U.S. 185, 193 (1884) (under the "mailbox rule," the presumption that something mailed "was received by the person to whom it was addressed" is "not a conclusive presumption," but may be

rebutted "by evidence that the letters never were received"). For instance, Defendants have held that an intended recipient may rebut the presumption with a denial of receipt, which follows an investigation and is corroborated by counsel. *See Rosebud Indian Land and Grazing Association v. Acting Great Plains Regional Director*, 39 IBIA 247, 250–51 (Mar. 1, 2004) ("*Rosebud*"). That is true even when the intended recipient is a private individual rather than a state government. *See id*.

93.    The operative *FTT Handbook* required Defendants to "consult[ ]" with the Tribe to "consider the option of posting" the Applications "on a website to make [them] easily accessible to the public (with confidential information redacted)."

94.    On information and belief, Defendants did not post the Applications on a website.

95.    The State pointed out that requirement below and Defendants offered no indication that they consulted with the Tribe about posting the Applications on a website.

96.    As described further below, Defendants' insistence on notice by mail caused the State to be unaware of the Applications at issue until well after the State should have received notice from Defendants.

97.    When confronted with substantial evidence proving that the State had never received the notices from Defendants, Defendants refused to allow the State the opportunity to rebut the presumption of receipt.

98.    Defendants' refusal to allow the State to rebut the presumption of receipt as required under both IBIA and court precedent illustrates Defendants' unlawful bias against the State.

99.    The second problem with Defendants' notice procedures is that they do not attempt to notify all of the relevant office(s) in state government that actually manage(s) the State's Indian affairs.

100.    Upon information and belief, Defendants generally attempt to comply with the notice requirement in 25 CFR § 151.10 by mailing the notice to the affected state's Governor and no one else. Nothing in Defendants' regulations or internal guidance requires this or otherwise prohibits mailing the notice to other relevant offices within the affected state.

101.    Defendants require notice to both the impacted state's Governor and Attorney General in other tribal contexts. *See* 25 C.F.R. §§ 83.22, 291.7. That shows that Defendants are aware that notice to both a Governor and an Attorney General is necessary to ensure that the impacted state receives timely notice of tribal matters, which often impact important state interests.

102.    Defendants have also held that when a regulation does "not specify which officials of a state or local government are to be provided notice" of a trust application, Defendants must err on the side caution and provide notice to all potentially interested offices. *E.g.*, *Avoyelle's Parish, Louisiana, Police Jury v. Eastern Area Director, Bureau of Indian Affairs*, 34 IBIA 149, 157 (Oct. 27, 1999).

103.    As described further below, Defendants here attempted to provide notice only to the Governor, even though they knew or should have known that the Attorney General has an important role in responding to fee-to-trust applications. *See* Conn. Gen. Stat. §§ 3-126, 31-57e(c), 47-7b.

104.    Defendants' refusal to provide notice consistent with their precedent and their refusal to allow the State an opportunity to submit comments once the State became aware of the Applications illustrates Defendants' unlawful bias against the State.

**C.    Defendants fail to properly notify the State of the Tribe's Applications**

105.    The BIA failed to comply with the notice and comment requirements of 25 C.F.R. § 151.10 in this case.

106.    On November 3, 2023, on information and belief, the BIA attempted to mail notices of the proposed acquisitions ("Notices") to the State's Governor.  (A-035, 041–42).

107.    However, the Governor never received them. (*Id.*)

108.    As a result, the State did not become aware of the Notices or the underlying Applications until it received the Notices from a third party on March 28, 2024. (*Id.*)

109.    The Notices explicitly provided that "[a]ny comments received within thirty days of receipt of this notice will be considered and made part of our record." (*Id.*)

110.    Thirty days from the date the State received the Notices would have been April 27, 2024.

111.    The Notices further provided that the recipient "may be granted one thirty day extension of time to furnish comments" upon request. (*Id.*).

112.    The State responded to the Notices on April 10, 2024 (well before the 30-day deadline from receipt of the Notices). It informed the BIA that it did not receive the Notices until March 28, 2024 and requested a thirty-day extension—as the Notices permitted—through and including May 27, 2024, so that the State could adequately address the important issues the Tribe's Applications presented. A true and accurate copy of the State's April 10 response is attached hereto at A-035.

113.    On April 17, 2024, the BIA denied the State's request for an extension of time and informed the State that it would refuse to accept any comments because the deadline had permanently closed on December 7, 2023—*more than four months before the State received the Notices*. The BIA indicated that confirmations of delivery indicated that the Notices were delivered to the "mailroom" of the office building at 210 Capital Avenue in Hartford, Connecticut—an address the Governor shares with many other State offices and hundreds of other State

employees—on November 7, 2023. The putative confirmations of delivery indicated that the mailings were signed for by someone named "M. Estrada." *Id.* A true and accurate copy of the BIA's decision is attached hereto at A-039.

114.    The BIA did not address the State's representation that the Governor never actually received the Notices. Instead, the BIA treated the delivery slips as dispositive.

115.    That was contrary to caselaw from the United States Supreme Court, caselaw from other federal courts, and precedent from the IBIA, which is the administrative appellate body that reviews most BIA decisions, all of which hold that the presumption of receipt is rebuttable.

116.    That was also contrary to other federal authority recognizing that state governments receive large volumes of mail and that, as a result, mail is not a reliable means of providing notice to a state. For example, the Federal Rules of Civil Procedure recognize that "[t]he United States is not expected to waive service for the reason that its mail receiving facilities are inadequate to assure that the notice is actually received by the correct person in the Department of Justice." *Advisory Comm. Notes to the 1993 Amend. to Fed. R. Civ. P. 4.* The Federal Rules apply the "same principle" to state governments. *Id.* Defendants' continued reliance on mail notice in the face of that is arbitrary and capricious. So too was Defendants' refusal to allow the State to rebut the presumption of receipt where Defendants' precedent has allowed private individuals to rebut the presumption.

117.    The concept that government mail systems face unique challenges is reflected in the Federal Rules governing service of this very action. The Rules allow service by mail on the United States, its officials, and its employees. *See* Fed. R. Civ. P. 4(i). But the Rules do not allow service by a single mailing to the President or to any single federal officer (comparable to the Governor), who can then use the government mail system to forward the materials along. Instead,

18

they require separate mailings to: (1) either "the United States attorney for the district where the action is brought—or to an assistant United States attorney or clerical employee whom the United States attorney designates in a writing filed with the court clerk—" or "the civil-process clerk at the United States attorney's office," Fed. R. Civ. P. 4(i)(1) (A); (2) "the Attorney General of the United States at Washington, D.C.," Fed. R. Civ. P. 4(i)(1)(B); (3) each "nonparty agency or officer of the United States" whose order is being challenged, Fed. R. Civ. P. 4(i)(1)(C); and (4) each "agency, . . . officer, or employee" named as a Defendant. Fed. R. Civ. P. 4(i)(2). Here, that required *seven* separate mailings. Courts have held that a failure to comply with those requirements warrants dismissal, even when the plaintiff is proceeding *pro se* and regardless of the nature of the underlying claims. *See, e.g.*, *McMasters v. United States*, 260 F.3d 814, 818 (7th Cir. 2001) (affirming the dismissal of a *pro se* mother's complaint based on her daughter's rape and murder because even though the mother mailed a copy of the summons and complaint to the Attorney General, she failed to also separately mail it to the United States Attorney).

118.    In addition to failing to address whether the Governor rebutted the presumption of receipt, the BIA failed to explain why it believed there was not good cause to extend the comment deadline.

119.    On April 26, 2024—again within the thirty-day deadline from when the State became aware of the Notices—the State respectfully requested that the BIA reconsider its decision. The State explained that the Governor had further investigated, confirmed that he did not receive the mailing, and that no one named "M. Estrada" (or any variant thereof) worked in the Governor's Office or the Executive Branch. A true and accurate copy of that request is attached hereto at A-047.

120.    The BIA summarily denied the State's request for reconsideration on May 1, 2024, again without addressing the State's representation that it never actually received the Notices from the BIA. A true and accurate copy of that decision is attached hereto at A-061.

### D.    Defendants refuse to provide the State with copies of the Tribe's Applications

121.    The BIA takes the position that a state has no right to see an application before it submits comments on that application.

122.    At the same time the State was attempting to secure an extension of time to submit comments, it was also attempting to obtain copies of the Tribe's Applications from the BIA.

123.    The BIA refused to provide them.

124.    In its initial April 10, 2024 letter to the BIA, the State first requested the Applications, emphasizing that it "would be difficult—if not impossible" to provide meaningful comments without reviewing the Applications the State was responding to. (A-036). This was, in part, because Defendants had revised the governing regulations as of December 12, 2023—the State could not determine which version of the regulations applied without knowing the dates the Applications were submitted. (*Id.*). The new December 12, 2023 regulations drastically changed the Secretary's standards for assessing fee-to-trust applications.

125.    On April 17, 2024, in its denial of the State's request for an extension of time, the BIA ignored the State's request to see the Applications the State was tasked with commenting on. (A-039).

126.    On April 26, 2024, the State reiterated its request for the Applications in its motion for reconsideration, emphasizing that the Tribe did not object. (A-047).

127.    On May 1, 2024, the BIA denied the request for reconsideration and told the State it could obtain copies of the Applications by filing a formal request under the Freedom of Information Act ("FOIA"). (A-061).

128.    Because the BIA would not grant an extension of time, time was of the essence. This made a FOIA request futile.

129.    The BIA usually takes many months to provide a copy of an application, despite having them readily available.

130.    Indeed, the Town of Ledyard had already submitted a FOIA request to the BIA on April 9, 2024, seeking the Applications. Incredibly, the Town did not receive the Applications until August 2024—*after the Applications had been ruled on*—in violation of FOIA. *See* 5 U.S.C. § 552(a)(6)(A)(i) (requiring a response within 20 business days absent extraordinary circumstances).

131.    Alternatively, the Notices provided that the State could travel more than 1,000 miles to Nashville, Tennessee to view the Applications in person, though the BIA would not guarantee that it would allow the State to review the full Applications or that the State would be permitted to copy them. (A-042). Obviously, that was impracticable.

132.    There is no reason the BIA could not provide the State electronic copies of the Applications, particularly where the Tribe did not object. The BIA's refusal to do so violated the State's rights to comment on trust applications. As the State repeatedly told the BIA, it could not meaningfully address the factors set forth in § 151.10 without the information in the Applications.

**E.    The BIA ignores the State's evidence that it never received the Notices and clear limits on the BIA's statutory authority.**

133.    Because a FOIA request likely would have taken months to process, and because the BIA had not yet ruled on the Applications, the State went ahead and submitted its comments

to the BIA on May 24, 2024 ("Comments"). A true and accurate excerpted copy of the Comments is attached hereto at A-064.

134.    The BIA received the Comments.

135.    The Comments raised procedural and substantive concerns. Procedurally, the State argued that the BIA improperly denied it an opportunity to be heard by providing inadequate notice, then refusing to hear the Comments even though it knew the State did not receive the Notices until after the putative Comment deadline. (A-064–66).

136.    As support, the State provided a sworn declaration from Kathryn Damato, Director of Operations for the Governor's Office. That declaration clarified that delivery to a "mailroom" at the State Legislative Office Building is not the same as delivery to the Governor. The Governor shares this mailroom with another branch of government, as well as hundreds of other state employees and policy makers with no connection to the Governor. (*See, e.g.*, A-068 ¶¶ 7–9). Moreover, the mailroom's purported acceptance of the Notices was unauthorized. As best the State could tell, an individual in the mailroom identified as "M. Estrada" allegedly agreed to accept the Notices, but never actually delivered them to the Governor's Office. (*See* A-070–71 ¶¶ 19–23). No one named "M. Estrada" (or any reasonable variation thereof) works for the Governor's Office or is otherwise authorized to accept documents on the Governor's behalf. (*See id.*) Likewise, there was no record of receipt, as would be expected in the normal course. When it receives a delivery from the mailroom, the Governor's Office records it in a logbook. (*See* A-070 ¶ 18). But the logbook has no record of the Notices, even though other mailings from Defendants are regularly received and recorded. (*See* A-068–70 ¶¶ 9–16, 18). Through representations by counsel and a detailed declaration, the State informed Defendants of these ample efforts to locate the Notices, but that it could not do so. *See* (A-064–66).

137.    Based on this evidence, the State reiterated its requests that the BIA allow the State to comment and provide the State copies of the Applications, again informing the BIA that the Tribe did not object. *Id.*

138.    Substantively, the State emphasized that it was "presently unable to provide detailed comments" because the BIA had refused to provide the State with copies of the Applications. (A-064–66). Nonetheless, the State incorporated the comments and objections submitted in connection with another fee-to-trust application submitted by the Tribe that was pending at the same time. (A073–105).

139.    The State argued, in part, that the BIA should deny the Applications because the BIA lacked statutory authority to grant the Applications. The Comments also raised questions as to whether the Tribe had any actual need for the land, and emphasized the importance of considering the impacts the acquisition would have on taxation, jurisdiction, and the environment.

140.    The BIA granted both Applications on August 5, 2024 in two separate written decisions signed by the Regional Director ("the Decisions"). True and accurate copies of the Decisions, which are identical in most respects, are attached hereto at A-107, 117.

141.    The Decisions did not acknowledge (much less substantively address) any of the State's procedural or substantive arguments. Incredibly, the Decisions did not even acknowledge that the State opposed the Applications. They simply stated that "[n]o comments or objections to the conveyance of the property in trust for the Tribe were received within the comment period," and that "[t]here were no comments by the state and local governments in opposition to the conveyance of this land into trust for the Tribe." (A-108–09, 118–19).

142.    The Decisions identified § 5 of the IRA as the sole statutory authority for the acquisitions. (A-108, 118). That was clear error. As described above, § 5 of the IRA only authorizes

the Secretary to take land into trust on behalf of tribes under federal jurisdiction in and federally recognized by 1934, *Carcieri*, 555 U.S. at 383, which the Tribe was not.

143.    The *FTT Handbook* operative at the time required the Tribal applicant to submit the statutory authority on which it relied.

144.    The Tribe relied on the Settlement Act. (A-004, 114).

145.    The *FTT Handbook* operative at the time advised tribes relying on the IRA to provide "[a]ny information in support of the Tribal applicant being 'under federal jurisdiction in 1934.'"

146.    The Tribe submitted no such information with the Applications.

147.    Despite that, the Regional Director relied solely on the IRA in the Decisions. The Regional Director did not explain why she failed to rely on the statutory authority the Tribe relied on or why she relied on the IRA even though the Tribe provided none of the necessary information to support her reliance on that statute.

148.    The *FTT Handbook* operative at the time required the Regional Director to include "analysis addressing whether the" Tribe "was under Federal jurisdiction in 1934" in her Decisions if she relied on the IRA.

149.    The Regional Director's Decisions contain no such analysis, instead in their section on statutory authority they state—in  their entirety—"25 U.S.C [sic] 5108 INDIAN REORG ACT JUNE 18 1934 (48 STAT. 984)." (A-108, 118) (capitalizations in the original).

150.    The *FTT Handbook* operative at the time required the Regional Director's Decisions to "contain analysis of comments and concerns by state and local governments." The Regional Director did not analyze the State's Comments or the concerns the State raised in her

Decisions. Instead, the Regional Director's Decisions did not explicitly reference the State's Comments at all and falsely implied that the State did not express any concerns.

      **F.**      **The ASIA's Decision compounds the BIA's errors**

151.    After the Regional Director granted the Applications, the State timely appealed both Decisions to the IBIA.

152.    The IBIA consolidated the State's administrative appeals.

153.    The former ASIA exercised his authority under 25 C.F.R. § 2.508 to assume jurisdiction over the consolidated appeals.

154.    Realizing her clear prior errors in the Decisions by relying on § 5 of the IRA as the purported source of statutory authority, in her brief on appeal to the ASIA, the Regional Director attempted to shift her position. She abandoned the IRA and instead relied on § 9(a) Settlement Act as the basis for the Secretary's statutory authority to take the land into trust.

155.    That was not permitted. An agency must articulate the basis for its decision at the time it makes a ruling. It may not offer a different rationale on appeal. *See, e.g.*, *SEC v. Chenery Corp.*, 318 U.S. 80 (1943).

156.    The former ASIA issued a decision in the consolidated appeals on January 10, 2025 ("the ASIA Decision")—ten days before the change in Presidential Administrations. A true and accurate copy of the ASIA Decision is attached hereto at A-158.

157.    Remarkably, the former ASIA's Decision agreed that the State did not actually receive the Notices, but nonetheless determined that the State's Comments were untimely. (*See* A-168) ("whatever caused the failure of the Governor to receive the mailings at issue"); *id.* ("whatever caused the State not to receive the Notice").

158.    As described above, the presumption that something mailed "was received by the person to whom it was addressed" is "not a conclusive presumption," but may be rebutted "by evidence that the letters never were received[.]" *Rosenthal*, 111 U.S. at 193. Defendants have consistently recognized this principle and held with regard to other parties that an intended recipient may rebut the presumption with a denial of receipt, which follows an investigation and is corroborated by counsel. *See Rosebud*.

159.    The former ASIA's Decision was arbitrary and capricious. It (correctly) acknowledged that the State had rebutted the presumption of receipt with sworn testimony that the Governor never received the Notices. Having done so, the former ASIA necessarily had to conclude that the State did not receive notice as required by 25 C.F.R. § 151.10, allow the State to submit comments, and require the Regional Director to consider them. Inexplicably, the former ASIA did not.

160.    The former ASIA also ruled that 25 C.F.R. § 151.10 did not require the BIA to notify the Connecticut Attorney General (in addition to the Governor) because the Attorney General "only has *general* supervision over all legal matters."  (A-163) (emphasis in original).

161.    That was incorrect and contrary to law because, as described above, the Attorney General has a specific statutory mandate regarding these very types of fee-to-trust claims, numerous other regulations require notice to the Attorney General in the tribal context, and binding precedent establishes that the BIA should attempt to notify all potentially interested government offices rather than simply picking one.

162.    Because the former ASIA concluded that the State did not provide timely Comments, the former ASIA refused to consider any of the State's arguments on the merits, including the State's challenge to the Secretary's statutory authority.

163.    The former ASIA refused to consider the State's challenge to the Secretary's statutory authority even though the State called the former ASIA's attention to the Supreme Court's decision in *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 144 S. Ct. 2244 (2024), which reinforced the importance of agencies operating within the bounds of their statutory authority.

164.    The former ASIA's public statements and other materials raise concerns that he harbored bias and/or prejudgment in favor of tribal interests and against the interests of state and local governments that led to his Decision that failed to apply court and agency precedent or to consider the limits on his authority, to the benefit of the Tribe and the detriment of the State.

165.    Even though the former ASIA's decision was dated January 10, 2025, the Certificate of Service indicates that the former ASIA did not mail notice of the ASIA Decision until January 14, 2025.

166.    The former ASIA has offered no explanation for that delay.

167.    Due to apparent delays in the mail before it arrived at the State, the State did not receive notice of the former ASIA's Decision from the former ASIA until February 3, 2025, 24 days after the date of the former ASIA's Decision.

168.    Three days later, the State submitted a request to the current ASIA for a stay of the Decision under 5 U.S.C. § 705. (A-248). That request informed the current ASIA that the State planned to seek judicial review of the former ASIA's Decision and respectfully requested that the ASIA postpone the final acquisition of the land pending judicial review. The Tribe opposed the request.

169.    The ASIA has yet to respond to the State's request for a stay at the administrative level.

**FIRST CAUSE OF ACTION**
**(The Secretary Lacks Statutory Authority to Take Land into Trust for the Tribe)**

170.    The State incorporates all preceding allegations.

171.    Defendants were obligated to determine whether the Secretary had statutory authority to take the lands at issue into trust. 25 C.F.R. § 151.10.

172.    The Secretary lacks authority to take the subject lands into trust under § 5 of the IRA because the Tribe was neither federally recognized nor under federal jurisdiction in 1934. *Carcieri*, 555 U.S. at 395.

173.    The Regional Director's Decisions relied only on the IRA and made no reference to the Settlement Act.

174.    The Regional Director could not change the basis of her statutory authority after issuing her Decisions without reconsidering and reissuing those Decisions and giving the State an opportunity to be heard.

175.    Even if the Secretary could rely on statutory authority that the Regional Director did not reference, the Settlement Act does not extend § 5 of the IRA to the Tribe.

176.    Section 9(a) of the Settlement Act does not extend § 5 of the IRA to the Tribe expressly or implicitly.

177.    Federal agencies are only authorized to take actions within the scope of their statutory authority.

178.    Defendants had an obligation to ensure that they had statutory authority to acquire the lands at issue before granting the Tribe's Applications.

179.    Once the State submitted its Comments clearly challenging the Secretary's statutory authority, Defendants were required to consider and analyze whether the Secretary had authority.

180.    The State submitted its Comments advising Defendants of the defects in their statutory authority well before the Regional Director issued her Decisions.

181.    Defendants refused to consider the State's statutory authority arguments.

182.    In addition, the recent Suspension Review of the M-Opinions that Defendants presumably relied on below further suggests that Defendants lack statutory authority here.

183.    The Secretary's approval of the Applications was arbitrary, capricious, an abuse of discretion, and exceeded his statutory authority.  5 U.S.C. § 706(2)(A) and (C).

184.    Defendants' failure to address the challenge to the Secretary's statutory authority and explain why they believe he did have statutory authority itself renders the granting of the Applications arbitrary, capricious, and an abuse of discretion.

## SECOND CAUSE OF ACTION
### (Section 5 of the IRA is an Unconstitutional Delegation of Authority)

185.    The State incorporates all preceding allegations.

186.    Section 5 of the IRA fails to provide an "intelligible principle" to guide the Secretary's exercise of his discretion. *Whitman*, 531 U.S. at 472.

187.    Instead, as interpreted by the Secretary, § 5 grants the Secretary unlimited authority to, "in his discretion," acquire land for tribes under federal jurisdiction in 1934.

188.    Section 5 is an unconstitutional delegation of authority to the Secretary that violates the separation of powers.

189.    Section 5's unconstitutionality is made more manifest to the extent it is interpreted to grant the Secretary authority that is not subject to review by any court.

190.    Because § 5 of the IRA is unconstitutional, it is not a valid basis on which the Secretary could acquire the land at issue, and any reliance on § 5 was arbitrary, capricious, and an abuse of discretion. 5 U.S.C. § 706(2)(A).

**THIRD CAUSE OF ACTION**
**(Defendants' Refusal to Consider the State's Comments Violates the APA)**

191.    The State incorporates all preceding paragraphs.

192.    Defendants' refusal to allow the State to submit comments on the Applications based on a conclusion that they were untimely violated 25 C.F.R. § 151.10, and was arbitrary, capricious, an abuse of discretion, and otherwise contrary to law.

193.    The State never received the Notices until after the putative comment deadline passed.

194.    The State proved with uncontroverted testimony that the Governor's Office never received the Notices from the BIA.

195.    Under established law, including court and IBIA precedent, the State's evidence that it never received the Notices rebutted the presumption that the State received the Notices when they were mailed, and required Defendants to consider the State's Comments.

196.    The former ASIA's conclusion that the Governor's failure to receive the Notices precluded the State from commenting was inconsistent with the governing "mailbox rule" and was arbitrary, capricious, and an abuse of discretion.

197.    The former ASIA's conclusion that proper notice did not require notifying the Attorney General was arbitrary, capricious, and contrary to law.

198.    Defendants violated court and IBIA precedent and acted arbitrarily and capriciously by not affording the State an opportunity to show cause as to why its Comments should be considered.

199.    Defendants violated court and IBIA precedent and acted arbitrarily and capriciously by refusing to provide the State with copies of the Applications before ruling on them.

## FOURTH CAUSE OF ACTION
### (The Decision Violates the State's Procedural Rights under 25 C.F.R. § 151.10)

200.    The State incorporates all preceding allegations.

201.    The State has rights to due process, notice, and an opportunity to be heard in these administrative proceedings, under 25 C.F.R. § 151.10.

202.    Defendants have corresponding duties, under 25 C.F.R. § 151.10.

203.    Defendants used procedures to deliver the Notices to the State that were inadequate and violated binding agency precedent.

204.    Defendants learned that the Governor's Office had not, in fact, received the Notices before the claimed comment period closed.

205.    Defendants improperly failed to grant the State an extension of time or otherwise permit the State to submit comments.

206.    Defendants improperly refused to consider the State's Comments and approved the Tribe's Applications several months later.

207.    Defendants improperly refused to provide the Applications to the State.

208.    The State's deprivation—loss of sovereign territory to the federal government without Congressional authorization—is severe.

## FIFTH CAUSE OF ACTION
### (The Decision Violates the State's Procedural Rights under 5 U.S.C. § 555)

209.    The State incorporates all preceding allegations.

210.    The State has rights to due process, notice, and an opportunity to be heard in these administrative proceedings, under 5 U.S.C. § 555.

211.    Defendants have corresponding duties, under 5 U.S.C. § 555.

212.    Defendants used procedures to deliver the Notices to the State that were inadequate and violated binding agency precedent.

213.    Defendants learned that the Governor's Office had not, in fact, received the Notices before the claimed comment period closed.

214.    Defendants improperly failed to grant the State an extension of time or otherwise permit the State to submit comments.

215.    Defendants refused to consider the State's Comments and approved the Tribe's Applications several months later.

216.    Defendants improperly refused to provide the Applications to the State.

217.    The State's deprivation—loss of sovereign territory to the federal government without Congressional authorization—is severe.

## SIXTH CAUSE OF ACTION
**(The Decision Violates the State's Procedural Rights under the Fifth Amendment)**

218.    The State incorporates all preceding allegations.

219.    The State has rights to due process, notice, and an opportunity to be heard in these administrative proceedings, under the Fifth Amendment.

220.    Defendants have corresponding duties, under the Fifth Amendment.

221.    Defendants used procedures to deliver the Notices to the State that were inadequate and violated binding agency precedent.

222.    Defendants learned that the Governor had not, in fact, received the Notices before the claimed comment period closed.

223.    Defendants improperly failed to grant the State an extension of time or otherwise permit the State to submit comments.

224.    Defendants refused to consider the State's Comments and approved the Tribe's Applications several months later.

225.    Defendants improperly refused to provide the Applications to the State.

226.    The State's deprivation—loss of sovereign territory to the federal government without Congressional authorization—is severe.

### SEVENTH CAUSE OF ACTION
**(The Decision Violates the State's Right to a Fair Proceeding under the Fifth Amendment)**

227.    The State incorporates all preceding allegations.

228.    The State has rights to a fair administrative proceeding, under the Fifth Amendment.

229.    Defendants have a corresponding duty, under the Fifth Amendment.

230.    Defendants used procedures to deliver the Notices to the State that were inadequate and violated binding agency precedent.

231.    On information and belief, Defendants knew or should have known that the procedures were inadequate and improper.

232.    Defendants learned that the Governor's Office had not, in fact, received the Notices before the claimed comment period closed.

233.    Defendants improperly failed to grant the State an extension of time or otherwise permit the State to submit comments.

234.    On information and belief, Defendants knew or should have known that their refusal to permit the State to submit comments was inadequate and improper.

235.    Nonetheless, Defendants refused to consider the State's Comments and approved the Tribe's Applications several months later.

236.    Defendants improperly refused to provide the Applications to the State.

237.    On information and belief, Defendants knew or should have known that its refusal to provide the Applications to the State was inadequate and improper.

238.    The State's deprivation—loss of sovereign territory to the federal government without Congressional authorization—is severe.

### Prayer for Relief

WHEREFORE, the State respectfully requests that this Court enter:

1.    A judgment declaring that Defendants lack statutory authority to take the subject lands into trust on behalf of the Tribe;

2.    A judgment declaring that § 5 of the IRA does not apply to the Tribe;

3.    A judgment declaring that the Settlement Act does not extend § 5 of the IRA to the Tribe;

4.    A judgment declaring that § 5 of the IRA is an unconstitutional delegation of authority;

5.    A judgment declaring that Defendants' actions in approving the Applications were arbitrary and capricious, an abuse of discretion, in excess of the Secretary's authority, and otherwise not in accordance with law, and therefore, a violation of the APA;

6.    A judgment holding unlawful and setting aside the ASIA and Regional Director Decisions below;

7.    A judgment declaring that the lands are subject to full state and local taxation and regulation just as they were prior to the Decisions below;

8.    A temporary order under 5 U.S.C. § 705 prohibiting Defendants from taking the subject lands into trust or taking any further steps toward taking the subject lands into trust until this Court decides to grant relief of longer duration;

9. A preliminary order under 5 U.S.C. § 705 prohibiting Defendants from taking the subject lands into trust or taking any further steps toward taking the subject lands into trust until the final resolution of this suit;

10. A permanent injunction prohibiting Defendants from taking the subject lands into trust;

11. A stay of Defendants' Decisions, including the January 10, 2025 ASIA Decision, and any actions Defendants or their employees or agents may perform in response to those Decisions pending the resolution of this dispute or, in the alternative, an order directing Defendants to affirmatively "unwind" any and all of the actions Defendants have taken to change the status of the lands at issue, including requiring Defendants to return the land to the non-trust, fee title status it had prior to the ASIA Decision and enjoining Defendants from refusing to do so;

12. Awarding the State attorney's fees and costs to the extent permitted by law, including—but not limited to—the Equal Access to Justice Act, 28 U.S.C. § 2412;

13. An order directing Defendants to provide digital notice to the Connecticut Office of the Attorney General and the Connecticut Office of the Governor of all filings, decisions, orders or other documents related to fee-to-trust applications in Connecticut, in addition to providing those Connecticut state officials notice by paper mail of all matters related to fee-to-trust applications in Connecticut;

14. An order directing Defendants to provide a copy of all fee-to-trust applications or other related document to the State of Connecticut upon request in electronic format, where reasonably available, or paper copy by mail;

15. An order directing Defendants to timely provide documents to the State responsive to the State's requests made pursuant to the Freedom of Information Act; and

16.    Any other and further relief the Court deems just, equitable, and appropriate.

Respectfully submitted,

PLAINTIFF
STATE OF CONNECTICUT

WILLIAM TONG
ATTORNEY GENERAL

BY: */s/  Robert J. Deichert*
Robert Deichert (ct24956)
Michael Rondon (ct31022)
Assistant Attorneys General
Attorney General's Office
165 Capitol Avenue
Hartford, CT 06106
860-808-5020 (phone)
860-808-5347 (fax)
robert.deichert@ct.gov
michael.rondon@ct.gov