# State of Connecticut's Appendix

## Table of Contents

Ex. 1 – Application for 119 Indiantown Rd. (Excerpts) ................................................................A-001

Ex. 2 – Application for 159 Indiantown Rd. (Excerpts) ...............................................................A-011

Ex. 3 – 25 C.F.R. Part 151 ...........................................................................................................A-020

Ex. 4 – Settlement Act ..................................................................................................................A-027

Ex. 5 – Letter from R. Deichert (Apr. 10, 2024).........................................................................A-034

Ex. 6 – Letter from R. Trickey (Apr. 17, 2024)..........................................................................A-038

Ex. 7 – Letter from R. Deichert (Apr. 26, 2024).........................................................................A-046

Ex. 8 – Letter from R. Trickey (May 1, 2024) ............................................................................A-060

Ex. 9 – Letter from R. Deichert & State's Comments (May 24, 2024) (Excerpts) .....................A-063

Ex. 10 – RD's Decision for 119 Indiantown Rd. (Aug. 5, 2024) ................................................A-106

Ex. 11 – RD's Decision for 159 Indiantown Rd. (Aug. 5, 2024) ................................................A-116

Ex. 12 – RD.'s Opp. to ASIA (Nov. 7, 2024) (Excerpts)...........................................................A-125

Ex. 13 – ASIA's Decision (Jan. 10, 2025) ..................................................................................A-157

Ex. 14 – Memorandum from G. Zerzan, Senior Adv. (Feb. 28, 2025) .......................................A-172

Ex. 15 – Memorandum to B. Ott (Jan. 28, 1988).........................................................................A-174

Ex. 16 – Memorandum to B. Ott (May 30, 1990) ........................................................................A-178

Ex. 17 – Def.'s Opp. to Mot. Admin. Stay, *Wintu Tribe of N. Cal. v. U.S. DOI* (Mar. 6, 2025) (Excerpts) ...A-182

Ex. 18 – Joint Reply in Supp. Mot. Abeyance, *Twin Metals Minn. v. U.S.* (Mar. 7, 2025) ............A-208

Ex. 19 – FTT Handbook (issued Jun. 28, 2016) (Excerpts)........................................................A-220

Ex. 20 – State's Req. for Admin. Stay (Feb. 6, 2025) .................................................................A-248

Ex. 21 – FedEx Delivery Slips for Notices to Governor (Nov. 7, 2023) ....................................A-263

Ex. 22 – RD's Decision for Case No. 55848 (Sept. 23, 2024).....................................................A-266

# EXHIBIT 1

**Mashantucket Pequot Tribal Nation**
*Office of Legal Counsel*

2 Matt's Path
P.O. Box 3060
Mashantucket, CT 06338-3060
Tel: 860-396-2099
Fax: 860-396-6295
JCummings@mptn-nsn.gov

August 25, 2023

**VIA FEDERAL EXPRESS AND VIA EMAIL (Kimberly.Bouchard@bia.gov)**

Ms. Kimberly Bouchard
Regional Director – Eastern Regional Office
Bureau of Indian Affairs
545 Marriott Drive, Suite 700
Nashville, TN 37214

**Re: Fee to Trust Applications for 119, 137 and 159 Indiantown Road, Ledyard, CT**

Dear Regional Director Bouchard:

Enclosed please find three (3) Fee to Trust applications for filing on behalf of the Mashantucket Pequot Tribe pursuant to 25 U.S.C. Section 5108 and 25 C.F.R. Section 151.1 *et seq.* Each application contains a narrative addressing the factors considered under 25 C.F.R. Section 151.10, as well as exhibits with supporting documents or information.

In an effort to provide all necessary information and to expedite the review of these applications, we have simultaneously sent requests for a preliminary title opinion to Annette Tarnawsky in the Office of the Solicitor. A copy of that correspondence is included as an exhibit in each of the applications. Our sincere hope is that with the extensive information provided for each application, including surveys and title policy commitments, we can avoid the delays we have experienced in the past. Of course, we understand how busy the department is and are ready to assist in providing any other information necessary for your review and decision. To that end, I ask that you and your staff feel free to contact me at jcummings@mptn-nsn.gov or Betsy Conway at bconway@mptn-nsn.gov.

Sincerely,

Jody A. Cummings
General Counsel
Mashantucket Pequot Tribe

Cc: Rodney A. Butler, Chairman, Mashantucket Pequot Tribe

**A-002**

**The Mashantucket Pequot Tribe's**

**Application for Conveyance of**

**Approximately 76.74 +/- acres of Contiguous Fee Land to Trust Status**

**("119 Indiantown Rd. Property Application")**

**1.0    Identification of Parties, Description of Property and Request for Action, Tribal Authorization for Requested Action (25 C.F.R. § 151.9)**

**1.1    Identification of the Applicant**

The Mashantucket Pequot Tribe a/k/a Mashantucket Pequot Tribal Nation (hereinafter referred to as the "Tribe" or "Nation") is a federally-recognized Indian Tribe eligible for special programs and services offered by the federal government to Indian Tribes. *See* Mashantucket Pequot Indian Land Claims Settlement Act, Public Law 98-134, 97 Stat. 851 (October 18, 1983) ("Settlement Act")[1]; List of Indian Entities Recognized by and Eligible to Receive Services from the United States Bureau of Indian Affairs, 88 F.R. 2112 (January 12, 2023). The Tribe is governed by a seven-member Tribal Council under a written Constitution.[2] *See* Constitution and By-Laws submitted herewith as **Exhibit 1**. Presently, there are approximately 1165 enrolled members or citizens of the Tribe.

The Tribe's Reservation consists of approximately 1635 acres of land held in trust by the United States for the benefit of the Tribe (the "Reservation"). The Reservation is located within the geographical boundaries of the County of New London in the State of Connecticut. The Reservation is depicted on a map submitted herewith as **Exhibit 2.**

**1.2    Description of the Land and Proposed Action**

In 2007, the Tribe obtained a parcel of land known as 119 Indiantown Rd, Ledyard, CT a/k/a "Indiantown Park" (hereinafter the "**Property**") through a land swap with the Town of Ledyard. The Property is highlighted on the map submitted herewith as **Exhibit 2**, as well as on a map submitted herewith as **Exhibit 3.** The land swap was advantageous for both the Town and the Tribe. The Tribe received approximately 76.74 acres contiguous to the Tribe's Reservation, while the Town received property known as the Clark Farm consisting of approximately 101.8 acres not contiguous to the Reservation. The Property received by the Tribe was previously used

---

[1] The Tribe's Settlement Act was codified at 25 U.S.C. §§1751 – 1760 prior to an administrative decision to "omit" all of Chapter 19 of Title 25 of the United States Code, which contained numerous settlement acts each addressing a different Indian tribe. The citation now is to the Public Law when enacted. Decisions and commentary on the Settlement Act prior to this administrative act will cite to the codified designation.

[2] The Tribe's Constitution refers to the Tribe as the Mashantucket (Western) Pequot Tribe.

as a town park, but had not been used as such since the late 1970's. There are currently no building structures or other permanent improvements on the Property. Rather, the Property consists of wooded land that is classified as forest lands under Connecticut General Statutes § 12-107b (2019).

The Tribe obtained the Property by Statutory Warranty Deed on September 4, 2007 (a copy of the deed is submitted herewith as **Exhibit 4**). The full legal description for the Property is submitted herewith as **Exhibit 5**, which legal description has been updated from the one attached to the Warranty Deed to provide metes and bounds based on a survey that was completed in August of 2023. The survey is submitted herewith as **Exhibit 6.**

The Property is contiguous with the boundaries of the Tribe's Reservation as depicted on the site location map (See **Exhibit 3**). As such, evaluation of the Tribe's trust acquisition request is pursuant to the criteria set forth in 25 C.F.R. §151.10.

The proposed action is for the United States to acquire title to the Property totaling approximately **76.74** acres, which is owned in fee status by the Tribe, and hold the land in trust status for the benefit of the Tribe.

### 1.3    Tribal Council Resolution Authorizing Submission of the Application Requesting Acquisition of Trust Land

The Mashantucket Pequot Tribal Council, the governing body of the Tribe, adopted Resolution No. **TCR081023-09 of 11** authorizing the filing of this application requesting that the United States Secretary of the Interior or her designee acquire the Property in trust for the benefit of the Tribe. (A copy of **TCR081023-09 of 11** is submitted herewith as **Exhibit 7**.)

### 2.0    On Reservation Acquisitions Evaluation Factors – (25 C.F.R. § 151.10)

As noted above, the Property is contiguous to the Tribe's Reservation and therefore the factors set forth in 25 C.F.R. 151.10 are the relevant factors for consideration and review.

### 2.1    Statutory Authority for Accepting Land into Trust – 25 C.F.R. § 151.10(a)

The Secretary of the Interior has authority to acquire land in trust for the benefit of the Tribe pursuant to Section 5 of the Indian Reorganization Act of 1934 ("IRA") (25 U.S.C. § 5108), which applies to the Tribe pursuant to the Settlement Act (a copy of the Settlement Act is submitted herewith for convenience as **Exhibit 8**). Section 9[3] of the Settlement Act recognizes the Tribe as a federally recognized tribe and specifically provides that laws of general application to Indians or

---

[3] Section 9 states: "Notwithstanding any other provision of law, Federal recognition is extended to the Tribe. Except as otherwise provided in this Act, all laws and regulations of the United States of general application to Indians or Indian nations, tribes or bands of Indians which are not inconsistent with any specific provision of this Act shall be applicable to the Tribe."

Indian nations are applicable to the Tribe. Additionally, Section 8[4] of the Settlement Act provides that lands within the Tribe's reservation or which are subject to a federal restraint against alienation shall be subject to federal laws relating to Indian lands. The language in the Settlement Act evinces a clear intent to make federal laws relating to lands, federal benefits and otherwise relating to Indians and Indian tribes applicable to the Tribe.

In 1983, when the Settlement Act was enacted, the Indian Reorganization Act, including authority related to trust acquisition, was one such law of general applicability to Indians and Indian tribes. The Court of Appeals for the Second Circuit interpreted the Settlement Act, in the face of a challenge by the State of Connecticut and local towns concerning the Secretary's authority to take land into trust under Section 5 of the IRA on behalf of the Tribe, and upheld the Secretary's authority under IRA to accept land into trust for the Tribe. *See Connecticut v. U.S. Dept. of Interior*, 228 F.3d 82 (2d Cir. 2000).

Most recently, the Bureau of Indian Affairs ("BIA") affirmed its trust acquisition authority for the Tribe in issuing its February 2017 decision to acquire land identified as 850R Shewville Road in trust for the Tribe. *See* February 13, 2017 letter from Bruce Maytubby, BIA Regional Director, Eastern Region to Rodney Butler, Mashantucket Pequot Tribal Chairman (a copy is submitted herewith as **Exhibit 9**). *See also* March 10, 2020 Memorandum from Robert S. Hitchcock, Attorney-Advisor, DOI Solicitor's Office to Bruce Maytubby, BIA Regional Director, Eastern Region, p. 10, notes 85&86 (citing the Mashantucket Pequot Settlement Act as an example of a statute where Congress provided for the Secretary's authority to take land into trust for a particular tribe and that the "IRA applied to [the] Tribe as a law of general application under the [Settlement] Act") (copy of that Memorandum is submitted herewith as **Exhibit 10**).

## 2.2    Need and Purpose

### 2.2.1    Statement of Need for Trust Land – 25 C.F.R. § 151.10(b)

Land acquisition is critical to tribal self-determination and sovereignty. Flawed federal and state policies imposed on tribal nations across the United States, including the Mashantucket Pequot Tribe, have dispossessed tribal nations of their homelands and hindered their ability to maintain self-sufficient communities, protect important cultural and sacred sites, support economic development initiatives, provide affordable housing opportunities for tribal citizens, and meet other critical needs.

Restoration of tribal homelands has been and continues to be a critical mission and focus for the Tribe. The Tribe occupies one of the oldest, continuously occupied Indian reservations in North America. Mashantucket was a 3,000-acre parcel of unspoiled woodland in the late 1600s. However, by 1856 illegal land sales had reduced Mashantucket to 213 acres. The Tribe initiated legal action in 1976 to recover land that had been sold illegally by the State of Connecticut in

---

[4] Section 8, in relevant part, states: "lands within the reservation which are held in trust by the Secretary for the benefit of the Tribe or which are subject to a Federal restraint against alienation at any time after the date of the enactment of this Act shall be subject to the laws of the United States relating to Indian lands, including section 2116 of the Revised Statutes (25 U.S.C. 177)."

1856. Eventually, the Mashantucket Pequot Indian Land Claims Settlement Act was enacted by the U.S. Congress and signed by President Reagan on Oct. 18, 1983. This act granted the Tribe federal recognition and enabled it to purchase and place land in trust. Currently, approximately 1,635 acres are held by the United States in trust for the benefit of the Tribe and the Tribe continues to seek restoration of lands.

The Property at issue in this application lies within the Tribe's traditional aboriginal territory and is contiguous to the Tribe's current Reservation.  Accepting the Property into trust will continue the work of restoring the Tribe's land base and ensure that the property is returned to tribal control for the benefit of the current and future Tribal citizens.

The Property consists of approximately 76.74 acres that are presently designated as forest lands under state statute governing taxation of real estate.  *See* C.G.S. §§12-107a *et seq*. This designation provides for lower property taxes.  The Property is contiguous to the Tribe's Reservation in a location adjacent to tribal housing, the tribal community center and child development center.  The Tribe's Museum and Research Center as well as the Tribe's Public Safety and Public Works facilities are also nearby.

Presently, the Property has ATV trails on it that are used by the tribal community and offers wooded area for hiking as well as important natural resource preservation. The Tribe does not have any immediate plans to change the use of this property; rather, it would continue to be important forest land, which has been a key focus of the Tribe over the years.  The Tribe first did an official forest management plan in the late 1980s and has continuously prioritized natural resource preservation and management (including specifically forest management).  The Tribe, on its own, and in conjunction with federal grant programs has worked to manage and protect its forested areas, including a robust program adopted in 2010 to address an invasive species decimating Hemlock growth in Connecticut more generally.  Due to the Tribe's keen focus and immediate action through its Natural Resource Committee and supporting department, the Tribe was able to arrest and prevent further harm to its Hemlock trees on the Reservation.  It is this type of action and control that the Tribe needs to preserve its land in the manner it deems appropriate.  We understand that outside the Reservation, similar actions were not taken and the damage to the Hemlock growth was significant.

The Tribe has enacted a land clearing regulation as part of its Land Use and Natural Resource Protection Regulation. The regulations require permits for tree cutting and/or clearing, and provide for enforcement and review of decisions.  Once in trust, this Property would be subject to the Tribe's laws related to land clearing, land use, historic preservation of sacred and cultural sites, as well as natural resource preservation.

The Tribal Historic Preservation Officer has identified at least one potential archeological site located on the Property that requires further study.  The site was located in 1989 during a Phase I reconnaissance survey for a water pipeline. The site is located on a stream terrace with a stream that flowed into the Great Cedar Swamp.  The Phase I consisted of an east to west transect of 50x50cm test pits at five-meter intervals. Two parallel lines of five-meter interval test pits were placed around the transect, one five meters north and one five meters south. Four units contained cultural material over a 400m square area. The thin scatter of materials recovered led to a recommendation by the archeologist to conduct further testing.

Accepting this Parcel into trust given, among other things, its location near critical tribal housing, infrastructure and community buildings, as well as the need to protect under tribal laws and regulations the forest and potential archeological sites, will promote tribal government, tribal economic self-sufficiency, and tribal self-determination and ensures the property is returned to tribal control for the benefit of current and future Tribal citizens.

### 2.2.2    Purpose for which Land will be Used – 25 C.F.R. § 151.10(c)

The Tribe does not anticipate a change in the use of the land at this time and there are no current plans to develop the Property.  As noted above, the Property is currently forest lands and used for hiking and ATV trails.

### 2.3    Impact on State and Political Subdivisions – 25 C.F.R. § 151.10(e)

### 2.3.1    Impact on State or Local Tax Revenues

The most recent tax bill from the Town of Ledyard reflects annual real estate taxes of $499.40. The minimal tax is due to the Property's classification as forest lands.  Since the amount of revenue received by the Town from the Tribe on this Parcel is small, taking the land into trust and, therefore, off of the Town's tax rolls will not significantly impact the Town.  Moreover, the Town receives substantial funds from the federal government as federal impact aid for education costs; receives substantial payments from the Mashantucket Pequot – Mohegan Fund comprised of payments made to the State by the two federally recognized Tribes in Connecticut based on slots or video facsimile revenue; and receives (payments in lieu of taxes) PILOT payments from the State for certain lands taken into trust for the Tribe.

The Property is bordered by Reservation trust land on one side and borders Tribal fee land on the other side.  The Tribe does not expect any negative impact to the Town from the trust acquisition.  If anything, the Tribe will be responsible for all services to the Property, alleviating any responsibility for services from the Town.

Since there is no anticipated change in use of the Property, the Tribe does not expect any conflicts in land use arising from the acquisition of the Property in trust. The Tribe is fully capable of providing all needed governmental services, including but not limited to, all public safety and first responder services, as well as land use regulation.

### 2.3.2    Notice to State and Local Governments

The Tribe expects that the Eastern Regional Office of the Bureau of Indian Affairs will notify the State of Connecticut and the Town of Ledyard of this application in accordance with 25 C.F.R. §151.10.

### 2.4    Identification of Jurisdictional Issues – 25 C.F.R. § 151.10(f)

The Tribe does not anticipate any jurisdictional issues with the land being placed into trust.  The Tribe will provide all necessary governmental services to the land including, but not limited to,

first responder services, land use regulation, utilities, to the extent required, and environmental and natural resource regulation.

## 2.5    Impact on BIA – 25 C.F.R. § 151.10(g)

Apart from the usual and customary role of the Bureau of Indian Affairs in supervising trust property, the Tribe does not anticipate requesting particular BIA services as a result of this application.

## 2.6    National Environmental Policy Act Compliance and Hazardous Substances Determinations – 25 C.F.R. § 151.10(h)

### 2.6.1    NEPA Compliance (516 DM 6) - Categorical Exemption

An environmental review under the National Environmental Policy Act ("NEPA"), 42 U.S.C. 4371 *et seq.*, is not required for this action.  Under the Council on Environmental Quality's regulations implementing NEPA, an agency may exclude from NEPA review categories of actions that do not individually or cumulatively have a significant effect on the human environment.  *See* 43 C.F.R. § 46.205 (providing that if an action is covered by a categorical exclusion no requirement for environmental assessment or environmental impact statement); §46.210 (listing actions that are categorically excluded unless an extraordinary circumstance applies); §46.215 (listing criteria for extraordinary circumstances). The Bureau of Indian Affairs has categorically excluded actions such as this one in regulations promulgated pursuant to NEPA. <u>See</u> 516 DM 10.5(I) (Lists as a categorical exclusion: "Approvals or grants of conveyances and other transfers of interests in land where no change in land use is planned.")

In addition, there are no extraordinary circumstances (as described in 43 C.F.R. §46.215) that would take this outside of the above-cited categorical exclusion.  The Tribe has no plans to develop, physically alter, or change the land use of the Property, and a review of the Categorical Exclusion Exception Review Checklist (submitted herewith as **Exhibit 11)** further demonstrates there are no extraordinary circumstances related to this trust acquisition that would otherwise override the finding of a categorical exclusion.  Since the trust acquisition proposed by this application fits within a categorical exclusion, nether an environmental assessment nor an environmental impact statement is required pursuant to NEPA.

### 2.6.2    Hazardous Substances Determination for Land Acquisitions (602 DM 2)

A Phase I Environmental Site Assessment for the Property was prepared on this property when the Tribe acquired it in 2007.  That assessment found no evidence of hazardous substances on the Property.  There have been no changes in use since the Tribe acquired the Property.  The Tribe is prepared to update the environmental site assessment prior to conveyance, if required.

**3.0 Title Review, Title Insurance, Survey, Conveyance Documents – 25 C.F.R. §151.13**

**3.1    Title Review and Title Insurance**

The Tribe acquired fee simple title to the Property under a Statutory Warranty Deed.  **See Exhibit 4**. The Tribe also purchased an owner's title insurance policy from Chicago Title Insurance Company ("Chicago Title") when it purchased the property in 2007 and the Tribe has never encountered any title issues with this Property.  For purposes of this application, the Tribe requested and Chicago Title issued a Commitment for Title Insurance for the requested conveyance to the United States government. (See copy of Title Policy Commitment and Pro Forma Policy submitted herewith as **Exhibit 12**).  Once a decision is made on the application and the Tribe executes a statutory warranty deed transferring the Property, Chicago Title will issue a Title Policy in the name of the United States of America in Trust for the benefit of the Mashantucket Pequot Tribe which will meet the federal government's ALTA title policy requirements for the transfer of title from fee to trust.

Please note that the Commitment for Title Insurance issued by Chicago Title includes exceptions described in Schedule B, Part I, which shall be addressed in the normal course of issuing the policy, and two exceptions in Schedule B, Part II, that will be excluded from coverage but do not have any material adverse effect on the proposed use or the marketability of title.  A Request for a Preliminary Title Opinion Memorandum is being sent to the Office of the Regional Solicitor, Eastern Region describing the exceptions and the Tribe's response to those exceptions demonstrating no adverse material effect.  A copy of that letter request (without exhibits) is submitted herewith as **Exhibit 13.**

**3.2    Survey**

The Tribe engaged Boundaries, LLC, a Connecticut Limited Liability Company with Connecticut licensed professional land surveyors to survey the Property and has obtained a survey showing no adverse encroachments on the Property.  See the Survey dated August 2023 submitted herewith as **Exhibit 6.**    Boundaries also created a metes and bounds description of the property based on the survey work and we have submitted that description as **Exhibit 5**.  The metes and bounds description also appears on the survey and corresponds to the survey.  The title policy also corresponds to the updated metes and bounds description and ties coverage to the same.

**3.3    Form of Conveyancing Documents**

The Tribe will convey the Property to the United States of America in Trust for the Mashantucket Pequot Tribe pursuant to a Statutory Warranty Deed; a form of which is attached as **Exhibit 14.**

**4.5    Inspection and Tax Affidavit**

We understand that a Certificate of Inspection and Possession will be completed prior to the United States accepting title to the Property in trust.  Also, immediately prior to trust acquisition

of the Property and in coordination with the issuance of the title policy, the Tribe will prepare an affidavit assuring that all taxes are paid up to the time of transfer.

**5.0    CONCLUSION**

The acquisition of the Property in trust meets all of the regulatory requirements, is in the best interests of the Tribe and its citizens, and will not be detrimental to the surrounding community. Accordingly, the Tribe respectfully requests that the Regional Director, pursuant to delegated authority from the Secretary of the Department of the Interior, approve this Application and accept the conveyance of 119 Indiantown Road to the United States of America to be held in trust for the benefit of the Mashantucket Pequot Tribe.

# EXHIBIT 2



**Mashantucket Pequot Tribal Nation**
*Office of Legal Counsel*

2 Matt's Path
P.O. Box 3060
Mashantucket, CT 06338-3060
Tel: 860-396-2099
Fax: 860-396-6295
JCummings@mptn-nsn.gov

August 25, 2023

**VIA FEDERAL EXPRESS AND VIA EMAIL (Kimberly.Bouchard@bia.gov)**

Ms. Kimberly Bouchard
Regional Director – Eastern Regional Office
Bureau of Indian Affairs
545 Marriott Drive, Suite 700
Nashville, TN 37214

**Re: Fee to Trust Applications for 119, 137 and 159 Indiantown Road, Ledyard, CT**

Dear Regional Director Bouchard:

Enclosed please find three (3) Fee to Trust applications for filing on behalf of the Mashantucket Pequot Tribe pursuant to 25 U.S.C. Section 5108 and 25 C.F.R. Section 151.1 *et seq.* Each application contains a narrative addressing the factors considered under 25 C.F.R. Section 151.10, as well as exhibits with supporting documents or information.

In an effort to provide all necessary information and to expedite the review of these applications, we have simultaneously sent requests for a preliminary title opinion to Annette Tarnawsky in the Office of the Solicitor. A copy of that correspondence is included as an exhibit in each of the applications. Our sincere hope is that with the extensive information provided for each application, including surveys and title policy commitments, we can avoid the delays we have experienced in the past. Of course, we understand how busy the department is and are ready to assist in providing any other information necessary for your review and decision. To that end, I ask that you and your staff feel free to contact me at jcummings@mptn-nsn.gov or Betsy Conway at bconway@mptn-nsn.gov.

Sincerely,

Jody A. Cummings
General Counsel
Mashantucket Pequot Tribe

Cc: Rodney A. Butler, Chairman, Mashantucket Pequot Tribe

**A-012**

**The Mashantucket Pequot Tribe's**

**Application for Conveyance of**

**Approximately 4.79 +/- acres of Contiguous Fee Land to Trust Status**

**("159 Indiantown Rd., Ledyard, CT Property Application")**

**1.0    Identification of Parties, Description of Property and Request for Action, Tribal Authorization for Requested Action (25 C.F.R. § 151.9)**

**1.1    Identification of the Applicant**

The Mashantucket Pequot Tribe a/k/a Mashantucket Pequot Tribal Nation (hereinafter referred to as the "Tribe" or "Nation") is a federally-recognized Indian Tribe eligible for special programs and services offered by the federal government to Indian Tribes. *See* Mashantucket Pequot Indian Land Claims Settlement Act, Public Law 98-134, 97 Stat. 851 (October 18, 1983) ("Settlement Act")[1]; List of Indian Entities Recognized by and Eligible to Receive Services from the United States Bureau of Indian Affairs, 88 F.R. 2112 (January 12, 2023).  The Tribe is governed by a seven-member Tribal Council under a written Constitution.[2]  *See* Constitution and By-Laws (submitted herewith as **Exhibit 1**). Presently, there are approximately 1165 enrolled members or citizens of the Tribe.

The Tribe's reservation consists of approximately 1635 acres of land held in trust by the United States for the benefit of the Tribe (the "Reservation").  The Reservation is located within the geographical boundaries of the County of New London in the State of Connecticut.  The Reservation is depicted on a map submitted herewith as **Exhibit 2.**

**1.2    Description of the Land and Proposed Action**

In 1994, the Tribe purchased a parcel of land known as the 159 Indiantown Rd consisting of 4.79 acres of land (hereinafter the "**Property**").  The Property is depicted on maps submitted herewith as **Exhibit 3.**  There are no improvements on the Property, however, there are overhead powerlines which connect to a barn on Tribally owned property located at 153 Indiantown Road.

The Tribe obtained the Property by Statutory Warranty Deed dated April 15, 1994 (a copy of the deed is submitted herewith as **Exhibit 4**).  The full legal description for the Property is submitted

---

[1] The Tribe's Settlement Act was codified at 25 U.S.C. §§1751 – 1760 prior to an administrative decision to "omit" all of Chapter 19 of Title 25 of the United States Code which contained numerous settlement acts each addressing a different Indian tribe.  The citation now is to the Public Law when enacted.  Decisions and commentary on the Settlement Act prior to this administrative act will cite to the codified designation.

[2] The Tribe's Constitution refers to the Tribe as the Mashantucket (Western) Pequot Tribe.

herewith as **Exhibit 5**.  The legal description is updated from the one attached to the Warranty Deed to reflect metes and bounds based on a survey that was completed in August 2023, which survey is submitted herewith as **Exhibit 6.**

The Property is contiguous to the Tribe's Reservation as depicted on the site location map (See **Exhibit 3**).  As such, evaluation of the Tribe's trust acquisition request is pursuant to the criteria set forth in 25 C.F.R. §151.10.

The proposed action is for the United States to acquire title to the Property totaling approximately **4.79** acres, which is owned in fee status by the Tribe, and hold the land in trust status for the benefit of the Tribe.

### 1.3    Tribal Council Resolution Authorizing Submission of the Application Requesting Acquisition of Trust Land

The Mashantucket Pequot Tribal Council, the governing body of the Tribe, adopted Tribal Council Resolution No. **TCR081023-11 of 11** authorizing the filing of this application requesting that the United States Secretary of the Interior or her designee acquire the Property in trust for the benefit of the Tribe. (A copy of **TCR081023-11 of 11** is submitted herewith as **Exhibit 7**.)

### 2.0    On Reservation Acquisitions Evaluation Factors – (25 C.F.R. § 151.10)

As noted above, the Property is contiguous the Tribe's Reservation and, therefore, the factors set forth in 25 C.F.R. 151.10 are the relevant factors for consideration and review.

### 2.1    Statutory Authority for Accepting Land into Trust – 25 C.F.R. § 151.10(a)

The Secretary of the Interior has authority to acquire land in trust for the benefit of the Tribe pursuant to Section 5 of the Indian Reorganization Act of 1934 ("IRA") (25 U.S.C. § 5108, which applies to the Tribe pursuant to the Settlement Act (a copy of the Settlement Act is submitted herewith for convenience as **Exhibit 8**).  Section 9[3] of the Settlement Act recognizes the Tribe as a federally recognized tribe and specifically provides that laws of general application to Indians or Indian nations are applicable to the Tribe.  Additionally, Section 8[4] of the Settlement Act provides that lands within the Tribe's reservation or which are subject to a federal restraint against alienation shall be subject to federal laws relating to Indian lands.  The language

---

[3] Section 9 states: "Notwithstanding any other provision of law, Federal recognition is extended to the Tribe. Except as otherwise provided in this Act, all laws and regulations of the United States of general application to Indians or Indian nations, tribes or bands of Indians which are not inconsistent with any specific provision of this Act shall be applicable to the Tribe."

[4] Section 8, in relevant part, states: "lands within the reservation which are held in trust by the Secretary for the benefit of the Tribe or which are subject to a Federal restraint against alienation at any time after the date of the enactment of this Act shall be subject to the laws of the United States relating to Indian lands, including section 2116 of the Revised Statutes (25 U.S.C. 177)."

in the Settlement Act evinces a clear intent to make federal laws relating to lands, federal benefits and otherwise related to Indians and Indian tribes applicable to the Tribe.

In 1983, when the Settlement Act was enacted, the Indian Reorganization Act, including authority related to trust acquisition, was one such law of general applicability to Indians and Indian tribes. The Court of Appeals for the Second Circuit interpreted the Settlement Act, in the face of a challenge by the State of Connecticut and local towns concerning the Secretary's authority to take land into trust under Section 5 of the IRA on behalf of the Tribe, and upheld the Secretary's authority under IRA to accept land into trust for the Tribe. *See Connecticut v. U.S. Dept. of Interior*, 228 F.3d 82 (2d Cir. 2000).

Most recently, the Bureau of Indian Affairs ("BIA") affirmed its trust acquisition authority for the Tribe in issuing its February 2017 decision to acquire land identified as 850R Shewville Road in trust for the Tribe. *See* February 13, 2017 letter from Bruce Maytubby, BIA Regional Director, Eastern Region to Rodney Butler, Mashantucket Pequot Tribal Chairman (a copy is submitted herewith as **Exhibit 9**). *See also* March 10, 2020 Memorandum from Robert S. Hitchcock, Attorney-Advisor, DOI Solicitor's Office to Bruce Maytubby, BIA Regional Director, Eastern Region, p. 10, notes 85&86 (citing the Mashantucket Pequot Settlement Act as an example of a statute where Congress provided for the Secretary's authority to take land into trust for a particular tribe and that the "IRA applied to [the] Tribe as a law of general application under the [Settlement] Act") (copy of that Memorandum is submitted herewith as **Exhibit 10**).

## 2.2    Need and Purpose

### 2.2.1    Statement of Need for Trust Land – 25 C.F.R. § 151.10(b)

Land acquisition is critical to tribal self-determination and sovereignty. Flawed federal and state policies imposed on tribal nations across the United States, including the Mashantucket Pequot Tribe, have dispossessed tribal nations of their homelands and hindered their ability to maintain self-sufficient communities, protect important cultural and sacred sites, support economic development initiatives, provide affordable housing opportunities for tribal citizens, and meet other critical needs.

Restoration of tribal homelands has been and continues to be a critical mission and focus for the Tribe. The Tribe occupies one of the oldest, continuously occupied Indian reservations in North America. Mashantucket was a 3,000-acre parcel of unspoiled woodland in the late 1600s. However, by 1856 illegal land sales had reduced Mashantucket to 213 acres. The Tribe initiated legal action in 1976 to recover land that had been sold illegally by the State of Connecticut in 1856. Eventually, the Mashantucket Pequot Indian Land Claims Settlement Act was enacted by the U.S. Congress and signed by President Reagan on Oct. 18, 1983. This act granted the Tribe federal recognition and enabled it to purchase and place land in trust. Currently, approximately 1,635 acres are held by the United States in trust for the benefit of the Tribe and the Tribe continues to seek restoration of lands especially those owned by the Tribe.

The Property at issue in this application lies within the Tribe's traditional aboriginal territory and is contiguous to the Tribe's Reservation. Accepting the Property into trust will continue the

work of restoring the Tribe's land base and ensure that the property is returned to tribal control for the benefit of the current and future tribal citizens.

The Property consists of approximately 4.79 acres of undeveloped land. The Property is in a critical location as it abuts the Tribe's Public Works and Public Safety facilities which provide essential governmental services to the Reservation community. The Property is also close to the Mashantucket Pequot Museum and Research Center.

Accepting this Parcel into trust given, among other things, its location near critical tribal governmental infrastructure and community buildings, will promote tribal government, tribal economic self-sufficiency, and tribal self-determination and ensure that the Property is returned to tribal control for the benefit of current and future tribal citizens.

### 2.2.2   Purpose for which Land will be Used – 25 C.F.R. § 151.10(c)

The Tribe does not anticipate a change in the use of the land at this time and there are no current plans to develop the Property. As noted above, the Property is currently undeveloped land that abuts critical Tribal infrastructure and governmental service facilities.

### 2.3    Impact on State and Political Subdivisions – 25 C.F.R. § 151.10(e)

### 2.3.1   Impact on State or Local Tax Revenues

The most recent tax bill from the Town of Ledyard reflects annual real estate taxes of $2,542.58. The tax payment is relatively low reflecting the undeveloped nature of the property. The tax amount includes 3 small shed/lean to type structures that are no longer on the Property. Since the amount of revenue received by the Town for the Property is small, taking the land into trust and, therefore, off of the Town's tax rolls will not significantly impact the Town. Moreover, the Town receives substantial funds from the federal government as federal impact aid for education costs; receives substantial payments from the Mashantucket Pequot – Mohegan Fund comprised of payments made to the State by the two federally recognized Tribes in Connecticut based on slots or video facsimile revenue; and receives (payments in lieu of taxes) PILOT payments from the State for certain lands taken into trust for the Tribe. The Town is already receiving significant impact aid based on other trust properties, the presence of tribal children attending schools in the Town, and because the Tribe has paid over $4.5 billion to the State since the start of gaming with much of that money being distributed to municipalities across the state. The Town of Ledyard has received additional monies from the State because of the Reservation's location.

With the Property being bordered by Tribal trust land on one side and Tribal fee land on the remaining sides, the Tribe does not expect any negative impact to the Town from the trust acquisition. If anything, the Tribe will be responsible for all services to the Property, alleviating any responsibility for services from the Town.

Since there is no anticipated change in use of the Property, the Tribe does not expect any conflicts in land use arising from the acquisition of the Property in trust. The Tribe is fully

capable of providing all needed governmental services, including but not limited to, all public safety and first responder services, as well as land use regulation.

### 2.3.2   Notice to State and Local Governments

The Tribe expects that the Eastern Regional Office of the Bureau of Indian Affairs will notify the State of Connecticut and the Town of Ledyard of this application in accordance with 25 C.F.R. §151.10.

### 2.4   Identification of Jurisdictional Issues – 25 C.F.R. § 151.10(f)

The Tribe does not anticipate any jurisdictional issues with the land being placed into trust.  The Tribe will provide all necessary governmental services to the land including, but not limited to, first responder services, land use regulation, utilities, to the extent required, and environmental and natural resource regulation.

### 2.5   Impact on BIA – 25 C.F.R. § 151.10(g)

Apart from the usual and customary role of the Bureau of Indian Affairs in supervising trust property, the Tribe does not anticipate requesting particular BIA services as a result of this application.

### 2.6   National Environmental Policy Act Compliance and Hazardous Substances Determinations – 25 C.F.R. § 151.10(h)

### 2.6.1   NEPA Compliance (516 DM 6) - Categorical Exemption

An environmental review under the National Environmental Policy Act ("NEPA"), 42 U.S.C. 4371 *et seq.*, is not required for this action.  Under the Council on Environmental Quality's regulations implementing NEPA, an agency may exclude from NEPA review categories of actions that do not individually or cumulatively have a significant effect on the human environment.  *See* 43 C.F.R. § 46.205 (providing that if an action is covered by a categorical exclusion no requirement for environmental assessment or environmental impact statement); §46.210 (listing actions that are categorically excluded unless an extraordinary circumstance applies); §46.215 (listing criteria for extraordinary circumstances). The Bureau of Indian Affairs has categorically excluded actions such as this one in regulations promulgated pursuant to NEPA. See 516 DM 10.5(I) (Lists as a categorical exclusion: "Approvals or grants of conveyances and other transfers of interests in land where no change in land use is planned.")

In addition, there are no extraordinary circumstances (as described in 43 C.F.R. §46.215) that would take this outside of the above-cited categorical exclusion.  The Tribe has no plans to develop, physically alter, or change the land use of the Property, and a review of the Categorical Exclusion Exception Review Checklist (submitted herewith as **Exhibit 11)** further demonstrates there are no extraordinary circumstances related to this trust acquisition that would otherwise override the finding of a categorical exclusion.  Since the trust acquisition proposed by this application fits within a categorical exclusion, nether an environmental assessment nor an environmental impact statement is required pursuant to NEPA.

**2.6.2   Hazardous Substances Determination for Land Acquisitions (602 DM 2)**

The Property is undeveloped land with no structures or permanent improvements.  There is no indication of the existence of hazardous substances on the Property.  The Tribe is prepared to have an environmental site assessment done prior to conveyance, if required.

**3.0 Title Review, Title Insurance, Survey, Conveyance Documents – 25 C.F.R. §151.13**

**3.1      Title Review and Title Insurance**

The Tribe acquired fee simple title to the Property under a Statutory Warranty Deed. **See <u>Exhibit 4</u>**. The Tribe also purchased an owner's title insurance policy from Chicago Title Insurance Company ("Chicago Title") when it purchased the property in 1994 and the Tribe has never encountered any title issues with the Property.   Chicago Title has issued a Commitment for Title Insurance for the requested conveyance to the United States government. (See copy of Commitment and Pro Forma Policy submitted herewith as **Exhibit 12**). Upon acceptance of the Statutory Warranty Deed, Chicago Title will issue a Title Policy in the name of the United States of America in Trust for the benefit of the Mashantucket Pequot Tribe which will meet the federal government's ALTA title policy requirements for the transfer of title from fee to trust.

Please note that the Commitment for Title Insurance issued by Chicago Title includes exceptions described in Schedule B, Part I, which shall be addressed in the normal course of issuing the policy, and one exception in Schedule B, Part II, that will be excluded from coverage but does not have any material adverse effect on the proposed use or the marketability of title.  A Request for a Preliminary Title Opinion Memorandum is being sent to the Office of the Regional Solicitor, Eastern Region describing the exception and the Tribe's response to those that exception demonstrating no adverse material effect on use or marketability.  A copy of that letter request (without exhibits) is submitted herewith as **<u>Exhibit 13.</u>**

**3.2      Survey**

The Tribe engaged Boundaries, LLC, a Connecticut Limited Liability Company with Connecticut licensed professional land surveyors to survey the Property and has obtained a survey showing no adverse encroachments on the Property.  See the Survey dated August 2023 submitted herewith as **<u>Exhibit 6.</u>**   Boundaries also created a metes and bounds description of the property based on the survey work and we have submitted that description as **<u>Exhibit 5</u>**.  The metes and bounds description also appears on the survey and corresponds to the survey.  The title policy also corresponds to the updated metes and bounds description and ties coverage to the same.

### 3.3    Form of Conveyancing Documents

The Tribe will convey the Property to the United States of America in Trust for the Mashantucket Pequot Tribe pursuant to a Statutory Warranty Deed; a form of which is attached as **<u>Exhibit 14</u>**.

### 4.5    Inspection and Tax Affidavit

We understand that Certificates of Inspection and Possession will be completed immediately prior to the United States accepting title to the Property in trust.  Also, immediately prior to trust acquisition of the Property and in coordination with the issuance of the title policy, the Tribe will prepare an affidavit assuring that all taxes are paid up to the time of transfer.

### 5.0    CONCLUSION

The acquisition of the Property in trust meets all of the regulatory requirements, is in the best interests of the Tribe and its citizens, and will not be detrimental to the surrounding community. Accordingly, the Tribe respectfully requests that the Regional Director, pursuant to delegated authority from the Secretary of the Department of the Interior, approve this Application and accept the conveyance of 159 Indiantown Road to the United States of America to be held in trust for the benefit of the Mashantucket Pequot Tribe.

# EXHIBIT 3

This content is from the eCFR and is authoritative but unofficial.

 Displaying the eCFR in effect on 8/25/2023. ⓘ

**Title 25 —Indians**
**Chapter I —Bureau of Indian Affairs, Department of the Interior**
**Subchapter H —Land and Water**

ENHANCED CONTENT - TABLE OF CONTENTS

**Part 151**   Land Acquisitions       151.1 – 151.15
§ 151.1   Purpose and scope.
§ 151.2   Definitions.
§ 151.3   Land acquisition policy.
§ 151.4   Acquisitions in trust of lands owned in fee by an Indian.
§ 151.5   Trust acquisitions in Oklahoma under section 5 of the I.R.A.
§ 151.6   Exchanges.
§ 151.7   Acquisition of fractional interests.
§ 151.8   Tribal consent for nonmember acquisitions.
§ 151.9   Requests for approval of acquisitions.
§ 151.10   On-reservation acquisitions.
§ 151.11   Off-reservation acquisitions.
§ 151.12   Action on requests.
§ 151.13   Title review.
§ 151.14   Formalization of acceptance.
§ 151.15   Information collection.

# ⊙ PART 151—LAND ACQUISITIONS

**Authority:** R.S. 161: 5 U.S.C. 301. Interpret or apply 46 Stat. 1106, as amended; 46 Stat. 1471, as amended; 48 Stat. 985, as amended; 49 Stat. 1967, as amended, 53 Stat. 1129; 63 Stat. 605; 69 Stat. 392, as amended; 70 Stat. 290, as amended; 70 Stat. 626; 75 Stat. 505; 77 Stat. 349; 78 Stat. 389; 78 Stat. 747; 82 Stat. 174, as amended, 82 Stat. 884; 84 Stat. 120; 84 Stat. 1874; 86 Stat. 216; 86 Stat. 530; 86 Stat. 744; 88 Stat. 78; 88 Stat. 81; 88 Stat. 1716; 88 Stat. 2203; 88 Stat. 2207; 25 U.S.C. 2, 9, 409a, 450h, 451, 464, 465, 487, 488, 489, 501, 502, 573, 574, 576, 608, 608a, 610, 610a, 622, 624, 640d-10, 1466, 1495, and other authorizing acts.

Cross Reference:

For regulations pertaining to: The inheritance of interests in trust or restricted land, see parts 15, 16, and 17 of this title and 43 CFR part 4; the purchase of lands under the BIA Loan Guaranty, Insurance and Interest Subsidy program, see part 103 of this title; the exchange and partition of trust or restricted lands, see part 152 of this title; land acquisitions authorized by the Indian Self-Determination and Education Assistance Act, see parts 900 and 276 of this title; the acquisition of allotments on the public domain or in national forests, see 43 CFR part 2530; the acquisition of Native allotments and Native townsite lots in Alaska, see 43 CFR parts 2561 and 2564; the acquisition of lands by Indians with funds borrowed from the Farmers Home Administration, see 7 CFR part 1823, subpart N; the acquisition of land by purchase or exchange for members of the Osage Tribe not having certificates of competency, see §§ 117.8 and 158.54 of this title.

**Source:** 45 FR 62036, Sept. 18, 1980, unless otherwise noted. Redesignated at 47 FR 13327, Mar. 30, 1982.

## ⊙ § 151.1 Purpose and scope.

These regulations set forth the authorities, policy, and procedures governing the acquisition of land by the United States in trust status for individual Indians and tribes. Acquisition of land by individual Indians and tribes in fee simple status is not covered by these regulations even though such land may, by operation of law, be held in restricted status following acquisition. Acquisition of land in trust status by inheritance or escheat is not covered by these regulations.

**A-021**

[79 FR 76897, Dec. 23, 2014]

## § 151.2 Definitions.

(a) **Secretary** means the Secretary of the Interior or authorized representative.

(b) **Tribe** means any Indian tribe, band, nation, pueblo, community, rancheria, colony, or other group of Indians, including the Metlakatla Indian Community of the Annette Island Reserve, which is recognized by the Secretary as eligible for the special programs and services from the Bureau of Indian Affairs. For purposes of acquisitions made under the authority of 25 U.S.C. 488 and 489, or other statutory authority which specifically authorizes trust acquisitions for such corporations, "Tribe" also means a corporation chartered under section 17 of the Act of June 18, 1934 (48 Stat. 988; 25 U.S.C. 477) or section 3 of the Act of June 26, 1936 (49 Stat. 1967; 25 U.S.C. 503).

(c) **Individual Indian** means:

(1) Any person who is an enrolled member of a tribe;

(2) Any person who is a descendent of such a member and said descendant was, on June 1, 1934, physically residing on a federally recognized Indian reservation;

(3) Any other person possessing a total of one-half or more degree Indian blood of a tribe;

(4) For purposes of acquisitions outside of the State of Alaska, *Individual Indian* also means a person who meets the qualifications of paragraph (c)(1), (2), or (3) of this section where "Tribe" includes any Alaska Native Village or Alaska Native Group which is recognized by the Secretary as eligible for the special programs and services from the Bureau of Indian Affairs.

(d) **Trust land or land in trust status** means land the title to which is held in trust by the United States for an individual Indian or a tribe.

(e) **Restricted land or land in restricted status** means land the title to which is held by an individual Indian or a tribe and which can only be alienated or encumbered by the owner with the approval of the Secretary because of limitations contained in the conveyance instrument pursuant to Federal law or because of a Federal law directly imposing such limitations.

(f) Unless another definition is required by the act of Congress authorizing a particular trust acquisition, *Indian reservation* means that area of land over which the tribe is recognized by the United States as having governmental jurisdiction, except that, in the State of Oklahoma or where there has been a final judicial determination that a reservation has been disestablished or diminished, *Indian reservation* means that area of land constituting the former reservation of the tribe as defined by the Secretary.

(g) **Land** means real property or any interest therein.

(h) **Tribal consolidation area** means a specific area of land with respect to which the tribe has prepared, and the Secretary has approved, a plan for the acquisition of land in trust status for the tribe.

[45 FR 62036, Sept. 18, 1980, as amended at 60 FR 32879, June 23, 1995]

## § 151.3 Land acquisition policy.

Land not held in trust or restricted status may only be acquired for an individual Indian or a tribe in trust status when such acquisition is authorized by an act of Congress. No acquisition of land in trust status, including a transfer of land already held in trust or restricted status, shall be valid unless the acquisition is approved by the Secretary.

(a) Subject to the provisions contained in the acts of Congress which authorize land acquisitions, land may be acquired for a tribe in trust status:

(1) When the property is located within the exterior boundaries of the tribe's reservation or adjacent thereto, or within a tribal consolidation area; or

(2) When the tribe already owns an interest in the land; or

(3) When the Secretary determines that the acquisition of the land is necessary to facilitate tribal self-determination, economic development, or Indian housing.

**A-022**

(b)   Subject to the provisions contained in the acts of Congress which authorize land acquisitions or holding land in trust or restricted status, land may be acquired for an individual Indian in trust status:

(1)   When the land is located within the exterior boundaries of an Indian reservation, or adjacent thereto; or

(2)   When the land is already in trust or restricted status.

## § 151.4 Acquisitions in trust of lands owned in fee by an Indian.

Unrestricted land owned by an individual Indian or a tribe may be conveyed into trust status, including a conveyance to trust for the owner, subject to the provisions of this part.

## § 151.5 Trust acquisitions in Oklahoma under section 5 of the I.R.A.

In addition to acquisitions for tribes which did not reject the provisions of the Indian Reorganization Act and their members, land may be acquired in trust status for an individual Indian or a tribe in the State of Oklahoma under section 5 of the Act of June 18, 1934 (48 Stat. 985; 25 U.S.C. 465), if such acquisition comes within the terms of this part. This authority is in addition to all other statutory authority for such an acquisition.

## § 151.6 Exchanges.

An individual Indian or tribe may acquire land in trust status by exchange if the acquisition comes within the terms of this part. The disposal aspects of an exchange are governed by part 152 of this title.

## § 151.7 Acquisition of fractional interests.

Acquisition of a fractional land interest by an individual Indian or a tribe in trust status can be approved by the Secretary only if:

(a)   The buyer already owns a fractional interest in the same parcel of land; or

(b)   The interest being acquired by the buyer is in fee status; or

(c)   The buyer offers to purchase the remaining undivided trust or restricted interests in the parcel at not less than their fair market value; or

(d)   There is a specific law which grants to the particular buyer the right to purchase an undivided interest or interests in trust or restricted land without offering to purchase all of such interests; or

(e)   The owner of a majority of the remaining trust or restricted interests in the parcel consent in writing to the acquisition by the buyer.

## § 151.8 Tribal consent for nonmember acquisitions.

An individual Indian or tribe may acquire land in trust status on a reservation other than its own only when the governing body of the tribe having jurisdiction over such reservation consents in writing to the acquisition; provided, that such consent shall not be required if the individual Indian or the tribe already owns an undivided trust or restricted interest in the parcel of land to be acquired.

## § 151.9 Requests for approval of acquisitions.

An individual Indian or tribe desiring to acquire land in trust status shall file a written request for approval of such acquisition with the Secretary. The request need not be in any special form but shall set out the identity of the parties, a description of the land to be acquired, and other information which would show that the acquisition comes within the terms of this part.

## § 151.10 On-reservation acquisitions.

Upon receipt of a written request to have lands taken in trust, the Secretary will notify the state and local governments having regulatory jurisdiction over the land to be acquired, unless the acquisition is mandated by legislation. The notice will inform the state or local government that each will be given 30 days in which to provide written comments as to the acquisition's potential impacts on regulatory jurisdiction, real property taxes and special assessments. If the state or local government responds within a 30-day period,

A-023

a copy of the comments will be provided to the applicant, who will be given a reasonable time in which to reply and/or request that the Secretary issue a decision. The Secretary will consider the following criteria in evaluating requests for the acquisition of land in trust status when the land is located within or contiguous to an Indian reservation, and the acquisition is not mandated:

(a)   The existence of statutory authority for the acquisition and any limitations contained in such authority;

(b)   The need of the individual Indian or the tribe for additional land;

(c)   The purposes for which the land will be used;

(d)   If the land is to be acquired for an individual Indian, the amount of trust or restricted land already owned by or for that individual and the degree to which he needs assistance in handling his affairs;

(e)   If the land to be acquired is in unrestricted fee status, the impact on the State and its political subdivisions resulting from the removal of the land from the tax rolls;

(f)   Jurisdictional problems and potential conflicts of land use which may arise; and

(g)   If the land to be acquired is in fee status, whether the Bureau of Indian Affairs is equipped to discharge the additional responsibilities resulting from the acquisition of the land in trust status.

(h)   The extent to which the applicant has provided information that allows the Secretary to comply with 516 DM 6, appendix 4, National Environmental Policy Act Revised Implementing Procedures, and 602 DM 2, Land Acquisitions: Hazardous Substances Determinations. (For copies, write to the Department of the Interior, Bureau of Indian Affairs, Branch of Environmental Services, 1849 C Street NW., Room 4525 MIB, Washington, DC 20240.)

*[45 FR 62036, Sept. 18, 1980, as amended at 60 FR 32879, June 23, 1995]*

## § 151.11 Off-reservation acquisitions.

The Secretary shall consider the following requirements in evaluating tribal requests for the acquisition of lands in trust status, when the land is located outside of and noncontiguous to the tribe's reservation, and the acquisition is not mandated:

(a)   The criteria listed in § 151.10 (a) through (c) and (e) through (h);

(b)   The location of the land relative to state boundaries, and its distance from the boundaries of the tribe's reservation, shall be considered as follows: as the distance between the tribe's reservation and the land to be acquired increases, the Secretary shall give greater scrutiny to the tribe's justification of anticipated benefits from the acquisition. The Secretary shall give greater weight to the concerns raised pursuant to paragraph (d) of this section.

(c)   Where land is being acquired for business purposes, the tribe shall provide a plan which specifies the anticipated economic benefits associated with the proposed use.

(d)   Contact with state and local governments pursuant to § 151.10 (e) and (f) shall be completed as follows: Upon receipt of a tribe's written request to have lands taken in trust, the Secretary shall notify the state and local governments having regulatory jurisdiction over the land to be acquired. The notice shall inform the state and local government that each will be given 30 days in which to provide written comment as to the acquisition's potential impacts on regulatory jurisdiction, real property taxes and special assessments.

*[60 FR 32879, June 23, 1995, as amended at 60 FR 48894, Sept. 21, 1995]*

## § 151.12 Action on requests.

(a)   The Secretary shall review each request and may request any additional information or justification deemed necessary to reach a decision.

(b)   The Secretary's decision to approve or deny a request shall be in writing and state the reasons for the decision.

(c)   A decision made by the Secretary, or the Assistant Secretary—Indian Affairs pursuant to delegated authority, is a final agency action under 5 U.S.C. 704 upon issuance.

(1)   If the Secretary or Assistant Secretary denies the request, the Assistant Secretary shall promptly provide the applicant with the decision.

## A-024

(2) If the Secretary or Assistant Secretary approves the request, the Assistant Secretary shall:

    (i) Promptly provide the applicant with the decision;

    (ii) Promptly publish in the FEDERAL REGISTER a notice of the decision to acquire land in trust under this part; and

    (iii) Immediately acquire the land in trust under § 151.14 on or after the date such decision is issued and upon fulfillment of the requirements of § 151.13 and any other Departmental requirements.

(d) A decision made by a Bureau of Indian Affairs official pursuant to delegated authority is not a final agency action of the Department under 5 U.S.C. 704 until administrative remedies are exhausted under part 2 of this chapter or until the time for filing a notice of appeal has expired and no administrative appeal has been filed.

(1) If the official denies the request, the official shall promptly provide the applicant with the decision and notification of any right to file an administrative appeal under part 2 of this chapter.

(2) If the official approves the request, the official shall:

    (i) Promptly provide the applicant with the decision;

    (ii) Promptly provide written notice of the decision and the right, if any, to file an administrative appeal of such decision pursuant to part 2 of this chapter, by mail or personal delivery to:

        (A) Interested parties who have made themselves known, in writing, to the official prior to the decision being made; and

        (B) The State and local governments having regulatory jurisdiction over the land to be acquired;

    (iii) Promptly publish a notice in a newspaper of general circulation serving the affected area of the decision and the right, if any, of interested parties who did not make themselves known, in writing, to the official to file an administrative appeal of the decision under part 2 of this chapter; and

    (iv) Immediately acquire the land in trust under § 151.14 upon expiration of the time for filing a notice of appeal or upon exhaustion of administrative remedies under part 2 of this title, and upon the fulfillment of the requirements of § 151.13 and any other Departmental requirements.

(3) The administrative appeal period under part 2 of this chapter begins on:

    (i) The date of receipt of written notice by the applicant or interested parties entitled to notice under paragraphs (d)(1) and (d)(2)(ii) of this section;

    (ii) The date of first publication of the notice for unknown interested parties under paragraph (d)(2)(iii) of this section.

(4) Any party who wishes to seek judicial review of an official's decision must first exhaust administrative remedies under 25 CFR part 2.

*[78 FR 67937, Nov. 13, 2013]*

## § 151.13 Title review.

(a) If the Secretary determines that she will approve a request for the acquisition of land from unrestricted fee status to trust status, she shall require the applicant to furnish title evidence as follows:

(1) The deed or other conveyance instrument providing evidence of the applicant's title or, if the applicant does not yet have title, the deed providing evidence of the transferor's title and a written agreement or affidavit from the transferor, that title will be transferred to the United States on behalf of the applicant to complete the acquisition in trust; and

(2) Either:

    (i) A current title insurance commitment; or

    (ii) The policy of title insurance issued to the applicant or current owner and an abstract of title dating from the time the policy of title insurance was issued to the applicant or current owner to the present.

(3) The applicant may choose to provide title evidence meeting the title standards issued by the U.S. Department of Justice, in lieu of the evidence required by paragraph (a)(2) of this section.

(b)   After reviewing submitted title evidence, the Secretary shall notify the applicant of any liens, encumbrances, or infirmities that the Secretary identified and may seek additional information from the applicant needed to address such issues. The Secretary may require the elimination of any such liens, encumbrances, or infirmities prior to taking final approval action on the acquisition, and she shall require elimination prior to such approval if she determines that the liens, encumbrances or infirmities make title to the land unmarketable.

*[81 FR 30177, May 16, 2016]*

## § 151.14 Formalization of acceptance.

Formal acceptance of land in trust status shall be accomplished by the issuance or approval of an instrument of conveyance by the Secretary as is appropriate in the circumstances.

*[45 FR 62036, Sept. 18, 1980. Redesignated at 60 FR 32879, June 23, 1995]*

## § 151.15 Information collection.

(a)   The information collection requirements contained in §§ 151.9; 151.10; 151.11(c), and 151.13 have been approved by the Office of Management and Budget under 44 U.S.C. 3501 *et seq.* and assigned clearance number 1076-0100. This information is being collected to acquire land into trust on behalf of the Indian tribes and individuals, and will be used to assist the Secretary in making a determination. Response to this request is required to obtain a benefit.

(b)   Public reporting for this information collection is estimated to average 4 hours per response, including the time for reviewing instructions, gathering and maintaining data, and completing and reviewing the information collection. Direct comments regarding the burden estimate or any other aspect of this information collection to the Bureau of Indian Affairs, Information Collection Clearance Officer, Room 337-SIB, 18th and C Streets, NW., Washington, DC 20240; and the Office of Information and Regulatory Affairs [Project 1076-0100], Office of Management and Budget, Washington, DC 20502.

*[60 FR 32879, June 23, 1995; 64 FR 13895, Mar. 23, 1999]*

**A-026**

# EXHIBIT 4

PUBLIC LAW 98-134—OCT. 18, 1983        97 STAT. 851

Public Law 98-134
98th Congress

An Act

To settle certain claims of the Mashantucket Pequot Indians.

Oct. 18, 1983
[S. 1499]

*Be it enacted by the Senate and House of Representatives of the
United States of America in Congress assembled,* That this Act may
be cited as the "Mashantucket Pequot Indian Claims Settlement
Act".

Mashantucket
Pequot
Indian Claims
Settlement Act.
25 USC 1751
note.

25 USC 1751.

### CONGRESSIONAL FINDINGS

SEC. 2. The Congress finds that—

(a) there is pending before the United States District Court for
the District of Connecticut a civil action entitled "Western
Pequot Tribe of Indians against Holdridge Enterprises Incorpo-
rated, et al., Civil Action Numbered H76-193 (D. Conn.)," which
involves Indian claims to certain public and private lands
within the town of Ledyard, Connecticut;

(b) the pendency of this lawsuit has placed a cloud on the
titles to much of the land in the town of Ledyard, including
lands not involved in the lawsuit, which has resulted in severe
economic hardships for the residents of the town;

(c) the Congress shares with the State of Connecticut and the
parties to the lawsuit a desire to remove all clouds on titles
resulting from such Indian land claims;

(d) the parties to the lawsuit and others interested in the
settlement of Indian land claims within the State of Connecticut
have reached an agreement which requires implementing legis-
lation by the Congress of the United States and the Legisla-
ture of the State of Connecticut;

(e) the Western Pequot Tribe, as represented as of the time of
the passage of this Act by the Mashantucket Pequot Tribal
Council, is the sole successor in interest to the aboriginal entity
generally known as the Western Pequot Tribe which years ago
claimed aboriginal title to certain lands in the State of Con-
necticut; and

(f) the State of Connecticut is contributing twenty acres of
land owned by the State of Connecticut to fulfill this Act. The
State of Connecticut will construct and repair three sections of
paved or gravel roadways within the reservation of the Tribe.
The State of Connecticut has provided special services to the
members of the Western Pequot Tribe residing within its bor-
ders. The United States has provided few, if any, special services
to the Western Pequot Tribe and has denied that it had jurisdic-
tion over or responsibility for said Tribe. In view of the provi-
sion of land by the State of Connecticut, the provision of paved
roadways by the State of Connecticut, and the provision of
special services by the State of Connecticut without being
required to do so by Federal law, it is the intent of Congress that
the State of Connecticut not be required to otherwise contribute
directly to this claims settlement.



AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

A-028

97 STAT. 852          PUBLIC LAW 98–134—OCT. 18, 1983

DEFINITIONS

25 USC 1752.

SEC. 3. For the purposes of this Act—

(1) The term "Tribe" means the Mashantucket Pequot Tribe (also known as the Western Pequot Tribe) as identified by chapter 832 of the Connecticut General Statutes and all its predecessors and successors in interest. The Mashantucket Pequot Tribe is represented, as of the date of the enactment of this Act, by the Mashantucket Pequot Tribal Council.

(2) The term "land or natural resources" means any real property or natural resources, or any interest in or right involving any real property or natural resources, including without limitation minerals and mineral rights, timber and timber rights, water and water rights, and hunting and fishing rights.

(3) The term "private settlement lands" means—

(A) the eight hundred acres, more or less, of privately held land which are identified by a red outline on a map filed with the secretary of the State of Connecticut in accordance with the agreement referred to in section 2(d) of this Act, and

(B) the lands known as the Cedar Swamp which are adjacent to the Mashantucket Pequot Reservation as it exists on the date of the enactment of this Act. Within thirty days of the enactment of this Act, the secretary of the State of Connecticut shall transmit to the Secretary a certified copy of said map.

(4) The term "settlement lands" means—

(A) the lands described in sections 2(a) and 3 of the Act To Implement the Settlement of the Mashantucket Pequot Indian Land Claims as enacted by the State of Connecticut and approved on June 9, 1982, and

(B) the private settlement lands.

(5) The term "Secretary" means the Secretary of the Interior.

(6) The term "transfer" means any transaction involving, or any transaction the purpose of which was to effect, a change in title to or control of any land or natural resources, and any act, event, or circumstance that resulted in a change in title to, possession of, dominion over, or control of land or natural resources, including any sale, grant, lease, allotment, partition, or conveyance, whether pursuant to a treaty, compact, or statute of a State or otherwise.

(7) The term "reservation" means the existing reservation of the Tribe as defined by chapter 824 of the Connecticut General Statutes and any settlement lands taken in trust by the United States for the Tribe.

APPROVAL OF PRIOR TRANSFERS; EXTINGUISHMENT OF ABORIGINAL TITLES AND INDIAN CLAIMS

25 USC 1753.

SEC. 4. (a) Any transfer before the date of enactment of this Act from, by, or on behalf of the Tribe or any of its members of land or natural resources located anywhere within the United States, and any transfer before the date of enactment of this Act from, by, or on behalf of any Indian, Indian nation, or tribe or band of Indians of land or natural resources located anywhere within the town of Ledyard, Connecticut, shall be deemed to have been made in accordance with the Constitution and all laws of the United States,

including without limitation the Trade and Intercourse Act of 1790,
Act of July 22, 1790 (ch. 33, sec. 4, 1 Stat. 137, 138), and all
amendments thereto and all subsequent reenactments and versions
thereof, and Congress hereby does approve and ratify any such
transfer effective as of the date of said transfer.

(b) By virtue of the approval and ratification of a transfer of land
or natural resources effected by subsection (a), any aboriginal title
held by the Tribe or any member of the Tribe, or any other Indian,
Indian nation, or tribe or band of Indians, to any land or natural
resources the transfer of which was approved and ratified by subsec-
tion (a) shall be regarded as extinguished as of the date of such
transfer.

(c) By virtue of the approval and ratification of a transfer of land
or natural resources effected by this section, or the extinguishment
of aboriginal title effected thereby, any claim (including any claim
for damages for trespass or for use and occupancy) by, or on behalf
of, the Tribe or any member of the Tribe or by any other Indian,
Indian nation, or tribe or band of Indians, against the United States,
any State or subdivision thereof or any other person which is based
on—

(1) any interest in or right involving any land or natural
resources the transfer of which was approved and ratified by
subsection (a), or

(2) any aboriginal title to land or natural resources the extin-
guishment of which was effected by subsection (b),

shall be regarded as extinguished as of the date of any such transfer.

(d) Nothing in this section shall be construed to affect or eliminate
the personal claim of any individual Indian (except for Federal
common law fraud claim) which is pursued under any law of general
applicability that protects non-Indians as well as Indians.

(e)(1) This section shall take effect upon the appropriation of     Effective date.
$900,000 as authorized under section 5(e) of this Act.

(2) The Secretary shall publish notice of such appropriation in the     Notice,
Federal Register when the funds are deposited in the fund estab-     publication in
lished under section 5(a) of this Act.                                Federal
                                                                     Register.

MASHANTUCKET PEQUOT SETTLEMENT FUND

SEC. 5. (a) There is hereby established in the United States     Establishment.
Treasury an account to be known as the Mashantucket Pequot     25 USC 1754.
Settlement Fund (hereinafter referred to in this section as the
"Fund"). The Fund shall be held in trust by the Secretary for the
benefit of the Tribe and administered in accordance with this Act.

(b)(1) The Secretary is authorized and directed to expend, at the     Expenditure.
request of the Tribe, the Fund together with any and all income
accruing to such Fund in accordance with this subsection.

(2) Not less than $600,000 of the Fund shall be available until     Private
January 1, 1985, for the acquisition by the Secretary of private     settlement
settlement lands. Subsequent to January 1, 1985, the Secretary shall     lands.
determine whether and to what extent an amount less than $600,000
has been expended to acquire private settlement lands and shall
make that amount available to the Tribe to be used in accordance
with the economic development plan approved pursuant to para-
graph (3).

(3)(A) The Secretary shall disburse all or part of the Fund together     Disbursement.
with any and all income accruing to such Fund (excepting the

97 STAT. 854          PUBLIC LAW 98-134—OCT. 18, 1983

amount reserved in paragraph (2)) according to a plan to promote the economic development of the Tribe.

Economic development plan.

(B) The Tribe shall submit an economic development plan to the Secretary and the Secretary shall approve such plan within sixty days of its submission if he finds that it is reasonably related to the economic development of the Tribe. If the Secretary does not approve such plan, he shall, at the time of his decision, set forth in writing and with particularity, the reasons for his disapproval.

Disapproval notice.

Waiver of liability.

25 USC 162a.

(C) The Secretary may not agree to terms which provide for the investment of the Fund in a manner inconsistent with the first section of the Act of June 24, 1938 (52 Stat. 1037), unless the Tribe first submits a specific waiver of liability on the part of the United States for any loss which may result from such an investment.

(D) The Tribe may, with the approval of the Secretary, alter the economic development plan subject to the conditions set forth in subparagraph (B).

(4) Under no circumstances shall any part of the Fund be distributed to any member of the Tribe unless pursuant to the economic development plan approved by the Secretary under paragraph (3).

Trust responsibility.

(5) As the Fund or any portion thereof is disbursed by the Secretary in accordance with this section, the United States shall have no further trust responsibility to the Tribe or its members with respect to the sums paid, any subsequent expenditures of these sums, or any property other than private settlement lands or services purchased with these sums.

Terms.

(6) Until the Tribe has submitted and the Secretary has approved the terms of the use of the Fund, the Secretary shall fix the terms for the administration of the portion of the Fund as to which there is no agreement.

(7) Lands or natural resources acquired under this subsection which are located within the settlement lands shall be held in trust by the United States for the benefit of the Tribe.

Trust responsibility.

(8) Land or natural resources acquired under this subsection which are located outside of the settlement lands shall be held in fee by the Mashantucket Pequot Tribe, and the United States shall have no further trust responsibility with respect to such land and natural resources. Such land and natural resources shall not be subject to any restriction against alienation under the laws of the United States.

Land or natural resources, acquisition.

40 USC 257.

40 USC 258a.

(9) Notwithstanding the provisions of the first section of the Act of August 1, 1888 (25 Stat. 357, chapter 728), as amended, and the first section of the Act of February 26, 1931 (46 Stat. 1421, chapter 307), the Secretary may acquire land or natural resources under this section from the ostensible owner of the land or natural resources only if the Secretary and the ostensible owner of the land or natural resources have agreed upon the identity of the land or natural resources to be sold and upon the purchase price and other terms of sale. Subject to the agreement required by the preceding sentence, the Secretary may institute condemnation proceedings in order to perfect title, satisfactory to the Attorney General, in the United States and condemn interests adverse to the ostensible owner.

Condemnation proceedings.

Involuntary conversion.

26 USC 1.

26 USC 1033.

(c) For the purpose of subtitle A of the Internal Revenue Code of 1954, any transfer of private settlement lands to which subsection (b) applies shall be deemed to be an involuntary conversion within the meaning of section 1033 of such Code.

(d) The Secretary may not expend on behalf of the Tribe any sums deposited in the Fund established pursuant to subsection (a) of this

PUBLIC LAW 98-134—OCT. 18, 1983          97 STAT. 855

section unless and until he finds that authorized officials of the Tribe have executed appropriate documents relinquishing all claims to the extent provided by sections 4 and 10 of this Act, including stipulations to the final judicial dismissal with prejudice of its claims.

(e) There is authorized to be appropriated $900,000 to be deposited in the Fund.

*Appropriation authorization.*

### JURISDICTION OVER RESERVATION

SEC. 6. Notwithstanding the provision relating to a special election in section 406 of the Act of April 11, 1968 (82 Stat. 80; 25 U.S.C. 1326), the reservation of the Tribe is declared to be Indian country subject to State jurisdiction to the maximum extent provided in title IV of such Act.

*25 USC 1755.*

*25 USC 1321.*

### LIMITATION OF ACTIONS; FEDERAL COURT JURISDICTION

SEC. 7. (a) Notwithstanding any other provision of law, the constitutionality of this Act may not be drawn into question in any action unless such question has been raised in—

(1) a pleading contained in a complaint filed before the end of the one-hundred-and-eighty-day period beginning on the date of the enactment of this Act, or

(2) an answer contained in a reply to a complaint before the end of such period.

(b) Notwithstanding any other provision of law, exclusive jurisdiction of any action in which the constitutionality of this Act is drawn into question is vested in the United States District Court for the District of Connecticut.

(c) Any action to which subsection (a) applies and which is brought in the court of any State may be removed by the defendant to the United States District Court for the District of Connecticut.

(d) Except as provided in this Act, no provision of this Act shall be construed to constitute a jurisdictional act, to confer jurisdiction to sue, or to grant implied consent to any Indian, Indian nation, or tribe or band of Indians to sue the United States or any of its officers with respect to the claims extinguished by the operation of this Act.

*Constitutionality. 25 USC 1756.*

### RESTRICTION AGAINST ALIENATION

SEC. 8. (a) Subject to subsection (b), lands within the reservation which are held in trust by the Secretary for the benefit of the Tribe or which are subject to a Federal restraint against alienation at any time after the date of the enactment of this Act shall be subject to the laws of the United States relating to Indian lands, including section 2116 of the Revised Statutes (25 U.S.C. 177).

(b) Notwithstanding subsection (a), the Tribe may lease lands for any term of years to the Mashantucket Pequot Housing Authority, or any successor in interest to such Authority.

*25 USC 1757.*

*Land leases.*

### EXTENSION OF FEDERAL RECOGNITION AND PRIVILEGES

SEC. 9. (a) Notwithstanding any other provision of law, Federal recognition is extended to the Tribe. Except as otherwise provided in this Act, all laws and regulations of the United States of general application to Indians or Indian nations, tribes or bands of Indians

*25 USC 1758.*

A-032

97 STAT. 856          PUBLIC LAW 98–134—OCT. 18, 1983

which are not inconsistent with any specific provision of this Act shall be applicable to the Tribe.

Organic governing document.

(b) The Tribe shall file with the Secretary a copy of its organic governing document and any amendments thereto. Such instrument must be consistent with the terms of this Act and the Act to Implement the Settlement of the Mashantucket Pequot Indian Land Claim as enacted by the State of Connecticut and approved June 9, 1982.

Federal services and benefits, eligibility.

(c) Notwithstanding any other provision of law, the Tribe and members of the Tribe shall be eligible for all Federal services and benefits furnished to federally recognized Indian tribes as of the date of enactment of this Act.

### OTHER CLAIMS DISCHARGED BY THIS ACT

25 USC 1759.

SEC. 10. Except as expressly provided herein, this Act shall constitute a general discharge and release of all obligations of the State of Connecticut and all of its political subdivisions, agencies, departments, and all of the officers or employees thereof arising from any treaty or agreement with, or on behalf of the Tribe or the United States as trustee therefor.

### INSEPARABILITY

Provisions held invalid.
25 USC 1760.

SEC. 11. In the event that any provision of section 4 of this Act is held invalid, it is the intent of Congress that the entire Act be invalidated. In the event that any other section or provision of this Act is held invalid, it is the intent of Congress that the remaining sections of this Act shall continue in full force and effect.

Approved October 18, 1983.

LEGISLATIVE HISTORY—S. 1499 (S. 366) (H.R. 982):

SENATE REPORT No. 98–222 (Comm. on Indian Affairs).
CONGRESSIONAL RECORD, Vol. 129 (1983):
    Sept. 30, considered and passed Senate.
    Oct. 4, considered and passed House.

A-033

# EXHIBIT 5



OFFICE OF THE ATTORNEY GENERAL
CONNECTICUT

April 10, 2024

Ms. Kimberly Bouchard
Regional Director
Bureau of Indian Affairs
Eastern Regional Office
Bureau of Indian Affairs
545 Marriott Drive, Suite 700
Nashville, TN 37214
Kimberly.Bouchard@bia.gov

Mr. Randall Trickey
Regional Realty Officer
Bureau of Indian Affairs
Eastern Regional Office
Bureau of Indian Affairs
545 Marriott Drive, Suite 700
Nashville, TN  37214
Randall.Trickey@bia.gov
**Via E-Mail and FedEx Standard Overnight Mail**

**Re: Request for an Extension of Time in which to Submit Written
Comments Regarding Non-Gaming Land Acquisition Application,
Real Estate Services TR-4609-P5 Case Number 53199**

Dear Ms. Bouchard and Mr. Trickey:

I am writing on behalf of my client, the State of Connecticut. The Governor of
Connecticut received the above-referenced Notice of Non-Gaming Land Acquisition
Application on March 28, 2024 ("the Notice").[1] According to the Notice, the
application seeks to have 4.790 acres of land acquired in trust on behalf of the
Mashantucket Pequot Indian Tribe ("the Tribe"). The Notice instructs that "[a]ny
comments received within thirty days of receipt of this notice will be considered and
made a part of our record." It further states that the recipient "may be granted one
thirty day extension of time to furnish comments, provided" the recipient "submit[s]

---

[1] The Notice is dated November 3, 2023 and states it was sent to the Governor by
Certified Mail. However, the Governor's Office's records indicate that it did not
receive any such mailing. The Governor did not become aware of the Notice until a
third party provided counsel a copy of the Notice on March 28, 2024.

a written justification requesting such an extension within thirty days of receipt of this letter." Lastly, the Notice states that "[a] copy of the application, excluding any documentation exempted under the Freedom of Information Act (FOIA) is available for review at" your Office in Nashville, Tennessee.

The Governor's written comments are presently due April 27, 2024 (thirty days from receipt of the Notice). Pursuant to the instructions in the Notice, the Governor respectfully requests a thirty day extension of time, through and including May 27, 2024, to furnish written comments. The requested extension will be necessary for the Governor to review and analyze the many legal and factual issues the application raises. That is particularly true given that the Governor will need time to receive and review the application, the content of which, of course, will be important to making meaningful comments. Indeed, without the application it will be difficult—if not impossible—for the Governor to properly respond; the Notice was dated before the current version of the land into trust regulations became effective. Under the regulations, the Tribe has the option of proceeding under either the current or prior regulations. *See* 25 C.F.R. § 151.17(a). The need for additional time is magnified because this application appears to be one of several recent applications filed involving land within the State of Connecticut and therefore involves cumulative taxing and jurisdictional impacts.

To expedite matters, I would greatly appreciate it if you could send a copy of the application in response to this letter. You can mail a paper copy to my address below or send a .pdf copy to Robert.Deichert@ct.gov if that will be easier for you. To avoid any unnecessary delay, if you are unwilling or unable to promptly provide a copy of the application, I will plan on filing a Freedom of Information Act (FOIA) request formally requesting a copy of the application. However, I would hope that you will be willing and able to promptly send a copy of the materials the Notice states are readily available for review in your Office as a matter of comity without being formally compelled to do so.

I appreciate your time and attention to this matter. Please do not hesitate to contact me if you have any questions, need any more information, or if there is anything I can do to make it easier for you to expeditiously respond. As I am sure you understand, this is an important matter for the State of Connecticut.

Respectfully,

Robert J. Deichert
Assistant Attorney General
165 Capitol Avenue
Hartford, CT 06106
(T) 860-808-5020
Robert.Deichert@ct.gov

# EXHIBIT 6



# United States Department of the Interior
## BUREAU OF INDIAN AFFAIRS
### EASTERN REGIONAL OFFICE
### 545 MARRIOTT DRIVE
### SUITE 700
### NASHVILLE, TN  37214

In Reply Refer To:
Real Estate Services
TR-4609-P5

APR 1 7 2024

Case Number: 53199

Certified Mail – Return Receipt Requested 7759 3100 5849

GOVERNOR, STATE OF CONNECTICUT
210 CAPITOL AVENUE
HARTFORD, CT 06106

### EXTENSION LETTER FOR FEE-TO-TRUST

Dear Interested Party

We are in receipt of your letter dated 04/10/2024 wherein you request an extension of time. The applicable regulation set forth in the Code of Federal Regulations (CFR) Title 25, Part 151.9(d), specifies the notice of application will inform the State and local government that each are given 30 calendar days in which to provide written comments to rebut the presumption of adverse impacts to regulatory jurisdiction, real property taxes, and special assessments.

Enclosed is a copy of the original Notice of Application letter and the confirmation of delivery for the notice received by your office on 11/07/2023. The comment period for this application closed 12/07/2023. In keeping with the Fee-to-Trust Regulation, your request for an additional 30 days is denied.

If you have any questions, please contact: MR. RANDALL TRICKEY, REGIONAL REALTY OFFICER, at (615) 564-6500.

Sincerely,

Sheri

REGIONAL DIRECTOR

Enclosures

FTG0D01



Office Codes: B,S,00,020 AD Number: 4200409330 Case: 53199

### A-039

CC:

<u>BY CERTIFIED MAIL:</u>

ASSISTANT ATTORNEY GENERAL
165 CAPITOL AVENUE
HARTFORD, CT 06106
Certified Mail ID: 7759 3548 1870



# United States Department of the Interior
### BUREAU OF INDIAN AFFAIRS
### EASTERN REGIONAL OFFICE
### 545 MARRIOTT DRIVE
### SUITE 700
### NASHVILLE, TN 37214

IN REPLY REFER TO:
Real Estate Services
TR-4609-P5

NOV 0 3 2023

Case Number:    53199

## NOTICE OF NON-GAMING LAND ACQUISITION APPLICATION

Pursuant to the Code of Federal Regulations, Title 25, INDIANS, 151.10 On-Reservation, notice is given of the application filed by the MASHANTUCKET PEQUOT INDIAN TRIBE to have real property accepted "in trust" for said applicant by the United States of America. The determination whether to acquire this property "in trust" will be made in the exercise of discretionary authority which is vested in the Secretary of the Interior, or his authorized representative, U.S. Department of the Interior. To assist us in the exercise of that discretion, we invite your comments on the proposed acquisition. In order for the Secretary to assess the impact of the removal of the subject property from the tax rolls, and if applicable to your organization, we also request that you provide the following information:

(1)    If known, the annual amount of property taxes currently levied on the subject property allocated to your organization;

(2)    Any special assessments, and amounts thereof, that are currently assessed against the property in support of your organization;

(3)    Any governmental services that are currently provided to the property by your organization; and

(4)    If subject to zoning, how the intended use is consistent, or inconsistent, with the zoning.

We provide the following information regarding this application:

**Applicant:**

MASHANTUCKET PEQUOT INDIAN TRIBE

**Legal Land Description/Site Location:**

See "Exhibit A" for legal descriptions.

NOLAQ01    

Office Codes: B.S.00.020 AD Number: 4200409330 Case: 53199

## A-041

**Project Description/Proposed Land Use:**

The Tribe does not anticipate a change in the use of the land at this time and there are no current plans to develop the Property. The Property is currently undeveloped land that abuts critical Tribal infrastructure and governmental service facilities.

As indicated above, the purpose for seeking your comments regarding the proposed trust land acquisition is to obtain sufficient data that would enable an analysis of the potential impact on local/state government, which may result from the removal of the subject property from the tax roll and local jurisdiction.

This notice does not constitute, or replace, a notice that might be issued for the purpose of compliance with the National Environmental Policy Act (NEPA) of 1969.

Your written comments should be addressed to the Bureau of Indian Affairs office listed at the top of this notice. Any comments received within thirty days of your receipt of this notice will be considered and made a part of our record. You may be granted one thirty day extension of time to furnish comments, provided you submit a written justification requesting such an extension within thirty days of receipt of this letter. Additionally, copies of all comments will be provided to the applicant for a response. You will be notified of the decision to approve or deny the application.

If any party receiving the enclosed notice is aware of additional governmental entities that may be affected by the subject acquisition, please forward a copy to said party.

A copy of the application, excluding any documentation exempted under the Freedom of Information Act (FOIA), is available for review at the above address. A request to make an appointment to review the application, or questions regarding the application, may be directed to the EASTERN REGIONAL OFFICE Office attention: MR. RANDALL TRICKEY, REGIONAL REALTY OFFICER, (615) 564-6500.

Sincerely,

REGIONAL DIRECTOR

Enclosure(s)



Office Codes: B,S,00,020 AD Number: 4200409330 Case: 53199

**A-042**

CC:

BY CERTIFIED MAIL:

TAX COLLECTOR, TOWN OF LEDYARD
741 COLONEL LEDYARD HIGHWAY
LEDYARD, CT 06339
Certified Mail ID: 7739 5590 1740
LEDYARD MAYOR'S OFFICE
741 COLONEL LEDYARD HIGHWAY
LEDYARD, CT 06339
Certified Mail ID: 7739 5596 9698
GOVERNOR, STATE OF CONNECTICUT
210 CAPITOL AVENUE
HARTFORD, CT 06106
Certified Mail ID: 7858 7437 8898

BY FIRST CLASS MAIL:


**A-043**

Case Number: 53199

Applicant Name: MASHANTUCKET
PEQUOT INDIAN TRIBE

# LEGAL DESCRIPTION EXHIBIT A

**Tract ID:**
**Tract Name: 159 INDIANTOWN ROAD**

| Land Area | Land Area Name | Tract Number | LTRO | Region | Agency | Resources |
|---|---|---|---|---|---|---|
| 020 | MASHANTUCKET PEQUOT | | ANADARKO, OK | EASTERN REGIONAL OFFICE | EASTERN REGIONAL OFFICE | Both (Mineral and Surface) |

| Lot | Block | Sub Division | USS | State | County | Acres |
|---|---|---|---|---|---|---|
| 99 | 99 | | | CONNECTICUT | NEW LONDON STAT | 4.790 |

DESCRIPTION: 159 Indiantown Road A certain tract or parcel of land situated
westerly of Indiantown Road in the Town of Ledyard, County of New London and State
of Connecticut bounded and described as follows: Beginning at a drill hole
recovered in the westerly line of Indiantown Road at the northeasterly corner of
the herein described parcel and the southeasterly corner of lands now or formerly
The United States of America in Trust for the Benefit of The Mashantucket Pequot
Tribe as more particularly shown on the herein referenced survey plan, Thence
following along the westerly line of Indiantown Road, by and along the face of a
stone wall in part, for the following courses and distances: S 37°35'02" W, for a
distance of 144.62' to a point, S 40°06'24" W, for a distance of 33.82' to a point,
S 37°47'08" W, for a distance of 277.52' to a point, S 37°10'41" W, for a distance
of 47.74' to a point, S 42°27'57" W, for a distance of 46.50' to a point, S
36°09'34" W, for a distance of 26.77' to a rebar with cap set, said rebar being the
southeasterly corner of the herein described parcel and the northeasterly corner of
lands now or formerly The Mashantucket Pequot Tribe located at 153 Indiantown Road
as more particularly shown on the herein referenced survey plan, Thence following
along said lands of The Mashantucket Pequot Tribe located at 153 Indiantown Road,
by and along the centerline of a stone wall in part, for the following courses and
distances: N 72°23'35" W, for a distance of 78.19' to a point, N 73°51'19" W, for a
distance of 114.56' to a rebar with cap set at an intersection of said stone wall,
said rebar being the southwesterly corner of the herein described parcel, Thence
continuing along said lands of The Mashantucket Pequot Tribe located at 153
Indiantown Road, by and along the centerline of a stone wall, for the following
courses and distances: N 0°55'07" W, for a distance of 44.25' to a point, N
3°35'47" W, for a distance of 133.81' to a point, N 5°02'22" W, for a distance of
116.47' to a rebar with cap set, N 6°12'35" W, for a distance of 214.81' to a
point, N 10°29'50" W, for a distance of 47.41' to a drill hole recovered at a
corner of said stone wall, said drill hole being the northwesterly corner of the
herein described parcel and a southwesterly corner of said lands now or formerly
The United States of America in Trust for the Benefit of The Mashantucket Pequot
Tribe, Thence following along said lands of The United States of America in Trust
for the Benefit of The Mashantucket Pequot Tribe, by and along the centerline of
the stone wall for the following courses and distances: S 75°06'09" E, for a
distance of 352.49' to a drill hole recovered, S 74°33'16" E, for a distance of
68.56' to a point, S 75°47'57" E, for a distance of 190.95' to a drill hole
recovered, said drill hole being the point and place of beginning. Said parcel
contains 4.79 acres more or less and is more particularly shown on a survey plan
prepared by Boundaries L.L.C. entitled: Perimeter Survey Prepared for The
Mashantucket Pequot Tribal Nation 159 Indiantown Road - Ledyard, Connecticut, Scale:
1" = 40', Date: July 2023, Job I.D. No. 23-3292, Sheet No. 1/1.

WDAEA01



Office Codes: B,S,00,020 AD Number: 4200409330 Case: 53199

**A-044**

**FedEx.**

November 28, 2023

Dear Customer,

The following is the proof-of-delivery for tracking number: 785874378898

---

**Delivery Information:**

| | | | |
|---|---|---|---|
| **Status:** | Delivered | **Delivered To:** | Mailroom |
| **Signed for by:** | M.ESTRADA | **Delivery Location:** | 210 CAPITOL AVE |
| **Service type:** | FedEx Standard Overnight | | |
| **Special Handling:** | Deliver Weekday | | HARTFORD, CT, 06106 |
| | | **Delivery date:** | Nov 7, 2023 09:07 |

---

**Shipping Information:**

| | | | |
|---|---|---|---|
| **Tracking number:** | 785874378898 | **Ship Date:** | Nov 6, 2023 |
| | | **Weight:** | 0.5 LB/0.23 KG |

**Recipient:**
Governor, State of Connecticut,
210 Capitol Ave
HARTFORD, CT, US, 06106

**Shipper:**
Randall Trickey, Bureau of Indian Affairs, ERO
545 Marriott Drive
Suite 700
Nashville, TN, US, 37214

**Reference**          NOA FTT- Mashantucket Pequot



Thank you for choosing FedEx

**A-045**

# EXHIBIT 7



OFFICE OF THE ATTORNEY GENERAL
CONNECTICUT

April 26, 2024

Ms. Kimberly Bouchard
Regional Director
Bureau of Indian Affairs
Eastern Regional Office
Bureau of Indian Affairs
545 Marriott Drive, Suite 700
Nashville, TN 37214
Kimberly.Bouchard@bia.gov

Mr. Randall Trickey
Regional Realty Officer
Bureau of Indian Affairs
Eastern Regional Office
Bureau of Indian Affairs
545 Marriott Drive, Suite 700
Nashville, TN 37214
Randall.Trickey@bia.gov
**Via E-Mail and FedEx Priority Overnight Mail**

**Re: Request for Reconsideration of the Denial of the Request for an Extension of Time in which to Submit Written Comments Regarding Non-Gaming Land Acquisition Application, Real Estate Services TR-4609-P5 Case Number 53199**

Dear Ms. Bouchard and Mr. Trickey:

I am writing on behalf of my client, the State of Connecticut ("the State"). As you may recall, the State sent the enclosed request for an extension of time dated April 10, 2023 informing you that the Governor's Office did not receive the above-referenced Notice of Non-Gaming Land Acquisition Application ("the Notice") until March 28, 2024 when it was provided by a third party. Although the Notice dated November 3, 2023 stated that it was sent to the Governor by Certified Mail, the State represented that the Governor's Office's records indicate that it did not receive any such mailing. Therefore, the State respectfully requested that the April 27, 2024 deadline—measured from the date the Governor received the Notice from a third party—be extended through May 27, 2024.

**A-047**

You denied that request in the enclosed letter dated April 17, 2024. The sole stated basis for your denial was the enclosed claimed "confirmation of delivery for the notice received by [the Governor's] office on 11/07/2023." The confirmation of delivery you provided purports that a mailing was signed for by someone named "M.ESTRADA." Upon receipt of your letter and the purported confirmation of delivery, the Governor's Office re-reviewed its records and investigated. The Governor's Office maintains files of the materials it receives, it re-reviewed those files, and it has confirmed that it did not receive the mailing. In addition, there is no employee of the Governor's Office or the executive branch named "M. Estrada" or any variant thereof. The Governor's Office is continuing to investigate what occurred but has definitively confirmed that no one at the Governor's Office received the mailing reflected in the purported confirmation.

Given that the Governor's Office did not receive the Notice until March 28, 2024, the State respectfully requests that you reconsider your decision denying the requested extension of time and grant a thirty day extension of time, through and including May 27, 2024, to furnish written comments. As previously noted, the requested extension will be necessary for the State to review and analyze the many legal and factual issues the application raises. That is particularly true given that the State will need time to receive and review the application, the content of which, of course, will be important to making meaningful comments.

In the State's initial request, it requested that you send a copy of the application in response to expedite matters. You have not responded to that request. The State is prepared to file a Freedom of Information Act (FOIA) request formally requesting a copy of the application. However, the State remains of the hope that you will be willing and able to promptly send a copy of the materials the Notice states are readily available for review in your Office as a matter of comity without being formally compelled to do so.

That is particularly true given that since the State's initial request, the State has spoken with Jody Cummings, Legal Counsel of the Mashantucket Pequot Tribal Nation, and Betsy Conway, Senior Legal Counsel of the Mashantucket Pequot Tribal Nation. Both represented to the State that they have informed your Office that they have no objection to your Office providing the application to the State. The State appreciates their willingness to allow the State to review the materials. I would greatly appreciate it if you could send a copy of the application in response to this letter. You can mail a paper copy to my address below or send a .pdf copy to Robert.Deichert@ct.gov if that will be easier for you.

I appreciate your time and attention to this matter. Please do not hesitate to contact me if you have any questions, need any more information, or if there is anything I

can do to make it easier for you to expeditiously respond. As I am sure you understand, this is an important matter for the State of Connecticut.

Respectfully,

Robert J. Deichert
Assistant Attorney General
165 Capitol Avenue
Hartford, CT 06106
(T) 860-808-5020
Robert.Deichert@ct.gov

CC: Jody Cummings, Legal Counsel of the Mashantucket Pequot Tribal Nation (via e-mail)
    Betsy Conway, Senior Legal Counsel of the Mashantucket Pequot Tribal Nation (via e-mail)



OFFICE OF THE ATTORNEY GENERAL
CONNECTICUT

April 10, 2024

Ms. Kimberly Bouchard
Regional Director
Bureau of Indian Affairs
Eastern Regional Office
Bureau of Indian Affairs
545 Marriott Drive, Suite 700
Nashville, TN 37214
Kimberly.Bouchard@bia.gov

Mr. Randall Trickey
Regional Realty Officer
Bureau of Indian Affairs
Eastern Regional Office
Bureau of Indian Affairs
545 Marriott Drive, Suite 700
Nashville, TN 37214
Randall.Trickey@bia.gov
**Via E-Mail and FedEx Standard Overnight Mail**

**Re: Request for an Extension of Time in which to Submit Written
    Comments Regarding Non-Gaming Land Acquisition Application,
    Real Estate Services TR-4609-P5 Case Number 53199**

Dear Ms. Bouchard and Mr. Trickey:

I am writing on behalf of my client, the State of Connecticut. The Governor of
Connecticut received the above-referenced Notice of Non-Gaming Land Acquisition
Application on March 28, 2024 ("the Notice").[1] According to the Notice, the
application seeks to have 4.790 acres of land acquired in trust on behalf of the
Mashantucket Pequot Indian Tribe ("the Tribe"). The Notice instructs that "[a]ny
comments received within thirty days of receipt of this notice will be considered and
made a part of our record." It further states that the recipient "may be granted one
thirty day extension of time to furnish comments, provided" the recipient "submit[s]

---

[1] The Notice is dated November 3, 2023 and states it was sent to the Governor by
Certified Mail. However, the Governor's Office's records indicate that it did not
receive any such mailing. The Governor did not become aware of the Notice until a
third party provided counsel a copy of the Notice on March 28, 2024.

**A-050**

a written justification requesting such an extension within thirty days of receipt of this letter." Lastly, the Notice states that "[a] copy of the application, excluding any documentation exempted under the Freedom of Information Act (FOIA) is available for review at" your Office in Nashville, Tennessee.

The Governor's written comments are presently due April 27, 2024 (thirty days from receipt of the Notice). Pursuant to the instructions in the Notice, the Governor respectfully requests a thirty day extension of time, through and including May 27, 2024, to furnish written comments. The requested extension will be necessary for the Governor to review and analyze the many legal and factual issues the application raises. That is particularly true given that the Governor will need time to receive and review the application, the content of which, of course, will be important to making meaningful comments. Indeed, without the application it will be difficult—if not impossible—for the Governor to properly respond; the Notice was dated before the current version of the land into trust regulations became effective. Under the regulations, the Tribe has the option of proceeding under either the current or prior regulations. *See* 25 C.F.R. § 151.17(a). The need for additional time is magnified because this application appears to be one of several recent applications filed involving land within the State of Connecticut and therefore involves cumulative taxing and jurisdictional impacts.

To expedite matters, I would greatly appreciate it if you could send a copy of the application in response to this letter. You can mail a paper copy to my address below or send a .pdf copy to Robert.Deichert@ct.gov if that will be easier for you. To avoid any unnecessary delay, if you are unwilling or unable to promptly provide a copy of the application, I will plan on filing a Freedom of Information Act (FOIA) request formally requesting a copy of the application. However, I would hope that you will be willing and able to promptly send a copy of the materials the Notice states are readily available for review in your Office as a matter of comity without being formally compelled to do so.

I appreciate your time and attention to this matter. Please do not hesitate to contact me if you have any questions, need any more information, or if there is anything I can do to make it easier for you to expeditiously respond. As I am sure you understand, this is an important matter for the State of Connecticut.

**A-051**

Respectfully,

Robert J. Deichert
Assistant Attorney General
165 Capitol Avenue
Hartford, CT 06106
(T) 860-808-5020
Robert.Deichert@ct.gov

3

**A-052**



# United States Department of the Interior
## BUREAU OF INDIAN AFFAIRS
### EASTERN REGIONAL OFFICE
545 MARRIOTT DRIVE
SUITE 700
NASHVILLE, TN 37214

In Reply Refer To:
Real Estate Services
TR-4609-P5

**APR 1 7 2024**

Case Number: 53199

Certified Mail – Return Receipt Requested 7759 3100 5849

GOVERNOR, STATE OF CONNECTICUT
210 CAPITOL AVENUE
HARTFORD, CT 06106

### EXTENSION LETTER FOR FEE-TO-TRUST

Dear Interested Party

We are in receipt of your letter dated 04/10/2024 wherein you request an extension of time. The applicable regulation set forth in the Code of Federal Regulations (CFR) Title 25, Part 151.9(d), specifies the notice of application will inform the State and local government that each are given 30 calendar days in which to provide written comments to rebut the presumption of adverse impacts to regulatory jurisdiction, real property taxes, and special assessments.

Enclosed is a copy of the original Notice of Application letter and the confirmation of delivery for the notice received by your office on 11/07/2023. The comment period for this application closed 12/07/2023. In keeping with the Fee-to-Trust Regulation, your request for an additional 30 days is denied.

If you have any questions, please contact: MR. RANDALL TRICKEY, REGIONAL REALTY OFFICER, at (615) 564-6500.

Sincerely,

REGIONAL DIRECTOR

Enclosures

FTG0D01    

Office Codes: B,S,00,020 AD Number: 4200409330 Case: 53199

## A-053

CC:

BY CERTIFIED MAIL:

ASSISTANT ATTORNEY GENERAL
165 CAPITOL AVENUE
HARTFORD, CT 06106
Certified Mail ID: 7759 3548 1870

**A-054**

# United States Department of the Interior
BUREAU OF INDIAN AFFAIRS
EASTERN REGIONAL OFFICE
545 MARRIOTT DRIVE
SUITE 700
NASHVILLE, TN 37214

In Reply Refer To:
Real Estate Services
TR-4609-P5

**NOV 0 3 2023**

Case Number:    53199

## NOTICE OF NON-GAMING LAND ACQUISITION APPLICATION

Pursuant to the Code of Federal Regulations, Title 25, INDIANS, 151.10 On-Reservation, notice is given of the application filed by the MASHANTUCKET PEQUOT INDIAN TRIBE to have real property accepted "in trust" for said applicant by the United States of America. The determination whether to acquire this property "in trust" will be made in the exercise of discretionary authority which is vested in the Secretary of the Interior, or his authorized representative, U.S. Department of the Interior. To assist us in the exercise of that discretion, we invite your comments on the proposed acquisition. In order for the Secretary to assess the impact of the removal of the subject property from the tax rolls, and if applicable to your organization, we also request that you provide the following information:

(1)    If known, the annual amount of property taxes currently levied on the subject property allocated to your organization;

(2)    Any special assessments, and amounts thereof, that are currently assessed against the property in support of your organization;

(3)    Any governmental services that are currently provided to the property by your organization; and

(4)    If subject to zoning, how the intended use is consistent, or inconsistent, with the zoning.

We provide the following information regarding this application:

**Applicant:**

MASHANTUCKET PEQUOT INDIAN TRIBE

**Legal Land Description/Site Location:**

See "Exhibit A" for legal descriptions.

NOLAA01

Office Codes: B.S.00.020 AD Number: 4200409330 Case: 53199

**A-055**

**Project Description/Proposed Land Use:**

The Tribe does not anticipate a change in the use of the land at this time and there are no current plans to develop the Property. The Property is currently undeveloped land that abuts critical Tribal infrastructure and governmental service facilities.

As indicated above, the purpose for seeking your comments regarding the proposed trust land acquisition is to obtain sufficient data that would enable an analysis of the potential impact on local/state government, which may result from the removal of the subject property from the tax roll and local jurisdiction.

This notice does not constitute, or replace, a notice that might be issued for the purpose of compliance with the National Environmental Policy Act (NEPA) of 1969.

Your written comments should be addressed to the Bureau of Indian Affairs office listed at the top of this notice. Any comments received within thirty days of your receipt of this notice will be considered and made a part of our record. You may be granted one thirty day extension of time to furnish comments, provided you submit a written justification requesting such an extension within thirty days of receipt of this letter. Additionally, copies of all comments will be provided to the applicant for a response. You will be notified of the decision to approve or deny the application.

If any party receiving the enclosed notice is aware of additional governmental entities that may be affected by the subject acquisition, please forward a copy to said party.

A copy of the application, excluding any documentation exempted under the Freedom of Information Act (FOIA), is available for review at the above address. A request to make an appointment to review the application, or questions regarding the application, may be directed to the EASTERN REGIONAL OFFICE Office attention: MR. RANDALL TRICKEY, REGIONAL REALTY OFFICER, (615) 564-6500.

Sincerely,

REGIONAL DIRECTOR

Enclosure(s)

NOLAQ01    
Office Codes: B,S,00,020 AD Number: 4200409330 Case: 53199

**A-056**

CC:

BY CERTIFIED MAIL:

TAX COLLECTOR, TOWN OF LEDYARD

741 COLONEL LEDYARD HIGHWAY

LEDYARD, CT 06339

Certified Mail ID: 7739 5590 1740

LEDYARD MAYOR'S OFFICE

741 COLONEL LEDYARD HIGHWAY

LEDYARD, CT 06339

Certified Mail ID: 7739 5596 9698

GOVERNOR, STATE OF CONNECTICUT

210 CAPITOL AVENUE

HARTFORD, CT 06106

Certified Mail ID: 7858 7437 8898

BY FIRST CLASS MAIL:

NOLAQ01

Office Codes: B.S.00.020 AD Number: 4200409330 Case: 53199

**A-057**

Case Number: <u>53199</u>

Applicant Name: MASHANTUCKET
<u>PEQUOT INDIAN TRIBE</u>

## LEGAL DESCRIPTION EXHIBIT A

**Tract ID:**
**Tract Name: 159 INDIANTOWN ROAD**

| Land Area | Land Area Name | Tract Number | LTRO | Region | Agency | Resources |
|---|---|---|---|---|---|---|
| 020 | MASHANTUCKET PEQUOT | | ANADARKO, OK | EASTERN REGIONAL OFFICE | EASTERN REGIONAL OFFICE | Both (Mineral and Surface) |

| Lot | Block | Sub Division | USS | State | County | Acres |
|---|---|---|---|---|---|---|
| 99 | 99 | | | CONNECTICUT | NEW LONDON STAT | 4.790 |

DESCRIPTION: 159 Indiantown Road A certain tract or parcel of land situated
westerly of Indiantown Road in the Town of Ledyard, County of New London and State
of Connecticut bounded and described as follows: Beginning at a drill hole
recovered in the westerly line of Indiantown Road at the northeasterly corner of
the herein described parcel and the southeasterly corner of lands now or formerly
The United States of America in Trust for the Benefit of The Mashantucket Pequot
Tribe as more particularly shown on the herein referenced survey plan, Thence
following along the westerly line of Indiantown Road, by and along the face of a
stone wall in part, for the following courses and distances: S 37°35'02" W, for a
distance of 144.62' to a point, S 40°06'24" W, for a distance of 33.82' to a point,
S 37°47'08" W, for a distance of 277.52' to a point, S 37°10'41" W, for a distance
of 47.74' to a point, S 42°27'57" W, for a distance of 46.50' to a point, S
36°09'34" W, for a distance of 26.77' to a rebar with cap set, said rebar being the
southeasterly corner of the herein described parcel and the northeasterly corner of
lands now or formerly The Mashantucket Pequot Tribe located at 153 Indiantown Road
as more particularly shown on the herein referenced survey plan, Thence following
along said lands of The Mashantucket Pequot Tribe located at 153 Indiantown Road,
by and along the centerline of a stone wall in part, for the following courses and
distances: N 72°23'35" W, for a distance of 78.19' to a point, N 73°51'19" W, for a
distance of 114.56' to a rebar with cap set at an intersection of said stone wall,
said rebar being the southwesterly corner of the herein described parcel, Thence
continuing along said lands of The Mashantucket Pequot Tribe located at 153
Indiantown Road, by and along the centerline of a stone wall, for the following
courses and distances: N 0°55'07" W, for a distance of 44.25' to a point, N
3°35'47" W, for a distance of 133.81' to a point, N 5°02'22" W, for a distance of
116.47' to a rebar with cap set, N 6°12'35" W, for a distance of 214.81' to a
point, N 10°29'50" W, for a distance of 47.41' to a drill hole recovered at a
corner of said stone wall, said drill hole being the northwesterly corner of the
herein described parcel and a southwesterly corner of said lands now or formerly
The United States of America in Trust for the Benefit of The Mashantucket Pequot
Tribe, Thence following along said lands of The United States of America in Trust
for the Benefit of The Mashantucket Pequot Tribe, by and along the centerline of
the stone wall for the following courses and distances: S 75°06'09" E, for a
distance of 352.49' to a drill hole recovered, S 74°33'16" E, for a distance of
68.56' to a point, S 75°47'57" E, for a distance of 190.95' to a drill hole
recovered, said drill hole being the point and place of beginning. Said parcel
contains 4.79 acres more or less and is more particularly shown on a survey plan
prepared by Boundaries L.L.C. entitled: Perimeter Survey Prepared For The
Mashantucket Pequot Tribal Nation 159 Indiantown Road - Ledyard, Connecticut, Scale:
1" = 40', Date: July 2023, Job I.D. No. 23-3292, Sheet No. 1/1.

WDAEA01



**A-058**



November 28, 2023

Dear Customer,

The following is the proof-of-delivery for tracking number: 785874378898

---

**Delivery Information:**

| | | | |
|---|---|---|---|
| **Status:** | Delivered | **Delivered To:** | Mailroom |
| **Signed for by:** | M.ESTRADA | **Delivery Location:** | 210 CAPITOL AVE |
| **Service type:** | FedEx Standard Overnight | | |
| **Special Handling:** | Deliver Weekday | | HARTFORD, CT, 06106 |
| | | **Delivery date:** | Nov 7, 2023 09:07 |

**Shipping Information:**

| | | | |
|---|---|---|---|
| **Tracking number:** | 785874378898 | **Ship Date:** | Nov 6, 2023 |
| | | **Weight:** | 0.5 LB/0.23 KG |

**Recipient:**
Governor, State of Connecticut,
210 Capitol Ave
HARTFORD, CT, US, 06106

**Shipper:**
Randall Trickey, Bureau of Indian Affairs, ERO
545 Marriott Drive
Suite 700
Nashville, TN, US, 37214

**Reference**          NOA FTT- Mashantucket Pequot



Thank you for choosing FedEx

**A-059**

# EXHIBIT 8



# United States Department of the Interior
## BUREAU OF INDIAN AFFAIRS
### EASTERN REGIONAL OFFICE
### 545 MARRIOTT DRIVE
### SUITE 700
### NASHVILLE, TN 37214

In Reply Refer To:
Real Estate Services
TR-4609-P5

**MAY 0 1 2024**

Case Number: 53199

Certified Mail – Return Receipt Requested 7761 7644 1230

GOVERNOR, STATE OF CONNECTICUT
210 CAPITOL AVENUE
HARTFORD, CT 06106

### EXTENSION LETTER FOR FEE-TO-TRUST

Dear Interested Party

We are in receipt of your letter dated 04/26/2024, wherein, you request a reconsideration to the denial letter dated 04/17/2024. The Bureau of Indian Affairs is subject to due process of the Code of Federal Regulations (CFR) Title 25, Part 151.

The Notice of Application letter was addressed properly to the State of Connecticut and delivery was confirmed. The comment period for this application closed 12/07/2023, in which no comments were received. In keeping with the Fee-to-Trust Regulation, your reconsideration request for an additional 30 days is denied. A FOIA request is the appropriate mechanism for seeking release of the fee-to-trust application.

If you have any questions, please contact: MR. RANDALL TRICKEY, REGIONAL REALTY OFFICER, at (615) 564-6500.

Sincerely,

REGIONAL DIRECTOR

FTG0D01



Office Codes: B.S.00.020 AD Number: 4200409330 Case: 53199

**A-061**

CC:

<u>BY CERTIFIED MAIL:</u>

ASSISTANT ATTORNEY GENERAL
165 CAPITOL AVENUE
HARTFORD, CT 06106
Certified Mail ID: 7761 7650 8760

# EXHIBIT 9



OFFICE OF THE ATTORNEY GENERAL
CONNECTICUT

May 24, 2024

Ms. Kimberly Bouchard
Regional Director
Bureau of Indian Affairs
Eastern Regional Office
Bureau of Indian Affairs
545 Marriott Drive, Suite 700
Nashville, TN 37214
Kimberly.Bouchard@bia.gov

Mr. Randall Trickey
Regional Realty Officer
Bureau of Indian Affairs
Eastern Regional Office
Bureau of Indian Affairs
545 Marriott Drive, Suite 700
Nashville, TN 37214
Randall.Trickey@bia.gov
**Via E-Mail and U.S. Mail**

**Re: The State of Connecticut's Written Comments Regarding Non-Gaming Land Acquisition Application, Real Estate Services TR-4609-P5 Case Number 53179**

Dear Ms. Bouchard and Mr. Trickey:

I am writing on behalf of my client, the State of Connecticut ("the State"). As you may recall, the State previously informed you that the Governor's Office did not receive the required Notice of Non-Gaming Land Acquisition Application ("the Notice") relating to this Application until March 28, 2024 when it was provided by a third party. The State respectfully requested an extension of the deadline to file written comments through May 27, 2024. You denied that request, asserting that your records indicate that someone named "M.ESTRADA" signed for the package containing the Notice on November 7, 2023.

Upon receipt of your letter and the purported confirmation of delivery, the Governor's Office re-reviewed its records and investigated. The Governor's Office maintains files of the materials it receives; it re-reviewed those files, and it has confirmed that it has never received the mailing from you. In addition, there is no

**A-064**

employee of the Governor's Office or the executive branch named "M. Estrada" or any variant thereof. Based on those findings, the Governor's Office respectfully requested that you reconsider your denial of the request for time and allow the State to submit written comments on or before May 27, 2024. You denied that request.[1]

In both the State's initial request and its request for reconsideration, the State requested that you promptly send a copy of the Application as a matter of comity to allow the State to respond to the Application as quickly as possible. You ignored the first request and rejected the second, saying that you would not provide the State a copy of the Application unless and until you received a formal request under the Freedom of Information Act ("FOIA").

The Town of Ledyard, Connecticut ("the Town") submitted a FOIA request to you on April 17, 2024. The Town requested *inter alia* the Application at issue here. It has now been 37 days (27 business days) since that request and you have not provided the Application, even though your own Notice states it is "available for review" in your office. *See* 5 U.S.C. § 552(a)(6)(A)(i) (requiring a response within 20 business days absent extraordinary circumstances). As a result, the State is presently unable to provide detailed comments on this specific Application at this time.

However, the State and the Town are timely submitting detailed comments on Case Number 55848 under separate cover on or before the May 26, 2024 deadline. The State incorporates those comments and their supporting materials in their entirety for your consideration as to this Application. Specifically, you should deny this Application for all of the applicable reasons set forth in the 55848 comments, including that: (1) the procedural aspects of the Bureau of Indian Affairs' (BIA) processing of this Application are arbitrary and capricious; (2) the federal government

---

[1] You did not explain the reason for your denial beyond stating that the time for the State to submit comments had expired as measured off of the date reflected on Federal Express receipts. The presumption of receipt that follows from mailing is rebuttable. Whether a purported recipient who denies receipt has rebutted that presumption "is a highly fact-dependent inquiry." *Ashe v. Saul*, 983 F.3d 1104, 1107 (9th Cir. 2020). Here, the facts are that the Governor of a State—through counsel, an officer of the court—denied receipt and provided details to support those denials. That should have been enough to rebut the presumption given the nature of this Application. In any event, the Governor's Office has now submitted a detailed Declaration under penalty of perjury again reiterating the fact that—to date—the Governor's Office has not received the Notices from the BIA. *See Declaration of Kathryn Damato in Support of the Comments of the State of Connecticut on the Applications* (attached).

lacks statutory authority to grant the Application; and (3) the regulations exceed the Secretary's authority under the Indian Reorganization Act and are unconstitutional because they violate the nondelegation doctrine.

To be clear, both your failure to provide the Application and the broader restrictions you have placed on timing as to all of the known Applications have substantially impaired the State's ability to provide the detailed and carefully considered comments that the State believes are necessary and appropriate given the importance and lasting impact of a decision to take land into trust. The State believes those actions have been arbitrary and capricious and expressly reserves all of its rights to submit additional information if and when it gets to see the Application and preserves all issues for any appeal or other court action that may become necessary.

I respectfully hope that the BIA will choose to stop treating the State as an adversary rather than a government that is trying in good faith to ensure that the BIA carefully considers the State's interests and those of its citizens before the BIA makes this decision. Please do not hesitate to contact me if you have any questions, need any more information, or if there is anything I can do to make it easier for you to expeditiously respond to the outstanding parts of the FOIA request. As I am sure you understand, this is an important matter for the State of Connecticut.

Respectfully,

Robert J. Deichert
Assistant Attorney General
165 Capitol Avenue
Hartford, CT 06106
(T) 860-808-5020
Robert.Deichert@ct.gov

CC: Betsy Conway, Senior Legal Counsel of the Mashantucket Pequot Tribal Nation (via e-mail)
Jody Cummings, Legal Counsel of the Mashantucket Pequot Tribal Nation (via e-mail)
Alexandra Smith, Bureau of Indian Affairs (via e-mail)
John Smith, Bureau of Indian Affairs (via email)

United States Department of the Interior
## Bureau of Indian Affairs

| | | |
|---|---|---|
| APPLICATIONS OF THE | : | Case Nos. 33175 |
| MASHANTUCKET PEQUOT | : | 53199 |
| INDIAN TRIBE FOR | : | 55848 |
| NON-GAMING LAND | : | |
| ACQUISITION | : | MAY 24, 2024 |

## Declaration of Kathryn Damato in Support of the Comments of the State of Connecticut on the Applications

Kathryn Damato, under penalty of perjury, hereby deposes and says:

1. I am over eighteen years of age and understand the nature and obligations of an oath.

2. I make this Declaration on my personal knowledge, information and belief.

3. At all times relevant to these Applications, I was employed by the Governor of Connecticut;

4. I have been the Director of Operations for approximately 12 years;

5. I remain in that position;

6. As part of my position, I oversee the receipt of mail and packages that are sent to the Governor's Office;

1

**A-067**

7. The Governor's Office is located in the Connecticut State Capitol, with a mailing address of 210 Capitol Avenue, Hartford, CT, 06016;

8. Because the Governor's Office is in the Connecticut State Capitol, the legislative branch of Connecticut's government controls the operation of the building, including the receipt, sorting, and distribution of mail;

9. When mail arrives that is directed to the Governor's Office, the mail room delivers it to the Governor's Office;

10. When a package, such as a Federal Express package, directed to the Governor is received, mailroom staff is instructed to have a courier deliver it directly to the Governor's Office. If no one in the Governor's office is available to sign for the package, a mailroom employee will sign and then deliver it to the Governor's office;

11. To my knowledge, the system works well and the Governor's Office generally receives mail soon after it is received at the 210 Capitol Avenue mailroom;

2

**A-068**

12.     For example, on information and belief, the Bureau of Indian Affairs ("the BIA") sent letters dated May 1, 2024 denying the Governor's requests for reconsideration of its denial of the Governor's requests for time to respond to the Applications given Case Numbers 53179 and 53199;

13.     On information and belief, the Governor's Office received those letters one day later, on May 2, 2024;

14.     Aside from the Federal Express packages at issue here, I am not aware of any time when there were indications that a Federal Express package directed to the Governor's Office from any sender was not properly delivered to the Governor's Office;

15.     For example, the Governor's Office received the Notice of Non-Gaming Land Acquisition Application dated March 26, 2024 for Case Number 55848 on April 1, 2024;

16.     On information and belief, after receiving the Notice discussed in the above paragraph, the State of Connecticut promptly sought an extension of time and the BIA granted that extension through May 26, 2024;

3

**A-069**

17.    Once I became aware of the potential issues with receipt of the Packages containing the Notices for Case Numbers 53179 and 53199 (Federal Express tracking numbers 773938413563 and 785874378898), I brought the matter to the attention of the mail room;

18.    When documents are received in the Governor's Office, they are logged and filed in a numbered box that corresponds to the number on the excel list, thus providing a tracking method for searching for documents. As a search of the excel lists does not reference these items, that would indicate that the Governor's Office never received the Notices for Case Numbers 53179 and 53199;

19.    I understand that the BIA provided Federal Express tracking receipts that purport to show that someone named "M.Estrada" signed for the packages on November 7, 2023;

20.    There is no employee of the Governor's Office with the name "M Estrada" or any variant thereof;

4

**A-070**

21.     There is no employee of the Executive Branch of the Connecticut government with the name "M Estrada" or any variant thereof;

22.     Once the Governor's Office became aware of the potential issue with the Packages (Federal Express tracking numbers 773938413563 and 785874378898) putatively sent to the Governor's Office in November 2023, the Governor's Office investigated with the mail room and determined that there is a Manual Estrada who works on the loading dock at Connecticut's Legislative Office Building;

23.     Manual Estrada was not authorized to sign for any Packages directed to the Governor's Office;

24.     Based on a careful investigation, I have determined that the Governor's Office has never received the Notices for Case Numbers 53179 and 53199 from the BIA;

25.     I have carefully read the above Declaration and certify that the foregoing is true and correct;

5

**A-071**

Pursuant to 28 U.S.C. § 1746, I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on May 24, 2024

KATHRYN DAMATO

**A-072**



OFFICE OF THE ATTORNEY GENERAL
CONNECTICUT

*Towns of Ledyard, North Stonington, and Preston, Connecticut*      

May 24, 2024

Ms. Kimberly Bouchard, Regional Director
Mr. Randall Trickey, Real Estate Services
TR-4609-P5
Bureau of Indian Affairs
Eastern Regional Office
545 Marriot Drive, Suite 700
Nashville, TN 37214

**RE:    Case No. 55848 for 58.610 acres of land located at 153 Indiantown Road**

Dear Ms. Bouchard and Mr. Trickey,

The State of Connecticut ("the State") and the Town of Ledyard, Connecticut ("the Town" or "Ledyard") submit these comments in response to the Bureau of Indian Affairs' ("BIA") Notice of Non-Gaming Land Acquisition Application dated March 26, 2024.[1] The Notice states that the Mashantucket Pequot Indian Tribe ("the Tribe") has applied to have 58.610 acres of land "situated westerly of Indiantown Road in the Town of Ledyard, County of New London and State of Connecticut" ("Property") taken into trust by the United States of America on behalf of the Tribe. The Notice represents that "[t]he Tribe does not anticipate a change in the use of the land at this time and there are no current plans to develop the Property."

At the outset, the State and the Town have concerns regarding how BIA has processed and is processing the Tribe's recent trust applications. This is the third of three known recent applications that the Tribe has submitted. Only Ledyard received notices for two other applications:[2]

---

[1] The Town received the Notice ("the Notice") on March 26, 2024; the State received the Notice on April 1, 2024. (Appendix ("A") at 0001.)

[2] The State never received notice of either of those two applications, as discussed below. It also appears that BIA recently acquired land in trust a 7.76-acre parcel located at 844 Shewville Road. Neither the State nor Ledyard received any notice of that acquisition when it was proposed, and neither were

1

**A-073**

- Case Number 53179: 76.740 acres at 119 Indiantown Road; and

- Case Number 53199: 4.790 acres at 159 Indiantown Road.

Regardless, these applications are clearly related and should be processed together. The lands in Case Numbers 53179 and 53199 each abut the Property. BIA should be processing these applications together, not in a piecemeal fashion that appears designed to minimize the apparent impacts of the proposed acquisition. It is also troubling that the Tribe has not filed applications for other abutting properties—including an intervening parcel—that it currently owns. The effects of these related applications on the State and the Town are cumulative and should be considered together.

The State and the Town are also placed in the difficult position of having to provide comments on the application for 153 Indiantown Road under two sets of regulations. The Tribe's application for Case Number 55848 ("Application") was filed on January 9, 2024—two days before the new regulations implementing Section 5 of the Indian Reorganization Act of 1934 ("IRA"), 25 U.S.C. § 5108, went into effect.[3] Although the Application is drafted to respond to the old Part 151 regulations, those regulations permit tribes with applications pending on January 11, 2024 to request in writing to proceed under the new regulations.[4] The State and the Town have no way of knowing whether the Tribe has asked BIA to process this application under the new regulations, and there does not appear to be any limit on when the Tribe may make such a request. As a consequence, the Town and the State are forced to prepare comments addressing both sets of regulations, as set forth below.

## COMMENTS

## I.    Procedural Objections

The Property is subject to the jurisdiction of the State and the Town.[5] Given that the Tribe does not anticipate any change in use, it appears that it filed this application primarily to obtain an "exemption from state and local taxation" and "tribal jurisdiction over the land."[6]

---

provided the opportunity to comment. We have filed FOIA requests for those applications, but have not received any information to date, despite it being well past BIA's deadline for responding.

[3] *See* Application Case No. 55848 (A-0004); *see also Final Rule on Land Acquisitions*, 88 Fed. Reg. 86222 (Dec. 12, 2023) ("Final Rule").

[4] 25 C.F.R. § 151.17(a) ("Requests pending on January 11, 2024 will continue to be processed under 25 C.F.R. part 151 (revised as of April 1, 2023) unless the applicant requests in writing to proceed under this part.").

[5] BIA has interpreted the acquisition of land under Section 5 of the IRA to not only eliminate state and local taxes—which Section 5 explicitly provides for, 25 U.S.C. § 5108—but also to eliminate the application of state and local jurisdiction.

[6] *See* 25 C.F.R. § 1.4(a) (providing that land held in trust is immune from state and local land use restrictions). *See also Land Acquisitions*, 87 Fed. Reg. 74334, 74335 (Dec. 5, 2022). The State and the Tribe dispute this premise. *See* Section II. 2.4, *infra*.

2

## A-074

The federal government has acknowledged that taking land into trust often has negative impacts on state and local communities. For example, the federal government has admitted that an acquisition "may negatively impact the ability of state and local governments to provide consistent and cohesive governance" and "incrementally increase the demand for local government services."[7] It also impairs the State's "sovereign interest in being in control of, and able to apply, its laws throughout its territory."[8] That loss of control here will deprive the Town of much-needed tax revenue and its ability to implement land use and zoning controls that protect all property owners within the Town. It also limits the State's ability to protect wetlands within its borders.

Those are important interests. The Supreme Court has long recognized that "taxes are the lifeblood of government, and their prompt and certain availability an imperious need."[9] Congress enacted the Tax Injunction Act, 28 U.S.C. § 1341, to protect state and local governments, and the Supreme Court enforces the "[m]ore embracive . . . comity doctrine" to limit federal actions "that risk disrupting state tax administration."[10] And federal law recognizes that "wetlands" have "significant ecological characteristics and are generally important to the environmental health of a region's ecosystem."[11]

Those important interests of state and local governments and the citizens those governments represent deserve respect and fair procedural protections where—as here—the federal government seeks to impair or eliminate them. But BIA has offered neither respect nor fairness, either broadly in the process that led to the promulgation of the Final Rule governing fee-to-trust acquisitions or in the processing of this Application. To the contrary, BIA's actions have been arbitrary and capricious throughout the process and BIA has treated the State and the Town as adversaries rather than governments with the duty to ensure the interests of their citizens are heard and considered.

---

[7] *Upstate Citizens for Equal., Inc. v. United States*, 841 F.3d 556, 564 (2d Cir. 2016) (quotation marks omitted).

[8] *Mashantucket Pequot Tribe v. Town of Ledyard*, 722 F.3d 457, 476 (2d Cir. 2013) (citing *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 188 (1989)).

[9] *Bull v. United States*, 295 U.S. 247, 259 (1935).

[10] *Levin v. Com. Energy, Inc.*, 560 U.S. 413, 417 (2010).

[11] *Healthy Gulf v. U.S. Army Corps of Eng'rs*, 81 F.4th 510, 517 (5th Cir. 2023) (citing 40 C.F.R. § 230.3(m)).

A-075

### A. This Application and the other recent applications illustrate the arbitrary and capricious nature of the process.

The Notice relating to this Application was dated March 26, 2024, and the Governor's Office received it on April 1, 2024, six days later. The Town received its notice more promptly. That Notice was a total of five pages, only three of which provided any information about the Application.[12] It contained a one-paragraph description of the proposed action and proposed land use and a two-page legal description of the land at issue. The Notice represented that "[a] copy of the application, excluding any documentation exempted under the Freedom of Information Act (FOIA)," was "available for review at" BIA's Eastern Regional Office in Nashville, Tennessee (approximately 1,000 miles from the Governor's Office). The Notice also stated that any comments were due "within thirty days of your receipt of the" Notice, but that BIA could grant "one thirty day extension of time to furnish written comments, provided" that the State and Town "submit[ted] a written justification requesting such an extension within thirty days of receipt of this letter."

The State promptly requested a thirty day extension of time on April 10, 2024, to run from May 1, 2024 (thirty days from receipt of the Notice) through May 31, 2024.[13] The State's request noted that the requested extension would "be necessary for the Governor to review and analyze the many legal and factual issues the application raises," particularly given that the State would "need time to receive and review the application, the content of which, of course, will be important to making meaningful comments."[14] The State noted that "[t]o expedite matters," it would "greatly appreciate it if" BIA would send a copy of the application in response to the letter and that it "hope[d] that" BIA would "be willing and able to promptly send a copy of the materials the Notice states are readily available for review in your Office as a matter of comity without being formally compelled to do so."[15] The Town's request raised similar concerns.[16]

BIA granted the State's requested extension in part, through May 26, 2024.[17] It did not offer any reason why it refused to grant the State the full thirty days from when the Governor received the Notice. As a practical matter, neither the State nor the Town were provided a 30-day extension. May 26 is the Sunday before Memorial Day weekend, and the extension letter states that comments "must be received and postal dated by 05/26/2024." BIA refuses to accept these comments by email—despite it regularly using email for other purposes—forcing the State and the Towns to finalize the comments by May 24.

---

[12] *See* A-0001.

[13] *See* State's Extension Letter on #55848 (A-0090-91). The Town also requested a 30-day extension. *See* Ledyard's Extension Letter on #55848 (A-0092-93).

[14] *See* State's Extension Letter on #55848 (A-0091).

[15] *Id.*

[16] *See* Ledyard's Extension Letter on #55848 (A-0092-93).

[17] *See* A-0094.

4

BIA also refused to provide the State and the Town a copy of the Application without filing a FOIA request. The Town submitted a formal FOIA request to BIA on April 17, 2024, and BIA responded in part on April 29, 2024, providing the Town "approximately 78 pages" responsive to the Town's "request for case 55858."[18] The Application raised a number of complex issues that were not made clear in the Notice. One is the basis for the Tribe's argument that the Secretary has the statutory authority to take land into trust on the Tribe's behalf. That argument relies in substantial part on analyses by the Department that are not included in the FOIA materials and that appear not to be publicly available without a separate FOIA request (if at all). Specifically, § 2.1 of the Tribe's Application references "notes 85&86" in a "March 10, 2020 Memorandum from Robert S. Hitchcock, Attorney-Advisor, DOI Solicitor's Office to Bruce Maytubby, BIA Regional Director, Eastern Region" ("Hitchcock Memorandum") which, in turn, cite to an Office of the Solicitor Memorandum that analyzed the Mashantucket Pequot Indian Claims Settlement Act, Public Law No. 98-134, 97 Stat. 855 (Oct. 18, 1983) ("Mashantucket Settlement Act"). To the knowledge of the State and the Town, the Hitchcock Memorandum is not available online or at any public library and presumably may be obtained only through a separate FOIA request that will take time that the State and the Town do not have given the arbitrary time limit BIA has placed on comments.

Another complex and important issue that the Notice did not make clear is that the land the Tribe seeks to have taken into trust includes wetlands. As discussed above, federal regulations recognize that "wetlands" have "significant ecological characteristics and are generally important to the environmental health of a region's ecosystem."[19] Consistent with that, Connecticut law carefully protects wetlands. The State and the Town will do their best to address the complex and important issues the Application raises based on the limited information they have been able to gather in the truncated timeline BIA has given. But requiring the State and the Town to do so where—as here—there is no reason why BIA could not timely give the State and the Town complete information and a reasonable timeline to respond is arbitrary and capricious.

The State's experience with other recent Applications by the Tribe further illustrates the arbitrary and capricious nature of BIA's process for providing notice of and reviewing land into trust applications. BIA's Notices explicitly provide notice to the State by certified mail to the Governor and state that "[a]ny comments received within thirty days of your receipt of this notice will be considered and made part of" BIA's record and that the Governor may request an extension of time "within thirty days of receipt of this letter."

To this day, the Governor has not received Notices regarding the Applications for Case Numbers 53179 and 53199 from BIA.[20] The Governor became aware of those

---

[18] FOIA Letter (A-0100).

[19] *Healthy Gulf*, 81 F.4th at 517 (citing 40 C.F.R. § 230.3(m)).

[20] Decl. Kathryn Damato in Support of Comments of the State of Connecticut on the Applications (May 24, 2024) (A-0188).

5

**A-077**

Notices on March 28, 2024, when he received them from counsel for the Town. The Governor promptly took action, explained that he did not receive the Notices until March 28, 2024, and requested that BIA give the State time to comment triggered off of the date the Governor received the Notices (precisely as contemplated on the face of the Notices themselves). BIA rejected those requests, asserting that FedEx receipts indicated that someone named "M.ESTRADA" received the Notices on the Governor's behalf. On April 26, 2024, the State respectfully requested reconsideration of the denial, reaffirming that the Governor's Office did not receive the mailing and that "there is no employee of the Governor's Office or the executive branch named 'M. Estrada' or any variant thereof." BIA denied that request for reconsideration, offering no reasoning beyond its assertion that "[t]he Notice of Application letter was addressed properly to the State of Connecticut and delivery was confirmed."

In that May 1, 2024 denial, BIA—for the first time—made clear to the State that it would not provide copies of Applications unless and until the State submitted formal FOIA requests. The Town submitted precisely such a FOIA request to BIA for the Applications for Case Numbers 53179 and 53199 on April 17, 2024. As of the date of these comments, BIA has not provided those applications.

The problems with notice are not limited to these applications. The Legal Description in Case Number 55848 references lands held by "The United States of America in Trust for the Benefit of The Mashantucket Pequot Tribe located at 886R Shewville Road." Neither the State nor the Town has been able to locate any notices relating to that acquisition, either at the initial stage or at the acquisition stage. The Town's April 17, 2024 FOIA request also asked BIA for all documents relating to that acquisition but, again, it has been over 37 days, and BIA has provided nothing.

### B. The process that led to the Final Rule lacked the necessary consultation with state and local governments and the resulting procedural processes are arbitrary and capricious.

Pursuant to Executive Order 13175 (titled Consultation and Consultation with Indian Tribal Governments), the United States Department of the Interior ("the Department") "hosted extensive consultation with federally recognized Indian Tribes in preparation of" the Final Rule, which included "a Dear Tribal Leader letter delivered to every federally recognized Tribe in the country, and through three consultation sessions" held in 2022 and three more consultation sessions during the public comment period in 2023.[21] The Final Rule reflects the results of those extensive consultations—it is explicitly designed to make "the fee-to-trust process more efficient, simpler, and less expensive to support restoration of Tribal homelands."[22] The Final Rule touts "the many benefits accorded to Tribal governments and their citizens" by trust acquisitions "such as heightened [tribal] jurisdiction over the lands, [and] exemptions from State and local taxation."[23]

---

[21] *Final Rule*, 88 Fed. Reg. at 86248; *see also id.* at 86222 (discussing the consultation process in detail).
[22] *Id.* at 86222.
[23] *Id.* at 86223.

The Department acknowledged in the Final Rule that the "many benefits" Tribal governments and their citizens receive from trust acquisitions come at the expense of state and local governments and their citizens.[24] Yet the Department took the position in the Proposed Rule that the "rule affects only individual Indians and tribal governments."[25] Much as Executive Order 13175 required the Department to carefully consult with Indian Tribal Governments to consider their interests and those of their members, both the Unfunded Mandates Reform Act of 1995, 2 U.S.C. §§ 1531–1538, and Executive Order 13132—titled Federalism[26]—required the Department to consult with state and local governments to ensure their interests and those of their citizens were fully heard and carefully considered before issuing the Final Rule.

The State reminded the Department of its obligations in the State's comments on the Proposed Rule.[27] The State noted that the Unfunded Mandates Reform Act requires the Department to "assess the effects of Federal regulatory actions on [inter alia] State [and] local . . . governments."[28] It also requires the Department "to develop an effective process to permit elected officers of State [and] local . . . governments (or their designated employees with authority to act on their behalf) to provide meaningful and timely input in the development of regulatory proposals containing significant Federal intergovernmental mandates."[29] And the Federalism Executive Order independently imposed a similar but more detailed requirement for the Department to "have an accountable process to ensure meaningful and timely input by State and local officials in the development of regulatory policies that have federalism implications."[30] The Executive Order provides that "[n]o agency shall promulgate any regulation that has federalism implications and that preempts State law, unless the agency, prior to the formal promulgation of the regulation" both "consulted with State and local officials early in the process of developing the proposed regulation" (i.e. before the proposed rule is issued) and detailed those consultation efforts in the proposed rule.[31] The State expressed concern that the Department had failed to comply with those obligations.

---

[24] *Id.*; *see, e.g.*, *id.* at 86246 (recognizing "the changes in regulatory jurisdiction that occur as a result of acquiring land into trust").

[25] 87 Fed. Reg. at 74340.

[26] *Federalism*, Executive Order 13132 (Aug. 4, 1999) (64 Fed. Reg. 43255) ("*Federalism Executive Order*"). Twenty-two states objected to the lack of consultation and the short timeline for comments—objections BIA ignored. *See, e.g.*, Letter from Attorneys General from Montana, Alaska, Georgia, Idaho, Iowa, Louisiana, Mississippi, Missouri, Oklahoma, North Dakota, Nebraska, Ohio, South Carolina, South Dakota, Texas, Virginia, Utah, West Virginia. (A-0152) *See also* Comments filed by Mike Dunleavy, State of Alaska (A-0157); Mike Gordon, Governor of Wyoming (A-0178); Rhode Island (A-0184). Their comments are incorporated by reference.

[27] *See* State of Connecticut's Comments on the Proposed Rule (A-0108-0113); *see also* Comments of the Towns of Ledyard, North Stonington, and Preston, Connecticut on the Proposed Rule (A-0132-40).

[28] 2 U.S.C. § 1531.

[29] 2 U.S.C. § 1534(a) (the Unfunded Mandates Reform Act of 1995).

[30] *Federalism Executive Order*, § 6(a).

[31] *Id.* § 6(c)(1) & (2).

7

The State also proposed a carefully considered process for inclusion in the Final Rule that would ensure that state and local governments had the information and time necessary to meaningfully respond to an application.[32] As to timing, the State requested that the period for state and local comments begin after receipt of the notification regarding the complete acquisition package and be 45 calendar days.[33] As to content, the State requested that the initial notice provided include "both a copy of the written request BIA received and a detailed description of any other information BIA has regarding that request."[34] That process would have "allow[ed] state and local governments reasonable notice, access and time to respond while still allowing the Secretary to consider all comments and issue a decision within 120 calendar days after issuance of the notice of a complete acquisition package."[35]

The Final Rule failed to meaningfully address the State's concerns. With regard to "the Unfunded Mandates Reform Act and Executive Order 13132," BIA stated—without analysis—that "[t]here is no requirement that BIA engage in" a consultation process "with states or local governments," apparently because BIA believes that the Final Rule does "not implicate the types of federalism concerns contemplated by Executive Order 13132."[36] BIA offers no basis for that statement. Nor is one evident. Elsewhere in the Final Rule, BIA advertises that it "has acquired over a million acres of land into trust for Tribes and individual Indians since Congress passed the IRA in 1934."[37] As the State pointed out, "[t]hat is an amount of land greater in size than the entire State of Rhode Island."[38] The State also pointed out that in litigation in Connecticut, the Secretary took the position that the federal government could take nearly "all of southeastern into Connecticut" into trust.[39] The Department explicitly states that a key benefit of trust acquisition (from the tribal applicant's perspective) is that it limits state and local "regulatory jurisdiction over the lands" and exempts them "from State and local taxation."[40] It is difficult to imagine a Final Rule that would raise more fundamental federalism concerns.

BIA responded to the State's procedural concerns by stating, without analysis, that the process the State proposed "would have the effect of slowing down the processing of applications and greatly expand the role of States and municipalities far beyond what is in the current regulations."[41] BIA did not give any detail as to why providing state and local governments adequate notice and opportunity to be heard would slow down the process or expand the State's role, nor is a reason evident—the State carefully considered and proposed a process that was intended to prevent any meaningful

---

[32] *See* State of Connecticut's Comments on the Proposed Rule (A-0113).

[33] *See id*. (A-0114).

[34] *Id*. (A-015).

[35] *Id*. (A-016).

[36] *Final Rule*, 88 Fed. Reg. at 86245, 86246.

[37] *Final Rule*, 88 Fed. Reg. at 86222.

[38] State of Connecticut's Comments on the Proposed Rule (A-0106).

[39] *Id*. (quotation marks omitted).

[40] *Final Rule*, 88 Fed. Reg. at 86223.

[41] *Id*. at 86241.

delay and the Final Rule already contemplates comments by state and local governments. In any event, the State pointed out—and BIA did not address—that where "fundamental aspects of state sovereignty" are concerned, mere "administrative convenience" is not sufficient to overcome the states' interests.[42] Put simply, it is arbitrary and capricious to require state and local governments to respond to applications that seek to deprive those governments of important sovereign interests in perpetuity without guaranteeing that the impacted governments will have proper notice, an opportunity to see the application they are responding to, and a reasonable amount of time in which to provide the information the Department acknowledges will "inform the Secretary's review of applications."[43]

The State and the Town understand "that the United States maintains a general trust relationship with Indian tribes, including" the Tribe.[44] But "the United States is a sovereign, not a private trustee."[45] As a sovereign, the United States has a duty "to do right by the competing interests of the country's millions of citizens," not just those who are members of Indian tribes.[46]

BIA has not done right by the State or the Town. The process that led to the Final Rule was characterized by extensive consultations over years with tribes and none with state and local governments, with BIA taking the position that "[t]here is no requirement that it engage in a" process similar to the process it engaged in with tribes "with States or local governments."[47] The State and Town disagree for the reasons stated above; in addition to the statute and Executive Order, the Constitution requires the federal government "to accord States the respect owed them as joint sovereigns."[48] In any event, a federal agency seeking to do right by all of the citizens its actions impact would presumably want to hear from all impacted governments regardless of whether it was legally obligated to do so, even if that entailed a single consultation session rather than the seven or more BIA held for tribes.[49]

BIA's adversarial posture toward state and local governments generally is reflected in its specific treatment of this Application and the other applications involving the State and the Town. Governor Lamont and his counsel sought time to respond to this Application and requested that BIA send a copy of the materials it had readily available in its office as a matter of comity. BIA responded by shorting the requested extension and simply ignoring the Governor's request for the Application. The Governor and his counsel repeatedly represented that they did not receive the Notices at issue

---

[42] *FMC v. S.C. State Ports Auth.*, 535 U.S. 743, 769 (2002).

[43] *Final Rule*, 88 Fed. Reg. at 86246.

[44] *Arizona v. Navajo Nation*, 599 U.S. 555, 565 (2023). The existence of that trust duty, however, is the subject of some dispute among members of the Court. Justice Thomas noted that "the idea of a generic trust relationship with all tribes—to say nothing of legally enforceable fiduciary duties—seems to lack a historical or constitutional basis." *Id.*, 599 U.S. at 574 (Thomas, J., concurring).

[45] *Id.*

[46] *Id.*, 599 U.S. at 570 (Thomas, J., concurring).

[47] *Final Rule*, 88 Fed. Reg. at 86245.

[48] *FMC*, 535 U.S. at 765 (quotation marks omitted).

[49] *Final Rule*, 88 Fed. Reg. at 86222.

from BIA and that they promptly took action to seek time when they received them from the Town. BIA responded by rejecting both the State's initial request and also its request for reconsideration. "Normally, a State's chosen representatives should be greeted in federal court with respect, not adverse presumptions."[50] There is no evident reason why the same should not be true here.[51] This Application impacts important state interests and seeks to strip state jurisdiction in perpetuity—it is arbitrary and capricious for BIA to proceed in this manner; when it comes to fair procedures, the federal government should not be publicly emphasizing its desire to "improve . . . customer service" for one type of government while placing arbitrary obstacles in front of other governments.[52]

## II.    Analysis of Applicable Factors

### 1.1    Identification of the Applicant

The Tribe states in its application that its reservation "consists of approximately 1635 acres of land held in trust by the United States for the benefit of the Tribe."[53] According to the Town's records, the Tribe has 1467.17 acres in trust. BIA should address the discrepancy by producing a list of all of the properties it has acquired in trust on behalf of the Tribe so that the Town or the Tribe can amend erroneous title records or the Tribe can modify its Application.

### 1.2    Description of the Land and Proposed Action

The Tribe has identified a parcel of land known as the 153 Indiantown Road, Ledyard, CT, which it describes as consisting of 58.61 acres of land. The parcel the Tribe has identified in the map below on the left does not match the Town's property records for 153 Indian Road, Parcel ID 45-1090-153. The map on the right below shows the parcel located at 153 Indiantown Road. Based on the Town's records, it appears that the Tribe has included a portion of another parcel—153R Indiantown Road—a 44.26-acre parcel designated Parcel ID 32-1090-153-R.

---

[50] *Berger v. North Carolina State Conference of the NAACP*, 597 U.S. 179, 197 (2022).
[51] *See FMC*, 535 U.S. at 747–68 (holding that similar protections for state sovereign interests apply in federal court and federal administrative proceedings).
[52] *Final Rule*, 88 Fed. Reg. at 86247.
[53] Application (A-0006).



In the Tribe's request for a title opinion, the Tribe states that "the metes and bounds legal description generated by the surveyor based upon the Survey completed and supplied are used in substitution for the legal description contained in the deed by which the Tribe took title to the Property and the prior deeds appearing of record in the chain of title."[54] It asserts that the "specificity, accuracy and reliability of the Survey description for the Property sought to be transferred to the United States of America in trust for the benefit of the Tribe is greatly increased as opposed to any use of prior deed descriptions, historical or otherwise." That may be correct, but it is not clear what information the surveyor based the survey on, given the significant differences between the deeds, the various maps, and other record information.

There also appear to be discrepancies between the Town's property records with the Tribe's other notices. For example, the Tribe's notice for Case Number 53179 describes the parcel at 119 Indiantown Road as 76.740 acres, whereas the Town's property records show the parcel as 76.82 acres. Similarly, the Town's records for 159 Indiantown Road show that the parcel is 4.78 acres, whereas the Tribe's application is 4.790 acres. While these differences are slight and likely attributable to the Tribe's more precise surveys, the Town would like to confirm the maps that the Tribe has provided against its own records. Unfortunately, we cannot determine whether the Tribe's maps are correct because BIA has not yet provided us with copies of the applications. If those applications are similar to 153 Indiantown Road, they should be approximately 80 to 90 pages of non-exempt information. There is no reason that BIA could not have produced them concurrently with the Application here. As the State noted, the Tribe had no objections to BIA releasing copies of those applications. It seems that the only reason BIA did not produce those applications when it produced the Application for 153 Indiantown Road was to deny the Town and the State of information they needed to submit fully informed comments.

Correct property descriptions are critical. Acquiring land in trust divests the State and Ledyard of their sovereign control over the land—at least under BIA's atextual

---

[54] *See* Application (A-0084).

interpretation of Section 5—and their taxing authority. Incorrect property descriptions create confusion in property records and leave uncertain where the State and Ledyard may exercise their jurisdiction. In addition, acquisitions must reflect preexisting property rights. If a property description is incorrect, preexisting property rights can be inadvertently cut off, creating potential takings claims against the United States. For example, the Tribe's request for a title opinion states that "the Survey for the Property locates portions of roadway marked 'Pequot Trail' and 'Old Pequot Trail' which are shown as being interior to the Parcel, which roadways are Tribal roads exclusively serving Tribal fee and Trust property for access and certain utilities."[55] The Pequot Trail, however, appears to be an 8-mile trail created and maintained by the Connecticut Forest & Park Association.

### 2.0    On Reservation Acquisitions Evaluation Factors—Old 25 C.F.R. § 151.10; New 25 C.F.R. § 151.10

The application states that the proposed acquisition should be processed under the regulations governing an on-reservation acquisition because it is contiguous with the Tribe's reservation.[56] Under the Mashantucket Settlement Act, the Tribe's reservation is limited to "the existing reservation of the Tribe as defined by chapter 824 of the Connecticut General Statutes and any settlement lands taken in trust by the United States for the Tribe."[57]

The original map of the Settlement boundary, however, has never been produced to the Connecticut Secretary of State in accordance with the Mashantucket Settlement Act.[58] As of 2018, the National Archives said it does not have a map showing the boundaries of the Mashantucket reservation. The Tribe's map included in Exhibit B is not based on the original map.[59] The Tribe states that its reservation, which is limited by federal law to its settlement boundaries, is 1635 acres. That amount, however, is inconsistent with the state and federal legislation. Under Section 3(3) of the Mashantucket Settlement Act, the Tribe received "the eight hundred acres, more or less, of privately held land which are identified by a red outline on a map filed with the secretary of the State of Connecticut in accordance with the agreement referred to in section 2(d) of this Act." Section 2(d) explains that the 800 acres was the land conveyed to the Tribe to settle the land claims lawsuit with private parties and the State, which is described in Section 2(a) of the *Act To Implement the Settlement of the*

---

[55] *Id.*

[56] Application (A-0005).

[57] Pub. L. No. 98-134, 97 Stat. 851, Sec. 3(7).

[58] From The Archive: Where is the Pequot Map?, Indianz.com (Feb. 8, 2001) https://indi-anz.com/News/archive.asp?ID=law/282001-2&day=2/8/01; From The Archive: Map at Center of Pequot Debate, Indianz.com (July 10, 2000) https://indianz.com/News/archive..asp?ID=law/7102000-7&day=7/10/00; ICT Staff, Mashantucket Pequot Tribe of Connecticut, ICT (Sept. 12, 2018), https://ictnews.org/archive/mashantucket-pequot-tribe-of-connecticut.

[59] *See, e.g.,* 2010 Census – Tribal Tract Reference Map: Mashantucket Pequot Reservation and Off-Reservation Trust Land, Census. https://www2.census.gov/geo/maps/dc10map/tribal_tract/r2145_mashantucket_pequot/DC10TT_R2145_001.pdf.

*Mashantucket Pequot Indian Land Claims* ("State Settlement Act"). Cedar Swamp, which is 500 acres, is also part of the private settlement lands. The private settlement lands, therefore, are approximately 1300 acres. Under Section 3 of the State Settlement Act, the State conveyed approximately 19.5 acres of land formerly owned by Mary Conch, which is referred to in Section 2(f) of the Mashantucket Settlement Act. According to the Tribe's website, its reservation had been illegally reduced from 989 acres to 213 acres via a 1856 land sale.[60] Section 3(4) of the Mashantucket Settlement Act describes the settlement lands as:

- "[T]he lands described in sections 2(a) and 3 of the Act to Implement the Settlement of the Mashantucket Pequot Indian Land Claims";

- "[T]he eight hundred acres, more or less, of privately held land which are identified by a red outline on a map filed with the secretary of the State of Connecticut in accordance with the agreement referred to in section 2(d) of this Act"; and

- "[T]he lands known as the Cedar Swamp which are adjacent to the Mashantucket Pequot Reservation as it exists on the date of the enactment of this Act. Within thirty days of the enactment of this Act, the secretary of the State of Connecticut shall transmit to the Secretary a certified copy of said map."[61]

But it is clear from Section 2(d) of the Mashantucket Settlement Act that the 800 acres used to settle the land claims suit is the same as the private settlement lands referred to in Section 2(a) of the State Settlement Act. The Settlement boundaries, therefore, do not exceed 1,320 acres. The Tribe's statement that its reservation, which is limited by federal law to its settlement boundaries, is 1635 acres exceeds what was provided for in the Mashantucket Settlement Act, even if the Tribe's 213 acres are in addition to the 1,320 acres. And its Settlement boundary map encompasses approximately 2,240 acres. The Town of Ledyard is approximately 25,600 acres; under the Tribe's map, its settlement area covers 11.43% of the total land area of the town.

BIA must locate the original map and confirm the precise location of the settlement boundaries before it can process the Tribe's application under 25 C.F.R. § 151.10.

---

[60] Tribal History, The Mashantucket (Western) Pequot Tribal Nation, https://www.mptn-nsn.gov/tribalhistory.aspx#:~:text=As%20for%20the%20remaining%20land,sufficiency%2C%20and%20revitalize%20tribal%20culture.
[61] Pub. L. No. 98-134, 97 Stat. 851, Sec. 3(4).

## 2.1 Statutory Authority for Accepting Land into Trust—Old 25 C.F.R. § 151.10(a); New 25 C.F.R. § 151.10(a)(1)

The Tribe argues that the Secretary "has authority to acquire land in trust for the benefit of the Tribe pursuant to Section 5 of the Indian Reorganization Act . . ."[62] The Tribe is incorrect.

### a. The Tribe does not qualify under the IRA for the acquisition of land in trust.

The IRA authorizes the Secretary "to acquire through purchase, relinquishment, gift, exchange, or assignment, any interest in lands . . . within or without existing reservations . . . for the purpose of providing land for Indians."[63] The IRA, in turn, defines "Indian" to

> include [1] all persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction, and [2] all persons who are descendants of such members who were, on June 1, 1934, residing within the present boundaries of any Indian reservation, and shall further include [3] all other persons of one-half or more Indian blood.[64]

It is well established that "[t]he Secretary may take land into trust only for persons and tribes that meet one of these definitions of Indian."[65] "In 2009, the Supreme Court held that the word 'now' unambiguously limits the first definition to members of those tribes that were under federal jurisdiction when the IRA became law in 1934."[66] The Tribe would fail the temporal requirements for both recognition and being under federal jurisdiction. The Tribe did not obtain federal recognition until 1983[67] and the Mashantucket Settlement Act that granted that recognition explicitly provided that "[t]he United States has provided few, if any, special services to the Western Pequot Tribe [the predecessor to the Tribe] and has denied that it had jurisdiction over or responsibility for said Tribe."[68] In addition, the Department opposed the

---

[62] Application (A-0005-06).

[63] 25 U.S.C. § 5108 (formerly 25 U.S.C. § 465).

[64] *Littlefield v. Mashpee Wampanoag Indian Tribe*, 951 F.3d 30, 33 (1st Cir. 2020) ("*Littlefield I*") (quoting 25 U.S.C. § 5129 (numbers in brackets added by the First Circuit)).

[65] *Id.*

[66] *Id.* at 36 (citing *Carcieri v. Salazar*, 555 U.S. 379, 391 (2009)).

[67] *Mashantucket Settlement Act*, § 9.

[68] *Id.*, § 2(f); *see, e.g.*, *United States v. John*, 437 U.S. 634, 650 (1978) (the IRA "defined 'Indians' not only as 'all persons of Indian descent who are members of any recognized [in 1934] tribe now under Federal jurisdiction'" (material in brackets the Supreme Court's; quoting 25 U.S.C. § 479)); *see also Littlefield I*, 951 F.3d at 33 (recognizing that *Carcieri* establishes that a tribe must have been under federal jurisdiction in 1934 to rely on the IRA). The State and the Town acknowledge that lower courts have concluded otherwise as to the temporal requirement for recognition. For example, the Ninth Circuit found the IRA "ambiguous" and the reading the State and the Town advance "plausible" but went on to conclude that the better reading was that the temporal limitation applies only to whether a tribe

14

Mashantucket Settlement Act, believing that the Tribe should have to go through the acknowledgment process.[69] As William H. Coldiron, the Solicitor for the Department, explained to Congress:

> The Connecticut Indians never entered into treaties with the Federal Government, and the Bureau of Indian Affairs has not provided services to them, nor has it exercised any jurisdiction over Indian lands in Connecticut. * * * We know very little about [the land claims suit] or the basis of their claims. We do not have them in our files.[70]

Consistent with the Solicitor's views, the Tribe acknowledged that "the State of Connecticut has assumed the role of guardian of my people."[71] The Tribe does not meet any of the IRA's definitions of "Indians" and cannot qualify for land under Section 5 of the IRA.

### b. *The Mashantucket Settlement Act does not extend the IRA's application to the Tribe.*

The Tribe's inability to qualify under the IRA requires BIA to deny the Application. But the Tribe appears to argue that the Mashantucket Settlement Act extends the IRA to the Tribe.[72] The Mashantucket Settlement Act does no such thing. Contrary to the Tribe's argument, the Act makes clear that Congress did not intend to allow the Tribe to use the IRA to have lands taken into trust on the Tribe's behalf.

### i. **When Congress intends to extend the IRA to a tribe, it says so, and Congress did not say so in the Mashantucket Settlement Act**.

The Tribe argues that the Secretary is authorized to acquire trust lands for it pursuant to Section 5 of the IRA, "which applies to the Tribe pursuant to the Mashantucket Settlement Act."[73] It bases its argument on the fact that Section 9 of the Mashantucket Settlement Act "specifically provides that laws of general application to Indians or Indian nations are applicable to the Tribe."[74] More accurately, the Mashantucket Settlement Act states that "[e]xcept as otherwise provided in this Act, all laws

---

was under federal jurisdiction. *County of Amador v. U.S. Dep't of the Interior*, 872 F.3d 1012, 1021 (9th Cir. 2017). The State and the Town believe the Ninth Circuit was incorrect, as were other courts reaching similar conclusions. The Tribe has not argued that it is eligible under the IRA because it was somehow under federal jurisdiction in 1934; it instead relies on the Mashantucket Settlement Act. In the event that the Tribe provides any evidence suggesting that it meets any of the IRA's definitions of "Indian," the State and the Town reserve the right to address the Tribe's arguments and evidence.

[69] Chitimacha and Mashantucket Pequot Indian land claims: hearing before the Select Committee on Indian Affairs, United States Senate, 97th Congress, 2d Sess., on S. 2294 and S. 2719 (July 14, 1982).

[70] *Id.* at 26.

[71] *Id.* at 67.

[72] *See* Application (A-0005).

[73] *Id.*

[74] *Id.*

15

**A-087**

and regulations of the United States of general application to Indians or Indian nations, tribes or bands of Indians which are not inconsistent with any specific provision of this Act shall be applicable to the Tribe."[75] In the Tribe's view, "[i]n 1983, when the Mashantucket Settlement Act was enacted, the Indian Reorganization Act, including authority related to trust acquisition, was one such law of general applicability to Indians and Indian tribes."[76]

The Tribe is incorrect. The IRA is not a law of general applicability. The IRA's definitions expressly limit its applicability to recognized tribes that were under federal jurisdiction in 1934.[77] The IRA's language makes that clear, but to the extent there could be any doubt, the Supreme Court's decision in *Carcieri* removes it. There, the Court held that the IRA unambiguously "limits the Secretary's authority to taking land into trust for the purpose of providing land to members of a tribe that was under federal jurisdiction when the IRA was enacted in June 1934."[78] As a result, the Court held that the IRA did not apply to the Narragansett Tribe.[79] The IRA is not a law of general applicability.[80]

The Tribe bases its contrary argument on a Second Circuit decision and the Hitchcock Memorandum, which cites to separate Solicitor Memoranda in footnotes.[81] Neither the decision (which the State and Town will discuss in more detail below) nor the Hitchcock Memorandum support the Tribe's argument.

The Hitchcock Memorandum actually undermines the Tribe's argument.[82] The Memorandum analyzes the Catawba Indian Tribe Settlement Act and concludes that settlement act was an example of the type of settlement act that the *Carcieri* Court found expanded "the Secretary's authority to accept land into trust through legislation, irrespective of whether the tribe would otherwise meet the IRA's definitions of Indian."[83] Importantly, the Catawba Settlement Act "**Expressly Extends the IRA to**

---

[75] *Mashantucket Settlement Act*, § 9(a).

[76] *See* Application (A-0005).

[77] 25 U.S.C. § 5129.

[78] *Carcieri*, 555 U.S. at 382; *see also County of Amador*, 872 F.3d at 1020 ("In *Carcieri*, the Court held that the temporal restrictions that apply to [the] definition of 'Indian' in § 5129 limit the set of tribes that can have land taken into trust for their benefit under § 5108" (quotation marks omitted)).

[79] *See County of Amador*, 872 F.3d at 1020.

[80] That is consistent with the Solicitor's Opinion M-37029 and the First Circuit's decision agreeing with the M-Opinion's conclusion that the Secretary cannot rely solely on Congress's plenary authority over Indian affairs to establish that a given tribe is eligible under the IRA because "[i]f the Secretary's decision were to rest solely on evidence of Congress's potential, but not actually exercised, power over Indian affairs, that would be in error, as it would thwart Congress's intent in imposing the limitation expressed in the 'under Federal jurisdiction' requirement." *Littlefield v. U.S. Dep't of the Interior*, 85 F.4th 635, 648 (1st Cir. 2023), *cert. denied*, 218 L. Ed. 2d 353 (2024) ("*Littlefield II*") (citing *Opinion M-37209*, at 9–12).

[81] *See* Application (A-0005) (citing *Connecticut ex rel. Blumenthal v. U.S Dep't of the Interior*, 228 F.3d 82, 84 (2d Cir. 2000) and the Hitchcock Memorandum).

[82] Hitchcock Memorandum (A-0057).

[83] Hitchcock Memorandum at 1 & n.5 (A-0057) (citing *Carcieri*, 555 U.S. at 392).

the Tribe."[84] Section 9(a) of the Catawba Settlement Act explicitly refers to "'the Act of June 18, 1934 (25 U.S.C. 461 et seq.; commonly referred to as the 'Indian Reorganization Act')'" and states that "[t]he Tribe *shall be subject to* such Act except to the extent such sections are inconsistent with this subchapter."[85] All of the examples the Supreme Court referenced in *Carcieri* similarly include language explicitly making the IRA applicable.[86] The same is true of nearly all of the statutes the Hitchcock Memorandum cites in the footnotes the Tribe references.[87]

The Mashantucket Settlement Act contains no language referencing the IRA, let alone language explicitly making it applicable to the Tribe. That should be dispositive. The above examples show that when Congress intends to extend the IRA to a tribe, Congress says so.

The Tribe's Application and the citations in the Hitchcock Memorandum appear to indicate that the Office of the Solicitor concluded otherwise in a January 2017 Memorandum.[88] It is unclear if the Tribe has seen the 2017 Memorandum. If the Tribe has, it should have submitted the 2017 Memorandum—which apparently analyzed the Mashantucket Settlement Act—rather than the Hitchcock Memorandum, which analyzed the Catawba Settlement Act. As discussed above, neither the State nor the Town have seen the 2017 Memorandum, which is not publicly available. Requiring the State and the Town to respond to legal arguments they cannot see is emblematic of the procedural unfairness of BIA's arbitrary and capricious process.

In any event, it is difficult for the State and the Town to imagine how the Solicitor apparently concluded the Mashantucket Settlement Act applied the IRA to the Tribe. If Congress had intended that, Congress presumably would have said so just as it did

---

[84] *Id.* (A-0066) (bolding in the original).

[85] *Id.* (quoting *Catawba Settlement Act*, § 9(a) (emphasis in the Memorandum)).

[86] *See Carcieri*, 555 U.S. at 392 n.6 (citing four examples and quoting the language from them that explicitly made the IRA applicable to those tribes).

[87] *See* Hitchcock Memorandum (A-0066). *See* Pub. L. No. 92-470, ¶ (b), 86 Stat. 783 (Oct. 6, 1972) (the Payson Community of Yavapai-Apache Indians, expressly provides that they are "a tribe of Indians within the purview of the Act of June 18, 1934, as amended (25 U.S.C. 461–479, relating to the protection of Indians and conservation of resources), and shall be subject to all of the provisions thereof"); Pub. L. No. 95-375, § 1(b), 92 Stat. 712 (Sept. 18, 1978) (Pascua Yaqui Indians of Arizona, expressly provides that "[t]he provisions of the Act of June 18, 1934 (48 Stat. 484), as amended, are extended to such members"); Pub. L. No. 101-42, § 3(e), 103 Stat. 92 (June 28, 1989) (Coquille Indian Tribe, expressly provides that "[t]he Act of June 18, 1934 (48 Stat. 984), as amended, shall be applicable to the Tribe and its members"); Pub. L. No. 100-411, § 4(a), 102 Stat. 1098 (Aug. 22, 1988) (Coushatta Tribe of Louisiana, expressly provides that "[t]he provisions of the Act of June 18, 1934 (25 U.S.C. 461 et seq.) are made applicable to the Coushatta Tribe of Louisiana . . . "); Pub. L. No. 100-89, § 103(a), 101 Stat. 667 (Aug. 18, 1987) (Ysleta del Sur Pueblo and the Alabama and Coushatta Indian Tribes of Texas, expressly provides that "[t]he Act of June 18, 1934 (48 Stat. 984), '25 USC 461' as amended, and all laws and rules of general application to Indians . . . which are not inconstant with any specific provision contained in this title shall apply to . . . the tribe . . .").

[88] *See* Hitchcock Memorandum (A-0066) (citing Office of the Solicitor, Memorandum to BIA Eastern Reg. Director (Jan. 19, 2017)).

17

**A-089**

in the Catawba Settlement Act and the many other Acts discussed above. *Carcieri* establishes that the absence of such language should be dispositive; Congress knows how "to expand the Secretary's authority to particular Indian tribes not necessarily encompassed within the definitions of 'Indian' set forth in" the IRA and (not surprisingly) Congress does that by explicitly referencing the IRA.[89] Congress did not do that in the Mashantucket Settlement Act. That should be dispositive.

### ii. Other aspects of the Mashantucket Settlement Act indicate that Congress did not authorize the Secretary to acquire these lands in trust.

Congress's failure to expressly extend the IRA to the Tribe in the Mashantucket Settlement Act should alone resolve the issue. But other aspects of the Mashantucket Settlement Act further support the conclusion that Congress did not intend to allow the Tribe to have the land at issue taken into trust.

First, Congress explicitly found that the United States denied that it had jurisdiction over the Tribe. That finding is indicative of why Congress declined to extend the IRA to the Tribe. The IRA's text and history "show[ ] that Congress" intended "that the Secretary could employ § 465's power to take land into trust in favor only of those tribes in respect to which the Federal Government already had the kinds of obligations that the words 'under Federal jurisdiction' imply" in 1934.[90] Congress presumably declined to expressly extend the IRA to the Tribe (as opposed to many other tribes) because Congress found in 1983 both that "the United States has provided few, if any, special services" to the Tribe and that "[t]he United States . . . denied that it had jurisdiction over or responsibility for said Tribe."[91] In contrast to statements by "executive officials," that clear statement by Congress should be "conclusive evidence of [the] Tribe's Federal jurisdictional status because" Congress has the plenary authority to "revoke Federal jurisdiction over a Tribe."[92]

Second, in 1988, the Regional Solicitor from the Southeast Region issued a memorandum concluding that BIA could not accept land situated outside settlement boundaries in trust.[93] In the Regional Solicitor's view, the legislative history conclusively established that the only lands that could be acquired in trust were those within the settlement boundaries and not purchased with settlement funds. The legislative history provides:

---

[89] *See Carcieri*, 555 U.S. at 392 & n.6 (citing examples).

[90] *Id.* at 397 (Breyer, J., concurring).

[91] *Mashantucket Settlement Act*, § 2(f).

[92] *Final Rule*, 88 Fed. Reg. at 86225; *see also Haaland v. Brackeen*, 599 U.S. 255, 272 (2023) (noting that "[i]n a long line of cases, we have characterized Congress's power to legislate with respect to the Indian tribes as plenary and exclusive" and citing cases (quotation marks omitted)).

[93] Memorandum to Bill Ott, Area Director, Eastern Area, BIA from Regional Solicitor, Southeast Region re: Acquisition of Non-Settlement Lands—Mashantucket Pequot Tribe (Jan. 28, 1988).

Section (5)(b) [25 U.S.C. § 1754(b)(8) specifically provides that lands not falling within the definition of "settlement lands" are to be held in fee by the Mashantucket Pequot Tribe and are not to be taken into trust by the United States. It provides further that the United States shall have no trust responsibility with respect to those lands. Finally, the subject provides that these lands will not be subject to any restraint against alienation imposed by the laws of the United States.[94]

In the Regional Solicitor's view, "the contours of the Act are immediately apparent" such that the United States cannot acquire lands in trust outside of the settlement boundaries.

Seven years later, the Regional Solicitor reversed his position based on his conclusion that the Mashantucket Settlement Act "does not *restrict* application of Section 5 of the IRA to the Pequot Tribe"—not that it extends its application.[95] That does not help the Tribe here; as discussed above, the Supreme Court has since made clear that the Tribe is not eligible under the IRA.

The Tribe relies on the Second Circuit's decision in *Connecticut ex rel. Blumenthal v. U.S. Department of the Interior*, 228 F.3d 82, 84 (2d Cir. 2000).[96] But that decision does not meaningfully help the Tribe. As an initial matter, *Connecticut ex rel. Blumenthal* was a pre-*Carcieri* decision. The State, the Town, and the other plaintiffs did not argue that the Tribe was not eligible under the IRA, and the Second Circuit did not address the issue.

The Second Circuit did reject the narrow argument that § 5(b)(8) of the Mashantucket Settlement Act (formerly codified as 25 U.S.C. § 1754(b)(8)) categorically "prohibits the Secretary from taking non-settlement lands purchased with non-settlement funds into trust for the benefit of the Tribe."[97] It is questionable whether that court or any other court would reach the same result given subsequent developments in the Supreme Court's precedent.[98]

In any event, the Second Circuit expressly noted that the issue of whether the Settlement Act limits the trust authority as to the Tribe was "more appropriately presented

---

[94] *Id.* (citing S. Rep. 98-222, 98th Cong. 1st Sess. at 14 (1983)).

[95] Memorandum to Bill Ott, Area Director, Eastern Area, BIA from Roger Sumner Babb, Regional Solicitor, Southeast Region re: Authority of the Bureau of Indian Affairs to Accept Trust Conveyances of Land Outside the Settlement Area of the Mashantucket Pequot Tribe (May 30, 1990).

[96] *See* Application (A-0005).

[97] *Connecticut ex rel. Blumenthal*, 228 F.3d at 87.

[98] *Compare, e.g.*, *id.* at 92–94 (applying *Chevron* deference to the federal government's interpretation of the Mashantucket Settlement Act), *with, e.g.*, *Buffington v. McDonough*, 143 S. Ct. 14, 21 (2022) (Gorsuch, J., dissenting from the denial of certiorari) (discussing the Supreme Court's move away from *Chevron* deference, noting *inter alia* that "[t]he federal government itself now often waives or forfeits arguments for *Chevron* deference before this Court—and it does so even in cases that might have once seemed obvious candidates for the doctrine's application").

19

as a challenge to the Secretary's exercise of discretion under the IRA" and "express[ed] no view" on that issue.[99] Consistent with the Second Circuit's decision, the State and the Town are raising the Mashantucket Settlement Act's limits on the trust authority in this context. For the reasons set forth above and in the Regional Solicitors' memoranda, it is clear that the Mashantucket Settlement Act did not intend to have the land at issue taken into trust.

That conclusion is supported by other aspects of the Mashantucket Settlement Act that neither the Regional Solicitors nor the Second Circuit addressed. The Tribe notes that "[t]he property is contiguous to the Tribe's Reservation as depicted on the site location map" and therefore seeks "evaluation of the Tribe's trust acquisition request pursuant to the criteria set forth in 25 C.F.R. § 151.10."[100] As a general matter, the Final Rule relaxes the standard applicable to requests involving contiguous land and provides that "the Secretary is no longer required to consider the need for a Tribal government's acquisition of contiguous land, the impact on State and local government tax rolls, and jurisdictional problems or conflicts of land use which may arise."[101]

That approach would directly contravene the Mashantucket Settlement Act. The Mashantucket Settlement Act expressly provides that in exchange for valuable consideration from the State[102], the Tribe agreed to "the extinguishment of [any] aboriginal title" in and gave up any claim "against the . . . State or [any] subdivision thereof . . . which is based on . . . any interest in or right involving" any land other than land that the Settlement Act gave the Tribe an interest in.[103] The land that the Tribe agreed to claim no interest in explicitly included "land . . . located anywhere within the town of Ledyard, Connecticut."[104] That includes the land covered by this Application.[105] Congress emphasized the importance of § 4 of the Mashantucket Settlement Act, explicitly providing that "[i]n the event that any provision of section 4 . . . is held invalid, it is the intent of Congress that the entire Act be invalidated."[106]

Ultimately, Congress has made clear both that the Mashantucket Settlement Act does not extend the IRA to the Tribe and that the Settlement Act extinguishes the Tribe's ability to claim that it has interests in the land at issue in this Application. Therefore, BIA should deny this Application and any and all other applications submitted by the Tribe.

---

[99] *Id.* at 94.
[100] Application (A-0004-05).
[101] *Final Rule*, 88 Fed. Reg. at 86227.
[102] *See* Mashantucket Settlement Act, § 2(f).
[103] *Mashantucket Settlement Act*, § 4.
[104] *Id.* at § 4.
[105] *See* Application (A-0004) (describing the property at issue as being in "Ledyard, CT").
[106] Mashantucket Settlement Act, § 11.

### c. BIA's new regulations violate the nondelegation doctrine and exceed the Secretary's authority under the IRA.

The nondelegation doctrine is straightforward: "Congress may not constitutionally delegate its legislative power to another branch of Government."[107] The doctrine "does not prevent Congress from obtaining the *assistance* of its coordinate Branches,"[108] but the delegation must "lay down by legislative act an intelligible principle" to govern an agency's exercise of the delegated power.[109] The new regulations violate that doctrine.

The Secretary claims in the final rule that she retains discretion under Section 5, but that is not so.[110] The regulations require the Secretary to defer to tribal interests by establishing various presumptions, including the presumption "that the acquisition will further the Tribal interests … and adverse impacts to local governments' regulatory jurisdiction, real property taxes, and special assessments will be minimal, therefore the application should be approved."[111] The regulations allow states and local governments to provide information to rebut the presumption that their impacts will be minimal, but the regulations do not indicate how the Secretary will consider those comments or what standards will be used to determine whether the presumption will be rebutted.[112]

In fact, the *regulations* do not explicitly require the Secretary to consider state and local comments at all.[113] The criteria that the Secretary is required to consider are: statutory authority; the need for additional land if the applicant is an Indian; the purposes for which the land will be used; and BIA's ability to discharge its duties.[114] While the Secretary says that she will consider state and local comments "*in a holistic analysis of the application*" in the preamble, the actual regulations omit any such requirement.[115] And the regulations control, not the preamble. Further, the Secretary is required to presume that "the acquisition will further the Tribal interests" identified in the rule, that "the application should be approved," and to "give great weight"

---

[107] *Touby v. United States*, 500 U.S. 160, 165 (1991) (citation omitted).

[108] *South Dakota v. U.S. Dep't of the Interior*, 69 F.3d 878 (8th Cir. 1995), *vacated*, 519 U.S. 919 (1996) (emphasis added).

[109] *Id.* (citing *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928), *quoted in Touby*, 500 U.S. at 165, and *Mistretta v. United States*, 488 U.S. 361, 372 (1989)).

[110] *See* 88 Fed. Reg. at 86250 (new 25 C.F.R. § 151.3 ("The Secretary retains discretion whether to acquire land in trust status where discretion is granted under Federal law.") This regulation is curious, given that the Secretary claims that she has wide discretion under the IRA.

[111] *See e.g.*, 25 C.F.R. § 151.9(c).

[112] *See* 25 C.F.R. §§ 151.9(d), 151.10(d), 151.11(d), 151.12(d).

[113] The regulations do require the Secretary to consider state and local comments submitted under the notice provisions of the old regulations in Part 151 (revised as of April 1, 2023), when a tribe requests the Secretary to review an application pending on January 11, 2024 under the new regulations. 25 C.F.R. § 151.17(a)(2).

[114] *See* 25 C.F.R. §§ 151.9(a), 151.10(a), 151.11(a), 151.12(a) (listing criteria the Secretary "shall consider").

[115] 88 Fed. Reg. at 86227.

to a list of tribal purposes, including anything that a tribe claims facilitates that catch-all category of "Tribal self-determination."[116] This is an unconstitutional delegation of federal decision making authority to the tribes.[117]

The Secretary relies on several cases to argue that no court has ever held Section 5 to be an impermissible delegation of legislative authority.[118] That is not so. The Eighth Circuit held that "the statute authorizing acquisition of the land[] is an unconstitutional delegation of legislative power in *South Dakota v. Department of the Interior*.[119] That decision was vacated only because the United States requested that the Supreme Court grant, vacate, and remand, based on a new regulation that allowed for judicial review.[120] Further, the decisions the Secretary cites were decided long before this new rule, which contains the Secretary's new interpretation of Section 5. If the Secretary's new interpretation of Section 5 set forth in the new regulations is a permissible reading of that provision, then Section 5 violates the non-delegation doctrine. If it is not, the regulations do.

Nor is the Secretary's expansive reading consistent with the authority granted to her in the IRA. The Secretary interprets Section 5 as a broad grant of power allowing her to acquire whatever fee land virtually any tribe purchases. The regulations provide:

> It is the Secretary's policy to acquire land in trust status through direct acquisition or transfer for individual Indians and Tribes to strengthen self-determination and sovereignty, ensure that every Tribe has protected homelands where its citizens can maintain their Tribal existence and way of life, and consolidate land ownership to strengthen Tribal governance over reservation lands and reduce checkerboarding.[121]

But Section 5 of the IRA does not authorize the Secretary to acquire homelands for "every Tribe"; it only authorizes her to acquire lands for certain tribes.[122] Nor was it intended to be an unlimited power. To the contrary, Section 5 limits the Secretary's trust authority fiscally, by appropriating "a sum not to exceed $2,000,000" for the "the acquisition of such lands, interests in lands, water rights, and surface rights, *and for expenses incident to such acquisition*."[123] When Congress passed the IRA, it was in the midst of the Great Depression, and its focus was on helping Indians who had become landless through allotment and to reduce fractionation so that tribes could

---

[116] *See, e.g.,* 25 C.F.R. § 151.10(b), (c).

[117] *See, e.g., Assiniboine and Sioux Tribes v. Bd. of Oil and Gas*, 792 F.2d 782, 795 (9th Cir. 1986)

[118] *See* 88 Fed. Reg. at 86230 (listing cases).

[119] *South Dakota*, 69 F.3d 878.

[120] *See* U.S. *Dep't of the Interior v. South Dakota*, 519 U.S. 919, 920 (1996) (Justices A. Scalia, S. O'Connor, C. Thomas dissenting).

[121] 25 C.F.R. § 151.3(a).

[122] *Carcieri*, 555 U.S. at 391.

[123] 25 U.S.C. § 5108.

better use their remaining reservation lands.[124] The basic purpose of the IRA was to reverse the General Allotment Act's policy to effect "the eventual assimilation of the Indian population… and the 'gradual extinction of Indian reservations and Indian titles.'"[125] As the Eighth Circuit (later) explained in holding that Section 5 of the IRA—"when it is viewed in the statutory and historical context"—did not violate the nondelegation doctrine, "[t]he statutory aims of providing lands sufficient to enable Indians to achieve self-support and ameliorating the damage resulting from the prior allotment policy sufficiently narrow the discretionary authority granted to the Department."[126]

Section 5 was understood to be an appropriation that enabled the *government* to acquire lands for Indians who were destitute and in need of federal support. As John Collier explained in a circular in 1935:

> Section 5 authorizes Congress to make an annual appropriation of $2,000,000 for the purchase of land *for landless Indians or for Indians whose holdings are too small or too poor to enable them to make a living thereon.* However, Congress has not as yet appropriated any money. The land to be purchased with this money may be added to existing reservations, in which case it must be for the sole use and occupancy of the tribe or tribes residing on that reservation, or new reservations may be formed. The title to all land bought under this authority will remain in the United States in trust for the Indian tribe or the individual Indian for whose benefit the purchase is made.[127]

The Department's new view bears no resemblance to what Section 5 means, when interpreted in its statutory and historical context.[128]

In fact, the Secretary found no need to promulgate regulations to implement Section 5 until 1978.[129] It proposed rules only because "[several] laws enacted in recent years add authorities for such acquisitions and contain differing requirements and conditions for the exercise of such authority."[130] The initial regulations allowed the

---

[124] BIA also wanted to reduce the burdens it faced managing highly fractionated parcels. *See generally*, The Indian Reorganization Act, Congresses and Bills, edited by Vine Deloria, Jr. (Univ. Oklahoma Press, 2002).

[125] *See Montana v. United States*, 450 U.S. 544, 559 n. 9 (1981) (quoting *Draper v. United States*, 164 U.S. 240, 246 (1896)).

[126] *See South Dakota v. U.S. Dep't of the Interior*, 423 F.3d 790, 799 (8th Cir. 2005).

[127] Indian Conditions & Affairs: Hearings Before the Subcommittee on General Bills of the Committee on Indian Affairs, House of Representatives, 74th Congress, 1st Session (1935) at 397 (emphasis added).

[128] The issues that the Department wanted to address were well explained by John Collier—the architect of the IRA—in his meetings with Indian tribes prior to the passage of the Act. *See generally* The Indian Reorganization Act, Congresses and Bills.

[129] *See* 43 Fed. Reg. 32311 (1978).

[130] *Id.*

Secretary to acquire gifts of land—which presumably is the rationale for allowing tribes to purchase lands and transfer title to the United States—only under the act of February 14, 1931 (46 Stat. 1106), as amended by the act of June 8, 1968 (Pub. T. 90-333; 82 Stat. 171)—authorities that the new regulations have omitted.

### 2.2.1 Statement of Need for Trust Land—25 C.F.R. § 151.10(b); No "Need" Requirement in New Regulations

The Tribe states that it needs the trust land with reference to alleged "illegal land sales" and assertions that "[t]he Property at issue in this application lies within the Tribe's traditional aboriginal territory."[131] BIA should not rely on those statements or any other statements that contravene the Mashantucket Settlement Act. The State provided the Tribe valuable consideration to settle its land claims.[132] In exchange, Congress expressly provided that any and all land transfers, including any "located within the town of Ledyard, Connecticut, shall been deemed to have been made in accordance with the Constitution and all laws of the United States" and expressly "approve[d] and ratif[ied] any such transfer effective as of the date of said transfer."[133] Congress also explicitly provided that "any aboriginal title" in such lands "shall be regarded as extinguished as of the date of such transfer." *Id.* at § 4(b).

Further, the Tribe's explanation of need lacks merit. The Tribe asserts that it needs more land because "[l]and acquisition is critical to tribal self-determination and sovereignty." Yet is also states that it does not have any intent to change the use of the land. The Interior Board of Indian Appeals has vacated decisions where a tribe's stated "need" for land is belied by the fact that it does not plan any change in use.[134] The Tribe has impressively succeeded in its self-determination and sovereignty efforts; it operates:

- The Museum and Research Center;
- The Pequot Health Care, which manages health care systems for Indian tribes;
- Lake of Isles, which includes two championship golf courses;
- The Spa at Norwich Inn;
- The Pequot Outpost, which includes a 5,000-square-foot building containing a convenience store and a 28-bay Mobil gasoline station;

---

[131] Application (A-0008).

[132] *See, e.g.*, Mashantucket Settlement Act, § 4(a).

[133] *Id.*

[134] *See, e.g., County of San Diego, California; Viejas Band of Kumeyaay Indians; and State of California v. Pacific Regional Director, BIA*, 63 IBIA 75, 84 (May 24, 2016) ("The Regional Director appears to have uncritically accepted all of the Band's representations, without attempting to reconcile the disjunct between the Band's potentially dire need for land for a tribal headquarters, and a need for suitable additional land for housing and commercial development—needs that Big Ewiiaapaayp and the SIHC parcel could not satisfy—and the stated intent not to develop the property.").

24

**A-096**

- Foxwoods, which comprises six casinos that offer more than 3,300 slot machines, 175 Table Games, and 100 Electronic Tables, a high-tech Race Book, and the world's largest Bingo Hall;
- A new $300 million development with Great Wolf Lodge.

Foxwoods's net revenues for 2023 are reported to have totaled $636.8 million. Online reports indicate that the Tribe's 2023–2024 budget proposed for the General Fund revenue is $77 million—approximately $70,000 per member. By contrast, Ledyard's 2023 budget of $63,510,221 amounts to annual spending of $4,125 per each of its 15,394 residents. The Tribe has been incredibly successful in its business endeavors on its existing land, generating resources that are more than sufficient for the Tribe's self-determination and sovereignty.

The Tribe also asserts the Property should be taken into trust "given, among other things, its location near critical tribal governmental infrastructure and community buildings" and that it has located historic and prehistoric artifacts on the land.[135] But the Property has been held in fee since April 18, 1994 without any impact on the Tribe's self-determination or sovereignty. The Tribe has developed the land as its seen fit and has protected the cultural resources it has uncovered on it.[136] The Tribe indicates that it has no plan to change the uses on the land. And it claims that the annual assessment of $16,359.68 is small, so that paying that should be no hardship for the Tribe—especially considering that its annual budget appears to be 17 times greater per capita than Ledyard's.[137]

Under the new regulations, the Department has eliminated a tribe's "need" for additional trust land from consideration. In the Department's view, the Secretary is no longer required to consider "the need for a Tribal government's acquisition of contiguous land, the impact on State and local government tax rolls, and jurisdictional problems or conflicts of land use which may arise, except as described below, because such impacts, problems or conflicts are presumed to have a minimal adverse impact."[138] According to the Secretary, contiguous land "set aside by the United States government for the use and welfare of a Tribe, and would, after acquisition, form a contiguous parcel, and based on the long experience of BIA in processing such applications and then administering land placed into trust, these factors need not be considered for every acquisition."[139] This interpretation is inconsistent with the history and purpose of the IRA, generally, and the Department's contemporaneous explanation of its Section 5 authority to tribes and Congress, as explained *supra,* in Section B.(2.1)(c).

---

[135] Application (A-0007).

[136] *Id.*

[137] *See, e.g.,* *Mashantucket Pequot Tribe v. Town of Ledyard*, 722 F.3d 457, 474, 476 (2d Cir. 2013) (holding in the context of taxes of approximately $20,000 per year that "[t]he economic effect of the tax on the Tribe is negligible; its economic value to the Town is not").

[138] 88 Fed. Reg. at 86227.

[139] *Id.*

**A-097**

### 2.2.2  Purpose for which land will be used—25 C.F.R. § 151.10(c); New 25 C.F.R. § 151.10(a)(3)

The Tribe has not identified any purpose for the acquisition. It does "not anticipate a change in the use of the land at this time," and it has "no current plans to develop the Property." The Tribe, however, has submitted applications to have three abutting parcels of land acquired in trust, several of which it has owned for 30 years. It acquired 153 and 159 Indiantown Road on April 18, 1994 and 119 Indiantown Road on September 4, 2007.[140] It is difficult to imagine that the Tribe—after decades of owning the respective properties—does not have any plans for them.

It also seems that the Tribe is trying to minimize the appearance of the impacts on the Town by filing separate trust applications. A single trust acquisition may have less dramatic (though still significant) effects on the Town, but the cumulative effects of multiple applications are very significant. NEPA prevents an agency from "dividing a project into multiple actions, each of which individually has an insignificant environmental impact, but which collectively have a substantial impact."[141]

### 2.3  Impact on State and Political Subdivisions—25 C.F.R. § 151.10(e); No Requirement that the Secretary Consider Impacts on State and Political Subdivisions in New Regulations

### 2.3.1  Impact on State or Local Tax Revenues

The old Part 151 regulations require the Secretary to consider "the impact on the State and its political subdivisions resulting from the removal of [land in unrestricted fee] from the tax rolls." The Tribe responds to that requirement by stating that the trust acquisition will result in an annual reduction of $16,359.68 to the Town, which "is relatively low reflecting the largely undeveloped nature of the property." It concludes the acquisition "will not significantly impact the Town."[142] The Tribe's assessment ignores the realities of the Town's funding sources, as well as cumulative effect of BIA's prior acquisitions on Ledyard, North Stonington, and Preston.

The cumulative effects on the Town are substantial. This application is not a one-off; the Tribe currently has three known applications pending and another parcel that was acquired in trust in January. This is in addition to the estimated $2,553,502.89 loss annually in taxes for the lands that have already been acquired in trust—an estimate that does not include the value of improvements on those lands. Nor does it include the increased value of the land; the Town based its estimates on the last assessed value of the parcel, which in some cases is decades old. The conservative estimate of $2.55 million amounts to 4% of the Town's annual budget—money that the

---

[140] It seems highly likely that the Tribe will submit an application for 137 Indiantown Road, which runs between 153 and 119 Indiantown Road, as well as 153R Indiantown Road.
[141] *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 894 (9th Cir. 2002).
[142] Application (A-0007).

Town desperately needs to provide critical governmental services. The lost tax revenues from the pending trust requests may seem trivial to the Tribe and BIA, but to the Town, they add to the already substantial erosion of its tax base.

In fact, other Connecticut towns are also very concerned about the apparently accelerating rate of the Tribe's fee-to-trust applications. The Tribe currently owns over 900 acres of fee lands within Ledyard, the assessed value of which is $19,674,057. Those properties generate $679,935 in annual taxes. In North Stonington, the Tribe owns several properties with an assessed value of $19,112,420, worth $543,748.35 in annual taxes. And in Preston, the Tribe owns another 236.8 acres of land valued at $1,603,560.

The Tribe then cites to the Mashantucket Pequot fund, to which it has contributed over $4.5 billion since the start of gaming to the State.[143] The $4.5 billion figure is only 25% of the Tribe's total slot machine revenue; the Tribe retained $13.5 billion from its slots alone. The Tribe's gaming procedures require the State to forgo gaming opportunities, which could have provided substantial additional revenue to the State. Many other states have authorized gaming and are able to tax all casino operations at higher rates. At the close of 2023, for example, Pennsylvania taxes on gaming in the Commonwealth brought in $2.34 billion in tax revenues in that year alone.[144] In FY22–23, casino gaming in Maryland generated $848.1 million in tax revenues.[145]

Unlike the Tribe, which can use a portion of its $13.5 billion (plus revenues from all of its gaming activities, as well as its other business ventures) to provide governmental services to its 1,100 members, the State uses the Pequot Fund to support the State's 169 municipalities, which serve 3.626 million people. Municipalities typically receive only a small percentage of the fund, usually around $52 million of the approximately $300 million generated by Foxwoods and Mohegan Sun annually. Of the $52 million, the towns directly impacted by trust acquisitions on behalf of the Tribe receive a small fraction. State law mandates distributions based on many factors, including: the value of state-owned property, private college and general hospitals, population, equalized net grand list, and per capita income.[146] For FY 2024, Ledyard, North Stonington, and Preston received, respectively, $1,391,000, $880,690, and $1,165,290 from the Pequot Fund.

The Tribe also maintains that Ledyard receives substantial impact aid from the federal government for education costs associated with children who live on trust or restricted fee lands.[147] Ledyard receives federal funding under Section 7003 of the

---

[143] Application (A-0008).
[144] Pennsylvania's Gaming Revenues Coming Up Aces, Allegheny Institute (Mar. 27, 2024), https://www.alleghenyinstitute.org/pennsylvanias-gaming-revenues-coming-up-aces/.
[145] Maryland Lottery and Gaming, Maryland Lottery and Gaming Control Agency, https://www.mdgaming.com/wp-content/uploads/2023/08/FY23-Summary-Report.pdf.
[146] CGS Sections 3-55i, j, and k.
[147] Application (A-0008).

Impact Aid Fund, which compensates school districts for educating students whose parents or legal guardians reside and/or work on federal property or Indian lands. The Town receives $5,000 per pupil residing on the Tribe's reservation. Ledyard's net current expenditure per pupil, however, was $16,871 as of November 2023. Moreover, Ledyard does not receive extra funding for Special Education (SPED) costs, which average an additional $50,000 per pupil who receives those services. Of the tribal members living on-reservation, 35% of students receive SPED services. The monies that Ledyard receives from federal education funding covers less than 30% of the costs of educating children living on-reservation, not including the average $50,000 additional costs for SPED students.

The Tribe also cites PILOT (payments in lieu of taxes) payments from the State for certain lands taken into trust for the Tribe. Last year, however, Ledyard received only $997,808 in PILOT related to the Tribe's trust lands—43 percent of the unimproved value of the Tribe's trust lands ($2,320,252.30). North Stonington received $25,441.00 in total PILOT payments, most of which comes from the State Forest. There is no question that the Town does not receive funding or support that approximates the amount of taxes it would be entitled to if the properties were not in trust. Every additional trust acquisition increases that differential, jeopardizing the Town's (and other towns') ability to provide critical governmental services.

In the event that the Tribe opts to have this application reviewed under the new regulations, 25 C.F.R. § 151.17(a)(2) requires the Secretary to consider these comments under the new regulations. The new regulations, however, do not require the Secretary to consider any of the comments that a state or political subdivision might submit.[148] Instead, the Secretary need only consider four criteria when evaluating trust requests: (1) her statutory authority; (2) the need for additional land, but only if the applicant is an individual Indian; (3) purpose; and (4) BIA's ability to discharge its responsibilities.[149] The regulations also require the Secretary to "presume[] that the acquisition will further the Tribal interests described in paragraph (b) of this section, and adverse impacts to local governments' regulatory jurisdiction, real property taxes, and special assessments will be minimal, therefore the application should be approved."[150]

Without the requirement that the Secretary actually consider the State and the Town's comments, and without any process for doing so or any standards to govern the information necessary to rebut the presumption, the presumption itself is irrebuttable and ultimately irrelevant to the Secretary's consideration. Irrebuttable presumptions are forbidden by the Due Process Clause.[151] States and local governments may not have due process rights, but their citizens do. In addition, the Administrative Procedures Act protects state and local governments from having their interests

---

[148] *See* 25 C.F.R. § 151.10(d).
[149] 25 C.F.R. § 151.10(a).
[150] 25 C.F.R. § 151.10(c).
[151] *Vlandis v. Kline*, 412 U.S. 441, 452 (1973).

destroyed using arbitrary and capricious procedures.[152] Yet there is no role at all for the public to participate in the trust process; no notice is provided to them during the fee-to-trust process. The only notice that the public might receive *before* an application is granted is pursuant to the National Environmental Policy Act, which in the case of a categorical exclusion—such as here—they will never hear. The Supreme Court held in *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak* that neighbors of a proposed acquisition "are reasonable—indeed, predictable—challengers of the Secretary's decisions: Their interests, whether economic, environmental, or aesthetic, come within § [5108's] regulatory ambit."[153] Yet the regulations completely cut the public out of the process, denying them of any opportunity to have their concerns heard.

From the perspective of the State and the Towns, the presumptions are a straightforward violation the Administrative Procedure Act (APA).[154] It is arbitrary and capricious for BIA to establish these presumptions "based on its longstanding practices and experience" and there is no evidence to support BIA's conclusion.[155] BIA provides no explanation how it reached that conclusion or what evidence supports it. And virtually every comment from states and local governments disputes that presumption. Indeed, BIA has denied applications in the past precisely because the acquisition would create conflicts and adversely affect local governments. On July 31, 2020, BIA denied the Cayuga Nation's trust application based on "serious" land use and jurisdictional problems with the Nation, including property destruction and public violence.[156]

The presumptions are arbitrary and capricious, unsupported by the evidence, and violate the due process rights of citizens affected by BIA's decisions.

---

[152] As a court reasoned in an analogous context, "[w]hile the IRS does not have a constitutional right to due process, it is a basic principle of justice . . . that a reasonable opportunity to be heard must precede judicial denial of a party's claimed rights." *In re Moore*, 2013 Bankr. LEXIS 3193, at *35, 112 A.F.T.R.2d (RIA) 2013-5629 (Bankr. M.D. Ga. Aug. 6, 2013) (quotation marks and citation omitted). "Thus, courts have construed that the notice requirements of the bankruptcy code apply to all creditors, vesting the government 'with a right akin to due process." *Id*. (quotation marks omitted).

[153] 567 U.S. 209, 227–28 (2012).

[154] 5 U.S.C. § 706(2)(a).

[155] *See e.g.*, 88 Fed. Reg. at 86223.

[156] *See* Letter from Assistant Secretary—Indian Affairs Tara Sweeney to Federal Representative Clint Halftown (Jul. 31, 2020) ("2020 Denial"), https://www.bia.gov/sites/default/files/dup/assets/asia/oig/2020.07.31%20Signed%20Final%20Decision%20Cayuga%20508%20Compliant.pdf. The 2020 Denial detailed how internal tribal conflicts led to violence in the community, prompted by the Nation (supported by the tribal police) using "bulldozers to demolish a working daycare center, store, schoolhouse and other buildings" run by tribal members who opposed the tribal government. The U.S. Attorney for the Western District of New York echoed the public's concerns regarding potential violence. The 2020 Denial concluded that acquiring the land in trust "at this time could heighten the current tension between the Nation and its neighbors, further complicating and exacerbating an already inflammatory situation." 2020 Denial at 7. It also noted that nothing in the application indicated a "need … for additional land." *Id*. at 8.

### 2.3.2  Notice to State and Local Governments

As set forth above, the notice that BIA provides is unreliable and inadequat

## 2.4    Identification of Jurisdictional Issues—25 C.F.R. § 151.10(f)

The Tribe maintains that it "does not anticipate any jurisdictional issues," because it "will provide all necessary governmental services to the land including, but not limited to, public safety and first responder services, land use regulation, utilities, to the extent required, and environmental and natural resource regulation."[157] BIA has interpreted the acquisition of land under Section 5 of the IRA to not only eliminate state and local taxes—which Section 5 explicitly provides for, 25 U.S.C. § 5108—but also to eliminate the application of state and local jurisdiction.[158] Section 5, however, says nothing about removing lands so acquired from state and local jurisdiction. There is no basis for concluding that Section 5 also eliminates state and local jurisdiction when it specifically addresses taxation but says nothing about state and local jurisdiction. It only provides:

> Title to any lands or rights acquired pursuant to this Act or the Act of July 28, 1955 (69 Stat. 392), as amended (25 U.S.C. 608 et seq.) shall be taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired, *and such lands or rights shall be exempt from State and local taxation*.[159]

Nothing in Section 5 refers to state or local jurisdiction, and there is no basis for reading it to eliminate any power other state or local power than the power to tax. In fact, it would be odd for Section 5 to eliminate state and local jurisdiction, given that it authorizes the acquisition of land in trust for individual Indians based on blood quantum. *See* 25 U.S.C. § 5129. Those Indians may not be a member of any tribe and would—as non-governmental entities—lack governmental authority. It is difficult to imagine that Congress intended for Indians not affiliated with any tribe and not within reservation boundaries to be exempt from state and local jurisdictional controls. In addition, if all trust lands were equivalent to reservation lands, there would seem to be little reason for Congress to have included Section 7, which gives the Secretary the authority to designate lands acquired under Section 5 a reservation.[160]

Under BIA's misinterpretation of Section 5, however, the Tribe will be free to change the use of the land as it pleases after it is acquired in trust.[161] The loss of jurisdiction creates the conflict. In BIA's view, transferring the land into trust "free[s] the parcel[]

---

[157] Application (A-0008).
[158] *See* 25 C.F.R. § 1.4(a) (providing that land held in trust is immune from state and local land use restrictions).
[159] 25 U.S.C. § 5108 (emphasis added).
[160] *See* 25 U.S.C. § 5110.
[161] The Tribe, however, has not—to date—asked BIA to acquire 153R or 137 Indiantown Road or other properties it owns within the area.

from local zoning or other regulatory controls that protect all landowners in the area."[162] There is a development across Indiantown Road with more than 50 homes, which may see development that they have no say over and different environmental and natural resource regulation.

For example, the land at issue contains wetlands and appears to be swampy and low lying, and includes 100 year flood plain. While wetlands on such properties have not been delineated, the presence of swampy, low lying areas and flood plains indicates that areas of inland wetlands, as defined by Connecticut law, are present at the site.

Under Connecticut law, wetlands are "land, including submerged land . . . which consists of any of the soil types designated as poorly drained, very poorly drained, alluvial and floodplain by the National Cooperative Soils Survey . . . of the Natural Resources Conservation Service of the United States Department of Agriculture."[163] Activity conducted within, and adjacent to, wetlands is closely regulated in Connecticut, by both municipal inland wetlands agencies and the Department of Energy and Environmental Protection. Activities that may disturb wetlands, such as the deposition of fill, require issuance of a permit after a technical review of potential impacts. This close regulation is necessary because the Connecticut General Assembly has determined that

> wetlands and watercourses of the state of Connecticut are an indispensable and irreplaceable but fragile natural resource . . . Many inland wetlands and watercourses have been destroyed or are in danger of destruction because of unregulated use by reason of the deposition, filling or removal of material, the diversion or obstruction of water flow, the erection of structures and other uses, all of which have despoiled, polluted and eliminated wetlands and watercourses. Such unregulated activity has had, and will continue to have, a significant, adverse impact on the environment and ecology of the state of Connecticut and has and will continue to imperil the quality of the environment . . .[164]

The federal government also regulates some activity within wetlands, but the scope of its regulation is not entirely concurrent with Connecticut's regulation of wetlands. Specifically, the federal government regulates only "waters of the United States," which includes some wetlands that are "adjacent to" navigable waters and are "relatively permanent, standing, or continuously flowing tributaries connected to" navigable waters.[165] While it is difficult to determine with any certainty without a delineation of on-site wetlands by a licensed soil scientist, it is possible that some or all on-site wetlands on the Property at issue are not waters of the United States. As a result, if the land is taken into trust, activity in such wetlands, which is currently subject to

---

[162] *City of Sherrill v. Oneida Indian Nation*, 544 U.S. 111 (citing *Felix v. Patrick*, 145 U.S. 317, 335 (1892)).

[163] Conn. Gen. Stat. § 22a-38(15).

[164] *Id.* § 22a-36.

[165] *See* 40 C.F.R. Part 120; *see also Sackett v. EPA*, 598 U.S. 651 (2023).

state and local regulation, would be left unregulated by either the federal or state governments because of the differences in state and federal law. If wetlands such as these are taken into trust, there may be no future controls on development.

Unregulated development within the wetlands directly contradicts the policy of the State. Development in wetlands may also impact water quality in the area and reduce the capacity of the wetlands for flood storage and groundwater recharge, potentially adversely impacting both neighboring properties and surface and groundwater on other parcels downgradient and downstream. That further counsels against granting the Application.

### 2.6.1 NEPA Compliance (516 DM 6) - Categorical Exemption

As noted above, BIA is processing obviously related trust requests in a piecemeal fashion to minimize the apparent impacts of the proposed acquisitions. The effects of these acquisitions are cumulative and should be evaluated together. Further, because there are no limits on the uses available to the Tribe on the lands, once they are acquired in trust, using a categorical exclusion in this context based on the statement that there will be no change in use allows tribes to escape NEPA review in every case. That is why establishing "need" for tribal acquisitions should be a basic requirement and why BIA should look closely at a tribe's justification. With respect to these lands, there is reason to believe that the use will change, given that the Tribe previously proposed using these three parcels for its Great Wolf resort. As the IBIA explained in *San Diego County*, it is error for a Regional Director to summarily conclude that "a categorical exclusion applies because the Band has no 'immediate' change-of-use plans. The definition of 'effects' under NEPA is not limited to 'immediate' effects."[166]

### CONCLUSION

For the reasons cited above, the State of Connecticut and the Towns of Ledyard, North Stonington, and Preston, Connecticut urge BIA to deny the Tribe's application for the approximately 58.610-acre parcel at 153 Indiantown Road, Case No. 55848.

Respectfully submitted,

*Robert J. Deichert*

Robert J. Deichert
Assistant Attorney General
165 Capitol Avenue
Hartford, CT 06106
(T) 860-808-5020

Jena A. MacLean
*On behalf of the Towns of Ledyard,*
*North Stonington, and Preston, CT*
Perkins Coie, LLP
700 13th Street, NW. Suite 800

---

[166] *See County of San Diego*, 63 IBIA at 90 (May 24, 2016) (vacating Regional Director's decision because tribe's stated need for land was inconsistent with its stated intent not to develop the property) (citing 40 C.F.R. § 1508.8).

Robert.Deichert@ct.gov   Washington, D.C. 20005-3960
              (T) 202-434-1648
              JMacLean@perkinscoie.com

Cc:  Jody Cummings, Legal Counsel of the Mashantucket Pequot Tribal Nation (via e-mail)
   Betsy Conway, Senior Legal Counsel of the Mashantucket Pequot Tribal Nation (via e-mail)
   Alexandra McWilliams, Bureau of Indian Affairs (via e-mail)
   John Smith, Bureau of Indian Affairs (via email)

**A-105**

# EXHIBIT 10



# United States Department of the Interior
## BUREAU OF INDIAN AFFAIRS
### EASTERN REGIONAL OFFICE
#### 545 MARRIOTT DRIVE
#### SUITE 700
#### NASHVILLE, TN 37214

In Reply Refer To:
Real Estate Services
TR-4609-P5

**AUG 0 5 2024**

Case Number:     53179

Certified Mail - Return Receipt Requested 7777 9420 2218

MASHANTUCKET PEQUOT INDIAN TRIBE
2 MATT'S PATH
P. O. BOX 3060
MASHANTUCKET, CT 06338-3060

## NOTICE OF DECISION

Dear Applicant:

This decision is a result of our analysis of an application filed by MASHANTUCKET PEQUOT INDIAN TRIBE for trust acquisition of fee lands. The property is described as follows:

See "Exhibit A" for legal descriptions.

<u>Regulatory Authority</u>

The applicable regulations are set forth in the Code of Federal Regulations (CFR) Title 25, Part 151. The regulations specify that it is the Secretary's policy to accept lands "in trust" for the benefit of Tribes when such acquisition is authorized by an Act of Congress; and, (1) when such lands are within the exterior boundaries of the Tribe's reservation, or adjacent thereto, or within a Tribal consolidation area, or (2) when the Tribe already owns an interest in the land; or (3) when the Secretary determines that the land is necessary to facilitate Tribal self-determination, economic development, or Indian housing.

This acquisition facilitates Tribal Self-Determination. Therefore, it is within the land acquisition policy as set forth by the Secretary of the Interior.

Pursuant to 25 CFR Part 151, the Secretary will consider the following requirements in evaluating tribal requests for the acquisition of lands in trust status, when the land is located within or contiguous to the tribe's reservation, and the acquisition is not mandated:

(a)   The existence of Statutory Authority for the acquisition and any limitations contained in such authority; (b) need of the individual Indian or the Tribe for additional land; (c) the purpose for which the land will be used; (d) if the land is to be acquired for an individual Indian, the amount of trust or restricted land already owned by or for that individual and the degree to which he needs assistance in handling his affairs; (e) impact on the State and its political subdivisions resulting from removal of the land from the tax rolls; (f) jurisdictional problems and potential conflict of land use

FTNDD01



Office Codes: B,S,00,020 AD Number: 4200409212 Case: 53179

## A-107

which may arise; (g) whether the Bureau of Indian Affairs is equipped to discharge the additional responsibilities resulting from the acquisition of the land in trust status; and, (h) the extent to which the applicant has provided information that allows the Secretary to comply with 516 DM 6, appendix 4, National Environmental Policy Act Revised Implementing Procedures, and 602 DM 2, Land Acquisitions.

Our review of the requirements to evaluate this Tribal request as set forth in 25 Code of Federal Regulations, § 151.10 (a) through (h), determined the following:

**1. 25 CFR § 151.10 (a) Statutory authority for the acquisition of the property.**

25 U.S.C 5108 INDIAN REORG ACT JUNE 18 1934 (48 STAT. 984)

**2. 25 CFR § 151.10 (b) – The need of the individual Indian or a Tribe for additional land.**

The Mashantucket Pequot Tribal Nation (Tribe) has pursued re-establishing their land base to ensure jurisdictional conservation for current and future generations. Preservation of forested lands is important to the tribal citizens, as they have completed extensive work to protect their natural resources. Based on the information provided within the request, it is my determination that the Tribe has adequately identified its need for additional land.

**3. 25 CFR § 151.10 (c) – Purpose for which the property will be used.**

The acquisition consists of 76.74 acres, more or less, in the town of Ledyard, Connecticut. The property is currently vacant. Although the Tribe has no immediate plans to develop the property at this time, it is evident that there was at least one sacred site uncovered during environmental testing. In support of the Tribe's conservation of efforts and to allow the Tribe to exercise jurisdiction over them, it is our determination that the Tribe has adequately described the purposes for which the land will be used.

**4. 25 CFR § 151.10 (d) – If the land is to be acquired for an individual Indian, the amount of trust or restricted land already owned by or for that individual and the degree to which he needs assistance in handling his affairs.**

N/A

**5. 25 CFR § 151.10 (e) – Impact on State and its political subdivisions resulting from the removal of this property from the tax rolls.**

The subject property is located approximately .5 miles south of the Tribe's Museum and Research Center and approximately 3.4 miles northeast from the Town of Ledyard, Connecticut. The property is contiguous to reservation trust land of the Tribe. By letters dated November 3, 2023, notices were sent to the proper addresses of the Connecticut State Governor's Office, Ledyard Mayor's Office, and Ledyard Tax Collector, requesting comments, including the amount of real property taxes and special assessments for the property, and current zoning. No comments or objections to the conveyance of the property in trust for the Tribe were received. The total property taxes on the property were $499.40 for the 2022 tax year and the current use is consistent with its zoning designation. Our analysis of the Tribe's request reveals that the proposed acquisition is not for gaming purposes. A change in use to gaming would require compliance with the provisions of Section 20 of the Indian Gaming Regulatory Act (IGRA), 25 USC 2719, prior to any gaming activities being conducted on the property. Revenues generated from the taxing of property in Connecticut provide funds that allow local governments to provide important services such as infrastructure, education, recreation, fire protection, and law enforcement. Real property, personal property, along with motor vehicle taxes, fund the operations of the Ledyard, CT which, among other responsibilities, provide for police and fire protection, road construction and

FTNDD01



Office Codes: B,S,00,020 AD Number: 4200409212 Case: 53179

**A-108**

maintenance, Ledyard Public Schools and other municipal government services. The total real property taxes paid in 2022 for the tract was $499.40, which amounts to less than 0.001% of the total $41,308,872.00 property taxes collected by the Town of Ledyard, see 2022 Financial Statements and Supplementary Information for the Town of Ledyard for the Year ended June 30, 2022. No special assessments or other outstanding tax assessments were identified. While any loss of revenue might be considered detrimental, no negative impacts to the level of services currently being provided to the property were identified. In addition, the cost of some community services provided to this land will be offset by the contributions of the Tribe by virtue of the land's trust status, such as, assumption of law enforcement responsibility and continued contributions from one-quarter of slot machine revenue to the State of Connecticut from the Foxwoods Resort Casino. Based on our analysis, we have determined that the acquisition of the property in trust for the Tribe will not have a significant impact on the existing level of services currently being provided by state and its political subdivisions.

### 6. 25 CFR § 151.10 (f) – Jurisdictional problems and potential conflicts of land use.

By letters dated November 3, 2023, notices were sent to the proper addresses of the Connecticut State Governor's Office, Ledyard Mayor's Office, and Ledyard Tax Collector, requesting comments, including the amount of real property taxes and special assessments for the properties, and current zoning. No comments or objections to the conveyance of property in trust for the Tribe were received within the comment period.   Our analysis finds that there are other trust lands in the town of Ledyard. The property is currently zoned for Resort Commercial Cluster District, and existing use of the property does not conflict with the land use patterns of the surrounding area. Additionally, identified within the property is "wetlands-old" according to the Zoning Map of the Town of Ledyard.  The Tribe currently provides law enforcement oversight on adjoining tribal trust property, maintaining a police department, tribal security, and dispatch department. There are no proposed changes in the jurisdictional arrangements currently in place for the reservation and existing Tribal trust properties.  Acknowledging the probability for jurisdictional issues and/or land use conflicts; the Tribe obtained the parcel through a land swap with the Town of Ledyard, which demonstrates a collaborative working relationship. It is not anticipated that the proposed use of the property will cause any change in the current need for police protection or forces in the local community as this will remain undeveloped and the Tribe will provide those services.   Thus, we find no current issues or potential conflicts of land use resulting from the proposed use of the property to be acquired in trust. We further find that any problems or conflicts that do arise can be resolved through collaborative discussions with the local government.

### 7. 25 CFR § 151.10 (g) – Whether the Bureau of Indian Affairs is equipped to discharge the additional responsibilities.

The requested property totals 76.74 acres, more or less, and is located approximately 1,025 miles northeast from the Eastern Regional Office in Nashville, Tennessee. The Tribe is located in Ledyard, Connecticut. Eastern Regional Office is responsible for administering trust services to approximately 1,635 acres of land held in trust for the Tribe. Trust resource management program services are provided by the Region as direct service to the Tribe. The Regional Office currently provides technical advice and limited direct field services on trust resources program management matters to the Tribe, as well as, to the other 34 federally recognized tribes and 3 Agency Offices of the Eastern Region. There are approximately 605,000 acres of tribal trust and restricted land in the Eastern Region. The Regional Office's trust resources management programs include real estate



services, forestry, archeology, environmental management services, and natural resources management. The Region's Realty staff consists of 1 Realty Officer, 1 Deputy Realty Officer, 3 Realty Specialists, and 1 Realty Assistant. There are also 8 Natural Resources staff persons with expertise in the fields of forestry, fire, archeology, environmental sciences, and natural resources management. These resources are considered minimally adequate for administering the existing trust and restricted properties of the Region.    While the distance of the properties from the Regional Office limits the number and frequency of onsite monitoring visits, the continued agricultural use of the property and its proximity to the Tribe's other trust lands minimize the need for critical management and regular onsite monitoring by Regional Office staff. Additionally, the Tribe actively manages the land as it contains all-terrain vehicle trails and hiking trails. Although Bureau resources are limited and not expected to increase, accepting the property into trust should not impose any significant additional responsibilities or burdens on the level of trust services currently being provided by the Bureau. Accordingly, it is our determination that the Bureau has the capability to assume the additional responsibilities resulting from the acquisition of the property in trust status.

## 8. 25 CFR § 151.10 (h) – Environmental Compliance:

<u>National Environmental Policy Act Compliance</u>

A fee-to-trust request that proposes no change in land use is subject to a "categorical exclusion" review under BIA policies and procedures for implementing NEPA. The record reflects compliance with 516 DM 6, Appendix 4, National Environmental Policy Act Revised Implementing Procedures. A Categorical Exclusion under exclusion category 516 DM 10.5(I) was issued for the property on May 9, 2024.  No further compliance is required for NEPA. The Tribe is proposing no change in land use; therefore, the Proposed Action is categorically excluded from further analysis under the National Environmental Policy Act (NEPA) in accordance with 516 DM 10.5 (I)- Land Conveyance and Other Transfers - Approvals or grants of conveyances and other transfers of interests in land where no change in land use is planned. BIA's action is administrative in nature and would result in the federal government holding title to the property in trust for the benefit of the Tribe. There would be no construction, or any ground-disturbing activities associated with the BIA action. Since there is no change in land use planned, there are no connected actions that need to be analyzed by BIA in accordance with NEPA.  As part of the categorical exclusion process, BIA environmental staff must consider and document an "extraordinary circumstances" review.  This review and the extraordinary circumstances are defined for the Department of the Interior at 43 CFR §46.215. Based on the extraordinary circumstances review it has been determined that a categorical exclusion review is the appropriate level of review in accordance with NEPA. The categorical exclusion is appropriate because there are no extraordinary circumstances potentially having effects that may significantly affect the environment.

<u>National Historic Preservation Act (NHPA) Compliance</u>

The proposed action will have no significant impacts on properties list or eligible for listing, on the National Register of Historic Places. As specified in 3 CFR 800.3(a)(l), the fee-to-trust approval, when no change in land use is planned is a type of activity that does not have the potential to cause effects on historic properties, and the BIA has no further obligations under section 106 of the National Historic Preservation Act for the fee-to trust approval undertaking.



Endangered Species Act (ESA) Compliance

The proposed action will have no significant impacts on species listed, or proposed to be listed, on the list of Endangered or Threatened Species or have significant impacts on designated Critical Habitat for these species. The proposed action is simply administrative in nature and will not result in any activities that would impact air, water or critical habitat for biological resources. Additionally, any future actions on the property would still be subject to compliance with the Endangered Species Act.

Hazardous Substances Determination

An Environmental Site Assessment prepared in compliance with 602 DM 2, Land Acquisitions: Hazardous Substances Determinations completed April 4, 2024, determined that no contaminants or other environmental problems were present on the property, and there were no obvious signs of any effects of contamination.

Other Environmental Requirements

This action is simply administrative in nature and would result in the federal government holding title to the property in trust for the benefit of the Tribe. There is no proposed construction, and the Tribe has no plans to change the current land use.  Future changes from the current uses of the properties would require an environmental assessment of the impacts.  Accordingly, it is our determination that approval of the Tribe's fee-to-trust application will have no adverse environmental impacts on public health or safety, wild or scenic rivers refuges, floodplains rivers placed on nationwide river inventory, prime or unique farmlands, and historic properties. Further, the identified wetlands will be subject to federal multijurisdictional oversight.

**Conclusion**

An analysis was made on the fee-to-trust application for 76.74 acres, more or less, for the Tribe.  There were no comments by the state and local governments in opposition to the conveyance of this land into trust for the Tribe. Information submitted by the Tribe to this office has been reviewed in accordance with 25 CFR 151. There is statutory authority to acquire the land in trust for the Tribe.  The proposed acquisition will facilitate tribal self-determination for a purpose which is not illegal, controversial or in conflict with local land use patterns.  While the acquisition will result in the loss of some property tax revenue; however, it is our determination that the loss will not significantly impact the existing level of services provided by the state and local governments. In addition, the Tribe will continue to make financial contributions to the State of Connecticut from slot machine revenues at the Foxwoods Casino.  Further, there is also the potential for jurisdictional problems and land use conflicts due to a change in jurisdictional authority. We have determined that the potential problems and conflicts are manageable and do not outweigh the findings in support of the trust acquisition; namely, the need of the Tribe for additional trust land to support tribal self-determination and the ability of the Bureau to assume the additional trust responsibility.   Based on an evaluation of each of the factors of 25 CFR 151 as discussed herein, it is our determination that the proposed fee-to-trust land acquisition request be approved, subject to a satisfactory title examination pursuant to 25 CFR 151.13.

**Notice of Appeal**



FTNDD01

Office Codes: B,S,00,020 AD Number: 4200409212 Case: 53179

**A-111**

Any party who wishes to seek judicial review of this decision must first exhaust administrative remedies. The Regional Director's decision may be appealed to the Interior Board of Indian Appeals (IBIA) in accordance with the regulations in 43 C.F.R. 4.310-4.340.

If you choose to appeal this decision, your notice of appeal to the IBIA must be signed by you or your attorney and **must be either postmarked and mailed (if you use mail) or delivered (if you use another means of physical delivery, such as FedEx or UPS) to the IBIA within 30 days from the date of receipt of this decision.** The regulations do not authorize filings by facsimile/fax or by electronic means. Your notice of appeal should clearly identify the decision being appealed. You must send your **original** notice of appeal to the IBIA at the following address: Interior Board of Indian Appeals, Office of Hearings and Appeals, U.S. Department of the Interior, 801 North Quincy Street, Suite 300, Arlington, Virginia 22203. You must send **copies** of your notice of appeal to (1) the Assistant Secretary – Indian Affairs, U.S. Department of the Interior, MS-4141-MIB, 1849 C Street N.W., Washington, D.C. 20240; (2) each interested party known to you; and (3) the Regional Director. Your notice of appeal sent to the IBIA must include a statement certifying that you have sent copies to these officials and interested parties and should identify them by names or titles and addresses.

If you file a notice of appeal, the IBIA will notify you of further procedures. If no appeal is timely filed, this decision will become final for the Department of the Interior at the expiration of the appeal period. No extension of time may be granted for filing a notice of appeal.

Sincerely,

REGIONAL DIRECTOR

Enclosure(s)

cc:

**BY CERTIFIED MAIL:**

TAX COLLECTOR, TOWN OF LEDYARD
741 COLONEL LEDYARD HIGHWAY
LEDYARD, CT 06339
Certified Mail ID: 7777 9497 7877

GOVERNOR, STATE OF CONNECTICUT
210 CAPITOL AVENUE
HARTFORD, CT 06106
Certified Mail ID: 7777 9510 6835

LEDYARD MAYOR'S OFFICE
741 COLONEL LEDYARD HIGHWAY
LEDYARD, CT 06339
Certified Mail ID: 7777 9516 1184

ASSISTANT ATTORNEY GENERAL
STATE OF CONNECTICUT
165 CAPITOL AVENUE
HARTFORD, CT 06106
Certified Mail ID: 7777 9522 7593

FTNDD01

Office Codes: B,S,00,020 AD Number: 4200409212 Case: 53179

**A-113**

Case Number: 53179

Applicant Name: MASHANTUCKET
PEQUOT INDIAN TRIBE

## LEGAL DESCRIPTION EXHIBIT A

**Tract ID:**
**Tract Name: 119 INDIANTOWN ROAD**

| Land Area | Land Area Name | Tract Number | LTRO | Region | Agency | Resources |
|---|---|---|---|---|---|---|
| 020 | MASHANTUCKET PEQUOT | | ANADARKO, OK | EASTERN REGIONAL OFFICE | EASTERN REGIONAL OFFICE | Both (Mineral and Surface) |

| Lot | Block | Sub Division | USS | State | County | Acres |
|---|---|---|---|---|---|---|
| 99 | 99 | | | CONNECTICUT | NEW LONDON | 76.740 |

DESCRIPTION: A certain tract or parcel of land situated westerly of Indiantown Road
in the Town of Ledyard, County of New London and State of Connecticut bounded and
described as follows:  Beginning at a drill hole recovered in the westerly line of
Indiantown Road at the northeasterly corner of the herein described parcel and the
southeasterly corner of other lands of The Mashantucket Pequot Tribe located at 137
Indiantown Road as more particularly shown on the herein referenced survey plan,
Thence following along the westerly line of Indiantown Road, by and along the face
of a stone wall in part, for the following courses and distances: S 44°49'45" W,
for a distance of 58.55' to a point at the beginning of said stone wall, S
42°13'17" W, for a distance of 151.51' to a rebar with cap recovered at the face of
said stone wall, S 31°52'37" W, for a distance of 517.58' to a drill hole recovered
at the face end of said stone wall, S 20°13'01" W, for a distance of 84.61' to a
point, S 9°41'32" W, for a distance of 346.02' to an iron pipe recovered, said iron
pipe being the northerly corner of lands now or formerly the Town of Ledyard as
more particularly shown on the herein referenced survey plan,  Thence following
along said Town of Ledyard lands for the following courses and distances: S
27°24'02" W, for a distance of 256.34' to a drill hole recovered, S 27°43'30" W,
for a distance of 138.03' to a point located in the centerline of a stonewall, said
point being the southwesterly corner of said Town of Ledyard lands and the
northwesterly corner of lands now or formerly Gerald F. Drury,  Thence following
along said Drury lands, by and along the centerline of a stone wall for the
following courses and distances: Along the arc of a 75.00' radius curve, deflecting
to the right and having a central angle of 41°28'46", for a distance of 54.30' to a
point, S 69°12'16" W, for a distance of 214.18' to a drill hole recovered at the
end of said stone wall, said drill hole being a southeasterly corner of the herein
described parcel, the northwesterly corner of said Drury lands, and further being
located in the easterly line of lands now or formerly The Mashantucket Pequot Tribe
as more particularly shown on the herein referenced survey plan,  Thence following
along said lands of The Mashantucket Pequot Tribe for the following courses and
distances: N 8°57'28" W, for a distance of 358.69' to a rebar with cap set at the
centerline beginning of a stone wall, By and along the centerline of a stone wall,
N 38°15'09" W, for a distance of 97.92' to a drill hole recovered, By and along the
centerline of a stone wall, N 24°02'39" W, for a distance of 130.26' to a point,
said point being the northeasterly corner of said lands of The Mashantucket Pequot
Tribe, S 70°46'18" W, for a distance of 2.43' to an iron pipe recovered, S
70°46'18" W, by and along the centerline of a stone wall in part, for a distance of
262.63'to a drill hole recovered at a corner of said stone wall, said drill hole
being the northwesterly corner of said lands of The Mashantucket Pequot Tribe all
as more particularly shown on the herein referenced survey plan,  Thence continuing
along said lands of The Mashantucket Pequot Tribe by and along the centerline of a
stone wall for the following courses and distances: S 18°21'50" E, for a distance
of 421.22' to a drill hole recovered, Along the arc of a 74.00' radius curve
deflecting to the right and having a central angle of 63°05'28", for a distance of
81.49' to a point, S 50°41'36" W, for a distance of 20.95' to a drill hole
recovered, said drill hole being a westerly corner of said lands of The
Mashantucket Pequot Tribe and further being located in the northerly line of lands
now or formerly Kendra Perry as more particularly shown on the herein referenced
survey plan,  Thence following along said Perry lands, lands now or formerly
Tristan Poirier, and lands now or formerly Laurelle R. Texidor, all in part by
each, by and along the centerline of a stone wall, for the following courses and
distances: S 62°16'15" W, for a distance of 190.97' to a rebar with cap recovered,
S 62°30'03" W, for a distance of 44.29' to a drill hole recovered, S 67°08'21" W,
for a distance of 222.91' to an iron pipe recovered, said iron pipe being the
southwesterly corner of the herein described parcel, the northwesterly corner of
said Texidor lands, and further being located in the easterly line of lands now or
formerly The United States of America in Trust for the Benefit of The Mashantucket



**A-114**

Case Number: 53179

Applicant Name: MASHANTUCKET
PEQUOT INDIAN TRIBE

Tract ID:
Tract Name: 119 INDIANTOWN ROAD

| Land Area | Land Area Name | Tract Number | LTRO | Region | Agency | Resources |
|---|---|---|---|---|---|---|
| 020 | MASHANTUCKET PEQUOT | | ANADARKO, OK | EASTERN REGIONAL OFFICE | EASTERN REGIONAL OFFICE | Both (Mineral and Surface) |

| Lot | Block | Sub Division | USS | State | County | Acres |
|---|---|---|---|---|---|---|

Pequot Tribe all as more particularly shown on the herein referenced survey plan, Thence following along said lands of The United States of America in Trust for the Benefit of The Mashantucket Pequot Tribe for the following courses and distances: N 19°32'28" W, for a distance of 83.65' to a stone pile, N 21°04'37" W, for a distance of 158.18' to a stone pile, N 19°28'21" W, for a distance of 167.81' to a merestone recovered, N 20°40'05" W, for a distance of 164.51' to a merestone recovered, N 20°19'16" W, for a distance of 335.50' to a stone pile, N 20°53'51" W, for a distance of 326.75' to a merestone recovered, N 20°58'55" W, for a distance of 333.98' to a stone pile, N 21°10'38" W, for a distance of 326.83' to a stone pile, N 21°02'31" W, for a distance of 159.28' to a merestone recovered, N 22°13'51" W, for a distance of 89.19' to a stone pile, N 26°46'11" W, for a distance of 81.01' to a merestone recovered, N 18°43'27" W, for a distance of 167.44' to a stone pile, N 21°08'25" W, for a distance of 165.27' to a stone pile, N 21°22'59" W, for a distance of 165.99' to a stone pile, N 44°14'31" W, for a distance of 130.67' to a concrete monument recovered, said monument being the northwesterly corner of the herein described parcel and further being located in the southerly line of lands now or formerly The Mashantucket Pequot Tribe located at 153 Indiantown Road all as more particularly shown on the herein referenced survey plan, Thence following along said lands of The Mashantucket Pequot Tribe located at 153 Indiantown Road and lands now or formerly The Mashantucket Pequot Tribe located at 137 Indiantown Road, both in part by each, for the following courses and distances: S 69°13'27" E, for a distance of 439.04' to an iron pipe recovered, S 73°34'37" E, for a distance of 465.82' to an iron pipe recovered, S 70°39'38" E, for a distance of 1071.37' to an iron pipe recovered, S 69°40'59" E, for a distance of 342.18' to a rebar with cap recovered at the centerline end of a stone wall, By and along said stone wall, S 77°40'42" E, for a distance of 49.97' to a point, By and along said stone wall, S 68°46'05" E, for a distance of 57.44' to a point, By and along said stone wall, S 70°47'21" E, for a distance of 465.01' to a drill hole recovered, said drill hole being the point and place of beginning. Said parcel contains 76.74 acres more or less and is more particularly shown on a survey plan prepared by Boundaries L.L.C. entitled: Perimeter Survey Prepared for The Mashantucket Pequot Tribal Nation 119 Indiantown Road - Ledyard, Connecticut, Scale: 1" = 120', Date: July 2023, Job I.D. No. 23-3292-1, Sheet No. 1/1.

# EXHIBIT 11



# United States Department of the Interior
### BUREAU OF INDIAN AFFAIRS
### EASTERN REGIONAL OFFICE
### 545 MARRIOTT DRIVE
### SUITE 700
### NASHVILLE, TN 37214

In Reply Refer To:
Real Estate Services
TR-4609-P5

**AUG 0 5 2024**

Case Number:    53199

Certified Mail - Return Receipt Requested 7777 9420 2218

MASHANTUCKET PEQUOT INDIAN TRIBE
2 MATT'S PATH
P. O. BOX 3060
MASHANTUCKET, CT 06338-3060

## NOTICE OF DECISION

Dear Applicant:

This decision is a result of our analysis of an application filed by MASHANTUCKET PEQUOT INDIAN TRIBE for trust acquisition of fee lands. The property is described as follows:

See "Exhibit A" for legal descriptions.

<u>Regulatory Authority</u>

The applicable regulations are set forth in the Code of Federal Regulations (CFR) Title 25, Part 151. The regulations specify that it is the Secretary's policy to accept lands "in trust" for the benefit of Tribes when such acquisition is authorized by an Act of Congress; and, (1) when such lands are within the exterior boundaries of the Tribe's reservation, or adjacent thereto, or within a Tribal consolidation area, or (2) when the Tribe already owns an interest in the land; or (3) when the Secretary determines that the land is necessary to facilitate Tribal self-determination, economic development, or Indian housing.

This acquisition facilitates Tribal Self-Determination. Therefore, it is within the land acquisition policy as set forth by the Secretary of the Interior.

Pursuant to 25 CFR Part 151, the Secretary will consider the following requirements in evaluating tribal requests for the acquisition of lands in trust status, when the land is located within or contiguous to the tribe's reservation, and the acquisition is not mandated:

(a)    The existence of Statutory Authority for the acquisition and any limitations contained in such authority; (b) need of the individual Indian or the Tribe for additional land; (c) the purpose for which the land will be used; (d) if the land is to be acquired for an individual Indian, the amount of trust or restricted land already owned by or for that individual and the degree to which he needs assistance in handling his affairs; (e) impact on the State and its political subdivisions resulting from removal of the land from the tax rolls; (f) jurisdictional problems and potential conflict of land use

FTNDD01


Office Codes: B,S,00,020 AD Number: 4200409330 Case: 53199

## A-117

which may arise; (g) whether the Bureau of Indian Affairs is equipped to discharge the additional responsibilities resulting from the acquisition of the land in trust status; and, (h) the extent to which the applicant has provided information that allows the Secretary to comply with 516 DM 6, appendix 4, National Environmental Policy Act Revised Implementing Procedures, and 602 DM 2, Land Acquisitions.

Our review of the requirements to evaluate this Tribal request as set forth in 25 Code of Federal Regulations, § 151.10 (a) through (h), determined the following:

**1. 25 CFR § 151.10 (a) Statutory authority for the acquisition of the property.**

25 U.S.C 5108 INDIAN REORG ACT JUNE 18 1934 (48 STAT. 984)

**2. 25 CFR § 151.10 (b) – The need of the individual Indian or a Tribe for additional land.**

The Mashantucket Pequot Tribal Nation (Tribe) has pursued re-establishing their land base to ensure jurisdictional conservation for current and future generations. Conservation and restoration are very important to the tribal citizens, as they are still occupying their aboriginal lands. The acquisition of 159 Indiantown Road is paramount to the Tribe's self-governance as the land is adjacent to Tribal buildings that facilitate crucial services to the community such as Public Works and Safety. Based on information provided with the request, it is my determination that the Tribe has adequately identified its need for additional land.

**3. 25 CFR § 151.10 (c) – Purpose for which the property will be used.**

The acquisition consists of 4.79 acres, more or less, in the town of Ledyard, Connecticut. The property is currently vacant. Although the Tribe has no immediate plans to develop the property at this time, it is adjacent to the Public Works and Safety buildings and is relatively close to the Mashantucket Pequot Museum and Research Center. The acquisition of the property in trust which would be supportive of the Tribe's self-determination efforts to enhance services to the tribal community and to allow the Tribe to exercise jurisdiction over tribal lands. Accordingly, it is our determination that the Tribe has adequately described the purposes for which the land will be used.

**4. 25 CFR § 151.10 (d) – If the land is to be acquired for an individual Indian, the amount of trust or restricted land already owned by or for that individual and the degree to which he needs assistance in handling his affairs.**

N/A

**5. 25 CFR § 151.10 (e) – Impact on State and its political subdivisions resulting from the removal of this property from the tax rolls.**

The subject property is located approximately .5 miles east of the Tribe's Museum and Research Center and approximately 4.2 miles northeast from the Town of Ledyard, Connecticut. The property is contiguous to reservation trust land of the Tribe. By letters dated November 3, 2023, notices were sent to the Connecticut State Governor's Office, Ledyard Mayor's Office, and

FTNDD01



Office Codes: B-S-00-020 AD Number: 4200409330 Case: 53199

**A-118**

Ledyard Tax Collector, requesting comments, including the amount of real property taxes and special assessments for the properties, and current zoning. No comments or objections to the conveyance of the property in trust for the Tribe were received. Property taxes on the property were $2,542.58 for the 2022 tax year and no zoning or special assessments were identified. Our analysis of the Tribe's request reveals that the proposed acquisition is not for gaming purposes. A change in use to gaming would require compliance with the provisions of Section 20 of the Indian Gaming Regulatory Act (IGRA), 25 USC 2719, prior to any gaming activities being conducted on the property. Revenues generated from the taxing of property in Connecticut provide funds that allow local governments to provide important services such as infrastructure, education, recreation, fire protection, and law enforcement. Real property, personal property, along with motor vehicle taxes, fund the operations of the Ledyard, CT which, among other responsibilities, provide for police and fire protection, road construction and maintenance, Ledyard Public Schools and other municipal government services. The total real property taxes paid in 2022 for the tract was $2,542.58, which amounts to less than 0.006% of the total $41,308,872.00 property taxes collected by the Town of Ledyard, see 2022 Financial Statements and Supplementary Information for the Town of Ledyard for the Year ended June 30, 2022. No special assessments or other outstanding tax assessments were identified. While any loss of revenue might be considered detrimental, no negative impacts to the level of services currently being provided to the property were identified. In addition, the cost of some community services provided to this land will be offset by the contributions of the Tribe by virtue of the land's trust status, such as, assumption of law enforcement responsibility and continued contributions from a portion of slot machine revenue to the State of Connecticut from the Foxwoods Resort Casino. Based on our analysis, we have determined that the acquisition of the property in trust for the Tribe will not have a significant impact on the existing level of services currently being provided by state and its political subdivisions.

**6. 25 CFR § 151.10 (f) – Jurisdictional problems and potential conflicts of land use.**

By letters dated November 3, 2023, notices were sent to the proper addresses of the Connecticut State Governor's Office, Ledyard Mayor's Office, and Ledyard Tax Collector, requesting comments, including the amount of real property taxes and special assessments for the properties, and current zoning. No comments or objections to the conveyance of the property in trust for the Tribe were received within the comment period. Our analysis finds that there are other trust lands in the town of Ledyard. No zoning ordinances outside of city limits were reported and the existing use of the property does not conflict with existing land use patterns of the surrounding area. The Tribe currently provides law enforcement oversight on adjoining tribal trust property, maintaining a police department, tribal security, and dispatch department. There are no proposed changes in the jurisdictional arrangements currently in place for the reservation and existing Tribal trust properties. Acknowledging the probability for jurisdictional issues and/or land use conflicts, the working relationship between the Tribe and local governments has cooperatively resolved conflict. It is not anticipated that the proposed use of the property will cause any change in the current need for police protection or forces in the local community as this will remain undeveloped and the Tribe will provide those services. Thus, we find no current issues or potential conflicts of land use resulting from the proposed use of the property to be acquired in trust. We further find that any problems or conflicts that do arise can be resolved through collaborative discussions with the local government.



**7. 25 CFR § 151.10 (g) – Whether the Bureau of Indian Affairs is equipped to discharge the additional responsibilities.**

The requested property totals 4.79 acres, more or less, and is located approximately 1,018 miles northeast from the Eastern Regional Office in Nashville, Tennessee. The Tribe is located in Ledyard, Connecticut. Eastern Regional Office is responsible for administering trust services to approximately 1,635 acres of land held in trust for the Tribe. Trust resource management program services are provided by the Region as direct service to the Tribe. The Regional Office currently provides technical advice and limited direct field services on trust resources program management matters to the Tribe, as well as, to the other 34 federally recognized tribes and 3 Agency Offices of the Eastern Region. There are approximately 605,000 acres of tribal trust and restricted land in the Eastern Region. The Regional Office's trust resources management programs include real estate services, forestry, archeology, environmental management services, and natural resources management. The Region's Realty staff consists of 1 Realty Officer, 1 Deputy Realty Officer, 3 Realty Specialists, and 1 Realty Assistant. There are also 8 Natural Resources staff persons with expertise in the fields of forestry, fire, archeology, environmental sciences, and natural resources management. These resources are considered minimally adequate for administering the existing trust and restricted properties of the Region.    While the distance of the properties from the Regional Office limits the number and frequency of onsite monitoring visits, the continued agricultural use of the property and its proximity to the Tribe's other trust lands minimize the need for critical management and regular onsite monitoring by Regional Office staff. Additionally, the Tribe actively manages the land as it abuts crucial tribal governmental and utility facilities. Although Bureau resources are limited and not expected to increase, accepting the property into trust should not impose any significant additional responsibilities or burdens on the level of trust services currently being provided by the Bureau. Accordingly, it is our determination that the Bureau has the capability to assume the additional responsibilities resulting from the acquisition of the property in trust status.

**8. 25 CFR § 151.10 (h) – Environmental Compliance:**

National Environmental Policy Act Compliance

A fee-to-trust request that proposes no change in land use is subject to a "categorical exclusion" review under BIA policies and procedures for implementing NEPA. The record reflects compliance with 516 DM 6, Appendix 4, National Environmental Policy Act Revised Implementing Procedures. A Categorical Exclusion under exclusion category 516 DM 10.5(I) was issued for the property on May 9,, 2024. No further compliance is required for NEPA. The Tribe is proposing no change in land use; therefore, the Proposed Action is categorically excluded from further analysis under the National Environmental Policy Act (NEPA) in accordance with 516 DM 10.5 (I)- Land Conveyance and Other Transfers - Approvals or grants of conveyances and other transfers of interests in land where no change in land use is planned. BIA's action is administrative in nature and would result in the federal government holding title to the property in trust for the benefit of the Tribe. There would be no construction, or any ground-disturbing activities associated with the BIA action. Since there is no change in land use planned, there are no connected actions that need to be analyzed by BIA in accordance with NEPA. As part of the categorical exclusion process, BIA environmental staff must consider and document an "extraordinary circumstances" review. This review and the extraordinary circumstances are defined for the Department of the Interior at 43 CFR §46.215. Based on the extraordinary circumstances review it has been determined that a categorical exclusion review is the



appropriate level of review in accordance with NEPA. The categorical exclusion is appropriate because there are no extraordinary circumstances potentially having effects that may significantly affect the environment.

National Historic Preservation Act (NHPA) Compliance

The proposed action will have no significant impacts on properties list or eligible for listing, on the National Register of Historic Places. As specified in 3 CFR 800.3(a)(l), the fee-to-trust approval, when no change in land use is planned is a type of activity that does not have the potential to cause effects on historic properties, and the BIA has no further obligations under section 106 of the National Historic Preservation Act for the fee-to trust approval undertaking.

Endangered Species Act (ESA) Compliance

The proposed action will have no significant impacts on species listed, or proposed to be listed, on the list of Endangered or Threatened Species or have significant impacts on designated Critical Habitat for these species. The proposed action is simply administrative in nature and will not result in any activities that would impact air, water or critical habitat for biological resources. Additionally, any future actions on the property would still be subject to compliance with the Endangered Species Act.

Hazardous Substances Determination

An Environmental Site Assessment prepared in compliance with 602 DM 2, Land Acquisitions: Hazardous Substances Determinations completed April 4, 2024, determined that no contaminants or other environmental problems were present on the property, and there were no obvious signs of any effects of contamination.

Other Environmental Requirements

This action is simply administrative in nature and would result in the federal government holding title to the property in trust for the benefit of the Tribe. There is no proposed construction, and the Tribe has no plans to change the current land use.  Future changes from the current uses of the properties would require an environmental assessment of the impacts.  Accordingly, it is our determination that approval of the Tribe's fee-to-trust application will have no adverse environmental impacts on public health or safety, wetlands, wild or scenic rivers refuges, floodplains rivers placed on nationwide river inventory, prime or unique farmlands, and historic properties.

**Conclusion**

An analysis was made on the fee-to-trust application for 4.79 acres, more or less, for the Tribe.  There were no comments by the state and local governments in opposition to the conveyance of this land into trust for the Tribe. Information submitted by the Tribe to this office has been reviewed in accordance with 25 CFR 151. There is statutory authority to acquire the land in trust for the Tribe.  The proposed acquisition will facilitate tribal self-determination for a purpose which is not illegal, controversial or in conflict with local land use patterns.  While the acquisition will result in the loss of some property tax revenue; however, it is our determination that the loss will not significantly impact the existing level of



services provided by the state and local governments. In addition, the Tribe will continue to make financial contributions to the State of Connecticut from slot machine revenues at the Foxwoods Casino. Further, there is also the potential for jurisdictional problems and land use conflicts due to a change in jurisdictional authority. We have determined that the potential problems and conflicts are manageable and do not outweigh the findings in support of the trust acquisition; namely, the need of the Tribe for additional trust land to support tribal self-determination and the ability of the Bureau to assume the additional trust responsibility. Based on an evaluation of each of the factors of 25 CFR 151 as discussed herein, it is our determination that the proposed fee-to-trust land acquisition request be approved, subject to a satisfactory title examination pursuant to 25 CFR 151.13.

**Notice of Appeal**

Any party who wishes to seek judicial review of this decision must first exhaust administrative remedies. The Regional Director's decision may be appealed to the Interior Board of Indian Appeals (IBIA) in accordance with the regulations in 43 C.F.R. 4.310-4.340.

If you choose to appeal this decision, your notice of appeal to the IBIA must be signed by you or your attorney and **must be either postmarked and mailed (if you use mail) or delivered (if you use another means of physical delivery, such as FedEx or UPS) to the IBIA within 30 days from the date of receipt of this decision.** The regulations do not authorize filings by facsimile/fax or by electronic means. Your notice of appeal should clearly identify the decision being appealed. You must send your **original** notice of appeal to the IBIA at the following address: Interior Board of Indian Appeals, Office of Hearings and Appeals, U.S. Department of the Interior, 801 North Quincy Street, Suite 300, Arlington, Virginia 22203. You must send **copies** of your notice of appeal to (1) the Assistant Secretary – Indian Affairs, U.S. Department of the Interior, MS-4141-MIB, 1849 C Street N.W., Washington, D.C. 20240; (2) each interested party known to you; and (3) the Regional Director. Your notice of appeal sent to the IBIA must include a statement certifying that you have sent copies to these officials and interested parties and should identify them by names or titles and addresses.

If you file a notice of appeal, the IBIA will notify you of further procedures. If no appeal is timely filed, this decision will become final for the Department of the Interior at the expiration of the appeal period. No extension of time may be granted for filing a notice of appeal.

Sincerely,



REGIONAL DIRECTOR

Enclosure(s)

cc:

**BY CERTIFIED MAIL:**
TAX COLLECTOR, TOWN OF LEDYARD
741 COLONEL LEDYARD HIGHWAY
LEDYARD, CT 06339
Certified Mail ID: 7777 9497 7877

GOVERNOR, STATE OF CONNECTICUT
210 CAPITOL AVENUE
HARTFORD, CT 06106
Certified Mail ID: 7777 9510 6835

LEDYARD MAYOR'S OFFICE
741 COLONEL LEDYARD HIGHWAY
LEDYARD, CT 06339
Certified Mail ID: 7777 9516 1184

ASSISTANT ATTORNEY GENERAL
STATE OF CONNECTICUT
165 CAPITOL AVENUE
HARTFORD, CT 06106

FTNDD01

Office Codes: B,S,00,020 AD Number: 4200409330 Case: 53199

**A-123**

Case Number: 53199

Applicant Name: MASHANTUCKET
PEQUOT INDIAN TRIBE

# LEGAL DESCRIPTION EXHIBIT A

**Tract ID:**
**Tract Name: 159 INDIANTOWN ROAD**

| Land Area | Land Area Name | Tract Number | LTRO | Region | Agency | Resources |
|---|---|---|---|---|---|---|
| 020 | MASHANTUCKET PEQUOT | | ANADARKO, OK | EASTERN REGIONAL OFFICE | EASTERN REGIONAL OFFICE | Both (Mineral and Surface) |

| Lot | Block | Sub Division | USS | State | County | Acres |
|---|---|---|---|---|---|---|
| 99 | 99 | | | CONNECTICUT | NEW LONDON STAT | 4.790 |

DESCRIPTION: 159 Indiantown Road A certain tract or parcel of land situated
westerly of Indiantown Road in the Town of Ledyard, County of New London and State
of Connecticut bounded and described as follows: Beginning at a drill hole
recovered in the westerly line of Indiantown Road at the northeasterly corner of
the herein described parcel and the southeasterly corner of lands now or formerly
The United States of America in Trust for the Benefit of The Mashantucket Pequot
Tribe as more particularly shown on the herein referenced survey plan, Thence
following along the westerly line of Indiantown Road, by and along the face of a
stone wall in part, for the following courses and distances: S 37°35'02" W, for a
distance of 144.62' to a point, S 40°06'24" W, for a distance of 33.82' to a point,
S 37°47'08" W, for a distance of 277.52' to a point, S 37°10'41" W, for a distance
of 47.74' to a point, S 42°27'57" W, for a distance of 46.50' to a point, S
36°09'34" W, for a distance of 26.77' to a rebar with cap set, said rebar being the
southeasterly corner of the herein described parcel and the northeasterly corner of
lands now or formerly The Mashantucket Pequot Tribe located at 153 Indiantown Road
as more particularly shown on the herein referenced survey plan, Thence following
along said lands of The Mashantucket Pequot Tribe located at 153 Indiantown Road,
by and along the centerline of a stone wall in part, for the following courses and
distances: N 72°23'35" W, for a distance of 78.19' to a point, N 73°51'19" W, for a
distance of 114.56' to a rebar with cap set at an intersection of said stone wall,
said rebar being the southwesterly corner of the herein described parcel, Thence
continuing along said lands of The Mashantucket Pequot Tribe located at 153
Indiantown Road, by and along the centerline of a stone wall, for the following
courses and distances: N 0°55'07" W, for a distance of 44.25' to a point, N
3°35'47" W, for a distance of 133.81' to a point, N 5°02'22" W, for a distance of
116.47' to a rebar with cap set, N 6°12'35" W, for a distance of 214.81' to a
point, N 10°29'50" W, for a distance of 47.41' to a drill hole recovered at a
corner of said stone wall, said drill hole being the northwesterly corner of the
herein described parcel and a southwesterly corner of said lands now or formerly
The United States of America in Trust for the Benefit of The Mashantucket Pequot
Tribe, Thence following along said lands of The United States of America in Trust
for the Benefit of The Mashantucket Pequot Tribe, by and along the centerline of
the stone wall for the following courses and distances: S 75°06'09" E, for a
distance of 352.49' to a drill hole recovered, S 74°33'16" E, for a distance of
68.56' to a point, S 75°47'57" E, for a distance of 190.95' to a drill hole
recovered, said drill hole being the point and place of beginning. Said parcel
contains 4.79 acres more or less and is more particularly shown on a survey plan
prepared by Boundaries L.L.C. entitled: Perimeter Survey Prepared for The
Mashantucket Pequot Tribal Na¿on 159 Indiantown Road – Ledyard, Connecticut, Scale:
1" = 40', Date: July 2023, Job I.D. No. 23-3292, Sheet No. 1/1.

WDAEA01    

## A-124

# EXHIBIT 12

United States Department of the Interior
OFFICE OF THE SECRETARY
Washington, DC 20240

| | |
|---|---|
| **STATE OF CONNECTICUT,** ) | |
| **Appellant,** ) | |
| ) | |
| **v.** ) | **APPELLEE'S BRIEF IN RESPONSE** |
| ) | **TO APPELLANT'S BRIEF** |
| **EASTERN REGIONAL DIRECTOR,** ) | |
| **BUREAU OF INDIAN AFFAIRS,** ) | |
| **Appellee,** ) | |
| ) | |
| **and** ) | **State of Connecticut Fee-to-Trust Appeal** |
| ) | |
| **MASHANTUCKET PEQUOT INDIAN** ) | |
| **TRIBE,** ) | |
| **Interested Party.** ) | |
| _____ ) | |

The Eastern Regional Director ("Regional Director"), Bureau of Indian Affairs ("BIA"), by and through her undersigned counsel, respectfully submits this brief in response to Appellant's brief in the above-styled case.

## INTRODUCTION

The State of Connecticut ("Appellant") seeks review of two decisions (collectively, "Decisions") dated August 5, 2024, of the Regional Director, BIA, to approve the trust acquisition for the Mashantucket Pequot Indian Tribe ("Tribe") of two properties located in the Town of Ledyard, Connecticut (collectively, "Properties").[1]

Appellant's brief claims the Regional Director (1) failed to provide Appellant and the state's Attorney General the required Notice of Non-Gaming Land Acquisition Applications ("Notices"); (2) failed to rebut Appellant's claim it did not receive the Notices; (3) violated

---

[1] The Properties are located at 119 Indiantown Road and at 159 Indiantown Road and their case numbers are 53179 and 53199, respectively.

Appellant's procedural protections; (4) refused to provide Appellant with copies of the Tribe's applications; and (5) lacks statutory authority to take the Properties into trust. Appellant requests the Assistant Secretary – Indian Affairs ("AS-IA"):

> Reverse the Decisions [or in] the alternative . . . vacate the decisions and remand them for further proceedings with directions to the Regional Director to allow [Appellant] reasonable time to update its Comments to reflect its review of the Applications and to address [Appellant's new] Comments.

Appellant's Br. at 30.

Most significantly, the Regional Director has statutory authority to take the Properties into trust status. The Regional Director may take land into trust pursuant to the Indian Reorganization Act ("IRA"). Congress made the IRA applicable to the Tribe when it enacted the Mashantucket Pequot Settlement Act ("Settlement Act") in 1983. The existence of such legislation, making the IRA and its trust acquisition provisions applicable to the Tribe, eliminates the need to determine whether the Tribe was under Federal jurisdiction in 1934, as required by the Supreme Court's decision in *Carcieri v. Salazar*.

Turning to Appellant's procedural arguments, the Regional Director is presumed to have provided the Notices to Appellant if the Regional Director sends the Notices to Appellant's last known address and the Notices were not returned. As shown in the Regional Director's proof-of-delivery, she provided Appellant with the Notices on November 7, 2023, to the Governor's address. The Notices went to the State Capitol mailroom and "M.ESTRADA" (a/k/a Manuel Estrada), a person employed at the State Capitol, signed for the Notices. Appellant may rebut this presumption if it can show the Regional Director sent the Notices to the wrong address, but Appellant has never argued any correspondence went to the wrong address. That is the end of the analysis.

Thus, the Regional Director did not violate Appellant's procedural due process rights. The Regional Director gave Appellant 30 days to respond to the Notices, as required by the regulations. However, Appellant remained silent for over four months. Appellant has responded to other correspondences the Regional Director has delivered to the State Capitol and which were signed for by "M.ESTRADA" (a/k/a Manuel Estrada). Consequently, Appellant has squandered its opportunity to comment on the applications. Appellant now seeks special treatment for its own failure to ensure its internal mail system works.

Appellant's contention that the Regional Director was required to provide it with the Tribe's applications shows a fundamental misunderstanding of the fee-to-trust process. State and local government comments are meant to provide specific information to help inform the Regional Director's decision. Appellant has no legal basis to conduct a parallel review of the Tribe's applications. Instead, the Regional Director uses her discretionary authority when making administrative decisions on fee-to-trust applications. And contrary to Appellant's position, that process is not meant to be a formal adjudication.

For the first time on appeal, Appellant argues the Regional Director should have provided the state's Attorney General with the Notices. However, the 25 C.F.R. Part 151 regulations do not require the Regional Director to send the Notices to the state's Attorney General because, under Connecticut law, the Governor is the supreme executive of the state. Thus, sending the Notices to any other state agency would be duplicative. Also, Appellant does not show the Attorney General exercises regulatory jurisdiction over the Properties, and therefore, the regulations do not require the Regional Director to serve the Notices on the Attorney General.

Finally, it is important to note that this appeal is based on a state law that discriminates against the Tribe and the Regional Director because it requires Appellant to oppose any fee-to-trust application regardless of the merit of those claims.

For the foregoing reasons, the Regional Director respectfully requests AS-IA to affirm the Regional Director's Decisions to take the Properties into trust.

## BACKGROUND

### I.    Status of the Tribe

The Tribe is a federally recognized Indian tribe which is eligible to receive services and funding from BIA by virtue of its status as an Indian tribe. *Indian Entities Recognized by and Eligible To Receive Serv. from the U.S. BIA*, Bureau of Indian Affairs, 89 Fed. Reg. 944, 945 (Jan. 8, 2024); Settlement Act, Pub. L. No. 98-134, § 9, 97 Stat. 851, 855-856 (Oct. 18, 1983). This includes the eligibility to have land taken into trust by the United States. Settlement Act at § 9(a). The Tribe maintains a government-to-government relationship with the United States. 89 Fed. Reg. at 944.

### II.    Description of the Properties

### A.  119 Indiantown Road

This property contains approximately 76.74 acres contiguous to the Tribe's Reservation. Administrative Record ("AR") 119-005, 030, 032. "There are currently no building structures or other permanent improvements on the Property. Rather, the Property consists of wooded land that is classified as forest lands . . . ." AR 119-005 – 006, 041. "The Tribe does not have any immediate plans to change the use of this property; rather, it would continue to be important forest land, which has been a key focus of the Tribe over the years." AR 119-008. "The Tribe obtained the Property

by Statutory Warranty Deed on September 4, 2007" in a land swap with the Town of Ledyard, Connecticut. AR 119-005 – 006, 034 – 035, 047 – 048.

### B. 159 Indiantown Road

This Property contains approximately 4.79 acres of land. AR 159-005. The Property is contiguous to the Tribe's reservation. AR 159-006. "There are no improvements on the Property . . . ." AR 159-005; *see* 159-008 ("The Property consists of . . . undeveloped land"). "The Tribe does not anticipate a change in the use of the land at this time and there are no current plans to develop the Property." AR 159-008. The Tribe acquired the Property by statutory warranty deed dated April 15, 1994. AR 159-005.

### III.    Procedural History

On August 25, 2023, the Tribe sent applications to the Regional Director for the United States to acquire title to the Properties and hold the land in trust status for the benefit of the Tribe. AR 119-004 – 118; AR 159-004 – 113.

On November 6, 2023, the Regional Director sent the Notices, dated November 3, 2023, via FedEx, certified mail, to Appellant. AR 119-298 – 309; 159-240 – 250. The Regional Director sent the Notices to "Governor, State of Connecticut, 210 Capitol Avenue, Hartford, CT 06106, Certified Mail ID: 7739 3841 3563". AR 119-304; 159-250. The Notices arrived the next day to the "Mailroom" and were signed for by "M.ESTRADA". *Id.* The Regional Director avers that M.ESTRADA is Manuel Estrada—an employee at the State Capitol building. *See* AR 119-584 – 585; 159-549 – 550.

On April 10, 2024—*over four months after the Notices arrived at the State Capitol*— Appellant sent a request for an extension of time in which to submit written comments. AR 119-

338 – 340; 159-400 – 402. These requests stated that the Governor's Office did not receive the Notices until March 28, 2024. *Id.*

On April 17, 2024, the Regional Director sent a letter to Appellant denying Appellant's request for an extension of time to submit written comments. AR 119-342 – 349; 159-404 – 410. The letter pointed out that the Notices were delivered to the Governor's Office on November 7, 2023, and therefore the comment period closed on December 7, 2023. *Id.* The Regional Director addressed the letter to "Governor, State of Connecticut, 210 Capitol Avenue, Hartford, CT 06106". AR 119-342; 159-404. FedEx delivered the letter to the "Mailroom" and was signed for by "M.ESTRADA". AR 119-353; 159-414. The Regional Director avers that "M.ESTRADA" is the same Manuel Estrada that signed for the Notices when FedEx delivered them on November 7, 2023.

On April 26, 2024—*nine days after FedEx delivered the letter denying the extension of time to the "Mailroom" and that was signed for by "M.ESTRADA" (a/k/a Manuel Estrada)*—Appellant sent a request for reconsideration of the Regional Director's denial of the extension of time. AR 119-355 – 357; 159-418 – 420. On May 1, 2024, the Regional Director sent a letter again denying Appellant's request for extension and that Appellant must make a Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, request to obtain a copy of the Tribe's fee-to-trust application. AR 119-470 – 471; 159-444 – 445. The letter was addressed to "Governor, State of Connecticut, 210 Capitol Avenue, Hartford, CT 06106". *Id.* This time, the letter was delivered to "Shipping/Receiving", but still signed by "M.ESTRADA". AR 119-473; 159-449. Again, the Regional Director avers "M.ESTRADA" is the same Manuel Estrada that signed for the Notices and the Regional Director's letter denying the extension of time.

On August 5, 2024, the Regional Director issued the Decisions for the Properties. AR 119-508 – 516; 159-476 – 483. The Regional Director sent the Decisions to "Governor, State of Connecticut, 210 Capitol Avenue, Hartford, CT 06106". AR 119-541, 523; 159-482, 487. On August 29, 2024, Appellant sent its notices of appeal to the Interior Board of Indian Appeals ("Board"), the Regional Director, AS-IA, and legal counsel for the Town of Ledyard and the Tribe. AR 119-538 – 807; 159-504 – 772.

## ARGUMENT

### I.    The Regional Director has statutory authority to take the Properties into trust.

Appellant's only substantive argument is that the Regional Director does not have statutory authority to take the Properties into trust. However, Appellant's argument is nothing more than simple disagreements and bare assertions that fail to overcome its burden to show the Regional Director abused her discretion. Therefore, AS-IA should find that the Regional Director has authority to take these Properties into trust because the Tribe's Settlement Act extends the IRA's land acquisition authority to the Tribe.

### A.  Standard of Review

The standard of review in trust acquisition cases is well established:

BIA is authorized to exercise its discretion to take land in trust, and the Board will not substitute its own judgment for that of BIA in discretionary decisions. The Board reviews discretionary decisions to determine whether proper consideration was given to all legal prerequisites, including any limitations established by regulation. An appellant bears the burden of showing that BIA did not properly exercise its discretion. The Board reviews legal issues and sufficiency-of-evidence issues de novo.

For an on-reservation trust acquisition, the record must show that BIA considered the factors set forth in 25 C.F.R. § 151.10. There is no requirement that BIA reach a particular conclusion with respect to each factor, or that BIA weigh or balance the factors in a particular way. Nor must BIA "resolve" objections to an objector's satisfaction. But the Board must be able to discern from the decision or the record

that the Regional Director gave due consideration to all timely submitted comments
by interested parties.

*St. of S.D. v. Great Plains Reg'l Dir., BIA*, 69 IBIA 173, 184 (2023) (citing *St. of S.D. v. Acting
Great Plains Reg'l Dir., BIA*, 63 IBIA 179, 182 (2016)). "Simple disagreement with or bare
assertions concerning BIA's decision are insufficient to carry an appellant's burden of proof." *Id.*,
69 IBIA at 185 (citing *Aitkin Cnty., Minn. v. Acting Midwest Reg'l Dir., BIA*, 47 IBIA 99, 104
(2008); *Cnty. of Sauk, Wis. v. Midwest Reg'l Dir., BIA*, 45 IBIA 201, 207 (2007)).

Here, Appellant argues that the Supreme Court decision in *Carcieri v. Salazar*, 555 U.S.
379 (2009), only allows the Regional Director "to take land into trust on behalf of tribes that were
either recognized or under federal jurisdiction in 1934" and Tribe does not meet either of these
definitions. Appellant's Br. at 29.[2] However, the administrative record and federal caselaw show
that Congress may make the IRA applicable to tribes through other legislation and that *Carcieri*
affirms this fact. AR 119-006 – 007, 053 – 057, 067 – 081; 159-006 – 007, 051 – 055, 065 – 079.

**B. Section 151.10(a) – the Regional Director has statutory authority to accept land
into trust on behalf of the Tribe because the Tribe's Settlement Act applies the
IRA to the Tribe.**

For an on-reservation acquisition—that is, a tribal request to acquire land located within or
contiguous to an Indian Reservation—the regulations require the Regional Director to consider the
existence of statutory authority for the acquisition and any limitations contained in such authority.
*Kenny v. Pac. Reg'l Dir., BIA*, 69 IBIA 226, 227-228 (2023) (citing 25 C.F.R. §§ 151.10(a)). Here,
the Regional Director determined she had statutory authority to accept the Properties into trust

---

[2] Appellant also makes vague reference to the Regional Director's decision in another fee-to-trust
case. Appellant's Br. at 29-30. But the regulations do not obligate AS-IA to consider information
not contained in the administrative record or timely submitted by the parties. 25 C.F.R. § 2.504.

pursuant to the Act of June 18, 1934, 48 Stat. 984. AR 119-509; 159-477. This Act is more

commonly known as the IRA.

> Section five [of the IRA] is the capstone of the land-related provisions of the IRA.
> It authorizes the Secretary "in his discretion" to acquire "any interest in lands, water
> rights, or surface rights to lands within or without existing Indian reservations"
> through purchase, gift, or exchange "for the purpose of providing land for Indians."

Cohen's Handbook of Federal Indian Law § 15.07 (Nell Jessup Newton ed., 2023) ("Cohen's

Handbook") (citing 25 U.S.C. § 5108).

### 1. The Settlement Act makes the IRA applicable to the Tribe because, at the time the Settlement Act was passed, it was widely understood that the IRA was a law of general application to tribes.

Sections 9(a) the Settlement Act states:

(a) Notwithstanding any other provision of law, Federal recognition is extended to
the Tribe. Except as otherwise provided in this Act, all laws and regulations of the
United States of general application to Indians or Indian nations, tribes or bands of
Indians which are not inconsistent with any specific provision of this Act shall be
applicable to the Tribe.

AR 119-053 – 057; 159-051 – 055 (emphasis added).

Federal courts have held that "[t]he Indian Reorganization Act [is a] statute[] of broad

general applicability." *The Chemehuevi Indian Tribe v. Cal. St. Bd. of Equalization*, 800 F.2d 1446,

1448 (9th Cir. 1986). "The IRA has long been understood to apply to all tribes, whether recognized

in 1934, or subsequently acknowledged by Congress or the executive." Cohen's Handbook §

15.07[1][a] (citing 25 U.S.C. § 2202 (providing that 25 U.S.C. § 5108 applies to all tribes)); 25

U.S.C. § 5123(f), (g) (barring disparate treatment among tribes); *Pit River Home & Agric. Coop.*

*Assn. v. U.S.*, 30 F.3d 1088, 1096 (9th Cir. 1994) (finding that Secretary legally took land into trust

for non-recognized group as "the Indians residing on one reservation"); *City of Sault Ste. Marie,*

*Mich. v. Andrus*, 532 F.Supp. 157, 161 (D.D.C. 1980) (fact that tribe was not recognized until after

1934 did not bar taking land into trust for tribe)).

Congress has stated that "[s]ince the enactment of the IRA, federal policy has sought to treat all tribes equitably and ensure they are entitled to the same federal rights and benefits." Sen. Rpt. 112-166, 112th Cong., 2d Sess. 22 (May 17, 2012). Congress explicitly stated *Section 9(a) of the Settlement Act* is evidence that "in nearly every individual recognition statute passed since the 1970s, Congress provided that the newly recognized or re-recognized tribe was permitted to access all of the rights and benefits provided by the IRA." *Id.* at 22-23 n.142 (citing Sen. Comm. on Indian Affairs, *Carcieri Crisis: The Ripple Effect on Jobs, Econ. Dev. and Pub. Safety in Indian Country: Hrg. on S. 676 Before S. Comm. on Indian Affairs*, 112th Cong., 1st Sess. 32 (Oct. 13, 2011)) (emphasis added).

The Second Circuit has also specifically found the IRA applies to the Tribe. *St. of Conn., ex rel. Blumenthal v. U.S. Dept. of the Interior*, 228 F.3d 82 (2nd Cir. 2000) *cert. denied, Conn., ex rel., Blumenthal v. Dept. of the Interior*, 532 U.S. 1007 (2001). In *Blumenthal*, the Second Circuit stated "[t]he Tribe may apply to the Secretary to take [lands] into trust under the 1934 IRA, and the Secretary's decision will be governed by the considerations outlined in the relevant regulations." *Id.*, 228 F.3d at 84. Consequently, the Court determined "the Connecticut plaintiffs' challenge is more appropriately presented as a challenge to the Secretary's exercise of discretion under the IRA." *Id.*, 228 F.3d at 94. Thus, under *Blumenthal*, the IRA applies to the Tribe and the Regional Director takes land into trust for the Tribe pursuant to 25 C.F.R. Part 151.

Because the IRA is a law of general applicability, the Second Circuit has held the IRA applies to the Tribe, and Congress has specifically found Section 9 of the Settlement Act applies the IRA to the Tribe, the Regional Director has statutory authority to take the Properties into trust.

//

//

**A-135**

## 2. The U.S. Supreme Court's decision in *Carcieri v. Salazar* supports Congress' authority to apply the IRA to the Tribe.

In 2009, relying on other statutory language defining "Indians" as "members of any recognized Indian tribe now under Federal jurisdiction," the Supreme Court held in *Carcieri* that the IRA only authorized the transfer of land into trust status for tribes that were under federal jurisdiction when Congress passed the IRA in 1934. *Carcieri* upended decades of understanding that the IRA applied to any federally recognized tribe. Sullivan, Bethany C. and Turner, Jennifer L. "Enough Is Enough: Ten Years of Carcieri v. Salazar," *Public Land & Resources Law Review*: Vol. 40, Art. 8 (2019). Prior to *Carcieri*, "administrative practice and lower court decisions had treated all federally recognized tribes as entitled to have land taken into trust under the IRA, so long as those tribes were recognized as of the time the land was placed in trust." Cohen's Handbook § 3.02[6][d] (citing *Pit River Home & Agric. Coop. Assn.*, 30 F.3d at 1096; *City of Sault Ste. Marie, Mich.*, 532 F.Supp. at 161 (fact that the U.S. did not recognize the tribe until after 1934 did not bar taking land into trust for tribe)).

Appellant argues that *Carcieri* "establishes that the IRA only grants the Secretary the authority to take land into trust on behalf of tribes that were either recognized or under federal jurisdiction in 1934" and that the "Tribe meets neither of those requirements." Appellant's Br. at 29.

However, as Justice Breyer noted in his concurrence, a specific statute recognizing a tribe can authorize a trust land acquisition. *Carcieri*, 555 U.S. at 407 (Breyer, J. concurring). The Justice gave specific examples of such statutes in footnote seven of his concurrence:

> Congress has passed specific statutes granting the Secretary authority to take land into trust for certain tribes . . . . Some of these statutes place explicit limits on the Secretary's trust authority and can be properly read as establishing the outer limit of the Secretary's trust authority with respect to the specified tribes. *See, e.g.*, § 1724(d) (authorizing trust land for the Houlton Band of Maliseet Indians, the

Passamaquoddy Tribe of Maine, and the Penobscot Tribe of Maine). <u>Other statutes, while identifying certain parcels the Secretary will take into trust for a tribe, do not purport to diminish the Secretary's residual authority under § [5801]</u>. *See, e.g.*, § 1775c(a) (Mohegan Tribe); § 1771d (Wampanoag Tribe); § 1747(a) (Miccosukee Tribe).[3] <u>Indeed, the Secretary has invoked his § [5801] authority to take additional land into trust for the Miccosukee Tribe despite the existence of a statute authorizing and directing him to acquire certain land for the Tribe.</u>[4]

*Id.*, 555 U.S. at 407 n.7 (Breyer, J. concurring) (emphasis added).

Additionally, the Solicitor's Opinion M-37029 recognizes that "[c]ertain tribes may have settlement acts that inform the legal analysis as to whether they can take land into trust. In *Carcieri*, the Court['s majority] declined to address Petitioners' argument that the Rhode Island Indian Claims Settlement Act barred application of the IRA to the Narragansett Tribe." Sol. Op. M-37029 at 23 n.150 (Mar. 12, 2014) (citing 555 U.S. at 393 n.7).[5] M-Opinions are binding on the reviewing official. *St. of N.Y. v. E. Reg'l Dir., BIA*, 58 IBIA 323, 334 n.17 (2014) (citing *Chemehuevi Indian Tribe v. W. Reg'l Dir., BIA*, 52 IBIA 192, 209 n.15 (2010)).

Thus, *Carcieri* is not the death knell Appellant seems to think it is. Appellant's Br. at 29. In fact, *Carcieri* undermines Appellant's position by acknowledging Congress may apply the IRA through separate legislation. That is exactly the case happened here.

//

---

[3] None of these settlement acts—just like the Settlement Act at issue here—specifically mention Section 5 of the IRA.

[4] The Miccosukee Tribe organized under the Section 16 of the IRA on January 11, 1962—28 years after Congress passed the IRA. Sen. Select Comm. on Indian Affairs, *Hrg. on S. 2931 – S. 2998 – S. 2893*, 97th Cong., 2d Sess. 89 (Dec. 7, 1982).

[5] While the Regional Director did not process the applications under the post-January 11, 2024, regulations, they make clear that "[f]or some Tribes, Congress enacted legislation after 1934 making the IRA applicable to the Tribe. The existence of such legislation making the IRA and its trust acquisition provisions applicable to a Tribe eliminates the need to determine whether a Tribe was under Federal jurisdiction in 1934." 25 C.F.R. § 151.4(b) (2024).

3. **Even if the language of the Settlement Act is ambiguous, the Indian law canons of statutory construction require AS-IA to interpret the Settlement Act in favor of the Tribe.**

"Ambiguities in federal law have been construed generously in order to comport with . . . traditional notions of [tribal] sovereignty and with the federal policy of encouraging tribal independence". *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 143-144 (1980); *Ramah Navajo Sch. Bd., Inc. v. Bureau of Revenue*, 458 U.S. 832, 846 (1982); *see Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 59–60 (1978) (Courts will not interpret federal statutes to "interfere[] with tribal autonomy and self-government . . . in the absence of clear indications of legislative intent".). Thus, "[s]tatutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." *Blumenthal*, 228 F.3d at 92 (citing *Mont. v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985)).

In *Blumenthal*, the Court stated section 5(e) of the Maine Indian Claims Settlement Act, Pub. L. No. 96-420, 94 Stat. 1785, 1791 (Oct. 10, 1980), was "an obvious demonstration that Congress knew how to prohibit the Secretary from taking into trust any lands outside of specifically designated settlement lands." 228 F.3d at 90; *see Carcieri*, 555 U.S. at 407 n.7 (Justice Breyer concurring also using the Maine Indian Claims Settlement Act as an example of Congress limiting the Secretary's authority under the IRA). Accordingly, "[t]he absence of an analogous provision in the Settlement Act . . . confirms that the Settlement Act was not meant to eliminate the Secretary's power under the IRA to take land . . . into trust for the benefit of the Tribe." *Id.*

Although the Regional Director believes the Settlement Act is not ambiguous—that the IRA is a statute of general applicability, and therefore, applies to the Tribe—to the extent AS-IA finds it is ambiguous, AS-IA must interpret the Settlement Act in the light most favorable to the Tribe. Here, that means finding Section 9 of the Settlement Act applies the IRA to the Tribe.

In conclusion, the Regional Director may take land into trust for a tribe through the land acquisition authority found in Section 5 of the IRA. Section 9 of the Tribe's Settlement Act makes the IRA applicable to the Tribe because the IRA is a statute of broad, general applicability. Thus, the Settlement Act removes the limitation that the Tribe must have been a "recognized Indian tribe now under Federal jurisdiction" in 1934. Appellant's arguments to the contrary are simply disagreement with and bare assertions concerning the Regional Director's Decisions, and are therefore, insufficient to carry Appellant's burden of proof.

**II.    The Regional Director sent the Notices to Appellant's address, the Notices went to Appellant's mailroom, a State Capitol worker signed for the Notices, and Appellant timely replied to other documents sent by the Regional Director, and therefore, the Regional Director properly served Appellant with the Notices.**

In the absence of clear evidence to the contrary, the Regional Director is presumed to discharge her official duties properly. *U.S. v. Chem. Found., Inc.*, 272 U.S. 1, 14-15 (1926) (citing *Confiscation Cases*, 87 U.S. 92, 108 (1873); *U.S. v. Page*, 137 U.S. 673, 679-680 (1891); *U.S. v. Nix*, 189 U.S. 199, 205 (1903)). "Without this presumption, agency officials might find themselves in court constantly, burdened with challenges from parties unhappy with the agency's decisions." *Sokaogon Chippewa Cmt'y v. Babbit*, 929 F.Supp. 1165, 1176 (W.D.Wis. 1996) (citing *Env. Defense Fund, Inc. v. Blum*, 458 F.Supp. 650, 663 (D.D.C. 1978)).

Appellant argues it never received the Notices. The Board has required a party claiming it had sent a document "to provide corroborating evidence that its [document] was mailed . . . ." *Cnty. of Santa Barbara, Cal. v. Pac. Reg'l Dir., BIA*, 65 IBIA 204, 220 (2018). The Regional Director has provided the FedEx proof-of-delivery for the Notices. AR 119-305; 159-250. This shows FedEx delivered the Notices to the State Capitol mailroom and "M.ESTRADA" (a/k/a Manuel Estrada) signed for the delivery. *Id.* It is now Appellant's burden to show the Regional Director did not mail the Notices to Appellant's address.

Appellant cites *Estate of Beverly M. Howard*, 55 IBIA 300, 303 (2012), for the proposition "that the presumption that notice mailed to a party has been received is rebuttable." Appellant's Br. at 13-14. But the *Howard* rebuttable standard is less expansive than Appellant makes it appear. In *Howard* the Board stated:

> There is a rebuttable presumption that notice sent to a party at his or her last known address and not returned has been received. To rebut the presumption, the party may show that the address used was not his or her correct current address and specifically contest receiving notice.

*Howard*, 55 IBIA at 303 (citing *Estate of Rose Hyson Hardick Sparlin*, 19 IBIA 153, 155 (1991)); *see Rosebud Indian Land and Grazing Assn. v. Acting Great Plains Reg'l Dir., BIA*, 39 IBIA 247, 248-249 (2004). Appellant has never claimed that the Regional Director mailed the Notices to the incorrect address. In fact, Appellant admits "the Governor shares [this address] with other policy makers and employees . . . ." Appellant's Br. at 3-4. And the Regional Director's proof-of-delivery shows the Notices were not returned to her. Therefore, Appellant has not rebutted the Regional Director's evidence that she had the Notices delivered to Appellant.

All Appellant provided to refute the Regional Director's presumption and evidence of delivering the notices was a sworn declaration from Kathryn Damato ("Damato"). AR 119-581 – 586; 159-546 – 551. That declaration states the "Governor's Office is located in the Connecticut State Capitol, with a mailing address of 210 Capitol Avenue, Hartford, CT, 06016". AR 119-582; 159-547. The Regional Director mailed all of her correspondence to that address. AR 119-304, 342, 470, 508; 159-250, 404, 444, 476. Additionally, Damato stated that "[b]ecause the Governor's Office is in the Connecticut State Capitol, the legislative branch of Connecticut's government controls the operation of the building, including the receipt, sorting, and distribution of mail." AR 119-582; 159-547. Therefore, it does not matter whether "M.ESTRADA" (a/k/a Manuel Estrada) is an employee of the Governor's Office because the Governor's Office does not control the receipt

of mail at the State Capitol. While the declaration states that "[w]hen mail arrives that is directed to the Governor's Office, the mail room delivers it to the Governor's Office." *id.*, Damato also stated that Appellant received the Regional Director's letters dated May 1, 2024—*which were signed for by "M.ESTRADA" (a/k/a Manuel Estrada)*. AR 119-583; 159-548. Neither Damato's declaration nor Appellant's brief deny that "M.ESTRADA" is a state employee or that part of his duties includes receiving FedEx deliveries. Thus, Appellant's sworn declaration only bolsters the fact that the Regional Director provided the Notices to Appellant, and that it was Appellant's internal delivery system that failed.

Still, Appellant then argues that if it denies the receipt of mail—despite evidence to the contrary—the presumption that the Regional Director complied with her official duties disappeared. Appellant's Br. at 15. Appellant continues—without citing any applicable legal authority—that the date the Governor received the Notices became a "factual question." *Id.* Appellant then seems to argue that the Regional Director must conduct protracted discovery to determine why Appellant failed to timely provide comments. *Id.* at 15-17. Nothing in the regulations requires her to do so.

Appellant finishes with an extended discussion of *Rosebud*. Appellant's Br. at 18-21. *Rosebud* was a highly fact-specific case. *Rosebud*, 39 IBIA at 249, 250. *Rosebud* involved an appellant's "confusion concerning case-specific procedures established by the Board, and was compounded by [a]ppellant apparently not receiving a follow-up order from the Board." *Id.*, 39 IBIA at 251. Here, Appellant's failure was to provide timely comments, which do not implicate the Board's procedures.

Additionally, the Board in *Rosebud* noted that "[a]ppellant provide[d] no explanation for why [it] admittedly received some correspondence concerning this case, but did not receive other

correspondence mailed to the same address." *Rosebud*, 39 IBIA at 250. Appellant does the same here. Appellant hides from the fact that it has responded to other correspondence from the Regional Director that FedEx delivered to the State Capitol and that "M.ESTRADA" (a/k/a Manuel Estrada) signed for.

Finally, Appellant argues its position is stronger than the appellant in *Rosebud*. Appellant's Br. at 20. However, this case simply does not present the extraordinary circumstances found in *Rosebud*. Here, Appellant did not produce timely comments because it failed to ensure its internal mail system functioned properly, and it is not the Regional Director's responsibility to clean up Appellant's mess.

In summary, it is uncontroverted that the Regional Director mailed the Notices to the correct address. FedEx delivered the Notices to the State Capitol's mailroom. While "M.ESTRADA" (a/k/a Manuel Estrada) may not be an employee of the Governor's Office, he undeniably works at the State Capitol, he regularly signs for FedEx deliveries and/or mail, and he has undeniably signed for other FedEx deliveries from the Regional Director which Appellant admits receiving. Therefore, the Regional Director has complied with the regulations' notice requirements and AS-IA should reject Appellant's impermissible burden-shifting and affirm the Regional Director's Decisions.

**III.    Appellant does not show the Regional Director violated its procedural due process rights.**

> The Due Process Clause of the Fifth Amendment states that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." This does not mean that a full courtroom trial must precede every deprivation of property; what constitutes "due process" is not "fixed," but is "flexible" and varies based on the "time, place and circumstances."

*Vill. of Hobart, Wis. v. Acting Midwest Reg'l Dir., BIA*, 69 IBIA 84, 102 (2023) (citing U.S. Const. amend. V.; *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (holding that due process did not

require an evidentiary hearing before the termination of disability benefits); *Walters v. Natl. Assn. of Radiation Survivors*, 473 U.S. 305, 320 (1985) (noting that "the processes required by the [Due Process] Clause . . . vary depending upon the importance attached to the interest and the particular circumstances under which the deprivation may occur")).

"The Regional Director's resolution of these fee-to-trust applications, however, was not a 'formal adjudication' . . . instead, it falls into the [Administrative Procedures Act's ("APA")] broad, catch-all category of 'informal adjudications.'" *Vill. of Hobart Wis.*, 69 IBIA at 103 (citing Cong. Rsch. Serv., R46930, Informal Administrative Adjudication: An Overview (2021), at 24-28). "The APA imposes only minimal requirements on informal adjudications like the resolution of these trust applications . . . ." *Id.* (citing 5 U.S.C. § 555(e) (requiring the agency to provide notice and reasons for denial of requests in an informal adjudication)).

The Supreme Court has held that "[t]he regulations implementing [the IRA] are sensitive to the complex interjurisdictional concerns that arise when a tribe seeks to regain sovereign control over territory." *City of Sherrill, N.Y. v. Oneida Indian Nation of N.Y.*, 544 U.S. 197, 220-221 (2005). Pursuant to those regulations, "[t]he notice will inform the state or local government that each will be given 30-days in which to provide written comments as to the acquisition's potential impacts on regulatory jurisdiction, real property taxes and special assessments." 25 C.F.R. § 151.10 (emphasis added). The Regional Director's Notices state:

> Any comments received within thirty days of your receipt of this notice will be considered and made a part of our record. You may be granted one thirty day extension of time to furnish comments, provided you submit a written justification requesting such an extension within thirty days of receipt of this letter.

AR 119-300; 159-242 (emphasis added). Thus, the Notices comport with the regulations the Supreme Court has endorsed.

**A. Appellant cannot show it was deprived of due process because Appellant was given to opportunity to comment on the Notices but failed to do so and the regulations do not require the Regional Director consider Appellant's five months late comments.**

The Board has held that the Regional Director is not required to consider untimely comments. *Cnty. of Santa Barbara, Cal.*, 65 IBIA at 221; *see St. of W. Va. v. Env. Protec. Agency*, 362 F.3d 861, 872 (D.C. Cir. 2004) (citing *Appalachian Power Co. v. Env. Protec. Agency*, 251 F.3d 1026, 1036 (D.C. Cir. 2001) ("It is black-letter administrative law that 'absent special circumstances, a party must initially present its comment to the agency . . . in order for a court to consider the issue.'")); *see also Friends of Endangered Species, Inc. v. Jantzen*, 589 F.Supp. 113, 117 (N.D.Cal. 1984) (Agency has no strict legal duty to consider three-month late comments.); *see also No Oilport! v. Carter*, 520 F.Supp. 334, 353 (W.D.Wash. 1981) (Agency is not required to respond to untimely comments.).

Appellant sent untimely, identical comments to the Regional Director on May 24, 2024. AR 119-578 – 586; 159-543 – 551.[6] Nevertheless, because the regulations do not require the Regional Director to consider the late comments, she did not include them in the Administrative Record to support her Decisions.[7] Still, Appellant continuously complains that the Regional Director did not provide an answer to why she denied Appellant's belated request for a 30-day extension to submit comments and decision not to consider Appellant's comments. Appellant's Br. at 1-7. Yet, the Regional Director's reason for denying Appellant's request for extension and

---

[6] Appellant states it received the Notices on March 28, 2024, from the Town of Ledyard's attorney. Appellant's Br. at 2-3. It then states any comments would be due April 27, 2024. Appellant's Br. at 3. Appellant did not send its comments to the Regional Director until May 24, 2024. Appellant's Br. at 5. It appears Appellant simply decided to give itself the 30-day extension to provide comments. Thus, even if AS-IA accepts Appellant's flawed premise that it did not receive the Notices until March 28, 2024, AS-IA should still disregard the comments because they were still untimely.

[7] The Regional Director included the comments as part of Appellant's notices of appeal.

consideration of comments is simple: *Appellant missed the comment period by over four months.*

AR 119-342, 470; 159-404, 444; *see* 5 U.S.C. § 555(e) (brief statement of the grounds for denial

is not required when affirming a prior denial or when the denial—as in the case here—is self-

explanatory).

> The Board has thus held that to demonstrate that an alleged procedural violation
> was more than harmless error, an appellant is required to identify the "colorable
> arguments" they were prevented from making to the regional director and not
> simply contend that they would have made colorable arguments.

*St. of S.D.*, 69 IBIA at 187 (citing *St. of S.D.*, 63 IBIA at 184; *see St. of S.D. v. U.S. Dep't of the*

*Interior*, 787 F.Supp.2d 981, 997 (2011) (explaining harmless error rule)). However, besides

Appellant's flawed contention that the Regional Director lacked statutory authority to approve the

applications, Appellant does not implicate any other of the section 151.10 factors the Regional

Director must consider. The Notices requested Appellant provide information regarding:

> (1) If known, the annual amount of property taxes currently levied on the subject
> property allocated to your organization;
> (2) Any special assessments, and amounts thereof, that are currently assessed
> against the property in support of your organization;
> (3) Any governmental services that are currently provided to the property by your
> organization; and
> (4) If subject to zoning, how the intended use is consistent, or inconsistent, with the
> zoning.

AR 119-299; 159-241.

Appellant's late comments do not provide any of the information the Regional Director

requested. Therefore, even if the Regional Director was required to consider five months late

comments, they would not impact the Regional Director's Decisions because Appellant failed to

provide any information requested by the regulations and the Notices.

While "the Part 151 regulations instruct BIA to provide interested parties notice and 30

days to comment . . . .", *St. of S.D.*, 69 IBIA at 187, there is nothing more for the Regional Director

to do if an interested party fails to provide timely comments. To hold otherwise would mean a party could wait months, while the fee-to-trust process continues, and then spring comments on the Regional Director, which may not even bear on the issues she is required to decide. Such a proposition cannot stand.

### B. Appellant does not even show it has an interest the Regional Director violated.

Appellant cites *Mashantucket Pequot Tribe v. Town of Ledyard*, 722 F.3d 457, 475-476 (2013), to explain "its own sovereign and proprietary interests in the land at issue that are entitled to constitutional protection." Appellant's Br. at 27. However, *Mashantucket* was a taxation case that dealt with a state generally applicable personal property tax which the defendants claimed applied to the Tribe's slot machines. Here, Appellant's challenge is to the Tribe's real property being taken into trust by the United States. This is not a taxation case that requires any balancing test. *See e.g., White Mountain Apache Tribe v. Bracker*, 448 U.S. 136 (1980). In *Mashantucket*, the Court described the state's interest as "the uniform application of its tax code." *Mashantucket*, 722 F.3d at 475. However, the Court also held the state's sovereign interest was diminished because "the sole application of the state law at issue is on the Tribe's reservation . . . ." *Id.*, 722 F.3d at 476.

Appellant does not reference its tax code. In fact, Appellant never explains what sort of interest it has in the Properties. Appellant makes ambiguous references to "the proprietary and economic interests of its non-tribal citizens." Appellant's Br. at 27. Putting aside the fact that members of the Tribe are also citizens of the state, Appellant cannot act as parens patraie of its citizens against the Federal Government. *Commonwealth of Mass. v. Mellon*, 262 U.S. 447, 485-486 (1923); *see S.C. v. Katzenbach*, 383 U.S. 301, 324 (1966) (finding state had no standing to

assert its citizens' due process rights in attempting to enjoin enforcement of federal discrimination statute).[8]

Appellant also makes bare assertions that these Decisions somehow implicate its ability to control and apply its laws, and its ability to protect the use and environmental quality of its lands, and the health and safety of its citizens. Appellant's Br. at 28. However, Appellant never explains what these interests are or how the Decisions will harm them.[9]

In sum, the Regional Director complied with due process when she sent the Notices to Appellant. Appellant failed to take advantage of that opportunity, and instead remained silent for months. Now, Appellant seeks special treatment to have the Regional Director consider comments that do not provide any information that the Regional Director requested in the Notices. Therefore, AS-IA should dismiss Appellant's due process arguments and affirm the Regional Director's Decisions to take the Properties into trust.

**IV.    The regulations do not require the Regional Director to provide Appellant with the Tribe's application because the fee-to-trust process is an exercise of the Regional Director's discretion in an administrative venue, not a formal adjudication.**

Appellant's premise that it is entitled to review, respond to, and be heard on the information that the [Regional Director] considers when evaluating a trust acquisition application displays a fundamental misperception of the 25 C.F.R. Part 151 decisionmaking process. The fee-to-trust application consideration is not intended to be an adjudicatory process. Rather, it is an exercise of the Secretary's discretionary authority under the IRA to take land into trust for the benefit of tribes and individual Indians. When a trust acquisition application is submitted, the regulations provide interested parties like the State notice of the application and an

---

[8] Appellant makes vague claims that the BIA acts exclusively, in the fee-to-trust context, on behalf of the Tribe. Appellant's Br. at 27-28. To the extent Appellant is claiming the Regional Director is somehow biased, it must do more than make mere allegations. *Vill. of Hobart, Wis.*, 69 IBIA at 102-103.

[9] Appellant also claims it has a substantial interest in the ability of local governments to obtain needed tax revenues. Appellant's Br. at 28. But Appellant did not contest the Regional Director's determination that the loss of tax revenues would not have a substantial impact. 25 C.F.R. § 151.10(e). Still, it is doubtful Appellant has standing to advocate on behalf of local governments which had an opportunity to appear in this appeal but failed to do so.

> opportunity to comment, BIA considers the information provided by the applicant and the interested parties within the parameters of the criteria set out by the law, and then BIA renders a decision. Nothing in Part 151 gives interested parties the right to conduct a parallel review of the information that BIA considers or mandates that they "be heard" on the proposed acquisition beyond commenting in response to the notice required by § 151.10.

*St. of S.D.*, 69 IBIA at 186-187 (citing *Thurston Cnty., Neb. v. Great Plains Reg'l Dir., BIA*, 56

IBIA 296, 304 n.11 (2013)). "Appellant's contention that it was entitled to obtain [the applications]

before the [Regional Director] made her decision confuses the trust acquisition procedures in 25

C.F.R. Part 151 with the administrative appeal procedures in 25 C.F.R. Part 2." *Id.*, 69 IBIA at

187. Thus, Appellant receives the applications in the administrative record during the appeal

process. It then has the opportunity to challenge the Decisions based on the whole administrative

record, assuming it timely requests the administrative record. Conversely, comments made during

the trust acquisition procedures should come from knowledge Appellant already has, which, if

timely sent, help inform the decision-making process.

Appellant cites various cases to show the Regional Director was required to provide the

applications before she issued the Decisions. Appellant's Br. at 22-23. However, these cases either

are not relevant here, *Guerrero v. N.W. Reg'l Dir., BIA*, 63 IBIA 346 (2016) (in trust estate

inventory case, the question of whether the house is trust property is not a discretionary decision)

or concerned appeals from local superintendents to their regional directors, *St. of Kan. v. Acting S.*

*Plains Reg'l Dir., BIA*, 56 IBIA 220 (2013); *see St. of S.D.*, 787 F.Supp.2d 981 (in appeal from

superintendent's decision, the regional director was required to supply appellant with complete

administrative record before affirming superintendent's decision).[10] However, whether the

---

[10] Appellant also cites *Town of Ignacio, Colo. v. Albuquerque Area Dir., BIA*, 34 IBIA 37 (1999). Appellant's Br. at 23. But Appellant's quotations are so tortured that they attempt to show the opposite of what the Board held in that case. *Id.*, 34 IBIA at 42-43.

Regional Director reviews a superintendent's decision or makes the initial decision herself presents very different standards of review. In the former, the Regional Director acts as the "ultimate decision maker", *St. of S.D. v. Great Plains Reg'l Dir., BIA*, 68 IBIA 300, 311-312 (2023) (citing *St. of S.D.*, 787 F.Supp.2d at 997), and the regulations in 25 C.F.R. Part 2 apply, *see id.* (citing 25 C.F.R. § 2.21(b), recodified as 25 C.F.R. § 2.504(b)). Here, the Regional Director was acting in the later role, and therefore, only the 25 C.F.R. Part 151 regulations apply, which do not require the Regional Director to supply Appellant with the Tribe's applications.

Appellant also argues that the Regional Director should have provided the applications as a matter of comity. Appellant's Br. at 22. However, Appellant does not point to any legal authority for this proposition, and therefore, the Regional Director is not required to do so.[11] Thus, AS-IA should affirm the Regional Director's Decisions.

### V.    The regulations do not require the Regional Director to send the Notices to the state's Attorney General.

"Upon receipt of a written request to have land taken in trust, the Secretary will notify the state and local governments <u>having regulatory jurisdiction</u> over the land to be acquired . . . ." 25 C.F.R. § 151.10 (emphasis added).

Appellant argues, for the first time on appeal, that the Regional Director should have sent copies of the Notices to both the Governor and the Attorney General. Appellant's Br. at 8. However, Appellant does not argue that it has previously requested the Regional Director to send fee-to-trust application notices to the Attorney General. Additionally, it is not clear what "regulatory jurisdiction" the Attorney General exercises over the Properties—especially since they are vacant land. The Attorney General only has "general supervision over all legal matters in which

---

[11] Appellant could also have asked the Tribe for a copy of the applications since it claims counsel for the Tribe had no objection to releasing the applications. Appellant's Br. at 5.

the state is an interested party . . . ." Conn. Gen. Stat. § 3-125. Thus, the Attorney General acts

only as the state's lawyer. In contrast, Connecticut law describes the Governor as "[t]he supreme

executive power of the state . . . ." Conn. Gen. Stat. § 3-1. Moreover, the Governor has some

authority over the Attorney General's operations. *See* Conn. Gen. Stat. § 3-125 (Governor

approves appointment of assistant attorneys general). Therefore, the Regional Director was correct

to send the Notices to the Governor because the Governor holds any regulatory power the state

exercises over the Properties.

Appellant then claims the inapplicable regulations for federal recognition and gaming[12]

show BIA contacts attorneys general in completely different situations. Appellant's Br. at 8-9.

However, 25 C.F.R. Part 151 does not include any such requirement. Because the regulations

require notification of an attorney general for federal recognition and gaming purposes, the

absence of notification to the state attorney general in Part 151 is deliberate and not an omission.

Appellant next goes on a tangent about the Regional Director providing digital notice.

Appellant's Br. at 10-11. But Appellant eventually concludes that "any process for digital notice

would need to include a reliable means to notify State and other entities that a digital notice had

been posted and was available." Appellant's Br. at 11 n.8. Thus, Appellant comes full circle and

realizes that when the Regional Director mails the Notices she complies with the regulations.

Finally, Appellant argues that *Avoyelle's Parish, La., Police Jury v. E. Area Dir., BIA*, 34

IBIA 149 (1999), requires the Regional Director send the Notices to the Attorney General.

Appellant's Br. at 12-13. However, *Avoyelee's Parish*, dealt with local governments—which

---

[12] The Office of Federal Acknowledgment conducts the federal recognition process, not the Regional Director. The Regional Director also does not determine that a tribe is eligible to request Class III gaming procedures and that said tribe's gaming proposal is complete. Appellant continuously conflates the role of the Regional Director in these fee-to-trust acquisitions and the Secretary's authority generally.

generally have more regulatory control over land in their jurisdiction. Still, in that case the Board only held that "it is not reasonable for BIA to expect an official to forward a BIA notice when it does not inform the official of that expectation." *Id.*, 34 IBIA at 157. Here, the Regional Director did not expect the Governor to forward the Notices to the Attorney General because the Attorney General does not exercise "regulatory jurisdiction" over the Properties. Certainly, the Governor, as the "supreme executive power of the state", is in a better position to present the information requested in the regulations and the Notices.

It is also unclear what remedy AS-IA can provide. The Attorney General has the Notices, and therefore, the issue of whether the Regional Director should have mailed the Notices to the Attorney General is moot. It is also not guaranteed the Attorney General would have sent timely comments.

**VI.    This appeal stems from an unconstitutional state law.**

Appellant states multiple times that it is required to contest these fee-to-trust applications pursuant to Connecticut state law. Appellant's Br. at 17, 20; *see* Conn. Gen. Stat. § 31-57e(c) ("The state shall oppose any application by a tribe, pursuant to 25 CFR chapter 151, to convert any parcel of fee interest land to federal trust status. The conversion shall be deemed contrary to the interest of the state and its residents.") ("State Law").

However, the U.S. Constitution prohibits states from interfering with or controlling the operations of the Federal Government and state laws must not regulate the United States directly or discriminate against the Federal Government or "those with whom it deals." *U.S. v. Wash.*, 596 U.S. 832, 838-839 (2022) (citing *N.D. v. U.S.*, 495 U.S. 423, 435, 444 (1990); *S.C. v. Baker*, 485 U.S. 505, 523 (1988); *U.S. v. Cnty. of Fresno*, 429 U.S. 452, 462-463 (1977)); *see McCulloch v. St. of Md.*, 17 U.S. (4 Wheat.) 316, 436 (1819) (under the Supremacy Clause, "the States have no

power, by taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by Congress to carry into execution the powers vested in the general government"). The Supreme Court has said that a state law discriminates against the Federal Government or "those with whom it deals" if it singles them out for less favorable treatment or regulates them unfavorably on some basis related to their governmental status. *Washington*, 596 U.S. at 839 (citing *Wash. v. U.S.*, 460 U.S. 536, 546 (1983); *N.D. v. U.S.*, 495 U.S. at 438).

The State Law cites the federal 25 C.F.R. Part 151 regulations. The purpose of those regulations is for a tribe to transfer its fee land to the Federal Government to hold in trust for the benefit of the tribe. Here, the Tribe is acting on the basis of their governmental status because it must deal with the Federal Government in order to put its land into trust.

In this instance, the State Law clearly discriminates against the Tribe because the State Law specifically singles out tribes seeking to put land into trust in the state. The Tribe is one of two federally recognized tribes in the state. Because tribes typically apply to put land into trust in the state where its reservation is located, the State Law particularly treats the Tribe unfavorably. Additionally, The State Law seeks to regulate the Tribe by forcing it to always defend its applications through administrative challenges. The Regional Director is not aware of any other state in the Eastern Region with such discriminatory legislation.

The State Law also discriminates against the Federal Government because the Regional Director acts pursuant to those regulations. Those regulations serve the legitimate purposes of the IRA. *See* Section I, *supra*. Always challenging the Regional Director's decision, regardless of the merit of that challenge, pulls resources that the Regional Director could use for more worthy causes. Finally, the United States takes title to land for other purposes (e.g., national parks, wildlife

refuges, etc.) and there does not appear to be any state law discriminating against those transactions.

Therefore, the State Law is unconstitutional, and Appellant cannot rely on it to bring these appeals. While AS-IA might not have authority to determine the State Law is unconstitutional, it should be concerned about the motive behind these appeals. Furthermore, the Regional Director preserves this argument should this appeal go any further.

**VII.    Appellant has forfeited any chance to respond to the administrative record because it failed to request the administrative record until the briefing period was nearly over and AS-IA did not schedule time for reply briefs.**

Appellant finishes with a statement that it "reserves the right to request an opportunity to address materials in the Administrative Record." Appellant's Br. at 30.

On September 11, 2024, the Board issued an Order for the Administrative Record. This Order required the Regional Director to assemble and transmit the administrative record to the Board. *See* 43 C.F.R. § 4.335. On September 23, 2024, the Acting Regional Director sent the certification of the record, table of contents, and privilege log to Appellant. Exhibit A.

On October 3, 2024, AS-IA issued an Order Adopting the Board's Order for the Administrative Records. This Order stated that "interested parties may view and may request copies of all or part of the administrative record at the [BIA], Eastern Regional Office." *See* 25 C.F.R. § 2.213(a)(3) ("Interested parties may request copies of all or part of the administrative record."). AS-IA's Order also included a Scheduling Order, wherein AS-IA granted Appellant 21 days to submit its initial brief and required the Regional Director and Tribe to file their initial briefs 14 days later. AS-IA's Order did not include any timelines for replies or sur-replies.

Appellant states it received AS-IA's Order on October 11, 2024. Appellant's Br. at 7-8. *Four days later*, on October 15, 2024, Appellant requested the administrative record from the

Regional Director. The Regional Director did not receive this request until October 21, 2024. Exhibit B. Nevertheless, the Regional Director sent the administrative records to Appellant by overnight mail on the same day. However, the administrative record did not arrive until October 23, 2024. Exhibit C.

Thus, Appellant knew the Regional Director had to assemble the administrative record and submit it to the Board on or about September 11, 2024. The Regional Director gave Appellant specific notice she compiled the administrative record on September 23, 2024. However, Appellant did not request the administrative record from the Regional Director until October 15, 2024. Therefore, Appellant's complaint that it did not receive the administrative record until October 23, 2024, is entirely Appellant's own fault.

The BIA appeal regulations do not allow for reply briefs absent a showing of good cause. 25 C.F.R. § 2.510(b). Additionally, these regulations grant AS-IA wide latitude on how he sets its briefing schedule. *Id.* Thus, AS-IA has foreclosed Appellant's ability to request reply briefing and Appellant cannot show good cause because it failed to prosecute acquiring the administrative record.[13] At the time of submission of this brief, the Regional Director's counsel has not received a request from Appellant to file a reply brief. However, the Regional Director strongly objects to any such request.

## CONCLUSION

The Regional Director has statutory authority to take the Properties into trust because the Tribe's Settlement Act applies the IRA's land acquisition authority to the Tribe. The Regional

---

[13] Additionally, the reviewing official "generally will not consider arguments raised by an appellant for the first time in a reply brief." *St. of N.Y.*, 58 IBIA at 355 n.40 (citing *Citation Oil & Gas Corp. v. Acting Navajo Reg'l Dir., BIA*, 57 IBIA 234, 245 n.13 (2013); *Rosebud Indian Land and Grazing Assn. v. Acting Great Plains Reg'l Dir., BIA*, 50 IBIA 46, 56 n.10 (2009).

Director's proof-of-delivery shows the Regional Director had the Notices delivered to Appellant's correct address and FedEx did not return the Notices. The Notices gave Appellant 30 days to respond, but it failed to do so. Thus, the Regional Director did not violate Appellant's procedural due process. Finally, the regulations do not require the Regional Director send the Notices to the state's Attorney General. Instead, she sent them to the Governor because he is the supreme executive of the state. For the foregoing reasons the Regional Director respectfully requests the Assistant Secretary – Indian Affairs to affirm the Decisions.

This the 7th day of November 2024.

Respectfully submitted,

Daniel S. Wenner
Counsel for Appellee
United States Department of the Interior
Knoxville Field Solicitor's Office
800 S. Gay Street, Ste. 1405
Knoxville, TN 37929
Phone: 865-545-4929
daniel.wenner@sol.doi.gov

## CERTIFICATE OF SERVICE

I, Daniel Wenner, do hereby certify that on this 7th day of November 2024, a true copy of the foregoing document was served upon the following parties entitled to service by email at Appeal.Filing@bia.gov and/or by FedEx:

Office of the Assistant Secretary – Indian
    Affairs
C/O Stephanie Sfiridis, Counselor to the
    Assistant Secretary
U.S. Department of the Interior
1849 C Street, NW, MS 4660 MIB
Washington, DC 20240

Robert J. Deichert, Esq.
Assistant Attorney General
State of Connecticut
165 Capitol Avenue
Hartford, CT 06106
*Representing Appellant*

Jody A. Cummings, Esq.
General Counsel
Mashantucket Pequot Indian Tribe
P.O. Box 3060
Mashantucket, CT 06338-3060
*Representing Interested Party*

Keith M. Harper, Esq.
Jenner & Block LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001
*Representing Interested Party*

Jena A. MacLean, Esq.
Perkins Coie, LLP
700 13th Street, NW, Suite 800
Washington, DC 20005-3960

Associate Solicitor – Indian Affairs
Assistant Solicitor, Branch of Environment
    and Lands
Nicholas M. Ravotti, Esq., Attorney-
    Advisor, Branch of Environment and
    Lands
Office of the Solicitor
U.S. Department of the Interior
1849 C Street, NW, MS 6513 MIB
Washington, DC 20240

Kimberly Bouchard, Regional Director
Bureau of Indian Affairs, Eastern Region
545 Marriot Drive, Suite 700
Nashville, TN 37214
(via direct email)

_____
Daniel S. Wenner
Counsel for Appellee

**A-156**

# EXHIBIT 13



# United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, DC 20240

| | | |
|---|---|---|
| **STATE OF CONNECTICUT,** | ) | |
| | ) | **DECISION AFFIRMING** |
| Appellant, | ) | **THE DECISION OF THE** |
| | ) | **EASTERN REGIONAL** |
| v. | ) | **DIRECTOR** |
| | ) | |
| **EASTERN REGIONAL DIRECTOR,** | ) | |
| **BUREAU OF INDIAN AFFAIRS,** | ) | |
| | ) | |
| Appellee. | ) | |

This matter was raised by the State of Connecticut ("Appellant" or "State") in response to two decisions ("Decisions") by the Eastern Regional Director ("Appellee" or "Regional Director"), Bureau of Indian Affairs ("BIA"), to acquire land in trust for the Mashantucket Pequot Indian Tribe ("Tribe"). The first decision concerns approximately 76.74 acres of land known as the 119 Indiantown Road Property, and the second decision concerns approximately 4.79 acres of land known as the 159 Indiantown Road Property (collectively referred to herein as "Property"). Both decisions were issued on August 5, 2024.

The State filed its Notices of Appeal for both Decisions on August 29, 2024, and the Interior Board of Indian Appeals ("IBIA" or "Board") issued its Pre-Docketing Notice, Order Consolidating Appeals, Order Concerning Service List, and Order for the Administrative Record(s) (hereinafter "Pre-Docketing Notice") on September 11, 2024. On October 3, 2024, I notified the Interior Board of Indian Appeals ("Board") that I was exercising my discretion under 25 C.F.R. § 2.508 to assume jurisdiction over the State's appeals and I contemporaneously issued a Scheduling Order and notified Appellant, Appellee, and the Tribe (collectively "Parties") that I would consolidate the two appeals and decide them together as one.

Appellant alleges both procedural and substantive errors as the substantial bases for its appeals. Procedurally, Appellant asserts it was not timely notified of the Tribe's application because it never received the Regional Director's Notice of Non-Gaming Application ("Notice of Application") as required by the regulation at 25 C.F.R. § 151.10.[1] Appellant alleges it learned of the Tribe's applications after its comment window had closed, and that it has rebutted the Mailbox Rule that mail properly addressed and posted is presumed to be delivered. As a

---

[1] The regulations governing the process to acquire land in trust are codified at 25 C.F.R. Part 151. Those regulations were revised and became effective on January 11, 2024. 88 Fed. Reg. 86,222 (Dec. 12, 2023). The revised regulations expressly state that requests to have land acquired in trust pending on the effective date of January 11, 2024, will be processed under the previous version of the Part 151 regulations. The Tribe's applications were submitted on August 25, 2023, and the Tribe did not request the BIA to process its application under the revised Part 151. As such, the revised Part 151 regulations are inapplicable to these applications and this appeal, and all citations to the regulations at 25 C.F.R. Part 151 are to the regulations in effect prior to January 11, 2024.

consequence of not receiving the Notice of Application, Appellant asserts that it was denied the opportunity to provide comments on the Tribe's application.[2]

Beyond Appellant's claim concerning the Mailbox Rule, Appellant also raises a due process challenge, asserting that, because the Regional Director did not notify the Attorney General of Connecticut in addition to notifying the Governor of Connecticut, the State would not have been provided proper notice even if it had received the Notice of Application.

Substantively, Appellant challenges the Regional Director's authority to acquire land in trust for the Tribe, alleging that the Tribe does not satisfy the Indian Reorganization Act's ("IRA's") requirement that the Tribe was under federal jurisdiction in 1934.[3] Appellant also challenges the revised regulations at 25 C.F.R. Part 151 on several bases. However, because the applications that are the subject of this consolidated appeal were not processed under the revised Part 151 regulations, Appellant's challenges based on the revised regulations are not ripe and are hereby dismissed from this appeal.

For purposes of disposing of this appeal, I consider the challenges raised by Appellant in the following order. First, I must determine whether the Regional Director erred by notifying only the Governor of the State of Connecticut and not also providing an identical and duplicative notice to the Attorney General. If the State prevails on this claim, I must then decide if the violation was so substantial that the Decisions must be remanded to the Regional Director to cure the violation by providing the Notice of Application to the Attorney General.

If the State does not prevail on its due process claim, then I must determine whether the State has provided sufficient evidence to adequately rebut the presumption under the Mailbox Rule that mail properly addressed is presumed to be delivered. If the State's proffered evidence is sufficient to rebut the presumption, I must then decide whether the State's purported comments were timely submitted to the Regional Director such that the Regional Director erred when she issued her Decisions without considering the State's purported comments.[4]

Only if the State can show both that it adequately rebutted the presumption under the Mailbox Rule and that its comments were timely submitted can I decide the substantive issue of whether the Tribe is eligible to have land acquired in trust under the IRA. If the state can only show that it adequately rebutted the presumption under the Mailbox Rule, but cannot show that its comments were timely submitted, then I must remand the Decisions back to the Regional Director so that she can consider the State's comments in the first instance. If, however, the State's proffered evidence is insufficient to rebut the presumption under the Mailbox Rule, then the State's comments are necessarily untimely, and this consolidated appeal must be dismissed because the

---

[2] As a preliminary matter, for clarity, Appellant sent what it styles as comments to the Regional Director on May 24, 2024, after the window to provide comments had closed. At times, Appellant alleges that the Regional Director failed to adequately consider these comments but does not concede that these comments were untimely and therefore not before the Regional Director when she made her Decisions.

[3] *Carcier v. Salazar*, 555 U.S. 379, 382 (2009) (interpreting 25 U.S.C. 5129).

[4] I note at the forefront that the State alleges it first learned of the Tribe's applications on March 28, 2024, and that it submitted what it styles to be comments on the applications on May 24, 2024, fifty-seven days after receiving notice.

2

**A-159**

State seeks to raise issues for the first time on appeal that were not before the Regional Director when she issued her Decisions.[5]

Following a review of the administrative record and consideration of the arguments presented by Appellants and Appellee during the pendency of this appeal, I find that the Regional Director did not err when she sent her Notice of Application to the Governor of the State of Connecticut, only, and not to the Governor and the Attorney General, both. As such, the State was provided the hallmarks of administrative due process—a notice and an opportunity to be heard—and has suffered no injury sufficient to warrant a remand to the Regional Director to provide the Notice of Application (which the Attorney General, as signatory to the State's briefs, has already received).

I further find that the evidence proffered by the State to be insufficient to rebut the presumption under the Mailbox Rule that mail properly addressed and posted is presumed to be delivered. On the contrary, the State's evidence tends to support the proposition that the Notice of Application was properly addressed, properly posted, and delivered as intended. The BIA's evidence showing delivery of the Notice of Application and demonstrating that subsequent mailings utilizing the same address were received and signed for by the same individual supports the reasonable conclusion that whatever caused the failure of the Governor to receive the mailings at issue in this consolidated appeal, the error occurred after the mail left the hands of the common carrier and cannot be attributed to any error on the part of the Regional Director or the BIA.

Finally, because the State has not met its burden to overcome the presumption under the Mailbox Rule, the State's purported comments were untimely and not before the Regional Director when she issued her Decisions, and the State therefore lacks standing to raise these issues now for the first time on appeal. As such, I hereby affirm the Regional Director's Decision approving the Tribe's applications and acquiring the Properties known as 119 Indiantown Road and 159 Indiantown Road in trust for the Tribe.

I.    **Disposition of Outstanding Motions by the Parties Concerning Appellant's Request to File a Reply Brief to the BIA's and the Tribe's "Initial" or "Answering" Briefs.**

On November 21, 2024, Appellant filed its "Request for Permission to Submit the Attached Reply Brief"[6] and the so referenced Reply Brief.[7] Appellant alleges that the BIA filed an overlong brief and Appellant should therefore be given an opportunity to respond. This set off oppositions from the Tribe[8] and the BIA,[9] with the Tribe attaching its Reply Brief of

---

[5] See *Morrison Cnty. v. Acting Midwest Reg'l Dir.*, 69 IBIA 137, 158 (2023); 25 C.F.R. § 2.504(a)(2) ("The reviewing official will consider . . . [a]ll relevant documents submitted by the decision-maker and participants that were filed in accordance with applicable deadlines . . . ."
[6] Hereinafter "Reply Brief Request."
[7] Hereinafter "Appellant's Reply Brief."
[8] Mashantucket Pequot Tribe's Opposition to State of Connecticut's Request to Submit Reply Brief (Nov. 27, 2024) (hereinafter "Tribe's Opposition").
[9] Appellee's Brief in Opposition to Appellant's Request for Permission to Submit a Reply Brief (Dec. 5, 2024) (hereinafter "BIA Opposition").

3

**A-160**

Mashantucket Pequot Tribe[10] to its opposition. Clearly, the wording of the Scheduling Order in this appeal has created confusion. To clarify, my description of "Appellee's Answer" in the second bullet point in the Scheduling Order was not meant to limit the BIA's brief to half the length of the State's. This would not further the purpose of briefings on appeal, which is to ensure a full and robust consideration of any relevant issues properly raised on appeal.

I must admit, the State's arguments that it should receive an opportunity to submit a thirty-page brief while limiting the BIA to only a fifteen-page brief seem strained to me. I also struggle to understand how the State was harmed by the BIA's brief, which was thirty pages in length while the State's brief was thirty-one pages in length. However, pursuant to my discretionary authority under the regulation at 25 C.F.R. § 2.510(b)(3), I will nonetheless grant, in part, Appellant's Reply Brief Request insofar as it requests to file a reply to the briefs of the BIA and the Tribe. I accept Appellant's Reply Brief as filed on November 21, 2024, insofar as Appellant's Reply Brief responds to arguments presented by the BIA and the Tribe in their initial/answering briefs. Consistent with long-standing precedent from the IBIA, I deny, in part, Appellant's Reply Brief Request to the extent that it seeks to inject new issues not properly before the Regional Director when she issued her Decisions and not properly presented in Appellant's Brief.[11]

I deny, in part, the Tribe's Opposition to Appellant's Reply Brief Request, but grant the Tribe's request to also submit a Reply Brief. I hereby accept the Tribe's Reply Brief as filed on November 27, 2024.

Finally, I deny, in part, and grant, in part, the BIA Opposition to Appellant's Reply Brief Request. I deny the BIA Opposition to the extent that it seeks to exclude Appellant's Reply Brief from filing. I grant the BIA Opposition to the extent that it objects to newly raised arguments not before the Regional Director or raised for the first time in Appellant's Reply Brief. Those portions of Appellant's Reply Brief called out in Section II of the BIA Opposition as newly raised are hereby stricken from Appellant's Reply Brief and are not accepted as filed. Also, as discussed below in Sections IV and V of this Decision, because Appellant's purported comments were untimely, the arguments presented in Sections V and VII were not before the Regional Director when she issued her Decisions and will not be considered in this appeal.

II.    **The Regional Director did not Err by Providing a Notice of Application only to the Governor of the State of Connecticut and not also Providing an Identical and Duplicative Notice to the Attorney General.**

a.    **The Regional Director Complied with the Applicable Regulations at 25 C.F.R. Par 151 to Provide Notice to the State.**

---

[10] Reply Brief of Mashantucket Pequot Tribe (Nov. 27, 2024) (hereinafter "Tribe's Reply Brief").

[11] *See Grenier v. Great Plains Reg'l Dir.,* 68 IBIA 151, 174 n.24 (2022): *Grenier v. Great Plains Reg'l* Dir, 66 IBIA 7, 18 n.15 (2018); *South Dakota v. Acting Great Plains Reg'l Dir.,* 63 IBIA 179, 191 (2016); *Howe v. Acting Great Plains Reg'l Dir.,* 63 IBIA 155, 161 (2016); *Est. of Mabel Atewooftakewa Simmons,* 68 IBIA 144, 146 (2022).

Decisions by the Regional Director to acquire land in trust are discretionary actions governed by the Indian Reorganization Act ("IRA") and its implementing regulations at 25 C.F.R. Part 151.[12] The regulation at 25 C.F.R. § 151.10 reads, in relevant part, as follows:

> [u]pon receipt of a written request to have lands taken in trust, the Secretary will notify the state and local governments having regulatory jurisdiction over the land to be acquired, unless the acquisition is mandated by legislation. The notice will inform the state or local government that each will be given 30 days in which to provide written comments as to the acquisition's potential impacts on regulatory jurisdiction, real property taxes, and special assessments.

The same rules of construction used to interpret statutory language are used to interpret regulatory language, including the rule that "courts should not insert omitted terms into plainly written text.[13]

Here, the State does not point to any statutory or regulatory requirement for the BIA to notify the Attorney General in addition to notifying the Governor of a tribe's fee-to-trust application. Nor could the State point to such a requirement, as it does not exist. Recognizing this, the State merely asserts that "[i]t is hardly unusual for the BIA to provide notice to multiple state officials."[14] But then, in the very next sentence, concedes the critical point that

> [a]lthough the regulations specific to trust land acquisitions do not specify where notice to a [s]tate should be directed and how it should be provided, other regulations dealing with tribal issues make clear that proper notice to a [s]tate must include notice to both the Governor and the Attorney General.[15]

Appellant then references the regulations at 25 C.F.R. Part 83 concerning petitions for federal acknowledgment of an Indian tribe and the regulations at 25 C.F.R. Part 291 concerning Indian gaming. The decisions under appeal here do not concern a petition for federal acknowledgment or a Class III gaming facility. Appellant's argument that "[t]here is no evident reason why the BIA treats notices of applications for trust land acquisitions differently [than other applications]" is a statement that answers itself—they are treated differently because they are different federal actions governed by different statutes and regulations.

The State then points to comments submitted on the revised Part 151 applications concerning how the BIA provides notice of an application. Appellant seems aggrieved by the fact that the BIA has not provided the kind of guidance to BIA staff that appellant feels is appropriate concerning notifications to states concerning fee-to-trust applications, but it is unclear why this is

---

[12] *Aitkin Cnty. v. Acting Midwest Reg'l Dir.*, 47 IBIA 99, 104 (2008); *Skagit Cnty. v. Northwest Reg'l Dir.*, 43 IBIA 62, 63 (2006).
[13] *Carter v. Southwest Airlines Co. Bd. of Trs.*, 2020 U.S. Dist. LEXIS 234271, *15 (citing *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 419-21(2014)) and *Alboniga v. Sch. Bd. of Broward Cnty. Fla.*, 87 F. Supp. 3d 1319, 1339 (S.D. Fla. 2015) (collecting cases).
[14] Appellant's Brief at 8.
[15] *Id.*

relevant. These comments are not authoritative and, as previously stated above, the revised Part 151 regulations are not applicable to these applications.

Finally, the State points to *Avoyelle's Parish, La. Police Jury v. E. Area Dir., BIA*,[16] but that case involved an instance where the BIA sent a notice sent to the City of Marksville rather than the local parish, which had regulatory jurisdiction over the property, and to the tax assessor subordinate to the parish itself. If the BIA had sent the Notice of Application to the Attorney General only and not the Governor, maybe *Avoyelles Parish* would have more persuasive effect. However, that is not the case here. The BIA sent its Notice of Application to the Governor of the State who, as Appellee points out, is "[t]he supreme executive power of the state . . . ."[17] The Attorney General, who only has "*general* supervision over all legal matters in which the state is an interested party . . .," may appoint assistant attorneys general "subject to the approval of the Governor," and "shall appear for the state, the Governor, [etc.] . . ." is necessarily not superior to the Governor.[18]

None of the points raised by Appellant overcome the fact that the regulations require the Regional Director to provide notice to the state, which the Regional Director did by sending the Notices of Application to the Governor and the Mayor of Ledyard on November 6, 2023, specifically requesting comments within thirty days of receipt.[19] Despite Appellant's hollow grievances that its Attorney General, in addition to its Governor, should also have received an identical and duplicative notice there simply is no requirement for this in the regulation at 25 C.F.R. § 151.10, and there is no cognizable reason to read into the regulation words that are not there. Doing so would allow the State to craft its own regulatory regime through this appeal.

### b. The State has been Afforded Adequate Due Process.

Because I have determined above in subsection (a) that the Regional Director satisfied the notice requirements of the regulations, there are no due process violations warranting a remand to the Regional Director and the Regional Director's Decisions will not be vacated or overturned on this basis.

The State dedicates a portion of its Initial Brief and its Reply to arguing that it has suffered "regulatory, statutory, and constitutional due process violations.[20] The State seems to allege that it was not provided an adequate notice of the Tribe's application and a meaningful opportunity to be heard thereon by not receiving the Regional Director's Notice of Application, in part because a duplicative copy of that Notice was not also sent to the State's Attorney General. The State then alleges that the Regional Director's discretionary decision to not accept the State's untimely purported comment letter constitutes an administrative due process violation under the Administrative Procedure Act ("APA").

---

[16] 34 IBIA 149 (1999)
[17] Conn. Gen. Stat. § 3-1.
[18] Conn. Gen. Stat. § 3-125.
[19] AR119 at 298-309; AR159 at 240-50.
[20] Appellant's Brief at 24; Appellant's Reply Brief, Sec. I.

The procedural due process requirements under the Fifth Amendment have been clear "[f]or more than a century" and require that "[p]arties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified. It is equally fundamental that the right to notice and an opportunity to be heard must be granted at a meaningful time and in a meaningful manner."[21] Since the administrative records contain evidence that the Regional Director did provide an adequate notice—the same notice provided to all states before regional directors make decisions on pending fee-to-trust applications—the State's constitutional due process argument must fail. As discussed below is Section III, that the Governor did not receive the notice after it was properly addressed and mailed by the BIA, received in the Governor's mail room, and accepted for deliver is not an error over which the Regional Director could have (or could be expected to have) any control. The Regional Director has satisfied her requirements to provide an adequate notice of the application and to provide the State with a meaningful opportunity to comment thereon, and the State's constitutional due process arguments must fail.[22]

The State also claims that the Regional Director has violated the administrative due process minimums guaranteed by the APA and codified at 5 U.S.C. § 555.[23] Appellant's Reply Brief goes so far as to characterize the Regional Director as having conceded this point by not confronting it in its Initial Brief.[24] Appellant's Reply Brief focuses its administrative due process arguments on 5 U.S.C. § 555(b), which reads as follows:

> A person compelled to appear in person before an agency or representative thereof is entitled to be accompanied, represented, and advised by counsel or, if permitted by the agency, by other qualified representative. A party is entitled to appear in person or by or with counsel or other duly qualified representative in an agency proceeding. So far as the orderly conduct of public business permits, an interested person may appear before an agency or its responsible employees for the presentation, adjustment, or determination of an issue, request, or controversy in a proceeding, whether interlocutory, summary, or otherwise, or in connection with an agency function. With due regard for the convenience and necessity of the parties or their representatives and within a reasonable time, each agency shall proceed to conclude a matter presented to it. This subsection does not grant or deny a person who is not a lawyer the right to appear for or represent others before an agency or in an agency proceeding.

---

[21] *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972) (internal citations omitted).

[22] To be clear, I decline to decide whether the Fifth Amendment to the United States Constitution is at all applicable to this or other fee-to-trust applications. The State and the Tribe have presented differing views on this point. *See* State's Brief at 27 (citing *Kentucky v. Biden*, 23 F. 4th 585, 597 (6th Cir. 2022) and *Washington v. Trump*, 84 7 F.3d 1151, 1160 (9th Cir. 2017)) and Tribe's Brief at 12 ("To the extent the State claims a right to constitutional due process independent from the guaranties of the Administrative Procedure Act, that argument is fundamentally flawed. It is well-established that the Fifth Amendment to the Constitution does not apply to the states." (citing *South Carolina v. Katzenbach*, 383 U.S. 301, 323-24 (1966)). Because the State has not met its burden to show that the Regional Director failed to provide an adequate notice and meaningful opportunity to be heard, the substantive question need not be answered.

[23] Appellant's Brief at 24-26; Appellant's Reply Brief at 1-2.

[24] Appellant's Reply Brief, Sec. I.

All Parties seem to agree that what constitutes administrative due process is not fixed, but is flexible and varies based on the time, place and circumstances.[25] However, the State's Reply Brief zeros in on the "orderly conduct of business" language to argue that its untimely submission of its purported comments would not interfere with the Regional Director's ability to discharge her duties to carry out the United States' government-to-government relationship with the Tribe on behalf of the Secretary of the Interior, who is charged with this responsibility. Under the State's characterization, "this was not a last-minute submission where the BIA was on the verge of issuing a decision;" but not only does the State have no support for this proposition, it is not the party who is best situated to make that determination. The Regional Director, the party charged with ensuring the "orderly conduct of business," is in that position, and made a reasoned decision within her discretion to deny the purported comments that were submitted <u>five months late</u>. Without deciding when untimely comments may be accepted, it is worth noting that five months is not a *de minimis* timeframe—indeed, five months is nearly half the entire period from the date the BIA received the Tribe's application to the date the Regional Director issued her Decision.

The State's arguments under 5 U.S.C. § 555(b) obscure the facts and circumstances giving rise to this appeal. These arguments overlook the fact that the Regional Director did provide notice to the State of the Tribe's application and provided a meaningful opportunity to be heard regarding that application by soliciting comments from the State. As discussed below in Section IV, the State asserts that it never received that notice and attempts to place the responsibility for this on the Regional Director for not sending a duplicative copy of the same to the Attorney General. From this, the State attempts to stitch together an administrative due process violation on the basis that the Regional Director's denial of the State's purported comments constitute a violation under 5 U.S.C. § 555. But this argument is flawed in at least two regards. First Deciding that the acceptance of these purported comments so late in the process would disrupt the orderly conduct of business is a decision well-within the Regional Director's discretion and does not violate the APA's due process protections for informal adjudications.[26] Second, the State's arguments that providing a duplicative notice to the Attorney General would have cured what the State characterizes as a lack of notice is questionable since the State itself seems to admit that it received the Notice of Application sent to the Governor, though the Notice of Application nonetheless fell into the ether once inside the Governor's Office. Whatever happened after the properly addressed and mailed Notice of Application was delivered to the Governor's Office cannot reasonably be placed at the feet of the Regional Director, and vacating or remanding the Regional Director's Decisions for refusing to accept untimely comments submitted nearly half-way through the decision-making process is not cognizable under 5 U.S.C. § 555.

For the reasons stated above, I find that the Regional Director provided an adequate notice of and meaningful opportunity to be heard on the Tribe's fee-to-trust applications and that the State's arguments that it suffered a violation of the administrative due process requirements under 5 U.S.C. § 555 must be denied.

---

[25] Appellant's Brief at 28 (citing Village of Hobart v. Acting Midwest Reg'l Dir., 69 IBIA 84, 103 (2023); Appellee's Brief at 17-18); Tribe's Brief at 11-12.
[26] *Thurston Cnty. v. Great Plains Reg'l Dir.*, 56 IBIA 296, 304 n.11 (IBIA 2013) ("[T]he fee-to-trust application process is not intended to be an adjudicatory process.").

8

**A-165**

### III.    The Regional Director did not Err by not Providing the Tribe's Application to the State Before Issuing her Decision.

The State argues that the BIA is either required to provide a copy of the Tribe's application before the Regional Director issues her decision, or, at the very least, the BIA *should* provide a copy of the application as a matter of comity.[27] In response, the BIA notes that the regulations do not require that the Tribe's application be provided to the State and that there are sensible reasons not to do so.

The Regional Director is required to consider all legal prerequisites to the exercise of her discretionary authority to acquire land in trust, including any limitations on her discretion that may be established in the regulations.[28] Appellants challenging decisions of the Regional Director bear the burden of proving that the Regional Director failed to properly exercise her discretion.[29] However, simple disagreement with or bare assertions concerning the Regional Director's decision are insufficient to carry this burden of proof.[30] As previously discussed in Section II, above, the Regional Director's consideration of a fee-to-trust application is not a formal adjudicatory process; it is a discretionary action. The State is provided an opportunity to comment on issues concerning its regulatory jurisdiction, conflicts of land use, and effects on tax rolls because those are the issues the State is best suited to speak to and which will help the Regional Director make her decision. The parts of the Tribe's application specific to Tribe's request that the United States acquire land in trust as part of <u>the United States' government-to-government relationship with the Tribe</u> would not be within the State's purview and would not assist the Regional Director in making her decision. If the State wishes to appeal the Regional Director's decision, the State is provided a copy of the full administrative record supporting those decisions, including the Tribe's applications, at which time the State is provided the full picture of all the facts relied upon by the Regional Director. As noted in *State of South Dakota v. Great Plains Reg'l Dir.,* providing a part of the administrative record (the Tribe's applications) before the full administrative record is complete and ready for review on appeal "confuses the trust acquisition procedures in 25 C.F.R. Part 151 with the administrative appeal procedures in 25 C.F.R. Part 2."[31]

Because the State's appeal concerns whether the Regional Director properly exercised her discretion under the regulations at 25 C.F.R. Part 151 in issuing her ultimate decision to acquire land into trust, providing the application to the State *after* those Decisions were made does not impose any burden on the State in pursuing its appeal.

### IV.    The State's Proffered Evidence is Insufficient to Adequately Rebut the Presumption under the Mailbox Rule that Mail Properly Addressed is Presumed to be Delivered.

---

[27] Appellant's Brief at 22-24.
[28] *Vill. Of Hobart v. Midwest Reg'l Dir.,* 57 IBIA 4, 12-13 (2013).
[29] *South Dakota v. Acting Great Plains Reg'l Dir.,* 39 IBIA 283, 291 (2004), *aff'd sub nom., South Dakota v. U.S. Dep't of the Interior,* 401 F. Supp. 2d 1000 (D.S.D. 2005), *aff'd* 487 F.3d 548 (8th Cir. 2007).
[30] *Vill. Of Hobart,* 57 IBIA at 12-13.
[31] 69 IBIA 186-87 (2023).

**A-166**

As stated above, the regulations at Part 151 require the Regional Director to provide a Notice of Application to the State and to seek comments thereon before issuing a decision on a pending fee-to-trust application. Based on the information contained in the administrative records, the Regional Director has complied with this requirement as noted above in Section II.  However, Appellant alleges that it never received the Notice of Application, and only learned of the Tribe's applications on March 28, 2024.[32] Under Appellant's theory, "once the Governor—through counsel—denied receipt, the presumption disappeared."[33] In support of this position, Appellant references a declaration that was submitted with its purported comments from the Director of Operations within the Governor's Office who oversees the receipt of mail and packages sent thereto.[34] Appellant asserts that this declaration, combined with its assertion that it did not receive the Notice of Application rebuts the presumption under the Mailbox Rule.

The Mailbox Rule is a well-settled principle of the common law[35] and is understood to mean that "the proper and timely mailing of a document raises a rebuttable presumption that the document has been received by the addressee in the usual time."[36] The Mailbox Rule "is a tool for determining, *in the face of inconclusive evidence*, whether or not receipt has actually been accomplished,"[37] and it applies "only when the fact of receipt is disputed."[38] Appellant is correct that the presumption under the Mailbox Rule is rebuttable, but seems to argue that any evidence submitted in an attempt to rebut that presumption necessarily achieves this result. Under Appellant's theory, once the State raised the issue of whether it received the Notice of Application and submitted *any* evidence supporting its argument that it did not, then the conclusion *must* be reached that the Notice of Application was not properly dispatched or not received. This is a fundamental misunderstanding both of the Mailbox Rule itself and the difference between rebuttable presumptions of fact and rebuttable presumptions of law.

Appellant seems to view the presumption under the Mailbox Rule as a rebuttable presumption at law which compels the trier of fact "to reach a conclusion in the absence of evidence to the contrary from the opponent."[39] However, the presumption under the Mailbox Rule is a rebuttable presumption of fact, which requires the fact finder to consider the weight of the evidence before him once the presumption is challenged.[40] Appellant has submitted evidence in the form of a

---

[32] Appellant's Brief at 15.

[33] *Id.*

[34] *Id.* at A-022. I note that this affidavit is not considered part of the administrative record for these appeals as it was submitted with the State's purported comments that were untimely and therefore not before the Regional Director when she made her Decisions. References to any documents in the Appendix to the State's Brief does not imply that, or incorporate these documents into, the administrative records for these appeals.

[35] *Atherton v. Atherton*, 181 U.S. 155, 171 (1901); *Dunlop v. United States*, 165 U.S. 486, 494-95 (1897); *Rosenthal v. Walker*, 111 U.S. 185, 193 (1884).

[36] *Schikore v. BankAmerica Supplemental Ret. Plan*, 269 F.3d 956, 961 (9th Cir. 2001).

[37] *Id.*

[38] *Payan v. Aramark Mgmt. Servs. Limited Partnership*, 495 F.3d 1119, 1123 n.4 (9th Cir. 2007) (citing *Busquets-Ivars v. Ashcroft*, 333 F.3d 1008, 1009-10 (9th Cir. 2003) (finding an incorrect zip code sufficient proof of improper mailing to dispute that receipt occurred); *Schikore*, 269 F.3d at 963-64 (accepting a sworn statement that claimant mailed the requisite form sufficient proof to presume receipt).

[39] *Legille v. Dann*, 544 F.2d 1, 5-6 (D.C. Cir. 1976) (internal quotation omitted).

[40] *Rios v. Nicholson*, 490 F.3d 928, 931 (Fed. Cir. 2007) ("When the presumption is opposed by evidence that the letters never were received, [it] must be weighed with all the other circumstances of the case, by the [trier of fact] in determining the question whether the letters were actually received or not.") (citing *Rosenthal*, 111 U.S. at 194 (internal quotation omitted).

10

**A-167**

sworn affidavit that it never received the Notice of Application and that there is "no employee of the Governor's Office or the Connecticut Executive Branch" by the name of "M. Estrada."[41] If the presumption under the Mailbox Rule *were* a presumption at law, *perhaps* this would be sufficient for Appellant to prevail. But the administrative record contains evidence that Appellee properly addressed and dispatched the Notice of Application and that the Notice of Application was delivered.[42] At the very least, this creates a balanced bar of evidence where, on one side, Appellant proffers it never received a mailing that, on the other side, Appellee proffers it sent.

In response to Appellant's attempt to rebut the presumption under the Mailbox Rule, however, Appellee also points to evidence in the administrative records demonstrating that the State has received other mail at the address used for the Notice of Application, including mail specific to the applications in question and all documentation filed in connection with this appeal. This evidence conclusively shows that Appellant has received those mailings, *and* that these mailings have been signed for by "M.Estrada."[43] Finally, the State concedes that there is a "Manual Estrada" who works "on the loading dock at Connecticut's Legislative Office Building," but that "Manual Estrada was not authorized to sign for any [p]ackages directed to the Governor's Office."[44] Taking the State at its word that it never received the Notice of Application, it seems clear that the breakdown occurred after the Notice of Application was mailed by the BIA, after it was delivered to the mailroom for the Governor's Office, and after it was signed for and received by an employee in that mailroom. The BIA obviously cannot control who signs for and receives mail it sends to the State, and holding the actions of a State employee against the BIA who discharged its duties properly would lead to twisted results that would frustrate these and future BIA decisions. Simply stated, whatever caused the State not to receive the Notices of Application that were properly addressed and posted did not occur because of any wrongful or derelict action by the BIA. Weighing the evidence proffered by both sides on this issue, I find that the State has not rebutted the presumption under the Mailbox Rule and that the Notice of Application was properly mailed and delivered to the State consistent with the requirements of the regulations at 25 C.F.R. Part 151.

Because the BIA provided the required Notice of Application and the weight of the evidence demonstrates that this Notice was delivered to the address used by the Governor's Office to receive mail of this kind, including other mailings for this appeal that have been signed for as received by M.Estrada, the State's purported comments that were submitted five months after the fact were not timely submitted. Because the regulations do not require the Regional Director to consider comments untimely submitted, the Regional Director did not err by refusing to accept and consider the states untimely purported comments.

> V.    **Because the State's Comments were Untimely, the Issues Raised Therein were not Before the Regional Director when she Issued her Decision and will be Considered for the First Time on Appeal.**

---

[41] Appellant's Brief at 4 & A-022.

[42] *See* AR119 at 298-309 & AR159 at 240-50 (showing Notices and delivery receipts).

[43] *See* Appellee's Brief at 6 (citing to AR119 at 353 & AR159 at 414 showing additional communications sent to the same address as the Notice of Application, signed for by "M.Estrada," and responded to by the Governor's Office).

[44] Appellant's Brief at A-026.

11

Having already held that the Regional Director complied with the notice requirements under 25 C.F.R. § 151.10 and that the State's purported comments were untimely, the remaining substantive arguments raised by Appellant in its Brief were not in front of the Regional Director when she issued her Decisions. In consideration of long-standing and well-established precedent from the Board that it will not consider arguments or issues raised for the first time on appeal,[45] and under the regulation at 25 C.F.R. § 2.504 stating that reviewing officials will consider "[a]ll relevant documents submitted by . . . participants that were filed in accordance with applicable deadlines," I decline to review the remaining issues raised by Appellant and these issues are hereby dismissed.

## CONCLUSION

For the reasons stated above, the Regional Director's August 5, 2024, Decisions to acquire approximately 76.74 acres of land known as the 119 Indiantown Road Property, and approximately 4.79 acres of land known as the 159 Indiantown Road Property for the Mashantucket Indian Tribe are hereby **AFFIRMED.**

Dated: January 10, 2025

Bryan Newland
Assistant Secretary – Indian Affairs

Distribution: See attached list.

---

[45] *See Morrison Cnty.*, 69 IBIA at 158.

12

**A-169**

## CERTIFICATE OF SERVICE

I certify that on this ⎵1⁴⎵ day of January 2025, I caused to be delivered a true and correct copy of the foregoing notice to each of the persons named on the attached distribution list by depositing an appropriately addressed copy of the same with the United States Postal Service, Certified Mail, Return Receipt Requested.

See attached distribution list.


Stephanie R. Cloud
Office of the Assistant Secretary – Indian Affairs
Department of the Interior
1849 C Street, N.W., MS 4660 MIB
Washington, DC 20240

**A-170**

**State of Connecticut v. Eastern Regional Director, Bureau of Indian Affairs**
**Distribution List**

Judy A. Cummings, Esq.
General Counsel
Mashantucket Pequot Indian Tribe
PO Box 3060
Mashantucket, CT 06338-3060
*Representing Mashantucket Pequot Tribe*

Keith M. Harper
Andrew C. DeGuglielmo
Jenner & Block LLP
1099 New York Ave., NW, Ste. 900
Washington, DC 20001
*Representing Mashantucket Pequot Tribe*

Robert J. Deichert, Esq.
Assistant Attorney General
State of Connecticut
165 Capitol Ave.
Hartford, CT 06106
*Representing State of Connecticut*

Jena A. MacLean, Esq.
Perkins Coie, LLP
700 13th St. NW, Ste. 800
Washington, DC 20005-3960
*Representing State of Connecticut*

Ledyard Mayor's Office
741 Colonel Ledyard Hwy.
Ledyard, CT 06339

Tax Collector
Town of Ledyard
741 Colonel Ledyard Hwy.
Ledyard, CT 06339

Kimberly Bouchard, Regional Director
Bureau of Indian Affairs, Eastern Region
545 Marriot Drive, Ste. 700
Nashville, TN 37214

Daniel Wenner
United States Department of the Interior
Knoxville Field Solicitor's Office
800 S Gay Street, Ste. 1405
Knoxville, TN 37929
*Representing Appellee*

Associate Solicitor – Indian Affairs
Office of the Solicitor
United States Department of the Interior
1849 C. St., N.W., MS 6513
Washington, DC 20240
*By interoffice mail*

Assistant Solicitor, Branch of Environment
    and Lands
United States Department of the Interior
1849 C. St., N.W., MS 6513
Washington, DC 20240
*By interoffice mail*

Nicholas M. Ravotti
Attorney-Advisor, Branch of Environment
    and Lands
United States Department of the Interior
1849 C. St., N.W., MS 6513
Washington, DC 20240
*By interoffice mail*

# EXHIBIT 14



# United States Department of the Interior
### OFFICE OF THE SOLICITOR
### Washington, D.C.  20240

February 28, 2025

Memorandum

To:        Assistant Secretaries
           Bureau and Office Heads

From:      Gregory Zerzan, Senior Advisor, exercising the delegated authority of the Solicitor

Subject:   M-Opinion Review

M-opinions, issued pursuant to 209 DM 3, constitute legal interpretations that are binding on all Department officials, until such time as they are repealed or modified by either the Secretary, Deputy Secretary, or the Solicitor.  Under the prior administration, numerous M-opinions were issued that reflected the prior administration's views of applicable law with respect to a variety of regulatory actions, decisions, and policy guidance.  However, these interpretations may not reflect the best interpretation of applicable law and may conflict with current policy priorities.

Accordingly, it is appropriate to conduct a thorough review of the M-opinions issued in the last administration.  To allow for the requisite legal and policy review, I have determined that each M-opinion issued between January 20, 2021, and January 20, 2025 (M-opinions numbered M-37065 through M-37084) shall be placed under a "Suspension Review."  With respect to the individual M-opinions covered by this memo, the Suspension Review period shall last until the individual M-opinion has been reviewed and a determination has been made as to whether that M-opinion should be reinstated, modified, or revoked.  During the Suspension Review period, no unit of the Department of the Interior should rely on those M-opinions as authoritative and binding without first consulting with the Office of the Solicitor for guidance.

You should ensure awareness within your organizations of the Suspension Review period and the implications thereof regarding reliance on these M-opinions.  Upon completion of the review of each individual covered M-opinion, you will be notified of the resulting determination and should disseminate it as appropriate within your organization.  During the review period, you should remain cognizant of the applicable contents of the covered M-opinions and promptly consult the Solicitor's Office in any case in which a covered M-opinion may materially influence a relevant decision.

# EXHIBIT 15

JER:fc
BIA.SE.7088
88-1-1073
IN-11

January 28, 1988

MEMORANDUM

TO:          Bill D. Ott, Area Director, Eastern Area, BIA

FROM:        Regional Solicitor, Southeast Region

SUBJECT:     Acquisition of Non-settlement Lands –
             Mashantucket Pequot Tribe

Your memorandum of January 12, 1988 requested our opinion on
the authority of the Bureau to accept a trust conveyance of
land from the Mashantucket Pequot Tribe situated outside the
tribe's legislatively created "settlement lands."

The pertinent provision of the Connecticut Indian Land
Claims Settlement Act states:

> Land or natural resources acquired under this
> subsection which are located outside of the
> settlement lands shall be held in fee by the
> Mashantucket Pequot Tribe, and the United States
> shall have no further trust responsibility with
> respect to such land and natural resources. Such
> land and natural resources shall not be subject to
> any restriction against alienation under the laws
> of the United States.

25 U.S.C. § 1754(b)(8).

In a letter from the tribe's attorney, dated December 17,
1987, a strong case is urged that lands acquired outside the
"settlement lands" must retain its fee status only when the
tribe's settlement funds are used for the acquisition. The
tribal attorney concludes that if other funds are used for
the acquisition, the prohibitions of the quoted provision do
not apply, and the lands may be taken into trust by the
Bureau.

A-175

- 2 -

This interpretation of the statute is at odds with its legislative history, and we cannot agree with it.

In discussing this particular provision, the legislative history states:

Section 5(b)(8)[25 U.S.C. § 1754(b)(8)] specifically provides that lands not falling within the definition of "settlement lands" are to be held in fee by the Mashantucket Pequot Tribe and are not to be taken into trust by the United States. It provides further that the United States shall have no trust responsibility with respect to those lands. Finally, the subsection provides that these lands will not be subject to any restraint against alienation imposed by the laws of the United States.

S. Rep. 98-222, 98th Cong. 1st Sess. at 14 (1983).

The contours of the Act are immediately apparent. Lands acquired by any means within the "settlement lands" may be taken in trust. 25 U.S.C. § 1754(b)(7); S. Rep. 98-222, supra, at 14 ("land or natural resources acquired pursuant to section 5(b) or otherwise lawfully acquired and located within the settlement lands as defined in subsection 3(d) are to be taken in trust...." [emphasis added]). The present tribal reservation shall retain its present fee status, subject to restrictions against alienation. See 25 U.S.C. § 1757(a). Lands located outside the "settlement lands" must be held in fee and are not subject to restrictions against alienation. Id. § 1754(b)(8).

Further inquiries regarding this matter may be directed to John H. Harrington at (404) 331-6342/FTS 242-6342.

(SGD.) ROGER SUMNER BABB
Roger Sumner Babb



# United States Department of the Interior

BUREAU OF INDIAN AFFAIRS
EASTERN AREA OFFICE
1951 Constitution Avenue NW.
Washington, D.C. 20245

REPLY REFER TO:

Trust Services

27 OCT 1989

Memorandum

To:      Associate Solitior — Indian Affairs

From:    Area Director

Subject: Interpretation of the Connecticut Indian Land Claims
         Settlement Act RE: 25 U.S.C. 1754(b)(8)

In December 1987 the Mashantucket Pequot Tribe formally requested that we
take into trust certain lands contiguous to their reservation which were
purchased with tribal monies and not trust funds.  The tribal attorney
asserts that the nature of the purchase, its contiguous location and the
purposes for which the land will be used fulfill the requirements of 25
CFR 151 and that the Secretary has the authority pursuant to 25 U.S.C. 465.

In response to our request, the Southeast Regional Solicitor on January
28, 1988 interpreted the captioned section in a manner contrary to that of
the tribal attorney, concluding that the legislative history (S. Rep.
98-222, 98th Cong. lst. sess., at 14 (1983)) alters the meaning of "land
...acquired under this subsection...."  The section in question, 1754, has
to do with the use of the tribe's Settlement funds as appropriated by
Congress and held by us in trust.

I seek your resolution of this dispute at your earliest convenience and
enclose pertinent letters and memoranda.

B. D. Ott

IX-131

**A-177**

# EXHIBIT 16



# United States Department of the Interior

OFFICE OF THE SOLICITOR
SOUTHEAST REGIONAL OFFICE

Richard B. Russell Federal Building
75 Spring Street, S.W.
Atlanta, Georgia 30303

REPLY REFER TO

JHH:fc
BIA.SE.0088
90-5-1732
IN-11

May 30, 1990

MEMORANDUM

TO:        Bill D. Ott, Area Director, Eastern Area, BIA

FROM:      Roger Sumner Babb, Regional Solicitor
           Southeast Region

SUBJECT:   Authority of the Bureau of Indian Affairs to
           Accept Trust Conveyances of Land Outside the
           Settlement Area of the Mashantucket Pequot
           Tribe

In our opinion of January 28, 1988, this office reached the
conclusion that the Bureau does not possess authority to
accept trust conveyances of land acquired by the
Mashantucket Pequot Tribe outside its settlement area.  You
have requested that we undertake a review of that opinion in
light of the general authority to accept trust conveyances
set forth in 25 U.S.C. 465.

## DISCUSSION

Section 5 of the Indian Reorganization Act (IRA), 25 U.S.C.
§ 465 provides in part:

> [t]itle to any lands or rights acquired pursuant
> to sections 461, 462, 463, 464, 465, 466, 470, 471
> to 473, 474, 475, 476 to 478, and 479 of this
> title shall be taken in the name of the United
> States in trust for the Indian tribe or individual
> Indian for which the land is acquired....

This provision authorizes the Secretary to accept a convey-
ance into trust of lands that have been acquired in fee by a
tribe.  See Chase v. McMasters, 573 F.2d 1011, 1015-16 (8th
Cir.), cert. denied, 439 U.S. 965 (1978); City of Sault Ste.
Marie, Michigan v. Andrus, 532 F.Supp. 157, 162 (D. D.C.
1980).

- 2 -

If the IRA's authorization to accept trust conveyances were the only enactment bearing on this matter, we would have no difficulty in concluding that the Pequot Tribe's acquisitions outside their settlement area would qualify for trust conveyance. However, we must also consider, and apply, the rules set forth in the Connecticut Indian Land Claims Settlement Act, 25 U.S.C. § 1751 et seq. (hereinafter referred to as the Connecticut Act).

The Connecticut Act, like others of recent years, was enacted as a legislative settlement of an Indian land claim filed in Federal Court by the Tribe. The Act, among other things, extinguished the Tribe's land claims and established a trust fund for acquisition of lands in a core settlement area. Section 5 of the Act sets forth the manner in which the Tribe's trust fund is to be administered and expended. Three subsections are crucial:

> As the Fund or any portion thereof is disbursed by the Secretary in accordance with this section, the United States shall have no further trust responsibility to the Tribe or its members with respect to the sums paid, any subsequent expenditures of these sums, or any property other than private settlement lands or services purchased with these sums.

25 U.S.C. § 1754(b)(5), emphasis added.

> Lands or natural resources acquired under this subsection which are located within the settlement lands shall be held in trust by the United States for the benefit of the Tribe.

Id. § 1754(b)(7).

> Land or natural resources acquired under this subsection which are located outside of the settlement lands shall be held in fee by the Mashantucket Pequot Tribe, and the United States shall have no further trust responsibility with respect to such land and natural resources. Such land and natural resources shall not be subject to any restriction against alienation under the laws of the United States.

- 3 -

Id. § 1754(b)(8), emphasis added.

It is clear from these provisions that lands acquired with trust fund monies fall into two categories. First, lands within the settlement area shall be held in trust by the United States. Second, lands outside the settlement area acquired with trust fund monies may not be taken into trust.

Inasmuch as section 1754 relates in its entirety to the Tribe's trust fund, none of its subprovisions as set forth above govern the status of lands acquired by other means with non-trust fund monies. Accordingly, on reconsideration of this matter, we must conclude that the Connecticut Act does not restrict the application of 25 U.S.C. § 465 to the Pequot Tribe. Hence, lands acquired by the Tribe outside the settlement area with monies derived from sources other than its trust fund may be transferred into trust status, and the Bureau, acting upon the Secretary's delegated authority, may accept such trust conveyances.

That such non-settlement lands may be taken in trust, however, does not mean that they can be declared part of the Tribe's reservation. The Connecticut Act defines reservation to include:

> the existing reservation of the Tribe as defined by chapter 824 of the Connecticut General Statutes and any settlement lands taken in trust by the United States for the Tribe.

Id. § 1752(7).

Ordinarily, the Secretary may add newly acquired lands to an existing reservation pursuant to section 7 of the IRA. Id. § 467. However, this general authority must bow to the more specific limitation of authority contained in the Connecticut Act.

Further inquiries may be directed to John H. Harrington at FTS 841-6342/(404) 331-6342.

*Kahlman R Faller*
for Roger Sumner Babb

A-181

# EXHIBIT 17

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **WINTU TRIBE OF NORTHERN CALIFORNIA, et al.,** | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | **Case No. 1:25-cv-00329-JMC** |
| **U.S. DEPARTMENT OF THE INTERIOR, et al.,** | ) ) ) | |
| Defendants. | ) ) | |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' <u>MOTION FOR ADMINISTRATIVE STAY</u>

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................ 1

BACKGROUND ............................................................................................................. 2

    I.     Legal Background ............................................................................................. 2

          A.    Indian Reorganization Act ..................................................................... 2

          B.    National Historic Preservation Act ........................................................ 2

          C.    Endangered Species Act ........................................................................ 3

          D.    Magnuson-Stevens Fishery Conservation and Management Act ............... 4

          E.    The National Environmental Policy Act ................................................. 4

          F.    Indian Gaming Regulatory Act .............................................................. 5

    II.    Factual Background .......................................................................................... 6

          A.    The Redding Rancheria .......................................................................... 6

          B.    The Redding Rancheria's Land-to-Trust Application ............................... 6

LEGAL STANDARDS .................................................................................................. 10

ARGUMENT ................................................................................................................. 11

    I.     Plaintiffs' Request for an Administrative Stay Is Improper and Should Be
Denied ........................................................................................................... 11

    II.    Plaintiffs Have Forfeited Any Argument for Preliminary Relief on Their
MSA Claim .................................................................................................... 14

    III.   Plaintiffs Are Unlikely to Succeed on the Merits of Their Claims ...................... 14

          A.    Plaintiffs Are Not Likely to Succeed on Their NHPA Claims ................. 15

                 1.    Interior Properly Determined the Area of Potential Effects ......... 15

                 2.    Plaintiffs Are Unlikely to Succeed on Their Identification
Claim ................................................................................... 17

                 3.    Plaintiffs' NHPA Consultation Claims Are Likely to Fail .......... 19

i

**A-184**

4.      Any Failure to Provide the SHPO Advance Notice that It Would Use NEPA Documents to Comply with the NHPA Process Is Harmless Error ............................................................. 21

B.      Plaintiffs' ESA Claims Are Likely to Fail ................................................ 21

1.      Plaintiffs Lack Article III Standing on Their ESA Claims ........... 21

2.      Plaintiffs Cannot Rely on Material Outside the Administrative Record in Support of Their Endangered Species Act Claims ....................................................................... 24

C.      Plaintiffs Are Unlikely to Succeed on the Merits of Their NEPA Claims ........................................................................................................ 26

1.      Plaintiffs' Offsite Access Claims Are Likely to Fail .................... 26

2.      Interior Took the Required Hard Look at Utilities ....................... 27

3.      Plaintiffs Cannot Show That Interior Failed to Discuss Mitigation of the Project's Traffic Impacts ................................. 29

4.      Interior Took a Hard Look at Impacts to Law Enforcement, Fire, and Emergency Services ....................................................... 30

5.      Interior Took a Hard Look at Aesthetic and Noise Impacts ........ 32

6.      Plaintiffs Are Unlikely to Succeed on Their Cultural Resources or Listed Species Claims ............................................. 33

D.      Plaintiffs Fail to Demonstrate a Likelihood of Success on their IGRA Claim ............................................................................................... 34

1.      It Was Proper for Interior to Apply the Restored Lands Exception to the Redding Rancheria's Application ..................... 35

2.      Interior's Finding that the Redding Rancheria Satisfied the Historical Connection Requirement Was Not Arbitrary and Capricious ...................................................................................... 36

3.      The Secretary's Waiver of the Temporal Requirement for the Restored Lands Exception Was Not Arbitrary and Capricious .... 37

E.      Plaintiffs Cannot Demonstrate a Likelihood to Succeed on the Merits of Their IRA Claim ....................................................................... 40

IV.      Plaintiffs Have Not Identified an Irreparable Harm That Would Warrant Preliminary Relief ....................................................................................................... 42

V.    Neither the Balance of Equities nor the Public Interest Weigh in Plaintiffs' Favor .................................................................................................... 44

CONCLUSION ............................................................................................................. 45

**A-186**

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Akiachak Native Cmty. v. Jewell*,
995 F. Supp. 2d 7 (D.D.C. 2014) .................................................................... 13

*Am. Pub. Gas Ass'n v. U.S. Dep't of Energy*,
72 F.4th 1324 (D.C. Cir. 2023) ...................................................................... 11

*Am. Soc. for Prevention of Cruelty to Animals v. Feld Ent., Inc.*,
659 F.3d 13 (D.C. Cir. 2011) ................................................................... 22, 33

*Am. Wildlands v. Kempthorne*,
530 F.3d 991 (D.C. Cir. 2008) ........................................................... 25, 31, 32

*Booth v. Bowser*,
597 F. Supp. 3d 1 (D.D.C. 2022) .................................................................... 44

*Brook v. Rogers*,
656 F. Supp.3d 78 (D.D.C. 2023) ................................................................... 25

*Butte Cnty. v. Chaudhuri*,
887 F.3d 501 (D.C. Cir. 2018) ....................................................................... 34

*Camp v. Pitts*,
411 U.S. 138 (1973) ....................................................................................... 25

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) ................................................................. 11, 42

*Citizens Against Burlington, Inc. v. Busey*,
938 F.2d 190 (D.C. Cir. 1991) ................................................................. 30, 31

*City of Alexandria, Va. v. Slater*,
198 F.3d 862 (D.C. Cir. 1999) ......................................................................... 2

*City of Roseville v. Norton*,
348 F.3d 1020 (D.C. Cir. 2003) ............................................................... 34, 38

*Coal. of Concerned Citizens To Make Art Smart v. Fed. Transit Admin. of U.S. Dep't of Transp.*,
843 F.3d 886 (10th Cir. 2016) ....................................................................... 16

*Colorado River Indian Tribes v. Marsh*,
605 F. Supp. 1425 (C.D. Cal. 1985) ............................................................. 17

*Comm. of 100 on Fed. City v. Foxx*,
87 F. Supp. 3d 191 (D.D.C. 2015) ................................................................. 27

*Comprehensive Cmty. Dev. Corp. v. Sebelius*,
No. 12-cv-0776 (PAE), 2012 WL 738185 (S.D.N.Y. Mar. 7, 2012) .................... 13

iv

## A-187

*Confederated Tribes of Grand Ronde Cmty. of Oregon v. Jewell*,
75 F. Supp. 3d 387 (D.D.C. 2014) ............................................................. 26, 32

*Crawford-Hall v. United States*,
394 F. Supp. 3d 1122 (C.D. Cal. 2019) ............................................................ 13

*Crawford-Hall v. United States*,
No. 2:17-cv-1616, 2018 WL 5816117 (C.D. Cal. May 31, 2018) .................. 12, 13

*Ctr. for Biological Diversity v. Env't. Prot. Agency*,
861 F.3d 174 (D.C. Cir. 2017) ..................................................... 4, 22, 23

*Ctr. for Biological Diversity v. FERC*,
67 F.4th 1176 (D.C. Cir. 2023) ...................................................................... 31

*Cuomo v. U.S. Nuclear Reg. Comm'n*,
772 F.2d 972 (D.C. Cir. 1985) ...................................................................... 10

*Dep't of Transp. v. Pub. Citizen*,
541 U.S. 752 (2004) .................................................................................. 4, 5

*Duncan's Point Lot Owners Ass'n Inc. v. FERC*,
522 F.3d 371 (D.C. Cir. 2008) ...................................................................... 16

*Food & Water Watch, Inc. v. Vilsack*,
808 F.3d 905 (D.C. Cir. 2015) ................................................. 21, 23, 24

*Fund for Animals v. Babbitt*,
903 F. Supp. 96 (D.D.C. 1995) ...................................................................... 25

*Hualapai Indian Tribe v. Haaland*,
No. CV-24-08154-PCT-DJH, 2024 WL 4678059 (D. Ariz. Nov. 5, 2024) ............ 17

*Indian River Cnty., Fla. v. Dep't of Transp.*,
348 F. Supp. 3d 17 (D.D.C. 2018) .................................................................. 33

*Izaak Walton League of Am. v. Marsh*,
655 F.2d 346 (D.C. Cir. 1981) ...................................................................... 27

*Johnson v. Panetta*,
953 F. Supp. 2d 244 (D.D.C. 2013) ................................................................ 14

*Koi Nation of N. Cal. v. U.S. Dep't of Interior*,
361 F. Supp. 3d 14 (D.D.C. 2019) ..................................................... 38, 41, 42

*Kondapally v. U.S. Citizenship & Immigr. Servs.*,
No. 20-cv-00920 (BAH), 2020 WL 5061735 (D.D.C. Aug. 27, 2020) ................. 13

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ........................................................................ 21, 22, 23

*Montana Wilderness Ass'n v. Fry*,
310 F. Supp. 2d 1127 (D. Mont. 2004) ............................................................ 17

v

**A-188**

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*,
    463 U.S. 29 (1983)................................................................................ 11, 14

*Muwekma Ohlone Tribe v. Salazar*,
    708 F.3d 209 (D.C. Cir. 2013)........................................................................ 39

*Mylan Pharms., Inc. v. Shalala*,
    81 F. Supp. 2d 30 (D.D.C. 2000)..................................................................... 43

*N.J. Dep't of Envtl. Prot. v. Nuclear Regul.Comm'n*,
    561 F.3d 132 (3d Cir. 2009)........................................................................... 27

*Narragansett Indian Tribe v. Warwick Sewer Auth.*,
    334 F.3d 161 (1st Cir. 2003).......................................................................... 20

*Nat. Parks Conservation Ass'n v. Jewell*,
    62 F. Supp. 3d 7 (D.D.C. 2014).................................................. 25, 28, 33, 38, 41

*Nat'l Parks Conservation Ass'n v. U.S. Forest Serv.*,
    No. 15-cv- 01582, 2016 WL 420470 (D.D.C. Jan. 22, 2016) ................................ 44

*Native Vill. of Eklutna v. U.S. Dep't of Interior*,
    No. 19-cv-2388, 2021 WL 4306110 (D.D.C. Sept. 22, 2021).............................. 39

*Nevada v. Dep't of Energy*,
    457 F.3d 78 (D.C. Cir. 2006).......................................................................... 21

*Nken v. Holder*,
    556 U.S. 418 (2009)........................................................................... 10, 42, 44

*Oceana, Inc. v. Pritzker*,
    26 F. Supp. 3d 33 (D.D.C. 2014)...................................................................... 4

*Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*,
    45 F.4th 291 (D.C. Cir. 2022)..................................................................... 18, 21

*Pueblo of Sandia v. United States*,
    50 F.3d 856 (10th Cir. 1995) ......................................................................... 18

*Redding Rancheria v. Jewell*,
    776 F.3d 706 (9th Cir. 2015) .......................................................... 7, 36, 37, 38

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989)......................................................................... 29, 30, 32

*Salt Pond Assocs. v. U.S. Army Corps of Eng'rs*,
    815 F. Supp. 766 (D. Del. 1993)................................................................ 11, 12, 13

*Sierra Club v. U.S. Army Corps of Eng'rs*,
    803 F.3d 31 (D.C. Cir. 2015)........................................................................... 4

*Singh v. Berger*,
    56 F.4th 88 (D.C. Cir. 2022).......................................................................... 11

**A-189**

Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior,
608 F.3d 592 (9th Cir. 2010) ................................................................ 20

Theodore Roosevelt Conservation P'ship v. Salazar,
661 F.3d 66 (D.C. Cir. 2011) ................................................................ 26

United Keetoowah Band of Cherokee Indians in Okla. v. FCC,
933 F.3d 728 (D.C. Cir. 2019) ................................................................ 3

WildEarth Guardians v. Jewell,
738 F.3d 298 (D.C. Cir. 2013) ................................................................ 5

Wreal, LLC v. Amazon.com, Inc.,
840 F.3d 1244 (11th Cir. 2016) ............................................................ 43

**Statutes**

16 U.S.C. § 1531(b) ................................................................................. 3

16 U.S.C. § 1855(b)(1) ............................................................................ 4

25 U.S.C. § 2701 ................................................................................... 41

25 U.S.C. § 2702(1) ................................................................................ 5

25 U.S.C. § 2703(4)(B) ............................................................................ 5

25 U.S.C. § 2719(a) ............................................................................... 34

25 U.S.C. § 2719(b)(1)(A) ....................................................................... 34

25 U.S.C. § 5108 .................................................................................... 2

25 U.S.C. § 5123(f) ........................................................................... 39, 40

25 U.S.C. § 5123(g) ................................................................................. 2

5 U.S.C. § 704 ......................................................................................... 2

5 U.S.C. § 705 ................................................................................... 10, 11

5 U.S.C. § 706(2)(A) ............................................................................... 11

**Regulations**

25 C.F.R. § 1.2 ....................................................................... 35, 37, 38, 39

25 C.F.R. § 151.11(a)(2) .......................................................................... 40

25 C.F.R. § 151.13(b) ............................................................................... 2

25 C.F.R. § 151.13(c) ............................................................................... 2

25 C.F.R. § 292.12 ................................................................................. 34

25 C.F.R. § 292.12(b) ........................................................................ 37, 39

25 C.F.R. § 292.12(c)(2) ................................................................ 7, 9, 10, 35

25 C.F.R. § 292.2 ............................................................................................ 36

25 C.F.R. § 292.7–12 .................................................................................... 5, 34

36 C.F.R. § 800 ................................................................................................. 3

36 C.F.R. § 800.16 ........................................................................................... 16

36 C.F.R. § 800.2(c)(5) ................................................................................... 20

36 C.F.R. § 800.2–800.6 ................................................................................... 3

36 C.F.R. § 800.3(c)(4) ................................................................................... 19

36 C.F.R. § 800.4(a) ........................................................................................ 16

36 C.F.R. § 800.4(b)(1) .............................................................................. 17, 18

36 C.F.R. § 800.8(a)(1) ................................................................................... 21

50 C.F.R. § 402.13–402.14 ............................................................................... 4

**A-191**

**TABLE OF EXHIBITS**

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| A | BIA March 04, 2020 Letter to SHPO |
| B | SHPO April 15, 2020 Letter to BIA |
| C | BIA October 16, 2019 Letter to SHPO |
| D | BIA February 24, 2023 Letter to SHPO |

## TABLE OF ACRONYMS

| ABBREVIATION | DESCRIPTION |
|---|---|
| "Assistant Secretary" | Assistant Secretary-Indian Affairs |
| "City" | City of Redding |
| "Interior" | U.S. Department of the Interior Bureau of Indian Affairs |
| "NMFS Concurrence" | Letter of Concurrence |
| "Secretary" | Secretary of the Interior |
| ACHP | Advisory Council on Historic Preservation |
| ALAN | Artificial Light at Night |
| APA | Administrative Procedure Act |
| APE | Area of Potential Effects |
| BA/EFHA | Biological Assessment and Essential Fish Habitat Assessment |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| FEIS | Final Environmental Impact Statement |
| IGA | Intergovernmental Agreement |
| IGRA | Indian Gaming Regulatory Act |
| IRA | Indian Reorganization Act |
| MSA | Magnuson-Stevens Fishery Conservation and Management Act |
| NAHC | Native American Heritage Commission |
| NEPA | National Environmental Policy Act |
| NHPA | National Historic Preservation Act |
| NMFS | National Marine Fisheries Service |
| ROD | Record of Decision |
| SHPO | State Historic Preservation Officer |

x

**A-193**

## INTRODUCTION

Plaintiffs have failed to meet their heavy burden to demonstrate they are entitled to the extraordinary remedy of an administrative stay of the U.S. Department of the Interior Bureau of Indian Affairs' ("Interior") decision to take land into trust for the Redding Rancheria, a federally-recognized tribe in Shasta County, California. Plaintiffs' challenge comes *seven months* after Interior took the land into trust. The action has already occurred, and there is nothing to stay. Though styled as a request for a stay, Plaintiffs are effectively asking the Court to order the land to be taken out of trust before their case is even heard on the merits. Plaintiffs are seeking too much from the Court, and far too late.

The Court should deny Plaintiffs' extraordinary request. As a threshold matter, Plaintiffs' motion is improper because they ask for affirmative relief through a statutory vehicle that can be used only to stay decisions and preserve the status quo. And even if they could use Section 705 of the Administrative Procedure Act to force agency actions, they have not shown any of the factors necessary for the Court to grant them preliminary relief. Plaintiffs' claims are likely to fail on the merits because they lack standing to bring their Endangered Species Act claims; have forfeited their request for preliminary relief for their Magnuson-Stevens Fishery Conservation and Management Act claim; and cannot show a violation of the requirements of the National Historic Preservation Act, National Environmental Policy Act, Indian Gaming Regulatory Act, or Indian Reorganization Act. As for irreparable harm, Plaintiffs' unexplained seven-month delay in filing this lawsuit seriously undermines their alleged harm, and their allegations do not otherwise meet the high bar for relief. Finally, the balance of the equities weighs in favor of denial, as taking the land out of trust would disrupt not only the agency process, but also the Redding Rancheria's jurisdiction and oversight of the tribal land. For these reasons, the Court should deny Plaintiffs' Motion for Administrative Stay.

1

**A-194**

# BACKGROUND

## I.    Legal Background

### A.    Indian Reorganization Act

Section 5 of the Indian Reorganization Act ("IRA") authorizes the Secretary of the Interior ("Secretary"), "in his discretion," to take lands into trust "for the purpose of providing land for Indians." 25 U.S.C. § 5108. IRA, as later amended, also prohibits Interior and other Federal agencies from issuing regulations or decisions that "classif[y], enhance[], or diminish[] the privileges and immunities available to a federally recognized Indian tribe relative to the privileges and immunities available to other federally recognized tribes by virtue of their status as Indian tribes." 25 U.S.C. § 5123(g).

The Assistant Secretary-Indian Affairs ("Assistant Secretary") holds delegated authority to review and approve applications for off-reservation trust acquisitions for gaming. The Assistant Secretary must make its decision in writing and provide the reasons for the decision. 25 C.F.R. §151.13(b). If the Assistant Secretary approves the application, Interior must file a notice in the Federal Register and "[i]mmediately acquire the land in trust status" once any other legal requirements are met. *Id.* § 151.13(c)(iii); *see also id.* § 151.16. "A decision made by the Office of the Secretary or the Assistant Secretary . . . pursuant to delegated authority, is a final agency action under 5 U.S.C. § 704 upon issuance." *Id.* § 151.13(c).

### B.    National Historic Preservation Act

Section 106 of the National Historic Preservation Act, 25 U.S.C. § 5108 ("NHPA"), "is essentially a procedural statute; it requires that agencies 'take into account the effect of [an] undertaking on any'" historic property. *City of Alexandria, Va. v. Slater*, 198 F.3d 862, 871 (D.C. Cir. 1999) (quotation omitted). Advisory Council on Historic Preservation ("ACHP") regulations

2

**A-195**

govern federal agency compliance with Section 106. *See* 36 C.F.R. Part 800. The regulations set forth a four-step process: (1) initiation (§ 800.3); (2) identification of historic properties potentially affected (§ 800.4); (3) assessment of any effects, including adverse effects (§ 800.5); and (4) efforts to resolve any adverse effects (§ 800.6). *See United Keetoowah Band of Cherokee Indians in Okla. v. FCC*, 933 F.3d 728, 745 (D.C. Cir. 2019). Agencies are to consult with the identified consulting parties in the second, third, and fourth steps. 36 C.F.R. §§ 800.2–800.6.

To determine the scope of identification efforts, the agencies must determine the area of potential effects ("APE"). *See id.* § 800.4(a). The APE is defined as the "geographic area or areas within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties, if any such properties exist." *Id.* § 800.16. The agency must determine the APE in consultation with the California State Historic Preservation Officer ("SHPO"). *Id.* § 800.4(a). When identifying historic properties, the agency must "make a reasonable and good faith effort." *Id.* § 800.4(b)(1). Once the properties are identified, the agencies must determine whether there will be any "adverse effects" to those properties. *Id.* § 800.5(a). If there is a finding of no adverse effect and the SHPO agrees, implementing the project in accordance with that finding "fulfills the agency official's responsibilities under [S]ection 106." *Id.* § 800.5(d)(1).

C.    **Endangered Species Act**

The Endangered Species Act ("ESA") provides "a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). Section 7 of the ESA requires "[e]ach Federal agency. . . in consultation with and with the assistance of" the National Marine Fisheries Service ("NMFS"), as relevant here, to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to

3

jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of" designated critical habitat. *Id.* § 1536(a)(2). If an agency determines that its actions may affect a listed species or critical habitat, as defined by the statute, then the agency must pursue either informal or formal consultation with NMFS. 50 C.F.R. §§ 402.13-402.14. "If during informal consultation it is determined by the [action] agency, with the written concurrence of the Service, that the action is not likely to adversely affect listed species or critical habitat, the consultation process is terminated, and no further action is necessary." *Id.* § 402.13(c); *see also id.* § 402.14(b)(1), (m)(3); *Ctr. for Biological Diversity v. Env't. Prot. Agency*, 861 F.3d 174, 178 (D.C. Cir. 2017).

## D. Magnuson-Stevens Fishery Conservation and Management Act

The Magnuson-Stevens Fishery Conservation and Management Act ("MSA") "balances the twin goals of conserving our nation's aquatic resources and allowing U.S. fisheries to thrive." *Oceana, Inc. v. Pritzker*, 26 F. Supp. 3d 33, 36 (D.D.C. 2014). As relevant here, the MSA requires NMFS to identify Essential Fish Habitat in connection with its fishery management plans. 16 U.S.C. § 1855(b)(1). It further provides, "Each Federal agency shall consult with [NMFS] with respect to any action authorized, funded, or undertaken, or proposed to be authorized, funded, or undertaken, by such agency that may adversely affect any essential fish habitat identified under this chapter." *Id.* § 1855(b)(2).

## E. The National Environmental Policy Act

"NEPA requires the federal government to identify and assess in advance the likely environmental impact of its proposed actions, including its authorization or permitting of private actions." *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 36 (D.C. Cir. 2015) (citing *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756–57 (2004)). NEPA's dual purpose is to

4

**A-197**

ensure that agencies make informed decisions that consider the environmental impact of their

actions, and that the public is informed of that impact and can participate in the decision-making

process. *Id.* "[I]nherent in NEPA . . . is a 'rule of reason.'" *Pub. Citizen*, 541 U.S. at 767. The

Court's role is not to "'flyspeck' an agency's environmental analysis, looking for any deficiency

no matter how minor." *WildEarth Guardians v. Jewell*, 738 F.3d 298, 308 (D.C. Cir. 2013).

## F.     Indian Gaming Regulatory Act

The Indian Gaming Regulatory Act ("IGRA") was enacted in 1988 "to provide a

statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal

economic development, self-sufficiency, and strong tribal governments[.]" 25 U.S.C. § 2702(1).

IGRA permits federally recognized tribes to conduct gaming (subject to rules dependent on the

type of gaming) on "Indian lands" within the tribe's jurisdiction. *Id.* §§ 2703(5), 2710(b)(1),

(d)(3). "Indian lands" is defined as land within the limits of an Indian reservation and "any lands

title to which is either held in trust by the United States for the benefit of any Indian tribe or

individual or held by any Indian tribe or individual subject to restriction by the United States

against alienation and over which an Indian tribe exercises governmental power." 25 U.S.C.

§ 2703(4)(B).

Generally, IGRA bars gaming on lands taken into trust after October 17, 1988. *Id.*

§ 2719(a). But there are limited exceptions to this rule. As relevant to the Redding Rancheria's

application, IGRA's time bar does not apply to lands taken into trust as part of "the restoration of

lands for an Indian tribe that is restored to Federal recognition." *Id.* § 2719(b)(1)(B)(iii).

Interior's IGRA implementing regulations articulate the standards that Interior follows when

interpreting the various exceptions to IGRA's prohibition on gaming, including the restored

lands exception. 25 C.F.R. §§ 292.7–12.

5

**A-198**

## II.    Factual Background

### A.    The Redding Rancheria

The Redding Rancheria was first federally recognized in 1922 when the Bureau of Indian Affairs acquired lands for the Rancheria. Trust Acquisition Letter 3 (2024) 10, ECF No. 2-2 ("2024 Decision Letter"). In 1965, the Redding Rancheria lost federal recognition under the California Rancheria Act. 2010 Trust Acquisition Letter, Mot. Ex. B 1-2, ECF No. 2 ("2010 Decision Letter"). Under the Act, much of the Rancheria's land "[fell] out of the Tribe's ownership and became distributed to individual Tribal members." 2024 Decision Letter 3.

In 1979, the Redding Rancheria sought federal recognition and trust status of their tribal lands. 2010 Decision Letter 5. The Redding Rancheria was subsequently restored to federal recognition on June 11, 1984, pursuant to a stipulated agreement. 2024 Decision Letter 3. This stipulated agreement did not, however, provide for the reacquisition of the Redding Rancheria's land or restore those lands to federal trust status, and many of the original Rancheria parcels had passed into third-party ownership. *Id.* "[S]ince the Tribe's restoration to federally-recognized status, the Tribe has worked diligently to re-acquire as many of the original Rancheria parcels as possible." Final Environmental Impact Statement 1-3, ECF No. 2-12 ("FEIS").

### B.    The Redding Rancheria's Land-to-Trust Application

This case involves land referred to as "Strawberry Fields." In 2003, the Redding Rancheria requested that Interior take the Strawberry Fields site into trust. 2024 Decision Letter 3. The Strawberry Fields site is approximately 221.41 acres in Shasta County, located near the City of Redding ("City"), and is 1.6 straight-line miles from the Redding Rancheria's existing trust lands. *Id.* 1, 6. The Redding Rancheria held title to the land in fee, purchasing portions of the property in 2004 and the remaining parcels in 2010. 2010 Decision Letter 1. Redding

6

**A-199**

Rancheria plans to relocate their existing gaming facility, Win-River, to the new site. This plan ("Project") will involve the development of a casino, hotel, convention center, and supporting facilities. Record of Decision 6, ECF No. 2-18 ("ROD"). The Redding Rancheria's current Win-River casino will be closed and converted for "tribal services and housing uses." *Id.* 22.

In 2008, the Redding Rancheria requested that Interior analyze the Rancheria's fee-to-trust application under new regulations governing IGRA's "restored lands exception," which were finalized by Interior earlier that year. Among other requirements, Interior's new IGRA regulations required that a tribe applying under the "restored lands exception" must "not [be] gaming on other lands." 25 C.F.R. § 292.12(c)(2). To comply with that requirement, the Redding Rancheria submitted a letter to Interior offering to close its existing Win-River gaming facility once Strawberry Fields was built. 2024 Decision Letter 2. In 2010, Interior denied the Redding Rancheria's fee-to-trust application because the Rancheria was already gaming on other lands. 2010 Decision Letter 8.

The Redding Rancheria challenged that decision, arguing in part that Interior denied the application without considering whether the regulations would bar a tribe from moving its existing casino to newly acquired trust lands. 2024 Decision Letter 2. The Ninth Circuit agreed with the Rancheria, remanding Interior's decision "for consideration of the Tribe's proposal to close its existing gaming operation upon construction of a new facility." *Redding Rancheria v. Jewell*, 776 F.3d 706, 715 (9th Cir. 2015). The Court pointed out that "[t]he regulation is not clear" as to whether the agency looks to the date of the application, or the date of the trust acquisition when determining whether "the tribe is not gaming on other lands." *Id.* 715; 25 C.F.R. § 292.12(c)(2).

7

**A-200**

On remand, while Interior continued to review the Rancheria's application, the agency started the environmental review process. In November 2016, Interior issued a Notice of Intent to prepare an Environmental Impact Statement (EIS) for the Proposed Project. The agency issued the Draft EIS and Final EIS for public comment on April 10, 2019 and April 3, 2024, respectively. ROD 1. Interior reviewed and responded to the comments received, including those from the Wintu Tribe, the Paskenta Band, and Speak Up Shasta Association, the Plaintiffs in this case. Environmental impacts were identified, and mitigation measures were adopted to minimize or avoid those impacts, including to cultural and paleontological resources. *Id.* 38.

Interior also undertook the federal action review process required by the ESA and consulted with the Fish and Wildlife Service and NMFS on potential impacts to endangered species and their designated critical habitat. Interior also assessed potential impacts to Essential Fish Habitat as provided by the MSA. As relevant here, in July 2018, Interior prepared a Biological Assessment and Essential Fish Habitat Assessment ("BA/EFHA", ECF No. 2-4 at 610 to ECF No. 2-5 at 324), assessing the potential impact of the Project on four fish species and their designated critical habitat: winter-run Chinook salmon; spring-run Chinook salmon; steelhead; and green sturgeon. BA/EFHA 9, 12. Each of those fish is listed either as threatened or endangered under the ESA. *Id.* 12-14. In addition, the nearby Sacramento River is Essential Fish Habitat for Chinook salmon. *Id.* 9, 12. Interior concluded that the Project would have no effect on the fish species, designated critical habitat, or Essential Fish Habitat. *Id.* 19. Interior initiated informal consultation with NMFS, and, on May 7, 2019, NMFS issued a detailed letter explaining its concurrence with the conclusion that the project was not likely to adversely affect the listed species or their designated critical habitats. Letter of Concurrence ("NMFS Concurrence") 1,

6, ECF No. 2-16 at 231-38. NMFS also determined that the action would not adversely affect Essential Fish Habitat and that consultation under the MSA was not required. *Id.* 1.

Throughout the environmental review process, Interior also consulted local governments, tribes, and the SHPO. In 2007 and 2016, Interior sent information-gathering letters to the California Native American Heritage Commission ("NAHC"). FEIS 3.6-11, ECF No. 2-13. While NAHC had no record of sacred sites within the Project area, NAHC supplied Interior with a list of individuals and groups that may have further information about cultural resources at Strawberry Fields and other alternative sites. *Id.* Interior reached out to these groups and individuals in 2007 and 2016, including the Wintu Educational and Cultural Council. *Id.* The Paskenta Band was not on this original list provided to Interior. Interior also invited the Paskenta Band to be a consulting party for the Project on January 15, 2020. FEIS, Vol. II App. P, ECF No. 2-17. The Paskenta Band did not respond to this request until August 2023, after the NHPA process had concluded. ROD 91.

Interior initiated NHPA consultation with the California SHPO in October 2019, detailing the Project sites, the area of potential effects ("APE"), and the potentially historic properties located within the sites. *See* Dec. of Julie Taomia ("Taomia Decl."), Ex. C ("2019 BIA Letter"). Interior provided the SHPO with more information about the site and historic properties and requested a concurrence with the agency's finding that there were no historic properties affected. On May 9, 2023, the California SHPO concurred with the agency's findings, concluding the Section 106 process. FEIS, Vol. II App. P, ECF No. 2-17. More than a year later (in August 2024), the Wintu Tribe and Paskenta Band contacted Interior requesting the process be reopened and that they be consulting parties. ROD 91.

9

**A-202**

On July 1, 2024, Interior issued its Record of Decision ("ROD") explaining Interior's decision to take the Strawberry Fields site into trust for the Redding Rancheria. ROD 48. That same day, Interior issued its decision letter concluding that the lands were eligible for gaming under IGRA. *See* 2024 Decision Letter. The Assistant Secretary determined that, although Interior's regulations require that "the tribe is not gaming on other lands" at the time of its application, based on all facts and circumstances before the agency, it would be "in the best interests of Indians" to waive the requirement that the Redding Rancheria not be "gaming on other lands." *Id.* Ex. B 7. He then determined that Redding Rancheria's "application meets all of the regulatory requirements as well as the spirit and purpose of the underlying statutes and therefore the Strawberry Fields Site will be acquired into trust as restored lands for a restored Tribe." *Id.* 17. Consistent with the ROD, Interior completed all steps necessary to acquire the Strawberry Fields site in trust.

## LEGAL STANDARDS

Plaintiffs request preliminary relief under 5 U.S.C. § 705. Section 705 of the Administrative Procedure Act ("APA") authorizes "the reviewing court" to "postpone the effective date of an agency action or to preserve status or rights pending" judicial review "to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705. The same factors governing preliminary injunctions also govern relief under Section 705. *See Cuomo v. U.S. Nuclear Reg. Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985). Under the standard for a stay, "a court considers four factors: (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 426 (2009) (citation omitted).

10

**A-203**

Failure to show irreparable harm is grounds for the Court to refuse to issue preliminary relief, "even if the other three factors entering the calculus merit such relief." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

While the standards under Rule 65 and Section 705 are the same, the relief available is not. Injunctions under Rule 65 can alter the status quo, though "courts are institutionally wary" of granting such relief. *Singh v. Berger*, 56 F.4th 88, 95 (D.C. Cir. 2022). Section 705, by contrast, is intended only to "postpone the effective date of an agency action" or "preserve status or rights" through a stay. 5 U.S.C. § 705. Mandatory injunctions that alter the status quo are not permitted. *Salt Pond Assocs. v. U.S. Army Corps of Eng'rs*, 815 F. Supp. 766, 776 (D. Del. 1993).

Because this is a review of final agency action, the APA standard of review applies to the merits. Under the APA, a court may set aside agency action if the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The Court "is highly deferential to the agency's decision and presumes that the agency action is valid." *Am. Pub. Gas Ass'n v. U.S. Dep't of Energy*, 72 F.4th 1324, 1336 (D.C. Cir. 2023) (cleaned up). The review "is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983).

## ARGUMENT

## I. Plaintiffs' Request for an Administrative Stay Is Improper and Should Be Denied

Plaintiffs request for preliminary relief should be denied because Section 705 does not offer the relief they seek. Plaintiffs request that the Court stay Interior's already completed decision to take Strawberry Fields into trust, giving the stay retroactive effect to July 1, 2024. *See, e.g.*, Pls.' Mot. for Administrative Stay 1, ECF No. 2 ("Mot.") ("Plaintiffs respectfully request that the Court stay the BIA Defendants' Decision to take Strawberry Fields into trust for gaming purposes and to approve the Project thereon, *nunc pro tunc* to the date of the Decision.").

11

**A-204**

To affect such a stay, Interior would be forced to take the land out of trust—which is the ultimate relief on the merits Plaintiffs seek. That extraordinary relief is unavailable under Section 705 and Plaintiffs' motion should be denied on this basis alone.

Section 705 allows courts to grant interim relief, but the scope of that relief "is limited to (1) a postponement of the agency action or (2) a preservation of . . . status or rights." *Salt Pond Assocs.*, 815 F. Supp. at 776. "By its very terms, Section 705 does not authorize a court to issue a preliminary injunction that alters the status quo or dictates specific terms and conditions to an agency." *Crawford-Hall v. United States*, No. 2:17-cv-1616, 2018 WL 5816117, *8 (C.D. Cal. May 31, 2018). Plaintiffs cannot show their requested relief falls under either permissible category of relief, as their retroactive stay would not postpone any agency action and would, instead, upend the status quo.

First, the retroactive stay would not "postpone the effective date of an agency action" because the relevant actions—Interior's decision to take land into trust, and all the steps necessary to implement that decision—have occurred. Interior issued its decision to take the land into trust for Redding Rancheria on July 1, 2024. *See generally* 2024 Decision Letter. Interior recorded the deed with the Interior's Land Titles and Records Office and the Redding County Official Records Office on July 5, 2024. Interior has therefore completed all the steps necessary to acquire the Strawberry Fields in trust, and Strawberry Fields is now part of the Redding Rancheria. There is no agency action to postpone, as all federal actions are complete.

Second, a retroactive stay would not preserve the status quo—it would dramatically alter it for both Defendants and the Redding Rancheria. When Plaintiffs filed their Complaint, the status quo was that the ROD was issued, the land was taken into trust by the United States, and the Redding Rancheria was moving forward with its gaming project. Granting Plaintiffs'

12

**A-205**

retroactive stay would force the agency to unwind all of those actions, including taking the land

out of trust and returning the land to the Redding Rancheria in fee for the pendency of the suit.

*Akiachak Native Cmty. v. Jewell*, 995 F. Supp. 2d 7, 18 (D.D.C. 2014) ("All parties would be

harmed by any confusion and ensuing litigation created by attempts to undo the land into trust

determinations."). And that status quo altering action would be unprecedented—only one court

has ever vacated a decision to take land into trust, and that was on the merits. *See Crawford-Hall

v. United States*, 394 F. Supp. 3d 1122, 1155 (C.D. Cal. 2019).

Despite failing to show their motion falls under either permissible category of relief,

Plaintiffs contend that the "APA gives the Court broad power to retroactively postpone the

effective date of an agency action to avoid irreparable injury." Mot. 21. Yet Plaintiffs fail to cite

a single case that grants courts that power under Section 705. Indeed, courts have consistently

denied requests for relief under Section 705 that would alter the status quo or force an agency to

take a specific action. *See, e.g.*, *Salt Pond Assocs.*, 815 F. Supp. at 776 (denying request to order

government to issue a permit with conditions).[1] And at least one court has denied the preliminary

relief Plaintiffs effectively request here: to take land out of trust and return it to a tribe during the

pendency of a suit. *Crawford-Hall*, 2018 WL 5816117, *7-*8 ("Plaintiffs assert that they have a

protectable right to compel Interior to convey the Property out of trust and back to the Tribe

during the pendency of this suit. But Plaintiffs have no plausible claim under . . . Section 705.").

Because Section 705 does not offer the relief Plaintiffs seek, the Court should deny the motion

on this threshold issue.

---

[1] *See also Kondapally v. U.S. Citizenship & Immigr. Servs.*, No. 20-cv-00920 (BAH), 2020 WL 5061735, at *5 (D.D.C. Aug. 27, 2020) (finding "Section 705 does not empower the Court" to grant affirmative relief); *Comprehensive Cmty. Dev. Corp. v. Sebelius*, No. 12-cv-0776 (PAE), 2012 WL 738185, at *8 (S.D.N.Y. Mar. 7, 2012) (same).

13

**A-206**

Respectfully submitted this 6th day of March, 2025.

ADAM R.F. GUSTAFSON
Acting Assistant Attorney General

By: */s/ Samuel Vice*
SAMUEL VICE, Trial Attorney
C.A. Bar No. 324687
DEVON L. TICE, Trial Attorney
C.A. Bar No. 357918
U.S. Department of Justice
Natural Resources Section
Environment & Natural Resources Division
P.O. Box 7611
Washington, DC 20044-7611
Tel: 202-305-0434 (Vice)
Email: samuel.vice@usdoj.gov
Tel: 202-598-1444 (Tice)
Email: devon.tice@usdoj.gov

SARA WARREN, Trial Attorney
G.A. Bar No. 966948
Wildlife and Marine Resources Section
P.O. Box 7611
Washington, DC 20044-7611
Tel: (202) 307-1147
Email: sara.warren@usdoj.gov

*Attorneys for Defendants*

**A-207**

# EXHIBIT 18

ORAL ARGUMENT WAS HELD ON JANUARY 13, 2025

No. 23-5254

_____

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

TWIN METALS MINNESOTA LLC, et al.,
*Plaintiffs-Appellants*,

v.

UNITED STATES, et al.,
*Defendants-Appellees*.

_____

Appeal from the United States District Court for the District of Columbia
No. 22-cv-2506-CRC (Hon. Christopher Reid Cooper)

_____

**JOINT REPLY IN SUPPORT OF MOTION FOR ABEYANCE**

_____

                                        ADAM R.F. GUSTAFSON
                                        *Acting Assistant Attorney General*

LISA S. BLATT
MARK S. STORSLEE                        RACHEL HERON
Williams & Connolly LLP                 REBECCA JAFFE
 680 Maine Avenue S.W.                  *Attorneys*
 Washington, DC 20024                   Environment and Natural Resources Division
 (202) 434-5000                         U.S. Department of Justice
 lblatt@wc.com                          Post Office Box 7415
                                        Washington, D.C. 20044
                                        (202) 305-0258
                                        rebecca.jaffe@usdoj.gov

**A-209**

## CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES

### A. Parties, Intervenors, and Amici:

**Plaintiffs-Appellants:**

Twin Metals Minnesota LLC

Franconia Minerals (US) LLC

**Defendants-Appellees:**

United States of America

U.S. Department of the Interior

Doug Burgum, Secretary of the Interior

Greg Zerzan, Senior Advisor to the Secretary, exercising the

delegated authority of the Solicitor of the Department of the Interior

U.S. Bureau of Land Management

Jon Raby, Nevada State Director, exercising the delegated authority of

the Director of the Bureau of Land Management

Mitchell Leverette, State Director, Eastern States, Bureau of Land

Management

**Intervenor-Defendant Appellees:**

Center for Biological Diversity

Ely Outfitting Company & Boundary Waters Guide Service

Freemans Explore, LLC

Friends of the Boundary Waters Wilderness

Hungry Jack Outfitters

Izaak Walton League of America

Northeastern Minnesotans for Wilderness

Northstar Canoe

Piragis Northwoods Company

River Point Resort and Outfitting Company

Sawbill Canoe Outfitters, Inc.

The Wilderness Society

Voyageur Outward Bound School

Wenonah Canoe, Inc.

Women's Wilderness Discovery


**Amici:**

American Exploration & Mining Association

Iron Range and Vicinity Building and Construction Trades Council

MiningMinnesota

Minnesota State Building and Construction Trades Council

**A-211**

National Mining Association

North America's Building Trades Unions

Range Association of Municipalities and Schools

**B.** **Rulings Under Review:**

The ruling at issue in this appeal is the District Court's September 6, 2023,

Order granting Appellees' and Appellee-Intervenors' motions to dismiss.  ECF No.

61.  A Memorandum Opinion by Judge Christopher R. Cooper of the United States

District Court for the District of Columbia accompanied the Order.  ECF No. 62.

**C.** **Related Cases:**

None.

/s/ *Rebecca Jaffe*
REBECCA JAFFE

Counsel for Defendants-Appellees

Federal Defendants and Plaintiff Twin Metals moved the Court to hold this case in abeyance because agency officials at the Department of the Interior are reviewing the actions at issue in this litigation. Intervenor Defendants oppose this request, but their arguments lack merit.

1.      Plaintiff Twin Metals challenges the Department of the Interior's decisions to cancel two mineral leases and deny two preference-right lease applications. The leases and lease applications at issue in this litigation cover lands with copper, nickel, and other critical mineral deposits. Agency officials at the Department of the Interior are now reviewing those actions to determine what if any steps Interior may take relevant to those actions. Leverette Decl. ¶ 6. Any such steps could materially alter the issues presented by this litigation, and therefore judicial restraint favors holding this action in abeyance.

2.      Intervenor Defendants do not dispute that, as a result of the ongoing review, Interior could take action that would affect the issues presented in this appeal. Instead, they emphasize that Interior has not *yet* decided to take such action. Opp'n ¶¶ 7–8, 10. But that the agency is in the middle rather than at the end of a deliberative process does not change the fact that there is a meaningful likelihood that the contours of the issues presented in this case will change as a result of the agency's review.

3.      To be clear, Interior's ongoing review involves serious scrutiny of the underlying actions responding to recent direction from the President and Secretary of the Interior.  As explained in our motion for abeyance, the President's recent executive orders emphasize the importance of mineral development in the United States.  The *Unleashing American Energy* Executive Order directed the Secretary of the Interior to "identify all agency actions that impose undue burdens on the domestic mining and processing of non-fuel minerals and undertake steps to revise or rescind such actions."  *Unleashing American Energy*, Exec. Order No. 14154, 90 Fed. Reg. 8353, 8358 § 9(a) (Jan. 20, 2025).  Secretary of the Interior Doug Burgum issued an order to implement the *Unleashing American Energy* Executive Order and to "direct[] the removal of impediments imposed on the development and use of our Nation's abundant energy and natural resources."  *Unleashing American Energy*, Interior Secretary's Order No. 3418, 2025 WL 435733, at *1 § 1 (Feb. 3, 2025).  In addition, just days ago, the President issued another relevant Executive Order, *Addressing the Threat to National Security from Imports of Copper*.  Exec. Order No. 14220, 90 Fed. Reg. 11001, 2025 WL 637294 (Feb. 25, 2025).  That order declared that copper—one of the minerals that these leases and lease applications cover—"is a critical material essential to the national security, economic strength, and industrial resilience of the United States."  *Id.* § 1.

**A-214**

4.      In addition, the lease cancellations at issue in this litigation were based on a 2022 M-Opinion,[1] *see,* Opening Br. 13, United States Br. 11, JA243–63, which Interior has now placed under a "Suspension Review."  On February 28, 2025, Interior Senior Advisor Gregory Zerzan, exercising the delegated authority of the Solicitor, placed all M-Opinions issued between January 20, 2021 and January 20, 2025—including the 2022 M-Opinion that led to the lease cancellations in this case—under a Suspension Review.  https://perma.cc/6AHX-L2YV.  The Suspension Review period "shall last until the individual M-opinion has been reviewed and a determination has been made as to whether that M-opinion should be reinstated, modified, or revoked." *Id.*  During the Suspension Review, Interior may not "rely on those M-opinions as authoritative and binding without first consulting with the Office of the Solicitor for guidance." *Id.*

5.      If after completing its review of the underlying actions, Interior reinstates the leases and preference-right lease applications at issue in this litigation, then this suit would likely become moot.  *See, e.g., Akiachak Native Cmty. v. U.S. Dep't of the Interior*, 827 F.3d 100, 113 (D.C. Cir. 2016) ("[O]nce the Department of Interior rescinded" the challenged regulation, "this case became moot."); *Freeport–McMoRan Oil & Gas Co. v. FERC*, 962 F.2d 45, 46 (D.C. Cir.

---

[1] M-Opinions are legal interpretations that Interior's Solicitor's Office can issue and that bind the Interior Department.

1992) (finding a case "plainly moot" where the challenged agency orders had been "superseded by a subsequent FERC order").  Intervenors contend that the Court "could still decide" the subject-matter jurisdiction issue in this suit, because a court may choose among possible jurisdictional bases for resolving litigation.  Opp'n ¶ 6.  But Intervenors miss the point.  If the challenged agency decisions no longer exist, then the appeal *as a whole* is a moot, including the question of whether the district court had subject-matter jurisdiction to adjudicate claims challenging the prior decisions.

6.      Intervenors similarly argue that because the lease cancellations and lease-application denials "remain on the books," the case "is not moot at the present time" and "remains ripe for decision."  Opp'n ¶¶ 8, 10 (cleaned up).  But Federal Defendants and Twin Metals are not arguing that the case is moot *now*.  We are arguing that the Court should hold this case in abeyance while Interior evaluates the actions at issue in this litigation because the actions are presently under review and therefore the case may become moot *in the future*.

7.      Intervenors further assert that the abeyance motion did not "disclose any concrete plans," Opp'n ¶ 7, but this Administration took office less than two months ago and officials need time to familiarize themselves with the issues in this case and the underlying agency actions, Leverette Decl. ¶ 6.  Intervenors similarly complain that the motion provided "no timetable," Opp'n ¶ 7, but Federal

Defendants proposed to file a status report in 90 days and, if necessary, can continue to provide status reports to the Court at regular intervals after that. Those status reports will give the Court and Intervenors an opportunity to assess Federal Defendants' progress in reviewing the actions at issue in this litigation. The Court can lift any abeyance if it determines based on new facts that litigation should resume. In the same vein, Intervenors could move to lift the abeyance if they believe they can present facts supporting that position.

8.      Finally, even though there are no ongoing activities pursuant to the presently cancelled leases or denied lease applications, Leverette Decl. ¶ 7—and therefore no disturbance to the environment—Intervenors contend that an abeyance would prejudice them because "uncertainty . . . will remain," Opp'n ¶ 13. But "uncertainty because a dispute remains unresolved is not legal prejudice." *Kamal v. Eden Creamery, LLC*, 88 F.4th 1268, 1280 (9th Cir. 2023).

**CONCLUSION**

For the foregoing reasons, this appeal should be held in abeyance, with a status report to be filed by Federal Defendants in 90 days.

Respectfully submitted,

*/s/ Lisa S. Blatt*                                     ADAM R.F. GUSTAFSON
LISA S. BLATT                                          *Acting Assistant Attorney General*
MARK S. STORSLEE
Williams & Connolly LLP                          */s/ Rebecca Jaffe*

**A-217**

680 Maine Avenue S.W.
Washington, DC 20024
 202  434-5000
■■@wc.com

RACHEL HERON
REBECCA JAFFE
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
 202  305-0258
■■■@usdoj.gov

March 7, 2025

**A-218**

**CERTIFICATE OF COMPLIANCE**

1.      This document complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(C) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) this document contains 1,121 words.

2.      This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

/s/ *Rebecca Jaffe*_____
REBECCA JAFFE

Counsel for Defendants-Appellees

# EXHIBIT 19

# Acquisition of Title to Land
# Held in Fee or Restricted Fee Status
# (Fee-to-Trust Handbook)



**Issued By:**

Department of the Interior
Bureau of Indian Affairs, Office of Trust Services
Division of Real Estate Services
1849 C Street, N.W.
Washington, DC  20240

Release # 16-47, Version IV (rev. 1), Issued: 6/28/16
Replaces: Version IV, Issued: 5/16/16

**A-221**

**TABLE OF CONTENTS**

1.  INTRODUCTION

2.  DEFINITIONS OF TERMS & ACRONYMS

3.  PROCESS AND PROCEDURES
    3.1. Standard Operating Procedures:  Fee-to-Trust Acquisitions
        3.1.1   On-reservation Discretionary Trust Acquisitions (25 CFR § 151.10)
        3.1.2   Off-reservation Discretionary Trust Acquisitions (25 CFR § 151.11)
        3.1.3   Mandatory Trust Acquisitions (Policy memorandum)
    3.2  Selecting the Correct Operating Procedure
    3.3  Step Sequence
    3.4  Reservation Proclamations
        3.4.1   Post-Trust Acquisition Reservation Proclamations
        3.4.2   Concurrent Trust Acquisitions and Reservation Proclamations

4.  POLICY AND DIRECTIVES
    4.1. Mandatory Acquisition Guidance
    4.2. Indian Affairs Manual (IAM) Part 52, Chapter 12 Processing Discretionary Fee-to-Trust
         Applications

5.  EXHIBITS
    5.1.   Brochure:  "Understanding the Fee-to-Trust Process for Discretionary Acquisitions"
    5.2.   Fee to Trust Quick Reference Guide
    5.3.   Required Elements: Application for Fee-to-Trust
    5.4.   Sample Documents
        5.4.1   Sample Acknowledgement Letter
        5.4.2   Sample Original 30-Day Notice of Incomplete Fee-to-Trust Application Package
        5.4.3   Sample Final Notice of Incomplete Fee-to-Trust Application Package
        5.4.4   Sample Return of Incomplete Fee-to-Trust Application
        5.4.5   Sample Environmental Compliance Review Memorandum
        5.4.6   Sample Notice of Application
        5.4.7   Sample Notice of Application Comments to Applicant
        5.4.8   Restrictive Covenants Acknowledgement Form
        5.4.9   Sample Appeal Rights for Inclusion in BIA Officials' Decisions
        5.4.10  Sample Public Notice to Acquire Land into Trust
        5.4.11  Sample Acceptance of Conveyance
        5.4.12  Sample Deed and Acceptance of Conveyance
        5.4.13  Sample Notice of Reservation Proclamation Request
        5.4.14  Sample Reservation Proclamation Insert to BIA Notice of Decision
    5.5  Preliminary Title Opinion Document Checklist

Release # 16-47, Version IV (rev. 1), Issued: 6/28/16
Replaces: Version IV, Issued: 5/16/16

**A-222**

5.6  Handbook for Gaming Acquisitions (Gaming Handbook)
5.7  Certificate of Inspection and Possession
    5.7.1    Certificate of Inspection and Possession (Form #1)
    5.7.2    Certificate of Inspection and Possession (Form #2)

Release # 16-47, Version IV (rev. 1), Issued: 6/28/16
Replaces: Version IV, Issued: 5/16/16

**A-223**

## 1.0  INTRODUCTION

The Indian Reorganization Act (IRA) [48 Stat. 984, 25 U.S.C. § 461 *et seq*. (June 18, 1934)] provides the Secretary with the discretion to acquire trust title to land or interests in land. Congress may also authorize the Secretary to acquire title to particular land and interests in land into trust under statutes other than the IRA.

The Secretary bases the decision to make a trust acquisition on the evaluation of the criteria set forth in Title 25 Code of Federal Regulations (CFR) Part 151 and any applicable policy.  With the exception of certain mandatory acquisitions, the decision to acquire title requires Secretarial approval.

This handbook describes standard procedures used by the Bureau of Indian Affairs (BIA) for the transfer of fee land into trust or restricted status.  These procedures include: (1) eligibility for an individual or Tribe to request the Secretary to take title in trust; (2) application requirements; (3) processing of an application for a trust acquisition, and (4) criteria used by BIA to evaluate trust acquisition requests.  This handbook also incorporates guidelines and requirements used by the BIA for Reservation Proclamation requests received from Tribes.

The BIA will review the content of this handbook periodically to determine the need for revisions.  This review may include input from Tribes, Tribal organizations, and DOI; all of whom rely on the procedures described in this handbook.

## 2.0    DEFINITION OF TERMS AND LISTING OF ACRONYMS

**Terms used in this handbook have specific definitions.  For the definition of terms used in this handbook, refer to the definitions in 25 CFR Part 151 and those provided in this section.**

*Contiguous parcels*: Two parcels of land having a common boundary notwithstanding the existence of non-navigable waters or a public road or right-of-way, including parcels that touch at a point.  Also referred to as "adjacent parcels."

*Discretionary Trust Acquisition*:  A trust acquisition authorized by Congress that does not require the Secretary to acquire title to any interest in land to be held in trust by the United States on behalf of an individual Indian or a Tribe.  The Secretary has discretion to accept or deny the request for any such acquisition.

*Encumbrance*:  A limitation on the title of property, such as a claim, lien, easement, charge, or restriction of any kind.

Release # 16-47, Version IV (rev. 1), Issued: 6/28/16
Replaces: Version IV, Issued: 5/16/16

A-224

*Fee*:  A form of ownership status where the person may freely alienate and encumber title without federal approval.  Land in trust status or restricted status is not held in fee.

*Gaming Acquisition*: The lands where the actual gaming operations will occur.  This does not include lands that are acquired to supplement the actual lands the gaming establishment will or does reside upon.  This does not include parcels acquired for parking lots, hotels, golf courses, gift shops, etc.

*The term "*Gaming Related*" is no longer used by the Department of the Interior and any acquisitions that are not specifically for gaming will be processed pursuant to the regulations at 25 CFR Part 151 and the applicable section of this Handbook.  This includes parking lots, hotels, golf courses and any lands other than those where a gaming facility is located.

*Mandatory Trust Acquisition*:  A trust acquisition directed by Congress or a judicial order that requires the Secretary to accept title to land into trust, or hold title to certain lands in trust by the United States, for an individual Indian or Tribe.  The Secretary does not have the discretion to accept or deny the request to accept title of land into trust.

*Reservation Proclamation:*  A formal declaration issued by the Secretary of the Interior or her designee proclaiming that certain lands are a new reservation or an addition to an existing reservation.  A reservation proclamation can encompass multiple trust parcels or a portion of a parcel taken into trust.

*Trust Acquisition*: The act or process by which the Secretary acquires title to any interest in land to be held in trust by the United States on behalf of an individual Indian or a Tribe.

*Undivided Fractional Interest*:  An ownership interest in property that is held in common with other owners as co-tenants in a parcel of land.

The following list of acronyms and terms are not all used in this handbook.  Some acronyms commonly used by BIA Real Estate Services are included.

| | |
|---|---|
| ALTA | American Land Title Association |
| BIA | Bureau of Indian Affairs |
| BILS | BLM Indian Land Surveyor |
| BLM | Bureau of Land Management |
| CAT EX, CAT, or CX | Categorical Exclusion |
| CFR | Code of Federal Regulations |
| CIP | Certificate of Inspection and Possession |
| CC & R | Covenants, Conditions, and Restrictions |
| DM | Department Manual |
| DOI | Department of the Interior |
| DOJ | Department of Justice |
| EA | Environmental Assessment |

Release # 16-47, Version IV (rev. 1), Issued: 6/28/16
Replaces: Version IV, Issued: 5/16/16

| | |
|---|---|
| EIS | Environmental Impact Statement |
| ECRM | Environmental Compliance Review Memorandum |
| ESA | Environmental Site Assessment |
| FTO | Final Title Opinion |
| FOIA | Freedom of Information Act |
| FONSI | Finding of No Significant Impact |
| IAM | Indian Affairs Manual |
| IBIA | Interior Board of Indian Appeals |
| IGRA | Indian Gaming Regulatory Act |
| ILCA | Indian Land Consolidation Act |
| IRA | Indian Reorganization Act |
| ITO | Interim Title Opinion |
| LDR | Legal Land Description Review |
| LTRO | Land Titles and Records Office |
| MSA | Municipal Service Agreement |
| NEPA | National Environmental Policy Act |
| NHPA | National Historical Preservation Act |
| NOA | Notice of Application |
| NOD | Notice of Decision |
| PLSS | Public Land Survey System |
| PILT | Payment in Lieu of Taxes |
| PTO | Preliminary Title Opinion |
| ROW | Right-of-way |
| SHPO | State Historical Preservation Office |
| THPO | Tribal Historical Preservation Office |
| TIN | Taxpayer Identification Number |
| TSR | Title Status Report |
| U.S.C. | United States Code |

## 3.0    PROCESS AND PROCEDURE

### 3.1    Standard Operating Procedures

Fee-to-trust applications involve the acquisition in trust of whole or undivided interests in land held in fee.   There are separate operating procedures for each type of acquisition and each section is titled as follows:

- 3.1.1  On-reservation Discretionary Trust Acquisitions (25 CFR § 151.10)
- 3.1.2  Off-reservation Discretionary Trust Acquisitions (25 CFR § 151.11)
- 3.1.3  Mandatory Trust Acquisitions (Applicable policy)

### 3.2    Selecting the Correct Standard Operating Procedure

To identify which operating procedure applies, you must review the submitted documentation and determine the following:

Release # 16-47, Version IV (rev. 1), Issued: 6/28/16
Replaces: Version IV, Issued: 5/16/16

A-226

- Is the applicant a Tribe or eligible individual Indian as defined in 25 CFR § 151.2?
- Is there legal authority for the requested acquisition?
- Is this a mandatory or discretionary trust acquisition?
- Is the requested parcel on-reservation or off-reservation?
  - On reservation means land that is within or contiguous to a reservation.
  - If there is a question whether the property is contiguous, consult the Office of the Solicitor (SOL) to review and concur. If the property is clearly contiguous to the exterior boundaries, no SOL analysis is needed.

If the stated purpose of the proposed acquisition is for gaming, follow the Office of Indian Gaming (OIG) Handbook for Gaming Acquisitions (Gaming Handbook) (under development by OIG):

- Notify OIG and provide that office the required documents and information; and
- Continue to process the fee-to-trust application pursuant to the regulations at 25 CFR Part 151 and the applicable section of the Fee-to-Trust Handbook concurrently with any gaming determinations being processed by OIG.

## 3.3    Step Sequence:

While steps within each of the standard operating procedures are numbered sequentially, you may proceed concurrently on other steps, when appropriate, or may repeat certain steps until the operating procedure is completed. *[See Exhibit 5.2: Fee-to-Trust Quick Reference Guide]*

## 3.4    Reservation Proclamations:

On July 22, 2014, the BIA Director issued revised internal guidelines for submitting reservation proclamation requests. These guidelines have now been replaced by a new section on processing reservation proclamations, incorporated herein. *[See Section 3.4.1 Guidelines and Requirements for Requesting a Reservation Proclamation]* The Secretary is authorized by the IRA to proclaim reservations under 25 U.S.C. § 467 as follows:

> The Secretary of the Interior is hereby authorized to proclaim new Indian reservations on lands acquired pursuant to any authority conferred by this Act, or to add such lands to existing reservations: Provided, That lands added to existing reservations shall be designated for the exclusive use of Indians entitled by enrollment or by Tribal membership to residence at such reservations.

Reservation proclamations can only be issued for completed trust acquisitions made pursuant to an authority conferred by the IRA. However, Tribes may choose to submit a reservation proclamation application with their FTT application, or alternatively, may submit a reservation proclamation for lands already accepted in trust. When Tribes submit a reservation proclamation with their FTT application, BIA will endeavor to process the reservation proclamation as soon as

Release # 16-47, Version IV (rev. 1), Issued: 6/28/16
Replaces: Version IV, Issued: 5/16/16

A-227

possible following acceptance of the land into trust.  These updated guidelines establish the standard operating procedures for reviewing reservation proclamation requests from Tribes, the requirements for Regional Offices, and the required documentation for approval by the Assistant Secretary – Indian Affairs (AS-IA).

Release # 16-47, Version IV (rev. 1), Issued: 6/28/16
Replaces: Version IV, Issued: 5/16/16

**A-228**

# 3.1.1
# On-Reservation Discretionary Trust Acquisitions

Release # 16-47, Version IV (rev. 1), Issued: 6/28/16
Replaces: Version IV, Issued: 5/16/16

## ON-RESERVATION DISCRETIONARY TRUST ACQUISITIONS

### Scope

This section of the handbook contains procedures for discretionary trust acquisitions on-reservation and/or contiguous to a reservation for individual Indians and Tribes.  This section applies to undivided fractional and full interests owned in fee by an eligible Tribe or individual.

### Procedure

To assist the applicant in preparing a request, the applicant should be provided a copy of "Required Elements: Application for Fee-to-trust" *[See Exhibit: 5.3]*, the brochure- "Understanding the Fee-to-Trust Process for Discretionary Acquisitions," and any other relevant information.

### Step 1:    Encoding the Fee-to-Trust System of Record

1. Within three (3) business days of receipt of a written request to initiate the application process, encode information into the fee-to-trust system of record.

2. The system of record <u>must</u> be updated within three (3) business days upon receipt of any additional information from the applicant or others (e.g., comments on the notice of application).

### Step 2:  Review of Written Request to Initiate Application Process

All fee-to-trust applications must contain the following:

1. Written request.
   A written request need not be in any special form but must contain each of the following items.

   a. A statement that the applicant is requesting approval of a trust acquisition by the United States of America for their benefit.

   b. Identification of applicant(s).

   c. Legal Land Description.

      1) A description of real property in legally acceptable terms that is definite, legally defensible and susceptible to only one interpretation. Perform a preliminary informal review of the legal land description to assure the obvious elements

Release # 16-47, Version IV (rev. 1), Issued: 6/28/16
Replaces: Version IV, Issued: 5/16/16

## A-230

identified below are present.   A Legal Land Description Review (LDR) is required later in the process.

2) Lands can be legally described a number of ways, most commonly by referencing the Public Land Survey System (PLSS), however, lands in the 13 original states and Texas are subject to other survey systems.

    1) All legal land descriptions utilizing PLSS or any other survey system shall contain the following elements:
- State
- County
- Acreage

    2) If the lands contained in the application are described using the PLSS, the description will contain the following elements that must be included to be a legitimate legal land description.
- Township
- Range
- Principal Meridian
- Section(s)
- Government Lots or Aliquot Parts

    3) All legal land descriptions described by metes and bounds within the PLSS, in addition to the elements contained in b) shall include:
- Commencement tie from a Government corner of PLSS to point of beginning of metes and bounds parcel.
- A metes and bound description which closes mathematically on itself.

    4) All legal land descriptions described by metes and bounds not within the PLSS shall contain the following applicable information:
- A point of beginning easily located on the ground.
- A metes and bound description which closes mathematically on itself.

d. Need for acquisition of the property
    1) Economic Development
    2) Tribal Self-Determination
    3) Indian housing (non-commercial)

e. Purpose for which the property is to be used. (If the purpose of the acquisition is identified by the Tribal applicant as "gaming," follow the procedures outlined in the Gaming Handbook and continue to process the application pursuant to the regulations at 25 CFR Part 151 and this section of the Fee-to-Trust Handbook. "Gaming Related" is no longer a term utilized by the Department of Interior.)

11 | Page

f. When the applicant is an individual who is not a member of the Tribe with jurisdiction and does not already own an undivided trust or restricted interest in the parcel of land to be acquired, written Tribal consent for nonmember applications must be provided.

g. When the applicant is a Tribe who is not the Tribe with jurisdiction and does not already own an undivided trust or restricted interest in the parcel of land to be acquired, written Tribal consent for the Tribal acquisition of land must be provided.

2. In addition to the requirements of Step 2.1., above, the Tribal applicant must also submit the following:

a. The application must state the Tribal name as it appears in the list of *Indian Entities Recognized and Eligible To Receive Services From the United States Bureau of Indian Affairs* published in the Federal Register, or as it appears in a federally approved Constitution.

b. Statutory Authority.

3. In addition to the requirements of Step 2.1. above, the following information is also required for an individual Indian's application:

a. Evidence of eligible Indian status of the applicant.

b. Amount of trust or restricted Indian land already owned by the applicant.

c. Information or a statement from the applicant addressing the degree to which the applicant needs assistance in handling their affairs.

4. When the required elements as noted above (1-3) have been fulfilled, notify the applicant that you have received the application, as required by 52 IAM Chapter 12, 1.3 Policy A. "Acknowledging Receipt of Applications for Fee-to-Trust Acquisitions" *[See Exhibit 5.4.1: Sample Acknowledgement Letter]*.

5. The application will then require the following, to allow for a complete review of the application:

a. Map depicting boundary and location of subject property <u>if necessary</u>.

b. Title evidence consisting of:
   1) The deed or other conveyance instrument providing evidence of the applicant's title or, if the applicant does not yet have title, the deed providing evidence of the transferor's title and a written agreement or affidavit from the

Release # 16-47, Version IV (rev. 1), Issued: 6/28/16
Replaces: Version IV, Issued: 5/16/16

transferor, that title will be transferred to the United States on behalf of the applicant to complete the acquisition in trust; and

2) Either: (i) a current title insurance commitment; or (ii) the policy of title insurance issued to the applicant or current owner and an abstract of title dating from the time the policy of title insurance was issued to the applicant or current owner to the present.
   ● The Department will look to the appropriate licensing authority for qualifications for the preparer of the abstract of title. An abstract of title means a compilation of all instruments of public record which in any manner affect title to the parcel of real property.
   ● "To the present" means a date as close to the date of the review as possible.

3) The applicant may choose to provide title evidence meeting the title standards issued by the U.S. Department of Justice, in lieu of the evidence required by number 2, above.
   ● If the applicant chooses to comply with DOJ Title Standards, they must comply with the requirements of that process. E.g., The preliminary commitment, or a binder of title evidence with a commitment, to issue final title insurance on the current ALTA U.S. Policy Form.
   ● The proposed insured should state, "The United States of America in trust for [insert legal name of the applicant (for Tribes, the legal name is the name as found in the Federal Register or a federally approved Constitution)]."
   ● The proposed policy coverage must meet the minimum title insurance required by the DOJ Title Standards, or the alternate title evidence submitted by the Tribe.

c. A draft Warranty Deed for the acquisition, with designation of BIA approval and delegation of authority or Warranty Deed with acceptance of conveyance. The deed must conform to local statutory recording requirements. [*See Exhibit 5.4.12 for a sample*]

d. A Restrictive Covenant Acknowledgement form may also be required [*See Exhibit 5.4.8: Restrictive Covenants Acknowledgement*].

e. A Legal Land Description Review (LDR) from a qualified individual that concurs with the validity of the legal land description including acreage. The concurrence is intended to verify that the description is accurate, correctly describes the subject property, and that it is consistent throughout the acquisition documents, such as commitments for title insurance, [survey] maps, deeds, etc.

Release # 16-47, Version IV (rev. 1), Issued: 6/28/16
Replaces: Version IV, Issued: 5/16/16

1) Legal land descriptions shall be reviewed to identify insufficiencies due to confusing boundaries, gaps or overlaps, encroachments, and other conflicts along a property line.

2) Relying solely on title evidence and title insurance creates the potential for overlooking boundary defects.

6. Identify all missing information or documentation that is required, or materials submitted that do not have appropriate signatures, dates or other deficiencies that would prevent a complete review of the application and result in incomplete status. Refer to Step 3 "Responding to an Incomplete Case" *[See Exhibit 5.4.2: Sample 30-day Notice-Incomplete Application Package]*.

7. Advise the applicant that it is beneficial to provide the following documentation, if available.

   a. Any documentation describing efforts taken to resolve identified jurisdictional problems and potential conflicts of land use that may arise as a result of the fee-to-trust acquisition.

   b. Any signed cooperative agreements relating to the fee-to-trust acquisition. Describe agreements for infrastructure development or services.

      ● Examples: utilities, fire protection, solid waste disposal.

   c. Agreements that have been negotiated with the State or local government.

      ● Example: payment in lieu of taxes (PILT).

   d. Description of those services not required of the state or local government(s) to the property because they are provided by the Tribal government.

   e. Any information in support of the Tribal applicant being "under Federal jurisdiction" in 1934, if applicable, or other statutory authority for the acquisition.

   f. Additional information or justification to assist in reaching a decision.

8. If the applicant has requested the transfer of an undivided fractional interest, there are two processing options to acquire this interest, and BIA must determine which applies.

   a. Discretionary. If the parcel did not have existing trust or restricted interests as of November 7, 2000, as evidenced by a report reflecting tract history from the BIA's official system of land records, the acquisition is discretionary. [See 25 U.S.C. § 2216(c)]. Refer to 25 CFR § 151.7 and this section of the handbook (covering On-Reservation Discretionary Trust Acquisitions) for further processing requirements.

Release # 16-47, Version IV (rev. 1), Issued: 6/28/16
Replaces: Version IV, Issued: 5/16/16

b. Mandatory.  If any interests in the parcel were held in trust or restricted status as of November 7, 2000 [See 25 U.S.C. § 2216(c)], the acquisition is mandatory.)].  Refer to the Mandatory Acquisitions section of this handbook and the most recent mandatory acquisition guidance. (*Adhere to Policy and Directives 4.1:  Mandatory Acquisition Guidance*).

## Step 3:    Responding to an Incomplete Case

1. When a written request or application is determined to be incomplete:

   a. Prepare a written notice to applicant including the following information and send by certified mail, return receipt requested.  *[See Exhibit 5.4.2: Sample Original 30-Day Notice of Incomplete Fee-to-Trust Application]. (Adhere to Policy and Directives 4.2: IAM, Part 52, Chapter 12 "Processing Discretionary Fee-to-Trust Applications", 1.3 Policy B. "Gathering information for Incomplete Fee-to-Trust Applications", and C. "Administrative and Legal Timeframes")*.

      1) A statement that the application is incomplete.

      2) Specify what information or documentation was omitted or required and explain why the requested information is necessary.

      3) Request the applicant provide the omitted or required documentation or information to BIA within 30 days of the applicant's receipt of the written notice or the application will be inactivated and returned.

   b. If the applicant does not provide the omitted or required documentation or information to BIA in accordance with the notice, send applicant a final notice and a notice enclosing the application and stating that BIA did not receive the information, so the application has been inactivated.  *[See Exhibit 5.4.3:  Sample Final Notice of Incomplete Fee-to-Trust Application Package, and Exhibit 5.4.4:  Sample Return of Incomplete Fee-to-Trust Application]*.

## Step 4:    Conducting Site Inspection and Completing Initial Certificate of Inspection

Whenever possible, the following should be done early in the acquisition process:

1. Conduct an inquiry.  Ask the landowner and any occupants whether there are any third party rights in the land.

2. Conduct a physical inspection of the land.  Compare condition and use of property as described in submitted documents. Examples of things to check during inspection are:
   a. Persons living on the property not shown as record owner(s).

Release # 16-47, Version IV (rev. 1), Issued: 6/28/16
Replaces: Version IV, Issued: 5/16/16

**A-235**

      b.  Work being done by contractors.
      c.  Change in use other than noted in application.
      d.  Lack of access to property.
      e.  Location of existing utility lines, roads, etc., not defined in title evidence.

3.  Prepare a Certificate of Inspection and Possession (CIP).

    a.  The CIP (including the inquiry and physical inspection, above) may be prepared by:

        1)  A duly authorized BIA or other Federal employee; or
        2)  A Tribal employee (whether or not performing contracted/compacted BIA
            realty functions) or contractor, as long as:
            ● The Tribal employee is not also an employee of the landowner (in other
               words, as long as the property is not being acquired in trust for the
               employee or the Tribe).  Neither the owner nor an employee of the owner
               of the inspected property should perform the inspection or execute the
               certificate.  AND
            ● The CIP is approved by BIA or other Federal employee.

    b.  The CIP should be on Form #1 [*see Exhibit 5.7.1*] or Form #2 [(*see Exhibit 5.7.2*].
       Form # 1 is designed to be completed by one individual. Form #2 is designed to be
       completed by two individuals -- one who does the inspection and one who makes
       inquiry of the landowner and any occupants.

        1)  No portion of the CIP forms may be deleted or scratched out.
        2)  All blanks must be filled in.
        3)  If a particular blank is not applicable to an acquisition, it should be filled in
            with "N/A".
        4)  Both forms anticipate that additional information can and often will be added
            to the CIP, especially if the inspection or inquiry reveals possible possessory
            rights of others in the property.

4.  Prepare a written notice to applicant advising of any inconsistencies that require an
    explanation and/or correction.  Advise applicant that unless the inconsistencies are
    addressed, applicant may be prohibited from taking land into trust.  See Step 3
    "Responding to an Incomplete Case" to issue the notice and 52 IAM 12 [*Policy and
    Directives 4.2: 52 IAM Chapter 12, 1.3 Policy B. "Gathering information for Incomplete
    Fee-to-Trust Applications"*].

Release # 16-47, Version IV (rev. 1), Issued: 6/28/16
Replaces: Version IV, Issued: 5/16/16

**Step 5:    Preparing the Preliminary Title Opinion (PTO)**

1. Confirm that you have the required title evidence documentation from applicant and copies of all documents that create encumbrances or exceptions to title.

2. Submit a written request for a Preliminary Title Opinion (PTO) to the Solicitor's Office. Attach the title evidence documents (listed in Step 2, above) and the following information/documents:

   a. Draft deed in trust to the United States, conforming to local statutory recording requirements and/or Draft Acceptance of Conveyance.

   b. Property boundary and location maps, if applicable.

   c. Initial Certificate of Inspection and Possession, if one has been completed.

   d. The LDR.

   e. Consistent with § 151.9, a written request for approval of the acquisition which adequately demonstrates it has been duly authorized by the Tribe.

   f. A copy of any agreement (such as a lease or right-of-way) currently applicable to the property.

   g. If the property is identified as a lot in a subdivision, a copy of the plat (which may contain restrictions) and, if there are any deed restrictions, a copy of each document that creates the restrictions.

**Step 6:    Preparing Notice of Application (NOA)**

1. If the application is to acquire a parcel or parcels that will cumulatively total 200 acres or more, notify the AS-IA of the application, by email at F2Tnotice@bia.gov, and by mail at: 1849 C Street, NW, MS-4141-MIB, Washington, DC 20240.

2. Prepare the NOA to inform state and local governments, including Tribal governments, having regulatory jurisdiction over the proposed acquisition property and/or any person or entity submitting a written request for notice that they have 30 days to submit comments.

3. Include the following in the notice *[See Exhibit 5.4.6:  Sample Notice of Application]*:

   a. General description of need and purpose.

   b. Solicitation of comments on the potential impact of the acquisition regarding regulatory jurisdiction, real property taxes and special assessments.

Release # 16-47, Version IV (rev. 1), Issued: 6/28/16
Replaces: Version IV, Issued: 5/16/16

**A-237**

    c.   Notification that parties have 30 days to submit comments.

    d.   A statement informing the state and local governments to forward the notification on to any of their local sub-districts.

4.   Send NOA by certified mail return receipt to the state and local governments.

5.   In consultation with the applicant, consider the option of posting the application on a website to make it easily accessible to the public (with confidential information redacted).

## Step 7:    Environmental Compliance Review

1.   Transmit NEPA, 602 DM 2 and other environmental compliance documents to the appropriate environmental staff and request environmental compliance review.  Update environmental staff on any changes in the application.

2.   The environmental staff is responsible for completing the Environmental Compliance Review Memorandum (ECRM) or other documentation of NEPA compliance.  NEPA compliance for every discretionary fee-to-trust transaction must be documented  *[See Exhibit 5.4.5:  Sample Environmental Compliance Review Memorandum]*.

3.   If the acquisition is for the purpose of gaming, the environmental compliance review must be performed in accordance with the Gaming Handbook and the Indian Gaming Regulatory Act.

## Step 8:    Comments to Notice of Application

1.   Provide a copy of all information responsive to the NOA to the applicant for their written response.   Send by certified mail return receipt *[See Exhibit 5.4.7:  "Sample Notice of Application Comments to Applicant"]*.

2.   The regulations state that the applicant has a reasonable amount of time to provide BIA its written response to the comments.  BIA has determined that 30 days with the opportunity for an extension is a reasonable amount of time.  If the applicant requests the Secretary to issue a decision without providing a response to any comment(s), proceed with Step 10, "Preparing Analysis and Notice of Decision."

## Step 9:    Clearance of PTO Objections before Notice of Decision (NOD)

1.   Notify applicant of objections outlined in the Preliminary Title Opinion (PTO).  The Solicitor's Office may require the elimination of any such liens, encumbrances, or infirmities (i.e., defects) prior to taking final approval action on the acquisition, and will

Release # 16-47, Version IV (rev. 1), Issued: 6/28/16
Replaces: Version IV, Issued: 5/16/16

require elimination prior to such approval if she determines that the liens, encumbrances or infirmities (i.e., defects) make title to the land unmarketable.

2. Do **not** send the PTO to the applicant, as it is attorney-client privileged information.

3. Request applicant to provide documents to show that objections of the PTO have been cleared.

4. If the applicant does not send the responsive information within a reasonable amount of time, refer to the policy found at 52 IAM Chapter 12 (Processing Discretionary Fee-to-Trust Applications). If no response is received within the timelines established by the policy, proceed with Step 10, "Preparing Analysis and Notice of Decision."

### Step 10: Preparing Analysis and Notice of Decision (NOD)

1. All gaming acquisition NOD's shall be prepared pursuant to the procedures outlined in the Gaming Handbook and submitted to OIG for publication in the Federal Register.

2. If a significant amount of time lapses between the date of the NOA and the NOD, reissue the NOA to allow for updates to the comments, applicant's responses to comments, and application documents (e.g., title evidence and ESA).

3. Consult with the Office of the Solicitor to prepare an analysis of whether the Tribal applicant was under Federal jurisdiction in 1934 for inclusion in the decision, if applicable.[1] BIA should consult with the Solicitor's Office as early in the process as possible (i.e., as soon as BIA has determined an application is complete) so that the Solicitor's Office has sufficient time to prepare a *Carcieri* opinion. For Tribes for whom the Solicitor's Office has already prepared an analysis of whether the Tribal applicant was under Federal jurisdiction in 1934, BIA may rely on that analysis.

4. Document case analysis and prepare NOD, which must include language on the right to appeal. The analysis and NOD must be based on the facts contained in the record and responsive to the following factors:

   a. The existence of statutory authority for the acquisition and any limitations contained in such authority, including analysis addressing whether the Tribal applicant was under Federal jurisdiction in 1934, if applicable.

   b. The need of the individual Indian or the Tribe for additional land.

   c. The purposes for which the land will be used.

---

[1] An opinion whether a tribal applicant was under Federal jurisdiction in 1934 (a "*Carcieri* opinion") is only required for applications submitted pursuant to 25 U.S.C. § 465 and that rely on the first definition of "Indian."

Release # 16-47, Version IV (rev. 1), Issued: 6/28/16
Replaces: Version IV, Issued: 5/16/16

**A-239**

d. If the land is to be acquired for an individual Indian, the amount of trust or restricted land already owned by that individual and the degree to which he/she needs assistance in handling their affairs.

e. If the land to be acquired is in unrestricted fee status, the impact on the State and its political subdivisions resulting from the removal of the land from the tax rolls.

f. Jurisdictional problems and potential conflicts of land use which may arise.

g. If the land to be acquired is in fee status, whether the Bureau of Indian Affairs is equipped to discharge the additional responsibilities resulting from the acquisition of the land in trust status.

h. The extent to which the applicant has provided information that allows BIA to comply with the National Environmental Policy Act (NEPA), and 602 DM 2, Land Acquisitions: Hazardous Substances Determinations. If a categorical exclusion applies (e.g., where there will be no change in land use), the decision should explain why the categorical exclusion applies and it should be documented in the record.

i. While not specified in the regulations, the NOD should contain analysis of comments and concerns by state and local governments.

## Step 11:   Providing Notice of the Decision

NOTE:  The notice and procedures for providing notice of the decision differ depending upon whether a BIA official (e.g., the Superintendent or Regional Director) or the AS-IA makes the acquisition decision. The process for each is set out below.

If a **BIA official** makes a decision to approve a request:

1. Prepare Public Notice of the decision to acquire land in trust pursuant to 25 CFR § 151.12(d) and the right to administratively appeal that decision.  The Public Notice must include the following *[See Exhibit 5.4.10: Sample Public Notice to Acquire land into Trust]*:

   a. Statement that a decision to acquire land in trust has been made and that there is a 30-day administrative appeal period.

   b. Instructions on how to obtain a copy of the BIA decision, including a website and/or physical location where a copy of the decision will be available.

   c. A legal land description of the land.

20 | Page

2. *Promptly* after approving the request:

   a. Address and send the original decision to the applicant. Attach a list of all parties, including state and local government entities that were provided a copy under paragraph d., below.

   b. Publish the Public Notice in a newspaper of general circulation serving the affected area, when the approval is at the Regional or Agency level. Complete this step as near in time as possible with sending the original decision to the applicant.

   c. Make a copy of the decision publicly available on the website and/or at a physical location identified in the Public Notice and ensure a copy of the decision is available at that location by the time the Public Notice is published.

   d. As near in time as possible with publication of the Public Notice, send a copy of the decision to:

      1) All interested parties[2] who have made themselves known, in writing, to BIA prior to the decision being made; and

      2) The state and local governments having regulatory jurisdiction over the land to be acquired.

3. If the decision is issued by the Regional Director and is for an acquisition of a parcel or parcels that cumulatively total 200 acres or more, notify AS-IA by email at F2Tnotice@bia.gov, and by mail at: 1849 C Street, NW, MS-4141-MIB, Washington, DC 20240.

4. After expiration of the 30-day appeal period*, confirm whether an appeal has been filed with the Interior Board of Indian Appeals (IBIA) (or with the Regional Director, if the Superintendent issued the decision). If an appeal has been filed with the IBIA, then:

   a. Consult with the Solicitor's Office on next steps, including the preparation of the administrative record;

   b. If the decision being appealed is for an acquisition of a parcel or parcels that cumulatively total 200 acres or more, notify AS-IA by email at F2Tnotice@bia.gov, and by mail at: 1849 C Street, NW, MS-4141-MIB, Washington, DC 20240.

5. Once administrative remedies are exhausted and the decision is final for the Department, proceed to Step 12 "Preparing Final Certificate of Inspection and Possession."

---

[2] BIA should assume every party making themselves known is an interested party for purposes of sending out notice of the decision.

Release # 16-47, Version IV (rev. 1), Issued: 6/28/16
Replaces: Version IV, Issued: 5/16/16

**A-241**

\* When does the 30-day appeal period expire?

| For: | The 30-day appeal period expires: |
|------|-----------------------------------|
| All interested parties who have made themselves known in writing to the BIA prior to the decision being made | 30 days after such interested party receives a copy of the decision |
| All state and local governments having regulatory jurisdiction over the land to be acquired | 30 days after such state or local government entity receives a copy of the decision |
| All other persons and entities | 30 days after publication of the Public Notice in a newspaper of general circulation |

To the greatest extent possible, these 30-day appeal periods should be timed to run at the same time, and should never run back-to-back.  In other words, the Public Notice should be published as close in time as possible to the notice of decision date.

If the Public Notice is provided several days after the notice of decision is provided to interested parties or state or local government entities:

- The issuance of Public Notice does not extend the time for interested parties or state or local government entities who received actual written notice to file an appeal.
- The 30-day appeal period (for all other persons and entities) provided by the Public Notice will extend beyond the interested parties' or state or local government entities' 30-day appeal period.
- **Wait until the expiration of the latest 30-day appeal period before proceeding with this step**.

If an interested party or state or local government entity receives a notice of decision after other parties or after the Public Notice is published:

- The 30-day appeal period for that interested party or state or local government entity extends beyond the 30-day appeal period provided by the other notices and Public Notice.
- **Wait until the expiration of the latest 30-day appeal period before proceeding with this step**

## If the **AS-IA** makes a decision to approve a request:

1. In coordination with AS-IA (through OIG or other AS-IA staff, as appropriate), prepare the Public Notice of the final Departmental decision to acquire land in trust pursuant to 25 CFR § 151.12 (d) and include the following *[See Exhibit 5.4.10: Sample Public Notice to Acquire Land into Trust – AS-IA Decisions]*:

    a. Statement that a decision to acquire land in trust has been made and that the decision is final for the Department.

    b. A legal land description of the land.

    c. Website address where the decision is made publicly available.

2. *Promptly* after approving the request:

    a. Address and send the original decision to the applicant.

    b. Publish the Public Notice in the Federal Register.  Complete this step as near in time as possible with sending the decision to the applicant.

Release # 16-47, Version IV (rev. 1), Issued: 6/28/16
Replaces: Version IV, Issued: 5/16/16

    c. Proceed to Step 12 "Preparing Final Certificate of Inspection and Possession." Note: Where AS-IA is issuing the decision, AS-IA will notify BIA of the anticipated or actual decision date to allow BIA time to complete this step and comply with Departmental requirements in 602 DM 2.

3. If a decision may be challenged in Federal court, consult with the Solicitor's Office on preparing the administrative record as early in the decision-making process as possible.

4. Upon the completion of any judicial review, instructions may be provided by the Office of the Solicitor based upon the outcome of the judicial review.

**If a BIA official** makes a decision to deny a request:

    Promptly provide the applicant with the decision and notification of any right to file an administrative appeal under 25 C.F.R. Part 2.

**If the AS-IA** makes a decision to deny a request:

    Promptly provide the applicant with the decision.

**Step 12:    Preparing Final Certificate of Inspection and Possession (CIP)**

1. Complete the Final CIP in the same manner as stated under Step 4 "Conducting Site Inspection and Completing Initial Certificate of Inspection" as close in time as possible to closing of the transfer.

2. Compare the Final CIP with the PTO and Initial CIP. [CIP's prepared more than 180 days prior to closing are not acceptable.]

3. If there are any inconsistencies between the initial and final CIP in relation to possessory rights or interests, provide written notice to the applicant requiring response within 30 days of receipt of notice identifying a plan for curative action and/or request for extension of time. Ascertain the interest or claim of any person(s) other than the record owner(s) who is occupying or using any part of the lands. If the interest will interfere with the contemplated use of the land, measures should be taken to eliminate claims which are not compatible by, for example:

    a. Obtaining disclaimers or quitclaim deeds from any person who has an uncertain interest in the property that we are trying to solve to ensure clear title;

    b. Obtaining attornment agreements from tenants with unrecorded leases;

    c. Agreeing to grant a private right-of-way or pipeline easement with specific terms and an agreed location and dimension for the easement, in return for the claimant's

Release # 16-47, Version IV (rev. 1), Issued: 6/28/16
Replaces: Version IV, Issued: 5/16/16

agreement to quitclaim any poorly defined possible easement which he/she may have acquired by prescription.

4.  If the applicant does not respond or follow through with curative action within the 30-day period or any granted extension(s), evaluate the effects of this failure and if those effects will impact the decision issued under Step 10.

## Step 13:    Acceptance of Conveyance

Note:  All gaming acquisition acceptance of conveyances are approved by the Assistant Secretary, Indian Affairs through OIG pursuant to the Gaming Handbook and are completed by the applicable field office.

1.  Immediately following completion of the CIP (Step 12) and fulfillment of any applicable Departmental requirements (including compliance with 602 DM 2), complete this step (Step 13) and Steps 14 and 15 to formally accept the land into trust.

2.  Confirm that the file contains all documentation that meets the requirements of the PTO and is in compliance with 25 CFR Part 151.

3.  Process the formal acceptance of conveyance.  The conveyance document must include:

    a.  Signature of the appropriate BIA official.

    b.  The statutory authority must be stated on the deed.

    c.  The delegation of authority must be stated on the acceptance document (e.g., Acceptance of Conveyance form or the Warranty Deed) *[See Exhibit 5.4.121: Acceptance of Conveyance]*.

## Step 14:    Final Title Opinion and Recordation

1.  Obtain the *original county-recorded deed and updated title evidence from the applicant.

2.  Request a Final Title Opinion (FTO) from the Office of the Solicitor and provide the Office of the Solicitor with a copy of the environmental compliance review memorandum.

3.  The request shall include:

    a.  The recorded Deed and Acceptance of Conveyance

    b.  Title Insurance Policy, if submitted

24 | Page

**A-244**

    c.  PTO

    d.  Updated title evidence to date of closing including evidence of corrective actions

    e.  LDR

    f.  Final Certificate of Inspection and Possession.

*A copy, versus the original recorded Warranty Deed may be sufficient to initiate a request for the final title opinion.

## Step 15:    Recording at Land Titles and Records Office

1.  Submit the following documents to the Land Titles and Records Office (LTRO) for recording:

    a.  The original county-recorded Warranty Deed and, if no federal approval is included on the Warranty Deed, the Acceptance of Conveyance.

    b.  LDR, including acreage.

    c.  Copy of applicable referenced surveys and maps.

    If any of these documents are missing or incomplete, fulfill the requirements in 52 IAM Chapter 12, 1.3 Policy C. "Administrative and Legal Timeframes."  Additionally, see 25 CFR § 150.7(a).

2.  Upon receipt of these documents the LTRO shall record and return to the entity that submitted the request within 5 business days.

3.  The processing office has the discretion to submit documents for recording in addition to those required above; upon receipt, the LTRO shall record those documents.

## Step 16:    Completed Application Package

1.  When the recorded documents have been received from the LTRO:

    a.  Return the original recorded documents to the office that is responsible to maintain custody of the record in accordance with Bureau record standards.

    b.  Provide a copy of the recorded package to the applicant.

    c.  Provide a recorded copy of the deed showing trust status to the Bureau of Land Management to update their records.

Release # 16-47, Version IV (rev. 1), Issued: 6/28/16
Replaces: Version IV, Issued: 5/16/16

**A-245**

2.  Close out electronic case file in Fee-to-trust system of record.

> END OF PROCEDURE

Release # 16-47, Version IV (rev. 1), Issued: 6/28/16
Replaces: Version IV, Issued: 5/16/16

# EXHIBIT 20



OFFICE OF THE ATTORNEY GENERAL
CONNECTICUT

ROBERT DEICHERT                                                      Phone: 860-808-5020
ASSISTANT ATTORNEY GENERAL

February 6, 2025

**By Email to Appeal.Filing@bia.gov and Certified Mail**

Bryan Mercier
Assistant Secretary – Indian Affairs
U.S. Department of the Interior
1849 C Street, N.W. MS-4660-MIB
Washington, D.C. 20240

Re:    *5 U.S.C. § 705 Request as to the Fee-to-Trust Applications (Case Nos. 53179, 53199)*
       *("Applications") of the Mashantucket Pequot Indian Tribe*

Dear Assistant Secretary Mercier:

Pursuant to 5 U.S.C. § 705, the State of Connecticut respectfully requests that the Department of the Interior ("Interior") and the Bureau of Indian Affairs ("BIA," and together with Interior, "Department") postpone the final acquisition of certain land to be taken into trust on behalf of the Mashantucket Pequot Indian Tribe ("Tribe").

Put simply, Congress did not authorize the Secretary of the Interior ("Secretary") to acquire this land for the Tribe. The State raised this argument, but because the State did not receive timely notice of the Applications, it submitted its objection beyond the putative deadline set by the BIA. Inexplicably, the BIA refused to consider it. Rather than address the critical issue of whether Congress had actually authorized the Secretary to make these acquisitions, the BIA ignored the problem entirely and refused to even acknowledge—much less alleviate—the State's concerns. When the State appealed the BIA's decision, the former Assistant Secretary—Indian Affairs ("ASIA") affirmed on the ground that the State's Comments were untimely and, again, did not consider whether the Secretary actually had the authority to make this acquisition.

If the BIA continues to ignore this lack of authority and completes the acquisition of the land, it will exacerbate an already flawed and unlawful process, from which the State is forced to seek judicial review. Without a stay, however, review will become unnecessarily complicated and result in a tremendous waste of resources.

Specifically, the State asks that the Department stay the acquisition for at least four reasons. **First**, the State has raised claims of great public importance—that is, whether a federal agency may strip the State of its sovereign territory without authorization from Congress and without affording the State an adequate opportunity to be heard. **Second**, a stay will preserve the status quo while the State promptly seeks judicial review. Without a stay, a number of legal and practical obstacles to relief will arise as soon as the federal government takes title to the land. **Third**, a delay will not hurt the agency or the Tribe. The Tribe represents that the land at issue is unused and that it foresees no

165 Capitol Avenue
Hartford, Conn. 06106

*An Affirmative Action/Equal Opportunity Employer*

**A-248**

P a g e  | **2**

immediate changes. ***Fourth***, a stay is consistent with agency policy. In similar circumstances, the BIA has repeatedly agreed that it would not interfere with judicial review and since then the United States Supreme Court has emphasized the importance of judicial review of agency action. Moreover, other recent legal developments—including President Trump's Memorandum titled "Regulatory Freeze Pending Review," 90 FR 8249 (Jan. 20, 2025), and the Acting Secretary's Temporary Suspension of Delegated Authority—either establish or, at least suggest, that a stay furthers the new administration's objective of evaluating important issues decided under prior leadership.

## I.  JUSTIFICATION FOR THIS REQUEST

### A.  Background

#### 1.  The Tribe submits Applications asking the Secretary to take land into trust.

In August 2023, the Tribe submitted the two Applications, which each requested that the BIA acquire a certain parcel of land in trust on the Tribe's behalf. *See* A003; A019 (App. for 119 Indiantown Rd.; App. for 159 Indiantown Rd.). The Tribe represented that both parcels were undeveloped and that it had no plans to change their use. *See* A007; A022 (App. for 119 Indiantown Rd.; App. for 159 Indiantown Rd.). The Tribe also argued that the Secretary had the statutory authority to acquire the land under the Indian Reorganization Act ("IRA"), which, the Tribe claimed, Congress implicitly extended to the Tribe through § 9(a) of the Mashantucket Pequot Indian Claims Settlement Act, 97 Stat. 851 (Oct. 18, 1983) ("the Settlement Act"). *See* A004–5; A020–21 (App. for 119 Indiantown Rd.; App. for 159 Indiantown Rd.).

#### 2.  The BIA fails to give the State an opportunity to comment on the Applications.

The Secretary was required to send the State notices of the Applications ("Notices") and provide the State an opportunity to comment. *See* 25 C.F.R. § 151.10. In November 2023, the BIA attempted to comply with that requirement by mailing the Notices to the State's Governor. *See* A026 (Ltr. from R. Trickey (Apr. 17, 2024)). But the Governor never received the mailed Notices from the BIA. As a result, the State only became aware of the Applications after learning about them from a third party in March 2024. A035 (Ltr. from R. Deichert (Apr. 26, 2024)). By then, the BIA's putative deadline to file comments had already passed. *See* A026 (Ltr. from R. Trickey (Apr. 17, 2024)).

As soon as the State learned of the Applications from a third party, it quickly requested an extension of time, so that it could weigh in on this important issue before the BIA took formal action. *See* A034 (Ltr. from R. Deichert (Apr. 26, 2024)). The BIA denied the request, however, claiming it had confirmation of delivery slips that indicated the Notices had been delivered to the mailroom of the State Legislative Office Building at 210 Capitol Avenue, Hartford, CT in November 2023—the Governor's Office's address. *See* A026 (Ltr. from R. Trickey (Apr. 17, 2024)). The Governor shares this address with another branch of government, as well as hundreds of state employees and policy makers with no connection to the Governor. *See, e.g.*, A052 ¶ 8 (Dec. of K. Damato (May 24, 2024)).

The BIA took the position (contrary to precedent) that the delivery slips were dispositive and the comment period had permanently closed on December 7, 2023—*more than four months before the*

**A-249**

P a g e  | 3

*State had even learned about the Applications. See* A026 (Ltr. from R. Trickey (Apr. 17, 2024)). The BIA did not dispute the representations from the Governor's Office, through counsel, that it never received the Notices by mail, even though the Notices had apparently been delivered to the mailroom at the State Legislative Office Building. Nor did the BIA give the State an opportunity to show cause as to why its opportunity to comment should not be time-barred.

So the State investigated further. Despite the existence of the delivery slips, the State concluded that the Governor's Office had not, in fact, received the Notices. Through representations by counsel and a detailed Declaration from the Governor's Office's Director of Operations, the State informed the BIA of its ample efforts to locate the Notices, but that it could not do so. *See* A048–56 (Ltr. from R. Deichert (May 24, 2024); Dec. of K. Damato (May 24, 2024)). As best the State could tell, an individual in the mailroom by the name "M. Estrada" signed for the Notices, but never actually delivered them to the Governor's Office. *See id.* No one named "M. Estrada" (or any reasonable variation thereof) works for the Governor's Office or is otherwise authorized to sign for documents on the Governor's behalf. *See id.* Moreover, the Governor's Office records every mailing it receives in a logbook, and the logbook has no record of the Notices. *See id.*

Without addressing any of the State's evidence, the BIA once again refused to allow the State to comment. *See* A093–109 (Not. of Dec. for 119 Indiantown Rd. (Aug. 5, 2024); Not. of Dec. for 159 Indiantown Rd. (Aug. 5, 2024)). This refusal was—and is—difficult to understand or to justify. The Tribe has owned the land for many years, uses it sparingly (e.g., for hiking), and averred that it has no plans to change its use of the land. Nothing about the Applications indicates that the acquisition of the parcels in trust was at all time sensitive. And the BIA did not rule on the applications until well after the State had submitted its Comments.

### 3.    The BIA refuses to provide the State copies of the Applications.

At the same time the State was trying to convince the BIA to hear its concerns, the State also attempted to obtain copies of the Applications so that it could evaluate the Tribe's request and provide informed comments.

The BIA refused. After the State twice respectfully asked the agency to provide the Applications to facilitate as full and prompt a response as possible, the BIA finally responded on May 1, 2024 that it would provide a copy of the Applications only if and when the State submitted a formal Freedom of Information Act ("FOIA") request. *See* A091 (Ltr. from Reg. Dir. (May 1, 2024). Or, the State could travel over 1,000 miles to Nashville, Tennessee to come look at the documents that the Regional Director said he had in his office. *See* A043 (Not. of Application (Nov. 3, 2023)). The BIA did not offer a reason—nor is any apparent—for refusing to provide the State electronic copies of the Applications. Indeed, providing a copy of an application along with its notice should be mandatory. Other agencies within the Department of the Interior provide a copy of an application along with public notice as a matter of course.

Timing was critical, so FOIA access was cold comfort. The BIA usually takes many months to provide a copy of an application, despite having them readily available. The Town of Ledyard, for example, had submitted precisely such a FOIA request to the BIA on April 9, 2024 seeking the two Applications. *See* A110 (FOIA Req. (Apr. 9, 2024)). But the Town did not receive a response on these two Applications until August 2024—after the Applications had been ruled on—in apparent violation

of FOIA. *See* 5 U.S.C. § 552(a)(6)(A)(i) (requiring a response within 20 business days absent extraordinary circumstances). Because time was of the essence, the State pressed forward with its Comments instead of waiting for a FOIA response that could take weeks or months to process.

      **4.    The BIA's ruling ignores the State's objections and exceeds the BIA's statutory authority.**

Even though the BIA had improperly denied the State's request for an opportunity to submit comments and withheld the Applications, the State submitted Comments on the Applications on May 24, 2024. The Comments raised both substantive and procedural concerns.

Substantively, the State noted it was unable to respond to the details of the Applications because the BIA had refused to provide them. Without the benefit of seeing the Applications, the State was nonetheless able to argue that the BIA should deny them because, among other reasons, the BIA lacks the statutory authority to grant the Applications. *See* A070–80 (State's Comments (May 24, 2024)).

Procedurally, the State argued that the BIA had improperly denied it an adequate opportunity to be heard. A confirmation of delivery slip might trigger a presumption of receipt, but precedent establishes that presumption is rebuttable. And the State had rebutted it by recounting the details of its investigation, which determined that the Notices had not, in fact, been received by the Governor. *See* A048–56 (Ltr. from R. Deichert (May 24, 2024); Dec. of K. Damato (May 24, 2024)). Therefore, the State's Comments were timely.

The Regional Director granted both Applications on August 5, 2024. *See* A093–109 (Not. of Dec. for 119 Indiantown Rd. (Aug. 5, 2024); Not. of Dec. for 159 Indiantown Rd. (Aug. 5, 2024)). The Decisions were effectively identical in most respects. Notably, they both identify the sole statutory authority for the acquisition of the properties as "25 U.S.C [sic] 5108 INDIAN REORG ACT JUNE 18 1934 (48 STAT. 984)." *See* A094; A103 (Not. of Dec. for 119 Indiantown Rd. (Aug. 5, 2024); Not. of Dec. for 159 Indiantown Rd. (Aug. 5, 2024)).

As the State will discuss in more detail below, that was clearly erroneous. For example, it directly contradicts Supreme Court precedent. It also conflicts with the Acting Regional Director's Decision granting the Tribe's Case No. 55448 Application for a separate parcel of land. In that instance, the Acting Regional Director relied on the Settlement Act (instead of the IRA) as a purported source of authority for the acquisition. To be clear, the Secretary lacks authority under either statute— the State and the Town of Ledyard have appealed the decision on Case No. 55448 to the Interior Board of Indian Appeals ("IBIA"). But the fact that the BIA cannot even reach internal agreement on the statutory authority for acquisitions on the Tribe's behalf speaks volumes.

The Decisions are also notable because they fail to acknowledge—let alone persuasively address—the State's argument that it had rebutted the presumption of notice from mailing or any of the arguments the State raised in its Comments. Remarkably, the Decisions simply state that "[n]o comments or objections to the conveyance of the property in trust for the Tribe were received within the comment period" and, otherwise, that "[t]here were no comments by the state and local governments in opposition to the conveyance of this land into trust for the Tribe." A094–95; A103 (Not. of Dec. for 119 Indiantown Rd. (Aug. 5, 2024); Not. of Dec. for 159 Indiantown Rd. (Aug. 5, 2024)).

Page | 5

### 5.    The former ASIA agrees the State did not receive actual notice, but nonetheless refuses to consider the State's arguments.

In August 2024, the Regional Director granted both Applications. The State timely filed Notices of Appeal to the IBIA, which the IBIA then consolidated. The former ASIA exercised his authority under 25 C.F.R. § 2.508 to assume jurisdiction over the appeals. On January 10, 2024, the former ASIA denied the appeals. *See* A111–24 (ASIA Dec. (Jan. 10. 2025)).

The timing of the former ASIA's issuance of notice of his decision was curious. Under the governing regulations, the agency must "immediately" take steps to acquire the land. 25 C.F.R. § 151.12(d)(2)(iv). Despite this, the former ASIA inexplicably waited four days to mail his decision to the impacted parties. And due to delays in the mail once the former ASIA belatedly sent his decision, the former ASIA's mailing did not arrive at the State's offices until February 3, 2025—24 days after the former ASIA's decision.

The substance of the former ASIA's decision is also notable because it agrees that the State did not receive notice, but nonetheless determines that the State's Comments were untimely. *See* A113 (ASIA Dec. at 3 (Jan. 10, 2025)) ("whatever caused the failure of the Governor to receive the mailings at issue"); A121 (*id.*) ("whatever caused the State not to receive the Notice"). The former ASIA thus refused to address any of the State's concerns on the merits, including the Secretary's lack of statutory authority to acquire the land at issue.

### B.    Standard

An agency may stay an action if "justice so requires . . . pending judicial review." 5 U.S.C. § 705. The overarching purpose of § 705 is to allow the agency to maintain the status quo while the case plays out in court. "[A]n agency stay under § 705 should be imposed for one—and only one—reason: to maintain the status quo in order to allow judicial review of the underlying regulation to proceed in a 'just' manner." *Bauer v. DeVos*, 325 F. Sup. 3d 74, 106–07 (D.D.C. 2018).

An agency has broad discretion to grant a stay. Although conveyed by statute, "[t]he authority granted is equitable." *See id.* at 105 (cleaned up). In general, the agency must "'balanc[e] the competing claims of injury,' 'consider[] the effect on each party of . . . granting' the stay, and 'pay[] particular regard for the public consequences.'" *Id.* (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008)). Although the State can satisfy the traditional judicial standard for preliminary relief, "nothing in the text of § 705 provides sufficient cause to require that agencies apply the same four-factor test that courts apply [in ruling on preliminary injunctions]." *Id.* at 105, 106; *see also Wyoming v. United States DOI*, Docket No. 2:16-CV-0285-SWS, 2018 U.S. Dist. LEXIS 221809, at *15 (D. Wyo. Apr. 30, 2018) (holding that § 705 "confers broad discretionary authority" that exceeds what is "available in those situations where preliminary injunctive relief is appropriate").

The Department has not elaborated on the meaning of the term "justice so requires," but in other contexts, federal courts have interpreted the phrase liberally to permit challengers to raise colorable claims. Most notably, courts must "freely" grant leave to amend a complaint "when justice so requires." Fed. R. Civ. P. 15(a). This is not a high bar. "The requirement of justice means that there is a strong policy to permit amendment, and that the court should grant leave to amend with considerable liberality." 1 Moore's Manual—Federal Practice and Procedure § 9.51. "Justice," in this

**A-252**

context, simply means that "the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief." *Johnson v. Precythe*, 141 S. Ct. 1622, 1626 (2021) (cleaned up).

When ruling on a request for a stay under § 705, the agency "[a]t a minimum must provide a reasoned explanation that is sufficient to enable courts to evaluate whether a stay was required to afford parties an adequate judicial remedy—that is, to ensure that the prevailing party in the pending litigation would ultimately obtain meaningful relief." *Bauer*, 325 F. Sup. 3d at 77 (cleaned up).

## C.     Grounds for a Stay

"[J]ustice . . . requires" a stay here for at least four reasons. 5 U.S.C. § 705. ***First***, the central issues are of great public importance: (1) the scope of the Secretary's authority to acquire land in trust for the Tribe under the IRA and the Settlement Act, and (2) the extent of a state's right to be heard when the federal government seeks to take its sovereign territory. ***Second***, delaying the acquisition will preserve the status quo. As soon as the Secretary takes title to the land, a number of legal and practical obstacles may bar the State from seeking review of these critical questions or obtaining relief. ***Third***, postponing the acquisition will cause no discernable prejudice to the agency or Tribe, since the land at issue is unused and the Tribe has no plans to develop it. ***Fourth***, agency policy favors a stay. In the past, the BIA has repeatedly refrained from interfering with judicial review in similar cases. And recent policy directives from the new administration and the Acting Secretary require or suggest that a stay is consistent with their intent to allow the new administration to evaluate—and potentially reverse—the policy decisions of the prior administration on these important issues.

### 1.     The State Is Raising Issues of Great Public Importance

Broadly speaking and without waiving any additional arguments, the State raised two types of critical issues below: (1) the limited scope of the Secretary's authority to acquire land; and (2) the extent of a state's right to be heard when the federal government seeks to take its sovereign territory. The BIA and former ASIA completely ignored the first issue and misconstrued the second.

#### a)     The BIA and Former ASIA Ignored the State's Arguments that the Acquisitions Were Unauthorized

The BIA's Decisions asserted statutory authority for the acquisitions under the IRA. *See* A094; A103 (Not. of Dec. for 119 Indiantown Rd. (Aug. 5, 2024); Not. of Dec. for 159 Indiantown Rd. (Aug. 5, 2024)). This was plainly incorrect. Whether a tribe qualifies under the IRA requires a careful examination of "the historical record" to determine whether it "supports [a] finding that the Tribe was under Federal jurisdiction in 1934." *Grand Traverse County Board of Commissioners v. Acting Midwest Director*, 61 IBIA 273, 281 (Sept. 25, 2015). There is no basis in the Administrative Records here to support that conclusion.

Realizing this error, in briefing on appeal to the former ASIA, the Regional Director shifted his position. He attempted to salvage the Decisions by instead relying on the Settlement Act, which, he claimed, implicitly extended the IRA to the Tribe.[1] *See* A131–38 (Br. of Reg. Dir. (Nov. 7, 2024)).

That was improper. An agency cannot rely on implied statutory authority to grant itself the ability to fundamentally shift the balance of power between states and the federal government. To the contrary, Congress must be "exceedingly clear" on points like these. *See Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021) ("precedents require Congress to enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power and the power of the Government over private property" (cleaned up)); *see also West Virginia v. EPA*, 597 U.S. 697, 723 (2022) ("agency instead must point to 'clear congressional authorization' for the power it claims" (cleaned up)). And when there are questions that the scope of an agency's statutory authority, courts—not agencies—get to have the final word. *See Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 392–95 (2024) ("Under the APA, it thus remains the responsibility of the court to decide whether the law means what the agency says. . . . [T]he role of the reviewing court under the APA is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits." (cleaned up)).

The agency's reading of the Settlement Act is also wrong. Even if it were acceptable for the BIA to rely on implied authority to take land from states—it is not—a closer look at the text confirms that there was no implied authority here for at least three reasons.

First, Congress's decision to omit reference to the IRA in the Settlement Act was intentional. *See generally* A013–17 (Settlement Act). It could have expressly mentioned the IRA if it wanted—just as it did plenty of times before and since enacting the Settlement Act. For example, consider the Coquille Restoration Act (Pub. L. No. 101-42, 103 Stat. 91 (June 28, 1989)). Sections 3(a) and (c) of the Coquille Restoration Act are effectively identical to Sections 9(a) and (c) of the Settlement Act.

But Congress did not consider this language sufficient to extend the IRA to the Coquille tribe. We know this because, in the Coquille Restoration Act, Congress took the additional step of adding § 3(e), which expressly extends the IRA:

> INDIAN REORGANIZATION ACT APPLICABILITY.—The Act of June 18, 1934 (48 Stat. 984), as amended, shall be applicable to the Tribe and its Members.

(capitalization in the original). Congress would not have included this language if it believed that §§ 3(a) and 3(c) of the Coquille Restoration Act had already implicitly extended the IRA to that tribe. Indeed, § 3(e) would do *nothing* if §§ 3(a) or 3(c) had already done it. *See Pulsifer v. United States*, 601 U.S. 124, 143 (2024) ("When a statutory construction thus 'render[s] an entire subparagraph meaningless,' . . . the canon against surplusage applies with special force." (citation omitted)).

That establishes that the Settlement Act language on which the Regional Director relies—§§ 9(a), and possibly, 9(c), which are substantially identical to §§ 3(a) and (c) of the Coquille Restoration

---

[1] As a threshold matter, the Settlement Act is not referenced in either Decision and the Regional Director cited no authority for the proposition that he may shift the statutory basis for the Secretary's authority on appeal.

Act—is not enough to extend the IRA to the Tribe. There is no language like § 3(e) of the Coquille Restoration Act in the Settlement Act. That should have been—and should be—dispositive.[2] That is strong evidence Congress did not want the IRA to apply here. At a minimum, it is not "exceedingly clear," as required. *Ala. Ass'n of Realtors*, 594 U.S. at 764.

Second, the BIA ignores other language in § 9(a) of the Settlement Act, which makes it clear Congress did not intend to apply the IRA to the Tribe. Specifically, § 9(a) says that only "law[s] of general application" apply to the Tribe. A016. The IRA is not a law of "general application"—it only applies to a specific subset of tribes (those that existed and had been federally recognized before 1934) to remedy a specific wrong (the harmful policies of the "allotment era," which came to an end in 1934). *See Carcieri v. Salazar*, 555 U.S. 379, 382–93 (2009). Many tribes fail to meet this test, of course, so the IRA cannot be said to be a law of "general application."

Third, even a law of "general application" applies to the Tribe only to the extent it is "not inconsistent with any specific provision of this [Settlement] Act." A016 (Settlement Act § 9(a)). Extending the IRA to the Tribe would be inconsistent with multiple specific provisions of the Settlement Act, including §§ 2(f), 5(b), and 3(7). For instance, in § 2(f) of the Settlement Act (enacted in 1983), Congress found that "[t]he United States has provided few, if any, special services to the" Tribe and "has denied that it had jurisdiction over or responsibility for said Tribe." A013 (*id.* § 2(f)). Applying the IRA to the Tribe would be inconsistent with this provision because the IRA only applies to "tribes in respect to which the Federal Government *already had* the kinds of obligations that the words 'under Federal jurisdiction' imply" in 1934. *Carcieri*, 555 U.S. at 397 (Breyer, J., concurring) (emphasis added). As § 2(f) makes clear, the Tribe was not one of those tribes. The IRA is therefore "inconsistent with" § 2(f) and not applicable to the Tribe.

---

[2] There are many other examples demonstrating that Congress expressly extends the IRA to a tribe when it wants the IRA to apply. The BIA has yet to identify a *single* other settlement act that does so implicitly, as it argues Congress did here. *E.g.*, Payson Community of Yavapai Apache Indians, Ariz., Village Site Selection, Pub. L. No. 92-470, ¶ (b), 86 Stat. 783 (Oct. 6, 1972) (the tribe at issue is "a tribe of Indians within the purview of the Act of June 18, 1934, as amended (25 U.S.C. 461–479, relating to the protection of Indians and conservation of resources), and shall be subject to all of the provisions thereof"); Pascua Yaqui Indians, Ariz., Extension of Federal Benefits, Pub. L. No. 95-375, § 1(b), 92 Stat. 712 (Sept. 18, 1978) ("[t]he provisions of the Act of June 18, 1934 (48 Stat. 484), as amended, are extended to such members" of the tribe at issue); Ysleta del Sur Pueblo Restoration Act, Pub. L. No. 100-89, § 103(a), 101 Stat. 667 (Aug. 18, 1987) ("[t]he Act of June 18, 1934 (48 Stat. 984), '25 USC 461' as amended, and all laws and rules of general application to Indians . . . which are not inconstant with any specific provision contained in this title shall apply to . . . the tribe . . ."); Coushatta Tribe of Louisiana Settlement Act, Pub. L. No. 100-411, § 4(a), 102 Stat. 1098 (Aug. 22, 1988) ("[t]he provisions of the Act of June 18, 1934 (25 U.S.C. 461 et seq.) are made applicable to the [tribe at issue]").

### b)    The State's Due Process Rights Were Violated

The State possesses various rights to notice and to be heard.[3] A key issue in this case is whether its rights were respected considering the seriousness of the deprivation—the loss of sovereign territory to the federal government without Congressional authorization—and the fact that the agency learned that the Governor's Office had not, in fact, received the Notices. *See Mathews v. Eldridge*, 424 U.S. 319 (1976) (due process requires balancing of the interests at stake and the risk of erroneous deprivation); *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 315 (1950) ("[P]rocess which is a mere gesture is not due process. The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it.").

They were not. Rather than according the State—a dual sovereign—the comity and respect owed to it under our system of federalism, the BIA barreled ahead with this flawed process. Remarkably, it failed to even attempt to grapple with the issue of whether it even had the authority to take the actions requested by the Tribe. Among other things, the BIA failed by (1) treating the confirmation of delivery slips as establishing conclusive presumption of receipt, even though the law is clear that the State may rebut this presumption; (2) ignoring the State's evidence showing that the State had not, in fact, received notice; and (3) failing to notify the Connecticut Attorney General, who has a statutory mandate to defend against these very types of tribal land claims, of the Applications.

The former ASIA then compounded these errors on appeal. Remarkably, he continued to rely on the *presumption* of receipt, even though he apparently agreed that the State did not, *in fact*, receive notice of the Applications. *See* A113 (ASIA Dec. at 3 (Jan. 10, 2025)) ("whatever caused the failure of the Governor to receive the mailings at issue"); A121 (*id.*) ("whatever caused the State not to receive the Notice").

This is nonsensical. "[T]he mailbox rule has never been an 'immutable legal command.' . . . . Rather, it is simply an evidentiary presumption . . . ." *Lupyan v. Corinthian Colleges, Inc.*, 761 F.3d 314, 321–22 (3d Cir. 2014). As the former ASIA's own case makes clear, the very purpose of the rule is to "help[] establish whether actual receipt occurred." *Schikore v. BankAmerica Supplemental Retirement Plan*, 269 F.3d 956, 961 (9th Cir. 2001) (cited at A120 (ASIA Dec. 10 n.36)).

Notice is not a box-checking exercise. It requires "further responsibility" when the government learns an attempt at notice has failed. *Jones v. Flowers*, 547 U.S. 220, 227, 229 (2006) ("[D]ue process entails further responsibility when the government becomes aware prior to the taking that its attempt at notice has failed. . . . If [the government] prepared a stack of letters to mail to [intended recipients], handed them to the postman, and then watched as the departing postman accidentally dropped the letters down a storm drain, one would certainly expect the [government] to prepare a new stack of letters and send them again. No one 'desirous of actually informing' the [recipients]

---

[3] These rights exist in the constitution, statutes, and regulations. *See* U.S. Const., 5th Amd.; 5 U.S.C. § 555; 25 C.F.R. § 151.10. Indeed, the BIA and the IBIA have consistently recognized the rights of State and local governments to notice and comment. *See e.g.*, *Village of Hobart, Wisc.*, 69 IBIA at 103 (village) ("Hobart"); *State of South Dakota v. Great Plains Regional Director, Bureau of Indian Affairs*, 69 IBIA 173, 190 (Oct. 19, 2023) (State); *State of New York, et al. v. Acting Eastern Regional Director, Bureau of Indian Affairs*, 58 IBIA 323, 353 (June 11, 2014) (municipality); *State of Kansas, et al. v. Acting Southing Plains Regional Director, Bureau of Indian Affairs*, 56 IBIA 220, 226 (2013) (State).

P a g e | **10**

would simply shrug his shoulders as the letters disappeared and say 'I tried.' Failure to follow up would be unreasonable . . . . [T]his is especially true when, as here, the subject matter of the letter concerns . . . an important and irreversible prospect . . . ." (cleaned up)).

Here, the Governor's Office never received the Notices. Ample evidence supported this. Again, the former ASIA's own case serves as a case in point—the Ninth Circuit described an evidentiary showing that would suffice to rebut the mailbox rule:

> [T]his requires [a purported recipient] to **describe in detail its procedures for receiving, sorting, and distributing mail**, to **show that these procedures were properly followed at the time when the document in question might conceivably have been delivered** by the postal service, to **provide evidence that it has conducted a thorough search** for the document at the addressee's physical facility, and to **establish that had the document been received around the time the claimant asserted it was mailed, it would presently be at the location searched** by the [purported recipient].

*Id.* at 964 (emphasis added).

This is *exactly* what the State did here. It detailed its procedures. *See* A052–54 ¶¶ 8–16, 18 (Damato Dec. ¶¶ 8–16, 18) ("When mail arrives that is directed to the Governor's Office . . . ."). It described a thorough, but unfruitful, search. *See* A054 –55 ¶¶ 17–23 (*id.*) ("When documents are received in the Governor's Office, they are logged and filed . . . on [an] excel list . . . . [A] search of the excel lists does not reference [the Notices]."). And it showed that, had the Notices actually arrived at the Governor's Office, there would have been a record. *See* A053 ¶¶ 12–16 (*id.*) (stating that the Governor's Office had records of *other* mailings received from the BIA, but not the Notices).[4] The former ASIA cited none of this.

Instead, the former ASIA improperly focused on who bore the blame for the fact that the Governor's Office did not receive the Notices, and determined that the BIA did nothing wrong. A121 (ASIA Dec. (Jan. 10, 2025)) ("whatever caused the State not to receive the Notices of Application . . . did not occur because of any wrongful or derelict action by the BIA"). The former ASIA cited no authority for the proposition that fault—as opposed to actual notice (or lack thereof)—is the dispositive factor. This was error.

The ASIA also incorrectly ruled that the BIA was not required to notify the Connecticut Attorney General. For example, he concluded that the Attorney General "only has '*general* supervision over all legal matters.'" A116 (ASIA Dec. (ASIA's emphasis)). That misses the point. The Attorney General does not "only" have a general mandate to litigate on the State's behalf—he also has a specific

---

[4] The State also explained that this was hardly unusual for a government mailing facility that absorbs hundreds or thousands of pieces mail each day. *See e.g.*, *Human Rights Defense Center v. Winn*, 431 F. Supp. 3d 925, 939 (E.D. Mich. 2020) (court would not assume notice was intentionally withheld where it "simply could have been lost in the mail," which was "likely when mailroom staff at [the subject] facilities . . . process hundreds of pieces of mail each day").

statutory mandate to oppose these very types of claims. *See* Conn Gen. Stat. § 31-57e(c) ("The state shall oppose any application by a tribe, pursuant to 25 CFR chapter 151, to convert any parcel of fee interest land to federal trust status."); *see also id.* § 47-7b ("The Attorney General may, in his discretion, represent the interests of the state in any lawsuit where the marketability of land titles has been threatened by a claim alleging that the disputed land was originally controlled or owned by an Indian tribe and was unlawfully transferred from that tribe.").

### 2.    A Stay Will Preserve the Status Quo

The State may suffer irreparable harm if the Secretary takes the land into trust. Specifically, it may be unable to receive a remedy because of a number of legal and practical obstacles.

Trust status comes with serious consequences. When a tribe owns land in fee, the land is subject to the laws of the jurisdiction, which restricts how a tribe can use it and allows state and local governments to protect the land. But the moment the Secretary takes land into trust, the federal government takes the position that those laws no longer apply and the Tribe's potential uses for the land increase exponentially.

This can create obstacles that might preclude relief. For example, a court would likely lack jurisdiction over the Tribe, which generally enjoys tribal sovereign immunity. *See Cheung Yin Sun v. Mashantucket Pequot Gaming Enterprise*, 309 F.R.D. 157, 162 (D. Conn. 2015) ("The Mashantucket Pequot Tribe is a 'federally recognized Indian tribe' entitled to tribal sovereign immunity."). This could prevent a court from being able to order the Tribe to remove equipment or structures it puts on the land. Similarly, the Tribe can alter the land as soon as the Secretary takes title. This would allow the Tribe to change the court's calculus in deciding whether to award injunctive relief while this action is pending—i.e., the more the Tribe improves the land, the more the equities tip in its favor.

Courts have held that preliminary injunctive relief is necessary under comparable circumstances to preserve the status quo. *E.g.*, *Akiachak Native Community v. Jewell*, 995 F. Supp. 2d 7, 18 (D.D.C. 2014), *appeal dismissed*, 827 F.3d 100 (D.C. Cir. 2016). For example, in *Jewell*, the court enjoined the Secretary from taking land into trust on behalf of tribes while Alaska challenged the Secretary's authority to do so under the IRA because undoing an acquisition would "be a *very difficult bell to un-ring*" and "confusion and chaos" would reign in the meantime. *Id.* (court's emphasis)).

The Department has repeatedly agreed that it would not interfere with judicial review in similar circumstances. For instance, in *Stand Up for California! v. United States DOI*, 919 F. Supp. 2d 51 (D.D.C. 2013), the court declined to enter a preliminary injunction preventing the Secretary from taking title—but only because the Secretary and tribe voluntarily removed all barriers to relief. The Secretary "repeatedly assured the Court, both in its briefs as well as at oral argument, that 'the Department of the Interior will take the land out of trust if ordered to do so by the Court.'" *Id.* at 82. The tribe also "provided an explicit waiver of its sovereign immunity" that would allow the court to exercise jurisdiction to order relief. *Id.* And to ensure that the land remained untouched while the case was pending, the court required the tribe to "provide notice to the parties and the Court at least 120 days prior to any physical alteration of the land," "which would provide ample opportunity for [the plaintiffs] to renew their request for preliminary injunctive relief." *Id.* at 84; *see also, e.g., Eastern Band of Cherokee Indians v. United States DOI*, Civil Action No. 20-757 (JEB), 2020 U.S. Dist. LEXIS 76113, at *19 (D.D.C. Apr. 30, 2020) (finding no irreparable harm because the Secretary and tribe "assure[d]"

**A-258**

the plaintiff they would take certain steps to preserve the status quo and stating that if they "fail to adhere to these . . . measures . . . [the plaintiff] would have grounds to return to court"); *Town of Verona v. Jewell*, Docket No. 6:08-CV-0647 (LEK/DEP), 2014 U.S. Dist. LEXIS 202575, at \*7 (N.D.N.Y. Aug. 12, 2014) (finding no irreparable harm due to "assurances by" the Secretary that the court could "'strip the federal government of title'").

The Department has taken this position, in part, to avoid violating the Constitution's nondelegation principle. After years of the BIA operating a "fiefdom" and exercising "unrestrained power" to acquire land without permitting judicial review at all, a federal appeals court held that the agency's exercise of absolute discretion violated the nondelegation principle. *South Dakota v. United States DOI*, 69 F.3d 878, 884–85 (8th Cir. 1995), *vacated and remanded on other grounds*, 519 U.S. 919 (1996). In response, the BIA did an "about-face with regard to the availability of judicial review under the APA" and adopted a self-stay policy to provide an opportunity for judicial review. *See DOI v. South Dakota*, 519 U.S. 919, 920 (1996) (Scalia, J., dissenting). The BIA has since abandoned its self-stay policy, based on a conclusion that it will take the same position as to states challenging trust acquisitions will be able to seek judicial review after the government takes title. *See* 78 FR 67928, 67929 ("Following [*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209 (2012)], the 1996 procedural rule establishing a 30-day waiting period is no longer needed . . . ."). However, the BIA has not made clear that it will take the same position as to states challenging trust acquisitions after title has transferred that it takes regarding private litigants who clearly have no "competing interest" in the property. *Patchak*, 567 U.S. at 217. Therefore, this stay is appropriate to ensure that the State is able to obtain judicial review of the important statutory and constitutional issues the former ASIA's decisions raise.

### 3.    A Stay Will Not Harm the Department or Tribe

As discussed above, the State may be immediately and irreparably harmed if the Secretary takes title before judicial review is complete. Conversely, there is no clear hardship for the Department. It simply holds the land in trust for the Tribe. Nor would the Tribe's interests suffer—it does not use the land and represents that it has "no current plans" to change this. A007; A022 (App. for 119 Indiantown Rd.; App. for 159 Indiantown Rd.).

### 4.    Agency and Presidential Policy Favor a Stay

Past and current agency policy and practice also weigh in favor of postponing the acquisition. As noted above, the Department has previously agreed not to interfere with judicial review when it might otherwise be precluded by the Quiet Title Act. *E.g.*, *Stand Up for California! v. United States DOI*, 919 F. Supp. 2d 51 (D.D.C. 2013); *Eastern Band of Cherokee Indians v. United States DOI*, Civil Action No. 20-757 (JEB), 2020 U.S. Dist. LEXIS 76113, at \*19 (D.D.C. Apr. 30, 2020); *Town of Verona v. Jewell*, Docket No. 6:08-CV-0647 (LEK/DEP), 2014 U.S. Dist. LEXIS 202575, at \*7 (N.D.N.Y. Aug. 12, 2014).

Moreover, recent policy directives from President Trump and the Acting Secretary suggest that a stay is appropriate to allow the new administration to evaluate the former ASIA's Decisions. On January 20, 2025, President Trump issued an executive order titled "Regulatory Freeze Pending Review," which, among other things, precluded a wide range of agency actions for 60 days to allow

newly appointed agency personnel to "review and approv[e]" the action. *Id.* § 1. During the freeze, the order also instructed agencies to "consider opening a comment period to allow interested parties to provide comments about issues of fact, law, and policy." *Id.* § 3.

Similarly, on January 20, 2025, the Acting Secretary issued Order No. 3414, which temporarily suspended delegated authority "[t]o grant . . . any conveyances of property or interests in property, including land sales or exchanges" and "[t]o publish, cause to be published, or aid in the publication of any notice in the Federal Register." *Id.* § 3(a), (c).

These directives favor granting the requested stay to prevent the United States from taking title to the land at issue. Even if they did not expressly preclude the acquisition here, they do make clear that the Department intends to exercise appropriate caution before proceeding further with rulings made under prior leadership. Given the serious federalism concerns raised by the State, a similar approach is warranted here.

## II.    CONCLUSION

The State respectfully requests that the Department stay the acquisitions at issue. Doing so will ensure that the State is able to obtain judicial review of serious and important questions, without any discernable negative effect on the Department or Tribe.

Very truly yours,

Robert J. Deichert
Assistant Attorney General
Robert.Deichert@ct.gov

See the attached Certificate of Service

## Certificate of Service

I hereby certify that consistent with the Assistant Secretary-Indian Affairs' October 3, 2024 Notice of Consolidated Appeals, Notice on Administrative Records, Notice on Service of Documents, Scheduling Order a true copy of the foregoing was filed on February 6, 2025 via e-mail to the Assistant Secretary — Indian Affairs at Appeal.Filing@bia.gov and by certified mail. In addition, on February 6, 2025, I caused to be delivered a true and correct copy of the foregoing to each of the persons named on the below distribution list by depositing an appropriately addressed copy of the same with the United States Postal Service, postage paid:

Jody A. Cummings
General Counsel
Mashantucket Pequot Tribe
2 Matt's Path
P.O. Box 3060
Mashantucket, CT 06338-3060
*Attorney for the Mashantucket Pequot Tribal Nation*

Kimberly Bouchard, Regional Director
John/Jane Doe, Acting Regional Director
Bureau of Indian Affairs, Eastern Region
545 Marriott Drive, Ste. 700
Nashville, TN 37214

Daniel Wenner
United States Department of the Interior
Knoxville Field Solicitor's Office
800 S. Gay Street, Ste. 1405
Knoxville, TN 37929
*Representing Appellee*

Associate Solicitor — Indian Affairs
Office of the Solicitor
United States Department of the Interior
1849 C. St., N.W., MS 6513
Washington, DC 20240

**A-261**

Assistant Solicitor, Branch of Environment and Lands
United States Department of the Interior
1849 C. St., N.W., MS 6513
Washington, DC 20240

Nicholas M. Ravotti
Attorney-Advisor, Branch of Environment and Lands
United States Department of the Interior
1849 C. St., N.W., MS 6513
Washington, DC 20240

Jena A. MacLean, Esq.
Perkins Coie, LLP
700 13th St. NW, Ste 800
Washington, DC 20005

Ledyard Mayor's Office
741 Colonel Ledyard Highway
Ledyard, CT 06339

Tax Collector
Town of Ledyard
741 Colonel Ledyard Highway
Ledyard, CT 06339

Robert J. Deichert
Assistant Attorney General

**A-262**

# EXHIBIT 21

**FedEx**

November 28, 2023

Dear Customer,

The following is the proof-of-delivery for tracking number: 785874378898

---

**Delivery Information:**

| | | | |
|---|---|---|---|
| **Status:** | Delivered | **Delivered To:** | Mailroom |
| **Signed for by:** | M.ESTRADA | **Delivery Location:** | 210 CAPITOL AVE |
| **Service type:** | FedEx Standard Overnight | | |
| **Special Handling:** | Deliver Weekday | | HARTFORD, CT, 06106 |
| | | **Delivery date:** | Nov 7, 2023 09:07 |

**Shipping Information:**

| | | | |
|---|---|---|---|
| **Tracking number:** | 785874378898 | **Ship Date:** | Nov 6, 2023 |
| | | **Weight:** | 0.5 LB/0.23 KG |

**Recipient:**
Governor, State of Connecticut,
210 Capitol Ave
HARTFORD, CT, US, 06106

**Shipper:**
Randall Trickey, Bureau of Indian Affairs, ERO
545 Marriott Drive
Suite 700
Nashville, TN, US, 37214

**Reference**          NOA FTT- Mashantucket Pequot



Thank you for choosing FedEx

**A-264**

April 12, 2024

Dear Customer,

The following is the proof-of-delivery for tracking number: 773938413563

**Delivery Information:**

| | | | |
|---|---|---|---|
| Status: | Delivered | Delivered To: | Mailroom |
| Signed for by: | M.ESTRADA | Delivery Location: | |
| Service type: | FedEx Standard Overnight | | |
| Special Handling: | Deliver Weekday | | HARTFORD, CT, |
| | | Delivery date: | Nov 7, 2023 09:07 |

**Shipping Information:**

| | | | |
|---|---|---|---|
| Tracking number: | 773938413563 | Ship Date: | Nov 6, 2023 |
| | | Weight: | 0.5 LB/0.23 KG |
| Recipient: | | Shipper: | |
| HARTFORD, CT, US, | | Nashville, TN, US, | |

| Reference | NOA FTT-Mashantucket Pequot |
|---|---|

FedEx Express proof-of-delivery details appear below; however, no signature is currently available for this shipment.  Please check again later for a signature.

Thank you for choosing FedEx

**A-265**

# EXHIBIT 22



# United States Department of the Interior

## BUREAU OF INDIAN AFFAIRS

Eastern Regional Office
545 Marriott Drive, Suite 700
Nashville, TN 37214

In Reply Refer To:
Real Estate Services
TR-4609-P5

**SEP 2 3 2024**

Case Number: 55848

Certified Mail – Return Receipt Requested 7787 5957 9325

MASHANTUCKET PEQUOT INDIAN TRIBE
2 MATT'S PATH
P. O. BOX 3060
MASHANTUCKET, CT 06338-3060

### NOTICE OF DECISION

Dear Applicant:

This decision is a result of our analysis of an application filed by MASHANTUCKET PEQUOT INDIAN TRIBE for trust acquisition of fee lands. The property is described as follows:
See "Exhibit A" for legal descriptions.

<u>Regulatory Authority</u>

The applicable regulations are set forth in the Code of Federal Regulations (CFR) Title 25, Part 151. The regulations specify that it is the Secretary's policy to accept lands "in trust" for the benefit of Tribes when such acquisition is authorized by an Act of Congress; and, (1) when such lands are within the exterior boundaries of the Tribe's reservation, or adjacent thereto, or within a Tribal consolidation area, or (2) when the Tribe already owns an interest in the land; or (3) when the Secretary determines that the land is necessary to facilitate Tribal self-determination, economic development, or Indian housing.

This acquisition facilitates Tribal self-determination, the Mashantucket Pequot Indian Tribe ("Tribe") owns the property in fee simple, and the property is adjacent to the Tribe's reservation. Therefore, it is within the land acquisition policy as set forth by the Secretary of the Interior.

Pursuant to 25 CFR Part 151, the Secretary will consider the following requirements in evaluating tribal requests for the acquisition of lands in trust status, when the land is located within or contiguous to the tribe's reservation, and the acquisition is not mandated:
   (a) The existence of Statutory Authority for the acquisition and any limitations contained in such
       authority; (b) need of the individual Indian or the Tribe for additional land; (c) the purpose for
       which the land will be used; (d) if the land is to be acquired for an individual Indian, the

amount of trust or restricted land already owned by or for that individual and the degree to which he needs assistance in handling his affairs; (e) impact on the State and its political subdivisions resulting from removal of the land from the tax rolls; (f) jurisdictional problems and potential conflict of land use which may arise; (g) whether the Bureau of Indian Affairs is equipped to discharge the additional responsibilities resulting from the acquisition of the land in trust status; and, (h) the extent to which the applicant has provided information that allows the Secretary to comply with 516 DM 6, appendix 4, National Environmental Policy Act Revised Implementing Procedures, and 602 DM 2, Land Acquisitions.

On January 11, 2024, revisions to the 25 C.F.R. Part 151 regulations went into effect. 88 Fed. Reg. 86222. However, because the Tribe submitted its application on January 9, 2024, the BIA Eastern Regional Office reviews this application under the pre-January 11, 2024, 25 CFR Part 151 regulations.

Our review of the requirements to evaluate this Tribal request as set forth in 25 Code of Federal Regulations, § 151.10 (a) through (h), determined the following:

**1. 25 CFR § 151.10 (a) Statutory authority for the acquisition of the property.**

The Regional Director's authority to take the subject property into trust comes from section five of the Act of June 18, 1934, Pub. L. No. 100-581, 48 Stat. 985, codified as 25 U.S.C. § 5801 (commonly referred to as the Indian Reorganization Act ("IRA")). This section authorizes the Secretary of the Interior, in her discretion, to acquire any interest in lands for the purpose of providing land for Indians. Additionally, title to said lands will be taken in the name of the United States in trust for the Indian tribe for which the land is acquired, and such lands shall be exempt from State and local taxation.

Congress made the IRA applicable to the Tribe through the Mashantucket Pequot Indian Claims Settlement Act. Pub. L. No. 98-134, 97 Stat. 851 (Oct. 18, 1983), codified as 25 U.S.C. §§ 1751 et seq. ("Settlement Act"). Subsections 9(a) and 9(c) of the Settlement Act provide specific authority for the Secretary to take lands into trust for the Tribe by making the IRA applicable to the Tribe. Accordingly, these provisions render immaterial the question of whether the Tribe was "under federal jurisdiction" in 1934 as required by the U.S. Supreme Court decision in Carcieri v. Salazar, 555 U.S. 379 (2009), because the Settlement Act constitutes an independent act of Congress that makes the IRA applicable to the Tribe.

We find the Supreme Court's decision in Carcieri does not bar the Tribe's fee-to-trust application. Instead, authority for the Secretary to take land into trust for the Tribe is found in the language in section 9(a) and 9(c) of the Settlement Act which extends application of the IRA to the Tribe.

**2. 25 CFR § 151.10 (b) – The need of the individual Indian or a Tribe for additional land.**

The Mashantucket Pequot Tribal Nation (Tribe) has pursued re-establishing their land base to ensure jurisdictional conservation for current and future generations. Conservation and restoration are very important to the tribal citizens, as they are still occupying their aboriginal lands. The acquisition of 153 Indiantown Road is paramount to the Tribe's self-governance as the land is adjacent to Tribal

buildings that facilitate crucial services to the community such as Public Works and Safety. Based on information provided with the request, it is my determination that the Tribe has adequately identified its need for additional land.

### 3. 25 CFR § 151.10 (c) – Purpose for which the property will be used.

The acquisition consists of 58.61 acres, more or less, in the town of Ledyard, Connecticut. The property is currently vacant. Although the Tribe has no immediate plans to develop the property at this time, it is adjacent to the Public Works and Safety buildings and is relatively close to the Mashantucket Pequot Museum and Research Center. The acquisition of the property in trust which would be supportive of the Tribe's self-determination efforts to enhance services to the tribal community and to allow the Tribe to exercise jurisdiction over tribal lands. Accordingly, it is our determination that the Tribe has adequately described the purposes for which the land will be used.

### 4. 25 CFR § 151.10 (d) – If the land is to be acquired for an individual Indian, the amount of trust or restricted land already owned by or for that individual and the degree to which he needs assistance in handling his affairs.

N/A

### 5. 25 CFR § 151.10 (e) – Impact on State and its political subdivisions resulting from the removal of this property from the tax rolls.

The subject property is located approximately 0.27 miles southeast of the Tribe's Museum and Research Center and approximately 3.31 miles northeast from the Town of Ledyard, Connecticut. The property is contiguous to the Tribe's reservation trust land of the Towns. By letters dated March 26, 2024, notices were sent to the Connecticut State Governor's Office, Ledyard Mayor's Office, and Ledyard Tax Collector, requesting comments, including the amount of real property taxes and special assessments for the properties, and current zoning. The State of Connecticut (State) and Perkins Coie, LLP, on behalf of the Towns of Ledyard, Stonington, and Preston, CT (Towns), submitted joint comments regarding the requested information and have been addressed further. Property taxes on the property were $16,616.82 for the 2022 tax year, zoning was consistent with surrounding parcels, no special assessments were identified.

Our analysis of the Tribe's request reveals that the proposed acquisition is not for gaming purposes. A change in use to gaming would require compliance with the provisions of Section 20 of the Indian Gaming Regulatory Act (IGRA), 25 USC 2719, prior to any gaming activities being conducted on the property. Revenues generated from the taxing of property in Connecticut provide funds that allow local governments to provide important services such as infrastructure, education, recreation, fire protection, and law enforcement. Real property, personal property, along with motor vehicle taxes, fund the operations of the Ledyard, CT which, among other responsibilities, provide for police and fire protection, road construction and maintenance, Ledyard Public Schools and other municipal government services.

While the State and Towns address the tax revenue funding governmental services, this property will remain undeveloped. The property tax revenue for the property was $16,616.82 in 2022. The Town of

Ledyard collected a total of $41,308,872.00 in property taxes in the same year, see 2022 Financial Statements and Supplementary Information for the Town of Ledyard for the Year ended June 30, 2022. Thus, losses from taxes from taking the property into trust would amount to less than 0.040% of the Town's total property taxes. With respect to the Town of Ledyard, the loss is considered minimal, and the action administrative in nature.

No special assessments or other outstanding tax assessments were identified. While any loss of revenue might be considered detrimental, no negative impacts to the level of services currently being provided to the property were identified. In addition, the cost of some community services provided

to this land will be offset by the contributions of the Tribe by virtue of the land's trust status, such as, assumption of law enforcement responsibility and continued contributions from a portion of slot machine revenue. The Foxwoods Resort Casino contributed a total of $89,479,411.00 to the State of Connecticut from video facsimile/slot machine revenue in calendar year 2023, see: https://data.ct.gov/Government/Selected-Video-Facsimile-Slot-Machine-Data-from-Fo/i6ts-ib7c/data_preview.

Based on our analysis, we have determined that the acquisition of the property in trust for the Tribe will not have a significant impact on the existing level of services currently being provided by the state and its political subdivisions.

## 6. 25 CFR § 151.10 (f) – Jurisdictional problems and potential conflicts of land use.

By letters dated March 26, 2024, notices were sent to the proper addresses of the Connecticut State Governor's Office, Ledyard Mayor's Office, and Ledyard Tax Collector, requesting comments, including the amount of real property taxes, and special assessments for the properties, and current zoning for the property.

Our analysis finds that there are other trust lands in the town of Ledyard. The property is currently zoned as Resort Commercial Cluster District, and the existing use of the property does not conflict with existing land use patterns of the surrounding area and there is no planned change in land use. Additionally, a small portion of the property is identified as "wetlands-soils" according to the Zoning Map of the Town of Ledyard. The State and Towns have raised concerns regarding unregulated development of wetlands. With respect to potential impacts to the State and Town of Ledyard, there is no proposed change in land use and any future action on wetlands will be subject to applicable authority of the Bureau of Indian Affairs, Environmental Protection Agency, and United States Army Corps of Engineers.

The Tribe has contiguous trust lands contiguous to the property, and the property would be treated the same as other trust lands within the reservation. Thus, I find any potential jurisdictional issues or conflicts of land use resulting from the proposed use of the property to be acquired in trust will be minimal. I further find that any problems or conflicts that do arise can be resolved through collaborative discussions with the State or local governments.

## 7. 25 CFR § 151.10 (g) – Whether the Bureau of Indian Affairs is equipped to discharge the additional responsibilities.

The requested property totals 58.61 acres, more or less, and is located approximately 1,019 miles northeast from the Eastern Regional Office in Nashville, Tennessee. The Tribe is located in Ledyard, Connecticut. Eastern Regional Office is responsible for administering trust services to approximately 1,635 acres of land held in trust for the Tribe. Trust resource management program services are provided by the Region as direct service to the Tribe. The Regional Office currently provides technical advice and limited direct field services on trust resources program management matters to the Tribe, as well as, to the other 34 federally recognized tribes and three Agency Offices of the Eastern Region. There are approximately 605,000 acres of tribal trust and restricted land in the Eastern Region. The Eastern Regional Office's trust resources management programs include real estate services, forestry, archeology, environmental management services, and natural resources management. The Region's Realty staff consists of 1 Realty Officer, 1 Deputy Realty Officer, 3 Realty Specialists, and 1 Realty Assistant. There are also 8 Natural Resources staff persons with expertise in the fields of forestry, fire, archeology, environmental sciences, and natural resources management. These resources are considered adequate for administering the existing trust and restricted properties of the Region.

While the distance of the properties from the Regional Office limits the number and frequency of onsite monitoring visits, the continued maintenance of the ATV trails and Pequot Trail within the property and its proximity to the Tribe's other trust lands minimize the need for critical management and regular onsite monitoring by Regional Office staff. Additionally, the Tribe actively manages the land as it abuts crucial tribal governmental and utility facilities, storing their equipment. Although Bureau resources are limited and not expected to increase, accepting the property into trust should not impose any significant additional responsibilities or burdens on the level of trust services currently being provided by the Bureau. Accordingly, it is our determination that the Bureau has the capability to assume the additional minimal responsibilities resulting from the acquisition of the property in trust status.

## 8. 25 CFR § 151.10 (h) – Environmental Compliance:

### National Environmental Policy Act Compliance

A fee-to-trust request that proposes no change in land use is subject to a "categorical exclusion" review under BIA policies and procedures for implementing NEPA. The record reflects compliance with 516 DM 6, Appendix 4, National Environmental Policy Act Revised Implementing Procedures. A Categorical Exclusion under exclusion category 516 DM 10.5(I) was issued for the property on May 9,, 2024. No further compliance is required for NEPA. The Tribe is proposing no change in land use; therefore, the Proposed Action is categorically excluded from further analysis under the National Environmental Policy Act (NEPA) in accordance with 516 DM 10.5 (I)- *Land Conveyance and Other Transfers - Approvals or grants of conveyances and other transfers of interests in land where no change in land use is planned*. BIA's action is administrative in nature and would result in the federal government holding title to the property in trust for the benefit of the Tribe. There would be no construction, or any ground-disturbing activities associated with the BIA action. Since there is no change in land use planned, there are no connected actions that need to be analyzed by BIA in accordance with NEPA.

As part of the categorical exclusion process, BIA environmental staff must consider and document an "extraordinary circumstances" review. This review and the extraordinary

circumstances are defined for the Department of the Interior at 43 CFR §46.215. Based on the extraordinary circumstances review it has been determined that a categorical exclusion review is the appropriate level of review in accordance with NEPA. The categorical exclusion is appropriate because there are no extraordinary circumstances potentially having effects that may significantly affect the environment.

National Historic Preservation Act (NHPA) Compliance
The proposed action will have no significant impacts on properties listed or eligible for listing, on the National Register of Historic Places. As specified in 36 CFR 800.3(a)(1), the fee-to-trust approval, when no change in land use is planned is a type of activity that does not have the potential to cause effects on historic properties, and the BIA has no further obligations under section 106 of the National Historic Preservation Act for the fee-to trust approval undertaking.

Endangered Species Act (ESA) Compliance

The proposed action will have no significant impacts on species listed, or proposed to be listed, on the list of Endangered or Threatened Species or have significant impacts on designated Critical Habitat for these species. The proposed action is simply administrative in nature and will not result in any activities that would impact air, water or critical habitat for biological resources. Additionally, any future actions on the property would still be subject to compliance with the Endangered Species Act.

Hazardous Substances Determination

An Environmental Site Assessment prepared in compliance with 602 DM 2, Land Acquisitions: Hazardous Substances Determinations completed April 4, 2024, determined that no contaminants or other environmental problems were present on the property, and there were no obvious signs of any effects of contamination.

Other Environmental Requirement

This action is simply administrative in nature and would result in the federal government holding title to the property in trust for the benefit of the Tribe. There is no proposed construction, and the Tribe has no plans to change the current land use. Future changes from the current uses of the properties would require an environmental assessment of the impacts.

Accordingly, it is our determination that approval of the Tribe's fee-to-trust application will have no adverse environmental impacts on public health or safety, wetlands, wild or scenic rivers refuges, floodplains rivers placed on nationwide river inventory, prime or unique farmlands, and historic properties.

**Conclusion**

An analysis was made on the fee-to-trust application for 58.61 acres, more or less, for the Tribe. The State and Towns submitted joint comments opposing the application. The comments were based under assumption of a change in land use; however, there is no proposed change in land use. Information submitted by the Tribe to this office has been reviewed in accordance with 25 CFR 151.

There is statutory authority to acquire the land in trust for the Tribe. The proposed acquisition will facilitate tribal self-determination for a purpose which is not illegal, controversial or in conflict with local land use patterns. While the acquisition will result in the loss of some property tax revenue; it is our determination that the loss will be minimal and outweighed by the financial contributions to the State of Connecticut from slot machine revenues at the Foxwoods Casino.

Further, transferring this land into trust will not significantly alter any jurisdictional issues that may currently exist. We have determined that the potential problems and conflicts are manageable and do not outweigh the findings in support of the trust acquisition; namely, the need of the Tribe for additional trust land to support tribal self-determination and the ability of the Bureau to assume the additional trust responsibility.

Based on an evaluation of each of the factors of 25 CFR 151 as discussed herein, it is our determination that the proposed fee-to-trust land acquisition request be approved, subject to a satisfactory title examination pursuant to 25 CFR 151.13.

### Notice of Appeal

Any party who wishes to seek judicial review of this decision must first exhaust administrative remedies. The Regional Director's decision may be appealed to the Interior Board of Indian Appeals (IBIA) in accordance with the regulations in 43 C.F.R. 4.310-4.340.

If you choose to appeal this decision, your notice of appeal to the IBIA must be signed by you or your attorney and must be either postmarked and mailed (if you use mail) or delivered (if you use another means of physical delivery, such as FedEx or UPS) to the IBIA within 30 days from the date of receipt of this decision. The regulations do not authorize filings by facsimile/fax or by electronic means. Your notice of appeal should clearly identify the decision being appealed. You must send your original notice of appeal to the IBIA at the following address: Interior Board of Indian Appeals, Office of Hearings and Appeals, U.S. Department of the Interior, 801 North Quincy Street, Suite 300, Arlington, Virginia 22203. You must send copies of your notice of appeal to (1) the Assistant Secretary – Indian Affairs, U.S. Department of the Interior, MS-4141-MIB, 1849 C Street N.W., Washington, D.C. 20240; (2) each interested party known to you; and (3) the Regional Director. Your notice of appeal sent to the IBIA must include a statement certifying that you have sent copies to these officials and interested parties and should identify them by names or titles and addresses.

If you file a notice of appeal, the IBIA will notify you of further procedures. If no appeal is timely filed, this decision will become final for the Department of the Interior at the expiration of the appeal period. No extension of time may be granted for filing a notice of appeal.

Sincerely,

Acting REGIONAL DIRECTOR

Enclosure(s)

cc:

**BY CERTIFIED MAIL:**
TAX COLLECTOR, TOWN OF LEDYARD
741 COLONEL LEDYARD HIGHWAY
LEDYARD, CT 06339
Certified Mail ID: 7787 6170 2341

GOVERNOR, STATE OF CONNECTICUT
210 CAPITOL AVENUE
HARTFORD, CT 06106
Certified Mail ID: 7787 6181 7965

LEDYARD MAYOR'S OFFICE
741 COLONEL LEDYARD HIGHWAY
LEDYARD, CT 06339
Certified Mail ID: 7787 6176 2233

ASSISTANT ATTORNEY GENERAL
STATE OF CONNECTICUT
165 CAPITOL AVENUE
HARTFORD, CT 06106
Certified Mail ID: 7787 6191 6012

Case Number: 55848

Applicant Name: MASHANTUCKET
PEQUOT INDIAN TRIBE

**Tract ID:**
**Tract Name: 153 INDIANTOWN ROAD**

| Land Area | Land Area Name | Tract Number | LTRO | Region | Agency | Resources |
|-----------|----------------|--------------|------|--------|--------|-----------|
| 020 | MASHANTUCKET PEQUOT | | ANADARKO, OK | EASTERN REGIONAL OFFICE | EASTERN REGIONAL OFFICE | Both (Mineral and Surface) |

| Lot | Block | Sub Division | USS | State | County | Acres |
|-----|-------|--------------|-----|-------|--------|-------|

with cap set, N 80°01'08" E, for a distance of 399.99' to a drill hole set at the
beginning of a stone wall, N 86°38'27" E, for a distance of 117.15' to a point, N
84°55'20" E, for a distance of 33.10' to a corner of said stone wall, N 28°49'35"
E, for a distance of 41.87' to a point in the center of said stone wall, N
25°11'22" E, for a distance of 146.11' to a rebar with cap set, N 87°18'37" E, for
a distance of 218.25' to a rebar with cap set, said rebar being a southeasterly
corner of said Main lands, N 15°20'46" W, for a distance of 344.14' to point at the
beginning of a stone wall, N 15°20'46" W, for a distance of 138.08' to a point, N
17°04'33" W, for a distance of 60.50' to a point, N 24°53'39" W, for a distance of
11.31' to a point located at the end of said stone wall, N 16°16'05" W, for a
distance of 43.70' to a rebar with cap recovered at the beginning of a stone wall,
said rebar being a northeast corner of said Main lands and further being a
southerly corner of lands now or formerly The United States of America in Trust for
the Benefit of The Mashantucket Pequot Tribe located at 175 Indiantown Road all as
more particularly shown on the herein referenced survey plan, Thence following
along said lands of The United States of America in Trust for the Benefit of The
Mashantucket Pequot Tribe, by and along the centerline of a stone wall in part, for
the following courses and distances: N 11°07'12" W, for a distance of 19.78' to a
point, N 25°46'31" W, for a distance of 10.84' to point, N 17°20'41" W, for a
distance of 155.64' to a drill hole recovered at a corner of said stone wall, N
71°04'27" E, for a distance of 63.49' to a point, N 73°45'13" E, for a distance of
57.92' to a point, N 75°02'00" E, for a distance of 151.66' to rebar with cap set
at the end of said stone wall, S12°27'10" E, for a distance of 79.69' to a point, S
83°59'06" E, for a distance of 51.61' to a rebar with cap set at the beginning of a
stone wall, S 83°59'05" E, for a distance of 137.94' to a point, S 81°58'49" E, for
a distance of 106.28' to a point, S 84°55'01" E, for a distance of 98.85' to a
point, S 85°53'27" E, for a distance of 75.75' to point, S 87°23'40" E, for a
distance of 97.76' to an iron pipe recovered at a corner of said stone wall, S
17°29'39" E, for a distance of 176.68' to a point located at a corner of said stone
wall, S 13°59'11" E, for a distance of 18.34' to a drill hole recovered at a corner
of a stone wall, said drill hole being a southerly corner of said lands of The
United States of America in Trust for the Benefit of The Mashantucket Pequot Tribe
and further being the northeasterly corner of lands now or formerly The
Mashantucket Pequot Tribe located at 159 Indiantown Road all as more particularly
shown on the herein referenced survey plan, Thence following along said lands of
The Mashantucket Pequot Tribe, by and along the centerline of a stone wall in part,
for the following courses and distances: S 10°29'50" E, for a distance of 47.41' to
a point, S 6°12'35" E, for a distance of 214.81' to a rebar with cap set, S
5°02'22" E, for a distance of 116.47' to a point, S 3°45'37" E, for a distance of
133.81' to a point, S 0°55'07" E, for a distance of 44.25' to a rebar with cap set
at a corner of said stone wall, said rebar being the southwesterly corner of said
Mashantucket Pequot Tribe lands, S 73°51'19" E, for a distance of 114.56' to a
point located at the end of said stone wall, S 72°23'35" E, for a distance of
78.19' to a rebar with cap set in the westerly line of Indiantown Road, said rebar
being the southeasterly corner of said Mashantucket Pequot Tribe lands and a
northeasterly corner of the herein described parcel all as more particularly shown
on the herein referenced survey plan, Thence following along the westerly line of
Indiantown Road for the following courses and distances: S 26°12'52" W, for a
distance of 66.28' to a point, S 29°43'18" W, for a distance of 62.08' to rebar
with cap recovered, S 26°23'11" W, for a distance of 77.79' to a point, S 24°29'07"
W, for a distance of 90.68' to a point, S 21°19'40" W, for a distance of 110.17' to
a point, S 18°10'13" W, for a distance of 213.76' to a point, Along the arc of a
665.00' radius curve deflecting to the right and having a central angle of
23°33'48", for a distance of 273.49' to a point, S 41°45'59" W, for a distance of
15.30' to a rebar with cap recovered, S 43°49'47" W, for a distance of 46.23' to an
iron pipe recovered, said iron pipe being the point and place of beginning. Said
parcel contains 58.61 acres more or less and is more particularly shown on a survey
plan prepared by Boundaries L.L.C. entitled: Perimeter Survey Prepared for The
Mashantucket Pequot Tribal Nation 153 Indiantown Road – Ledyard, Connecticut,
Scale: 1" = 120', Date: September 2023, Job I.D. No. 23-3292, Sheet No. 1/1.

WDAEA01



Office Codes: B,S,00,020 AD Number: 4200429033 Case: 55848

**A-275**