**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

STATE OF CONNECTICUT,

*Plaintiff*,

v.

U.S. DEPARTMENT OF THE INTERIOR, DOUG BURGUM, BUREAU OF INDIAN AFFAIRS, BRYAN MERCIER, ERIC WILCOX,

*Defendants.*

Case No. 3:25-cv-00580-VDO

**OPPOSITION OF MASHANTUCKET PEQUOT TRIBAL NATION TO STATE OF CONNECTICUT'S MOTION FOR EMERGENCY STAY UNDER 5 U.S.C. § 705**

Interested Party Mashantucket Pequot Tribal Nation ("Tribe") hereby opposes Plaintiff State of Connecticut's ("State") request pursuant to 5 U.S.C. § 705 for this Court to enjoin Defendants taking two parcels into trust for the Tribe's benefit. In its motion, the State attempts to mislead this Court into applying the incorrect standard of review, to mischaracterize the proceedings below, and to obfuscate the legal authorities on which it relies. The State's motion is untimely and its arguments are meritless. In short, the State fails to establish that a stay is "necessary and appropriate" as required by Section 705.

## BACKGROUND

### I. The Mashantucket Pequot Tribal Nation

The Tribe has long endeavored to restore its homelands. The Tribe and its thousands of members inhabited an area of about 160,000 acres—or 250 square miles—in southeastern Connecticut since time immemorial. *See, e.g.*, N. Bruce Duthu, *American Indians and the Law* 65–66 (Colin G. Calloway ed., 2008). But the Connecticut Colony in 1655 forced the Tribe and its members onto a 2000-acre reservation, removing them from the portion of their lands adjacent

to Long Island Sound. *See Chitimacha and Mashantucket Pequot Indian Land Claims: Hearing on S. 2719 Before the S. Select Comm. on Indian Affs.*, 97th Cong. 67 (1982); *Settlement of Indian Land Claims in the States of Connecticut and Louisiana: Hearing on H.R. 6612 Before the H. Comm. on Interior and Insular Affs.*, 97th Cong. 62 (1982).

After smallpox epidemics resulted in the deaths of thousands of Pequots, *see, e.g.*, Ronald Dale Carr, *"Why Should You Be So Furious?": The Violence of the Pequot War*, 85 J. Am. Hist. 876, 895 n.53 (1998), the Connecticut Colony in 1637 spearheaded the massacre of hundreds of the remaining Pequot children, women, and men, *see id.* 876. The next year, the Connecticut Colony entered into the Treaty of Hartford with two other Indian tribes. *See generally* Treaty of Hartford (Sept. 21, 1638), https://humilityandconviction.uconn.edu/wp-content/uploads/sites/1877/2018/09/Treaty-of-Hartford-Translation.pdf. The Treaty required those tribes to "remove the heads of any Pequot who" had resisted the massacre, and it provided a process by and prices at which the "remaining Pequots … [were] to be divided up and sold" into captivity and slavery. The treaty further purported that "[t]he Pequots will no longer live on their homelands." *Id.*

In 1761, the Colony further annexed half of the reservation and deeded to the Tribe the remaining 1000 acres in fee simple. *Hearing on S. 2719*, 97th Cong. 67; *Hearing on H.R. 6612*, 97th Cong. at 62. But in 1855, the now-State sold all but 200 acres of the Reservation over the Tribe's protests that the sales violated federal law. *Hearing on S. 2719*, 98th Cong. 59, 67, 75; *Hearing on H.R. 6612*, 98th Cong. 62. Even though the Tribe "never consented to the forced sales of their land," the Tribe for more than a century "could not obtain legal assistance because [the Tribe] could not afford the attorney's fees." *Hearing on S. 2719*, 97th Cong. 67; *Hearing on H.R. 6612*, 97th Cong. 62.

## II. The Settlement Act

Things changed in 1976, when the Tribe brought suit in this district with aid from the Native American Rights Fund. *See Hearing on S. 2719*, 97th Cong. 67; *Hearing on H.R. 6612*, 97th Cong. 46, 62. The Tribe's claim was straightforward: Because Congress never approved these land transfers, the State's 1855 sale of 800 acres violated the Trade and Intercourse Act of 1790, 25 U.S.C. § 177, which prohibits the alienation of Indian lands unless based on treaty or the Constitution. *See Connecticut ex rel. Blumenthal v. U.S. Dep't of the Interior* ("*Blumenthal*"), 228 F.3d 82, 86 (2d Cir. 2000). The parties reached a settlement "after years of negotiations," 128 Cong. Rec. 31612 (1982), which included testimony before Congress by the Tribe's then-Tribal Chairman, who emphasized "the desire of the Mashantucket Pequot people to continue to exist on its land as a tribe and to be self-governing, maintain a good standard of living for its people, and become self-determining and self-sufficient." *Hearing on S. 2719*, 97th Cong. 68; *Hearing on H.R. 6612*, 97th Cong. 64. As legislation took form, then-Governor William O'Neill recognized that "[t]he Mashantucket Pequot are an asset to the State of Connecticut and to the people of the United States," that "[t]hey are honest, hard-working, [and] progressive," and that "[p]assage of this bill will ensure realization of that dream … and assist the Tribe in developing its resources in an orderly and beneficial manner." S. Rep. No. 98-222, at 22 (1983) (emphasis added).

Congress enacted the Mashantucket Pequot Indian Claims Settlement Act ("Settlement Act"), Pub. L. No. 98-134, 97 Stat. 851 (1983) (formerly codified at 25 U.S.C. § 1751 *et seq.*), on October 18, 1983. The Act extended federal recognition to the Tribe, provided the Tribe with a small settlement fund of $900,000 to enable the Tribe to purchase land, and, as Interior has consistently recognized, conferred on the Secretary of the Interior the authority to take land into trust for the benefit of the Tribe pursuant to Section 5 of the Indian Reorganization Act ("IRA"),

25 U.S.C. § 5108. To that end, Section 9(a) of the Settlement Act provides that "all laws and regulations of the United States of general application to Indians or Indian nations, tribes or bands of Indians which are not inconsistent with any specific provision of this Act shall be applicable to the Tribe." And Section 9(c) otherwise provides that "[n]otwithstanding any other provision of law, the Tribe and members of the Tribe shall be eligible for all Federal services and benefits furnished to federally recognized Indian tribes as of [October 18, 1983]."

The Tribe quickly expended the small settlement fund and began making requests to Interior to take various parcels of land already owned in fee simple by the Tribe into trust for the Tribe's benefit pursuant to the Secretary's Section 5 IRA authority as extended to the Tribe through the Settlement Act. But the State, joined by the Towns of Ledyard, Preston, and Stonington, filed suit in this district challenging the Secretary's land-into-trust authority as applied to the Tribe. *See* Compl., *Connecticut ex rel. Blumenthal v. Babbitt*, No. 3:95-cv-849 (D. Conn. May 11, 1995), Dkt. No. 1; Compl., *Town of Ledyard v. United States*, No. 3:95-cv-0211 (D. Conn. May 11, 1995), Dkt. No. 1. Instead of claiming, as it does in this case, that the Settlement Act does not extend the Secretary's Section 5 IRA authority, the State instead claimed that "the Tribe is barred under [the Settlement Act] from augmenting its trust lands beyond the boundaries of the Reservation created in [the Settlement Act]." Compl. ¶ 21(b), *Blumenthal*, No. 3:95-cv-849. The Second Circuit squarely rejected this interpretation of the Settlement Act, holding that the Settlement Act's land-related limitations of Section 5 of the Settlement Act applied only to lands "acquired by the Tribe with settlement funds," and that the trust or fee status of such lands turned on whether that land was located within "the boundaries of the settlement lands" designated by the Settlement Act. *Blumenthal*, 228 F.3d at 88. Because Section 5 was "silent with regards to lands" that were "not purchased with settlement funds," the Second Circuit reasoned, Section 5's limitations "d[id] not

apply" to those lands. *Id.* "As to such lands" not purchased with Settlement Funds, the Second Circuit continued, "[t]he Tribe may apply to the Secretary to take them into trust under the 1934 IRA, and the Secretary's decision will be governed by the considerations outlined in the relevant regulations." *Id.*

## III. This Action

The State has continued to oppose the Tribe's efforts for the federal government to take land that the Tribe already owns in fee simple into trust for its benefit, even going so far as to enact legislation requiring that it "shall oppose any application by a tribe … to convert any parcel of fee interest land to federal trust status" as "contrary to the interests of the [S]tate and its residents." Conn. Gen. Stat. § 31-57e(c). In the most recent chapter of this longstanding dispute, the Tribe requested on August 25, 2023 that the Secretary take into trust 76.74 acres of land at 119 Indiantown Road and 4.79 acres 159 Indiantown Road, both located in Ledyard, Connecticut, into trust for the Tribe's benefit. *See* AR 119-004–119-012; AR 159-004–159-012.[1] The Tribe already owns both parcels in fee simple, the parcels are both contiguous to the Tribe's existing reservation and part of the Tribe's historic homelands, and the Tribe has no plans to change the use of the properties, which are presently undeveloped and will remain open forest lands. *See* AR 119-005, 119-009, 119-032; AR 159-008, 159-031, 159-034.

The Eastern Regional Director ("ERD")—the agency official responsible for reviewing and rendering a decision on the Tribe's applications—sent notices of the Tribe's pending applications to the State and Town of Ledyard on November 3, 2023, providing recipients 30 days to submit comments related to the application or a written justification requesting an extension. AR 119-300; AR 159-427; *see* 25 C.F.R. § 151.10 (2023). Although the State received and signed

[1] There are two administrative records, one for each of the Tribe's applications.

for those notices, *see* AR 119-305; AR 159-430, it now alleges that it did not. And more than four months after the 30-day deadlines elapsed, on April 10, 2024, the State submitted requests to the ERD for extensions of time to submit comments. AR 119-338; AR 159-400. The ERD rightly rejected those requests on May 1, 2024, and subsequently granted the Tribe's applications on August 5, 2024, citing the IRA as the source of statutory authority supporting the trust acquisition. *See* AR 119-508–119-513; AR 159-476–159-481.

The State and Towns appealed the ERD's decisions to the Interior Board of Indian Appeals ("IBIA") on August 29, 2024, challenging the decisions on the same grounds as here. The IBIA then consolidated the appeals on September 11, 2024. *See* Pre-Docketing Notice, Order Consolidating Appeals, Order Concerning Service List, and the Administrative Record(s), *Connecticut v. E. Reg'l Dir.* (IBIA Sept. 11, 2024). On October 3, 2024, the then-Assistant Secretary for Indian Affairs ("ASIA") exercised his authority pursuant to 25 C.F.R. § 2.508 and 43 C.F.R. § 4.332(b) to assume jurisdiction over the appeals from the IBIA. *See* Notice of Consolidated Appeals, Notice on Administrative Records, Notice on Service of Documents, Scheduling Order, *Connecticut v. E. Reg'l Dir.* (Interior Dec. Oct. 3, 2024). The ASIA rejected the State's and Towns' challenges and affirmed the decisions below.

Prior to the instant lawsuit, the State on February 6, 2025, initially sought redress directly from Defendant Mercier, requesting that he stay the effective date of the decisions for substantially the same reasons the State asserts in this Court. *See generally* ECF No. 4. The Tribe responded in kind, and Defendant Mercier has not granted the State's request. The State filed the instant suit on April 11, 2025. *See* ECF No. 5.

Separate from this litigation and the parcels at issue herein, the Tribe also requested that the Secretary take into trust for the Tribe's benefit another 58.61 acres of undeveloped land owned

by the Tribe in fee simple located at 153 Indiantown Road in Ledyard, Connecticut. The State and Towns in that proceeding, unlike here, did timely respond to the Regional Director's notice soliciting comments, submitting 33 single-spaced pages of comments that raise the same substantive legal challenges to the Secretary's land-into-trust authority that the State here asserts. Even though the State protests that it was deprived of the opportunity to make those same arguments in the agency proceedings prior to the instant suit, the ERD nonetheless granted the Tribe's application to take that parcel into trust even considering those arguments in this separate proceeding. The State and Towns appealed that decision to the IBIA as well, and that matter is fully briefed and pending resolution by the IBIA. *See Town of Ledyard v. Acting E. Reg'l Dir.*, Dkt. Nos. IBIA 25-015 & 25-016 (filed Oct. 24, 2024).

## LEGAL STANDARD

Despite the State's suggestion otherwise, "[t]he standard for a stay under 5 U.S.C. § 705 is the same as the standard for a preliminary injunction." *New York v. U.S. Dep't of Educ.*, 477 F. Supp. 3d 279, 294 (S.D.N.Y. 2020); *accord Cuomo v. U.S. Nuclear Regul. Comm'n,* 772 F.2d 972, 974 (D.C. Cir. 1985) (per curiam); *Airlines for Am. v. Dep't of Transp.*, 110 F.4th 672, 674 (5th Cir. 2024); *Ohio ex rel. Celebrezze v. U.S. Nuclear Regul. Comm'n*, 812 F.2d 288, 290 (6th Cir. 1987); *Cook Cnty. v. Wolf*, 962 F.3d 208, 221 (7th Cir. 2020); *Colorado v. EPA*, 989 F.3d 874, 883 (10th Cir. 2021). "[T]he preliminary injunction is one of the most drastic tools in the arsenal of judicial remedy" and "should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Grand River Enters. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (internal quotation marks omitted).

To obtain a preliminary injunction, the State would ordinarily be required to "show '(1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the

merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest.'" *St. Joseph's Hosp. Health Ctr. v. Am. Anesthesiology of Syracuse, P.C.*, 131 F.4th 102, 106 (2d Cir. 2025) (internal quotation marks omitted). But "[w]hen, as here, the moving party seeks a preliminary injunction that will affect government action taken in the public interest pursuant to a statutory or regulatory scheme, the injunction should be granted only if the moving party meets the more rigorous likelihood-of-success standard," that is, the movant "must establish a clear or substantial likelihood of success on the merits." *Sussman v. Crawford*, 488 F.3d 136, 140 (2d Cir. 2007) (internal quotation marks omitted). "'The first two factors … are the most critical,' and where, as in this case, the government is the party opposing the stay, the third and fourth factors 'merge.'" *Sarr v. Garland*, 50 F.4th 326, 335 (2d Cir. 2022) (quoting *Nken v. Holder*, 556 U.S. 418, 434–35 (2009)).

## ARGUMENT

The State's request fails at the outset because the request is untimely. Even if the Court proceeds to evaluate the request on the merits, the State cannot satisfy any of the four requirements to obtain the injunctive relief they seek.

### I. The State's Request is Untimely.

The Court should deny the State's request at the outset because it is untimely. Section 705 by its terms permits the Court to "postpone the effective date of an agency action or to preserve status or rights *pending conclusion of the review proceedings*." 5 U.S.C. § 705 (emphasis added) But it does not, as the State assumes, authorize the suspension of an agency action "that is already in effect," *Ctr. for Biological Diversity v. Regan*, 691 F. Supp. 3d 1, 8 (D.D.C. 2023). Put differently, once the "'egg … has been scrambled,' … Section 705 does not authorize an agency

to reinaugurate some [pre]-effective date 'status quo' pending judicial review." *Id.* at 12 (quoting *Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 97 (D.C. Cir. 2002)).

Courts in the Second Circuit have expressed similar views, holding that Section 705 "empowers courts to act to maintain the status quo" while emphasizing that the status quo for consideration is that which exists "at the commencement of th[e] lawsuit." *Comprehensive Cmty. Dev. Corp. v. Sebelius*, No. 12-CV-776, 2012 WL 738185, at *8 (S.D.N.Y. Mar. 7, 2012). And they have rejected attempts by litigants to frame the effective date for purposes of Section 705 as some date other than that on which the final agency action at issue became effective. *See Nat. Res. Def. Council v. U.S. Dep't of Energy*, 362 F. Supp. 3d 126, 152 (S.D.N.Y. 2019); *cf. Safety-Kleen Corp. v. EPA*, No. 92-1629, 1996 U.S. App. LEXIS 2324, at *2–3 (D.C. Cir. Jan. 19, 1996) (per curiam) ("[Section 705] permits an agency to postpone the effective date of a not yet effective rule, pending judicial review. It does not permit the agency to suspend without notice and comment a promulgated rule.").

Here, the ASIA's decision took effect immediately upon its issuance on January 10, 2025. The applicable regulations governing land-into-trust acquisitions confirm this conclusion by requiring that "the Assistant Secretary shall … [i]mmediately acquire the land in trust" upon issuance of the ASIA's decision. 25 C.F.R. § 151.12(c)(2)(iii) (2023).[2] Defendants thus became obligated to take the parcels into trust on January 10 and has remained so obligated for more than six months. At any point, the Tribe can bring suit under the Administrative Procedure Act on the grounds that the ASIA's failure to fulfill this regulatory obligation constituted agency action unlawfully withheld and unreasonably delayed. *See* 5 U.S.C. § 706(1); *see also e.g.*, *Sharkey v.*

[2] The former regulation applied because the Tribe filed the underlying application on August 25, 2023, such that the agency adjudicated the Tribe's application under the regulations then in effect. The current regulation is virtually identical in this regard and is codified at 25 C.F.R. § 151.13(c)(2)(iii).

*Quarantillo*, 541 F.3d 75, 89 n.13 (2d Cir. 2008) (unlawfully withheld agency action); *Giammarco v. Beers*, 170 F. Supp. 3d 320, 330 (D. Conn. 2016) (unreasonably delayed agency action).

When the instant suit commenced, the state of affairs was a post-effective date status quo in which Interior is required to take the parcels into trust, and the State cannot turn back the clock through Section 705. The Court should reject the State's attempts to miscast the effective date as a different "date[] with teeth" for purposes of Section 705 and deny the State's motion for this reason alone. *California v. U.S. Bureau of Land Mgmt.*, 277 F. Supp. 3d 1106, 1118 (N.D. Cal. 2017).

## II. The State Will Not Suffer Irreparable Harm.

The State cannot establish that irreparable harm will result in the absence of a stay because it cannot identify "an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (internal quotation marks omitted). The State asserts three grounds in an attempt to establish irreparable harm; each is fatally flawed.

*First,* the State asserts that if the parcels are taken into trust, the State will lose its ability to enforce its laws over the parcels. But much of the State's legal authority concerns interests in real property, and it is undisputed that the Tribe already owns each of the parcels at issue here. The State further argues that it will be unable to enforce its environmental laws over the parcels' wetlands and to enforce its motor vehicles laws over the all-terrain vehicle use that will occur on the existing trail on 119 Indiantown Road. *See* ECF No. 35-1 at 13. As to the former, the State ignores that the Tribe has enacted an extensive statutory scheme governing land use, *see generally* 14 M.P.T.L., https://law.mptn-nsn.gov/globalassets/laws/title-14-land-use-law.pdf, and that,

pursuant to that scheme, it has promulgated comprehensive regulations governing activities on wetlands, predicated on the Tribe's "commit[ment] to preserve and protect the inland wetlands and watercourses on the Mashantucket Pequot Tribal Lands," 5 M.P.T.N. Land Use Regs. ch. 1, § 1(a), https://landuse.mptn-nsn.gov/globalassets/land-use-regs/landuseregulations.pdf. And as to the latter, the Tribe has enacted a similarly comprehensive scheme regarding motor vehicle use, including use of all-terrain vehicles, that requires users to first register with the State or federal government, imposes myriad rules of operation, and subjects violators to liability. *See generally* 7 M.P.T.L. ch. 9, https://law.mptn-nsn.gov/globalassets/laws/title-7-traffic-safety-code.pdf.

The State also argues that it will be deprived of its ability to collect taxes on the property but ignores the direct benefits to the State from the Tribe's on-reservation activities, including at The Tribe's Foxwoods Resort Casino. In 2024 alone, the Tribe provided more than $92,000,000 in slot contribution and $48,700,000 in gaming-related taxes to the State itself. *See* Rodney Butler, Chairman, Mashantucket Pequot Tribal Nation, Testimony of the Mashantucket Pequot Tribal Nation at Connecticut General Assembly General Law Committee Informational Forum on Gaming (Jan. 27, 2025), https://www.cga.ct.gov/gl/related/20250127_Informational%20Forum%20on%20Gaming/1.27.25%20GL%20info%20forum%20on%20gaming.pdf. Since the Tribe commenced gaming operations 33 years ago, it has provided more than $4,800,000,000 in contributions to the State, and its operations have an annual impact on the State's economy that exceeds $1,000,000,000. *See id.* Simply put, the Tribe-related benefits to the State exponentially exceed any revenue-related deficits from these acquisitions.

*Second,* the State argues that accepting the parcels into trust will solidify the Interior's denial of the State's due process rights, including its constitutional right to due process. *See* ECF No. 35-1 at 13–16. Setting aside that it is well-established that states have no constitutional due

process rights of their own, *see South Carolina v. Katzenbach*, 383 U.S. 301, 323–24 (1966), the State apparently concedes that this argument rises and falls with the success of its notice-related arguments, which are meritless for the reasons set forth below, *see infra*, at Section III(B).

*Third*, the State argues that taking the land into trust will complicate this Court's ability to judicially review Interior's decisions granting the Tribe's applications. *See* ECF No. 35-1 at 17–23. While the State makes much ado about the fact that Interior no longer waits 30 days from the time of its land-into-trust decision to take the parcel into trust, it ignores that Interior reached this conclusion because, in *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209 (2012), the Supreme Court "held … that the Indian lands exception to the [Quiet Title Act's] waiver of United States sovereign immunity for quiet title actions does not itself bar judicial review under the APA of the Department's decision to acquire land in trust unless the aggrieved party seeks to quiet title to the subject property." Land Acquisitions, 78 Fed. Reg. 67,928, 67,929–30 (Nov. 13, 2013). The State's assertions that the Defendants could try to reassert sovereign immunity notwithstanding *Patchak* or that the Tribe may immediately change the character of the parcels once it is taken into trust are pure conjecture by their very articulation and thus insufficient to establish irreparable harm. *See, e.g.*, ECF No. 35-1 at 20 ("Defendants *may* try a similar strategy again here." (emphasis added)), 21 ("[T]he Tribe *can* alter the land as soon as Defendants take title." (emphasis added)). If the State has some basis for suggesting that the United States would after the merits stage not follow this Court's order, it has not effectively laid out a sound basis for that curious contention.

## III. The State Has Not Established a Clear or Substantial Likelihood of Success on the Merits.

The State has not even attempted to establish the "clear or substantial likelihood of success on the merits" required when seeking to "affect government action taken pursuant to a statutory or

regulatory scheme." *Sussman* 488 F.3d at 140. Instead, the State couches its arguments in terms of the lesser, serious questions standard. *See* ECF No. 35-1 at 23; *see also, e.g.*, *Mendez v. Banks*, 65 F.4th 56, 63 (2d Cir. 2023) (preliminary injunction may issue where the plaintiff establishes "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the [plaintiffs'] favor" (internal quotation marks omitted)), *cert. denied*, 144 S. Ct. 559 (2024). Because the State does not so much as purport to make the requisite showing, the Court should deny the State's motion for this reason, too. To the extent the Court considers the State's arguments, which are virtually identical to those previously raised to and rejected by Interior, each is wholly without merit.

**A. The Eastern Regional Director Properly Relied on the Indian Reorganization Act.**

The State principally argues that, even if the Settlement Act extends the IRA to the Tribe, the ERD erroneously cited the IRA as the basis for the Secretary's statutory authority in connection with the Tribe's applications. *See* ECF No. 35-1 at 23–25; *see also* AR 119-477; AR 159-477. But the State's argument misunderstands the operation of the Settlement Act. By providing that "all laws and regulations of the United States of general application to Indians or Indian nations shall be applicable" to the Tribe, the Settlement Act extends the Secretary's existing land-into-trust authority under the IRA to the Tribe. Settlement Act § 9(a). The Tribe has not argued, nor has Interior purported to understand, that Section 9 is a standalone source of secretarial land-into-trust authority. That result is consistent with the Supreme Court's holding in *Carcieri v. Salazar*, where the Supreme Court held that Congress has "chose[n] to expand the Secretary's authority to particular Indian tribes" without regard to whether a particular tribe was under federal jurisdiction in 1934. *Id.* at 392; *see id.* n.6 (discussing examples of such statutes providing that sections of the IRA were "made applicable" and "shall apply" to certain tribes (first quoting 25 U.S.C. § 1300b-

14(a); and then quoting 25 U.S.C. § 1300g-2(a))). As a result, when the ERD stated that the IRA is the source of authority, that is precisely correct—an unavoidable consequence of Congress, exercising plenary authority, explicitly stating that laws of general applicability such as the IRA shall be applicable to the Tribe.[3]

Moreover, the State does not grapple with the effect of a holding in their favor on this score: nothing. It is well established that "[a]n error does not require a remand if the remand would be pointless because it is clear that the agency would adhere to its prior decision in the absence of error." *Bechtel v. Admin. Rev. Bd.*, 710 F.3d 443, 449 (2d Cir. 2013) (quoting *Xiao Ji Chen v. U.S. Dep't of Just.*, 471 F.3d 315, 338 (2d Cir. 2006)). Suppose that, despite the inexcusable tardiness of the State's filing, Interior excused the tardiness and addressed the State's argument regarding authority. We know for a fact that Interior would have rejected this argument. That is because in a separate fee to trust challenge, the State timely made these arguments and Interior took the correct position that the Settlement Act authorizes the fee-to-trust acquisitions at issue. *See* AR-0801, *Town of Ledyard v. Acting E. Reg'l Dir.*, Dkt. Nos. IBIA 25-015 & 25-016 ("Congress made the IRA applicable to the Tribe through the [Settlement Act]. Subsections 9(a) and 9(c) of the Settlement Act provide specific authority for the Secretary to take lands into trust for the Tribe by making the IRA applicable to the Tribe."). So even if the State's argument passed muster, which it does not, remand for the ERD to simply cite the Settlement Act instead is unwarranted.

[3] As discussed below, the Second Circuit in *Connecticut ex rel. Blumenthal v. United States Department of the Interior*, 228 F.3d 82 (2d Cir. 2000), interpreted Section 5 of the Settlement Act, which established a settlement fund and provided that lands purchased by the Tribe with that fund would be held in trust by the United States if located within geographic boundaries delineated by the Act, and held in fee by the Tribe if outside those boundaries. *See* 25 U.S.C. § 1754(b)(7), b(8). That authority is distinct from the Secretary's fee-to-trust authority under the IRA that Section 9 extended to the Tribe, although the State attempts to conflate the two. *See* ECF No. 35-1 at 33.

**B. The Settlement Act Extends the IRA to the Tribe.**

The cornerstone of the State's challenge to Interior's decisions to take the parcels into trust for the Tribe's benefit is the State's view that the Settlement Act does not extend the Secretary's land-into-trust authority under the IRA to the Tribe because the IRA is not a "law[] of general application to Indians and Indian nations." Settlement Act § 9(f); *see* ECF No. 37-1 at 26–36. But every applicable mode of statutory interpretation confirms that the IRA is a law of general application such that the Settlement Act extended the Secretary's land-into-trust authority thereunder to the Tribe, and the State's arguments to the contrary wholly lack merit.

**1. The IRA is a Law of General Application to Indian Tribes.**

**a. Plain Language**

The Settlement Act's text alone suffices to resolve this interpretive question. The Supreme Court has explained, "The preeminent canon of statutory interpretation requires [courts] to presume that [the] legislature says in a statute what it means and means in a statute what it says there. Thus, [the] inquiry begins with the statutory text, and ends there as well if the text is unambiguous." *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) (internal quotation marks and citations omitted)). The State's argument proceeds from the premise that the word "general" means "universal." However, a "survey of the relevant dictionaries" confirms that it does not. *Taniguchi v. Kan Pac. Saipan, Ltd*., 566 U.S. 560, 569 (2012). Rather, a general law is one that "purports to apply to all persons or places *of a specified class.*" *Law*, *Black's Law Dictionary* (12th ed. 2024) (emphasis added).

In that vein, the Supreme Court has also emphasized that that "the Oxford English Dictionary" ("OED") is "one of the most authoritative on the English language." *Taniguchi* 566 U.S. at 569. And the OED authoritatively defines "[g]eneral" as "[o]f a rule, law, principle,

formula, or description: applicable *to a variety of cases*; true or purporting to be true for all or most of the cases *which come under its terms*," and confirms that the word "general," in fact, "implie[s] *opposition to universal.*" General, *Oxford English Dictionary* (2023 ed.) (emphases added). Ballentine's Law Dictionary similarly defines "[g]eneral" as "[c]ommon to many" and specifically makes clear it means "extensive though *not universal*." *General*, *Ballentine's Law Dictionary* (3d ed. 1969) (emphasis added).

The IRA unequivocally falls within that definition. The IRA defines "Indian" and "tribe" that serve as prerequisites for the Act to be applicable to a particular tribe. *See* 25 U.S.C. § 5129. The IRA then accords any such tribe numerous abilities, including, for example, "the right to organize for its common welfare, and … adopt an appropriate constitution and bylaws, and any amendments thereto," 25 U.S.C. § 5123(a), to "petition" the Secretary to "issue a charter of incorporation to such tribe," *id.* § 5124,[4] and, as relevant here, to have land taken into trust for its benefit by the Secretary, *see* 25 U.S.C. § 5108. These provisions confirm what courts and Congress understood at the time the Settlement Act was enacted in 1983, that is, that the IRA is a "statute[] of broad general applicability." *Chemehuevi Indian Tribe v. Cal. State Bd. of Equalization*, 800 F.2d 1446, 1448 (9th Cir. 1986).

Numerous similarly-structured Indian law statutes of general applicability corroborate this conclusion. For example, the Indian Civil Rights Act, 25 U.S.C. §§ 1301–1303, sets forth a series of constitutional guarantees that must be upheld by and a cause of action for habeas relief against an "Indian tribe," but it narrows the universe of applicable tribes only to those "subject to the jurisdiction of the United States and recognized as possessing powers of self-government." 25

[4] This Section provides the foundation for Section 17 corporations. *See Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1184 n.8 (10th Cir. 2010). The Tribe currently has several Section 17 entities, thus illustrating another legal context in which the Department has routinely applied the IRA to the Tribe.

U.S.C. § 1301(1). The Major Crimes Act provides that certain crimes fall within the "exclusive jurisdiction of the United States," 18 U.S.C. § 1153(a), but only those committed within "Indian country," which bears a specific definition set forth by 18 U.S.C. § 1151. And the provisions of the Indian Self-Determination and Education Assistance Act, 25 U.S.C. § 5301 *et seq.*, apply only to an "Indian tribe," defined as any tribe "recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians," 25 U.S.C. § 5304(e). These statutes are clearly of general, not universal, applicability to Indian tribes.

By contrast, there are statutes of universal, not general, application to Indians and Indian tribes. For example, the Trade and Intercourse Act of 1790, 25 U.S.C. § 177, which served as the basis for the Tribe's suit that culminated in the Settlement Act, prohibits the alienation of lands "from any Indian nation or tribe of Indians" unless based on a treaty or the Constitution. 25 U.S.C. § 177. Courts have long understood this articulation to encompass any Indian tribe regardless of whether a particular tribe is federally recognized. *See, e.g.*, *Joint Tribal Council of the Passamaquoddy Tribe v. Morton*, 528 F.2d 370, 378 (1st Cir. 1975). The IRA and other statutes of general applicability discussed above fundamentally differ for this reason.

Further corroborating this understanding, Section 9(c) of the Settlement Act provides that "[n]otwithstanding any other provision of law, the Tribe and members of the Tribe shall be eligible for all Federal services and benefits furnished to federally recognized Indian tribes as of [October 18, 1983]." The Secretary's authority to take land into trust, predicated on "the purpose of providing land for Indians" and conferred in 1934, necessarily falls within this ambit.[5]

[5] It bears emphasis that the Section 9(c) extends the universe of "*all* Federal services and benefits furnished to federally recognized tribes," not only the subsets that are also furnished to *all* federally recognized tribes. And because tribunals "engaged in the business of interpreting statutes … presume differences in language like this convey differences in meaning," *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 86 (2017), Section 9(c) necessarily extends those services and benefits only available to a subset of tribes, *e.g.*, those that were under federal jurisdiction in 1934.

**b. Statutory Landscape**

While the State offers a remarkably one-sided view of the statutory landscape, *see* ECF No. 35-1 at 28–30, contemporaneously and subsequently enacted congressional statutes only confirm the result dictated by the Settlement Act's plain language.

The interpretive value of these other statutes stems from the black letter law that "the meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000); *see also Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 126 (2016) ("[S]imilarity of language" in two different statutes "is … a strong indication that the two statutes should be interpreted *pari passu*." (alteration in original) (internal quotation marks omitted)). And in enacting legislation subsequent to the Settlement Act that extended federal recognition to other tribes, Congress used identical statutory language making "applicable" "all laws and regulations of the United States of general application to Indians or Indian tribes," and it further made explicit that such laws and regulations "includ[e] the [IRA]." *See, e.g.*, *City of Council Bluffs v. U.S. Dep't of Interior*, 11 F.4th 852, 854 (8th Cir. 2021) (Ponca Restoration Act, Pub. L. No. 101-484, § 3, 104 Stat. 1167, 1167 (1990) (formerly codified at 25 U.S.C. § 983 *et seq.*)); *Kelsey v. Pope*, 809 F.3d 849, 852 (6th Cir. 2016) (Little Traverse Bay Bands of Odawa Indians and Little River Band of Ottawa Indians Act, Pub. L. No. 103-324, 108 Stat. 2156 (1994) (formerly codified at 25 U.S.C. § 1300k *et seq.*)).[6]

[6] Section 3 of the Ponca Restoration Act provides, "All Federal laws of general application to Indians and Indian tribes (including the Act of June 18, 1934 (48 Stat. 984; 25 U.S.C. 461 et seq.), popularly known as the Indian Reorganization Act) shall apply with respect to the Tribe and its members." Similarly, Section 4 of the Little Traverse Bay Bands of Odawa Indians and Little River Band of Ottawa Indians Act provides, "All laws and regulations of the United States of general application to Indians or nations, tribes, or bands of Indians, including the Act of June 18, 1934 (25 U.S.C. 461 et seq.; commonly referred to as the 'Indian Reorganization Act'), which are not inconsistent with any specific provision of this Act shall be applicable to the Bands and their members."

It is also "hornbook law that the use of the word 'including' indicates that the specified list … that follows is illustrative." *Am. Hosp. Ass'n v. Azar*, 983 F.3d 528, 534 (D.C. Cir. 2020) (internal quotation marks omitted); *accord Carroll v. Trump*, 49 F.4th 759, 769 (2d Cir. 2022); *United States v. Hawley*, 919 F.3d 252, 256 (4th Cir. 2019); *see Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941) ("'[I]ncluding' … connotes simply an illustrative application of the general principle."). So when Congress in these subsequent statutes expressly referenced the IRA through a phrase that began with the word "including," it thereby made clear that it understands the IRA to be a law of general application and intends acts that extend such laws to tribes—like the Tribe's Settlement Act—to include the IRA.

Indeed, in later considering a draft of the Ysleta Del Sur Pueblo and Alabama and Coushatta Indian Tribes of Texas Restoration Act, Pub. L. No. 100-89, 101 Stat. 667 (1987), which contained language identical to Section 9(a) of the Tribe's Settlement Act and did not expressly mention the IRA, a representative from Interior's Office of Congressional and Legislative Affairs testified that the IRA "would apply … anyway" and confirmed that the "[IRA] is an act of general application," but explained that the express reference should be included simply "for the sake of clarity." *Restoration of Federal Recognition to the Ysleta Del Sur Pueblo and the Alabama and Coushatta Indian Tribes of Texas: Hearing on H.R. 1344 Before the S. Select Comm. on Indian Affs.*, 99th Cong. 19 (1986); *see id.* at 12 (identical draft language). And in the section-by-section analysis accompanying the Ponca Restoration Act, for example, Congress explained that the section of the Act including reference to the IRA "provide[d] that all laws of general application to Indians shall be applicable to that tribe." S. Rep. 101-330, at 3 (1989). These indicia only further confirm what the text of the Settlement Act makes plain—the IRA is a law of general application which applies with equal force to the Tribe as with other tribes.

Rather than grapple with these interpretive precepts, the State cherry-picks two tribal restoration acts that contain express reference to the IRA. *See* ECF No. 35-1 at 30. But those acts are structured differently and thus inapposite for purposes of interpreting the Tribe's Settlement Act. *Cf. Puerto Rico*, 579 U.S. at 126.

**c. Legislative History**

The legislative history precipitating the Settlement Act provides additional "corroborating evidence" further corroborating the result compelled by the Settlement Act's plain language. *Tapia v. United States*, 564 U.S. 319, 331 (2011). Congress noted that in 1983 the extension of federal recognition to a tribe "by statute [was] an unusual procedure." H.R. Rep. No. 98-43, at 11 (1983); *see also* S. Rep. No. 98-222, at 14. While such a practice has become somewhat more common since, the only prior legislation of this nature was the Maine Indian Claims Settlement Act of 1980 ("Maine Settlement Act"), Pub. L. No. 96-420, 94 Stat. 1785 (formerly codified at 25 U.S.C. § 1721 *et seq.*), which the Second Circuit in *Blumenthal* acknowledged "was a model for the Mashantucket Pequot's Settlement Act." 228 F.3d at 90; *see* H.R. Rep. No. 98-43 at 12 ("The Committee notes that precedent for this action is found … under the Maine Indian Claims Settlement Act."); S. Rep. No. 98-222, at 17 (same). The Maine Settlement Act, like the Tribe's Settlement Act, provides, "Except as other wise provided in this Act, the laws and regulations of the United States which are generally applicable to Indians, Indian nations, or tribes or bands of Indians or to lands owned by or held in trust for Indians, Indian nations, or tribes or bands of Indians shall be applicable in the State of Maine." Maine Settlement Act § 6(h).

Critically, though, "[i]n marked contrast to the Settlement Act," "the Maine Settlement Act has a broad provision that prevents lands not specifically covered by that Act from being taken into trust by the Secretary: 'Except for the provisions of this subchapter, the United States shall

have no authority to acquire lands or natural resources in trust for the benefit of Indians … in the State of Maine.'"[7] *Blumenthal*, 228 F.3d at 90 (quoting Maine Settlement Act § 5(e)).

In further contrast, the Maine Settlement Act's clause making Indian laws of general application applicable in the State of Maine is immediately followed by the proviso that "no law or regulation of the United States … which accords or relates to a special status or right of or to any Indian, Indian nation, … Indian lands, Indian reservations, Indian country, Indian territory or land held in trust for Indians … shall apply within the State." Maine Settlement Act § 6(h). Congress would not have needed to include this language if the Maine Settlement Act's extension of Indian laws of general applicability did not, by default, include the IRA. *See, e.g.*, *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 128–29 (2018) ("Absent clear evidence that Congress intended this surplusage, the Court rejects an interpretation of the statute that would render an entire subparagraph meaningless.").

These distinctions between the Tribe's Settlement Act and the Maine Settlement Act supply "an obvious demonstration that Congress knew how to prohibit the Secretary from taking into trust any lands outside of specifically designated settlement lands." *Blumenthal*, 228 F.3d at 90; *see also Council Bluffs*, 11 F.4th at 859 ("Congress has shown that it knows how to limit a tribe's ability to conduct gaming on its land when it wishes to do so."). Accordingly, Congress's omission of these limitations from the Settlement Act affirmatively indicates that it understood Section 9 to extend the Secretary's IRA authority to the Tribe, as the Court must "presume

[7] Congress's differing choices with respect to the Tribe's Settlement Act and the Maine Settlement Act in this regard make sense in view of the vastly discrepant amount of funds set aside by each. Where the Tribe's Settlement Act provided $900,000 in settlement funds, *see* Settlement Act § 5(e), the Maine Settlement Act provided $27,000,000 in settlement funds for just two tribes, *see* Maine Settlement Act § 5(a), and a separate land acquisition fund in the amount of $54,500,000 for three tribes, *see id.* § 5 (c).

differences in language like this convey differences in meaning." *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 86 (2017); *see Blumenthal*, 228 F.3d at 88.

Moreover, Congress's section-by-section analysis accompanying the Tribe's Settlement Act expressly identified every instance in which a provision of the Tribe's Settlement Act was intended to be "similar to" its analogous provision in the Maine Settlement Act, *e.g.*, S. Rep. No. 98-222, at 13; H.R. Rep. No. 98-43, at 8. Congress even noted where linguistic departures from the Maine Settlement Act in the Tribe's Settlement Act were "stylistic only and are *not* to be interpreted as effecting a substantive difference" between the two statutes. S. Rep. No. 98-222, at 11 (emphasis added); H.R Rep. No. 98-43, at 6. Significantly, though, Congress did not make any such notes with respect to Section 9 of the Settlement Act's corollary in the Maine Settlement Act, thus confirming its intent that those sections bear different meanings. *See* S. Rep. No. 98-222, at 17–18; H.R. Rep. No. 98-43, at 11–12.

Other, directly germane legislative history is in accord. The House Committee on Interior and Insular Affairs noted that the Settlement Act was not "intended to limit any authority of the Secretary to accept settlement lands in trust for the benefit of the tribe which may be purchased with funds besides those provided through the Settlement Fund." H.R. Rep. No. 98-43, at 9. And the contemporaneous testimony of all involved illustrates a widely-held understanding that the Settlement Act was intended to promote the Tribe's broader, centuries-long efforts to restore its homelands. S. Rep. No. 98-222, at 22; *Hearing on S. 2719*, 97th Cong. 67, 78; *Hearing on H.R. 6612*, 97th Cong. at 62.

**d. Indian Canon**

While the Tribe maintains that the Settlement Act unambiguously extends the IRA to the Tribe and that this understanding is confirmed by other congressional acts and the legislative

history, the Indian canon of construction only further compels that conclusion. The canon requires that "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." *Cobell v. Norton*, 240 F.3d 1081, 1101 (D.C. Cir. 2001) (quoting *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985)); *accord New York v. Mountain Tobacco Co.*, 942 F.3d 536, 548 (2d Cir. 2019). For this reason, the Settlement Act "*must* be construed in favor of the [Tribe], i.e., as" extending the IRA to the Tribe. *Muscogee (Creek) Nation v. Hodel*, 851 F.2d 1439, 1444–45 (D.C. Cir. 1988).

The Settlement Act makes the availability of the Indian canon especially clear through its extension of federal recognition to the Tribe. *See* Settlement Act § 9(a). This is because the Indian canon is "rooted in the trust relationship between the federal government and Indian tribes," and "federal recognition of an Indian tribe institutionalizes that relationship" as a matter of law. *Metlakatla Indian Cmty. v. Dunleavy*, 58 F.4th 1034, 1046 (9th Cir. 2023). Consistent therewith, Congress expressly recognized that the "operation" of the Settlement Act would "ipso facto establish a trust relationship between the Mashantucket Pequot Tribe and the United States." H.R. Rep. No. 98-43, at 12; S. Rep. No. 98-222, at 17.

By the same token, "the Indian canon applies uniformly to treaties, statutes[,] and executive orders" such that, in addition to the interpretation of ambiguities to the Indians' favor, these legal instruments "are interpreted as the Indians would have understood them." *Metlakatla Indian Cmty.*, 58 F.4th at 1046, 1042 (alteration in original) (internal quotation marks omitted). That treatment is especially appropriate here, as the Settlement Act was enacted following "years of negotiations," 128 Cong. Rec. 31612, that included the Tribe, the State, the private landowners, and the federal government. *See generally* S. Rep. No. 98-222. The statements of the Tribe's

representatives discussed above illustrate that the Tribe understood the Settlement Act to facilitate, not limit, its centuries-long efforts to restore its homelands that engendered enactment.

Moreover, it would be farcical to think that the Tribe would have agreed to a settlement that put an end to these homeland restoration efforts. As discussed above, the Settlement Act allocated just $900,000 in settlement funds for the Tribe to use to purchase lands or natural resources. Settlement Act § 5(e). Those funds were expended quickly. To illustrate this point, and although it did not use settlement funds for this particular purchase, the Tribe paid $300,000 for the 4.79-acre 159 Indiantown Road parcel in 1994. AR 159-033–159-034. The State's view of the Settlement Act, then, *see* ECF No. 35-1 at 35, produces the absurd result that the Tribe would not have been able to acquire in trust even the 800 acres at issue in the litigation that resulted in the Settlement Act, let alone be able to pursue the broader restoration of tribal homelands. *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) ("[I]nterpretations of a statute that would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available.").

**2. The Major Questions Doctrine Does Not Apply.**

The State also takes the peculiar position that the major questions doctrine applies to the Settlement Act such that Congress would have to have been "exceedingly clear" had it intended the Settlement Act to extend the IRA to the Tribe. ECF No. 35-1 at 27–28. But the major questions doctrine does not apply. To the contrary, the Supreme Court has applied the doctrine only where "the authority claimed by the agencies had *nationwide* repercussions and, for certain agency decisions, entailed *costs in the billions of dollars*." *Alaska v. Newland*, No. 23-cv-00007, 2024 WL 3178000, at *8–9 (D. Alaska June 26, 2024) (emphases added), *appeal filed*, No. 24-5280 (9th Cir. filed Aug. 28, 2024). A case that "involves the Secretary's authority to take private

land held in fee in [a state] that the fee owner seeks to voluntarily transfer to the federal government to be held in trust" plainly does not fall into this category. *Id.* at *9 (reaching this conclusion with respect to the Alaska Indian Reorganization Act, Pub. L. No. 74-538, 49 Stat. 1250 (1936)).

In any event, Congress did use exceedingly clear language in the IRA, which is the source of the authority with which the State takes issue. *See id.* (concluding major questions doctrine satisfied with respect to the IRA because "Congress clearly gave the Secretary authority for trust land acquisitions … in the plain language of the IRA."). The relevant provision plainly provides that the "Secretary of the Interior is authorized, in his discretion, to acquire … any interest in lands, water rights, or surface rights to lands … for the purpose of providing lands for Indians." 25 U.S.C. § 5108. It is difficult to imagine a clearer expression of congressional intent.

Additionally, the major questions doctrine is, in the manner the State seeks to invoke it, incompatible with the Indian canon. As the Supreme Court has explained, the major questions doctrine is fundamentally concerned with "significant[] alter[ations]" in "the balance between federal and state power." *Sackett v. EPA*, 598 U.S. 651, 680 (2023) (quoting *U.S. Forest Serv. v. Cowpasture River Preservation Ass'n*, 590 U.S. 604, 622 (2020)). But the State's power in the domain of federal Indian law is limited. The Supreme Court has recognized—consistently and for centuries—that "'virtually all authority over Indian commerce and Indian tribes lies with the Federal government'" and that "Congress's power to legislate" pursuant to that authority "is muscular, superseding … state authority." *Haaland v. Brackeen*, 599 U.S. 255, 272–73 (2023) (quoting *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 62 (1996)); *see Dick v. United States*, 208 U.S. 340, 353 (1908) ("Congress has power to regulate commerce with the Indian tribes, and such power is superior and paramount to the authority of any State within whose limits are Indian tribes."); *In re Kansas Indians*, 72 U.S. 737, 757 (1866) ("As long as the United States recognizes

[the tribe's] national character they are under the protection of … the laws of Congress, and their property is withdrawn from the operation of State laws."). For this reason, the Supreme Court has repeatedly held that state authority over Indians in Indian Country "is pre-empted" altogether "if it interferes with the federal and tribal interests reflected in federal law." *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 216 (1988) (quoting *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 333 (1983)); *see McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164, 170–171 (1973) ("[S]tate laws generally are not applicable to tribal Indians on an Indian reservation except where Congress has expressly provided that State laws shall apply." (internal quotation marks omitted)); *Williams v. Lee*, 358 U.S. 217, 220 (1959) ("[T]he question has always been whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them.").

Because Congress already has "plenary and exclusive" authority in Indian affairs by virtue of its enumerated powers under Article I, Section 5 of the Constitution, the equities underpinning the major questions doctrine are entirely absent. *United States v. Lara*, 541 U.S. 193, 200 (2004). Simply put, there is no power balance for Congress to alter. And, even if there were, the alteration was necessarily effected by Section 5 of the IRA, which unequivocally authorizes the Secretary to "in his discretion, … acquire … any interest in lands … for the purpose of providing land for Indians," and not through the Settlement Act, which extends that authority to a single tribe. 25 U.S.C. § 5108. Either way, this case does not involve an "agenc[y] asserting highly consequential power beyond what Congress could reasonably be understood to have granted"; rather, the agency is asserting a quintessential federal power that Congress indisputably conferred with regard to myriad federally recognized tribes. *West Virginia v. EPA*, 597 U.S. 697, 724 (2022). In the

Settlement Act, Congress simply made plain that this general authority enjoyed by the Secretary extended to another tribe.

Even accepting the State's premise that the Settlement Act implicates the major questions doctrine, the State cites no legal authority in support of the proposition that the doctrine trumps the Indian canon, and the Tribe has not identified a single case concluding as much. To the contrary, courts have directed "departure from" typical jurisprudential "norms aris[ing] from the fact that the rule of liberally construing statutes to the benefit of Indians arises not from ordinary exegesis, but from principles of equitable obligations and normative rules of behavior[] applicable to the trust relationship between the United States and the Native American people." *Cobell*, 240 F.3d at 1101 (internal quotation marks omitted). Departure under the circumstances is entirely consistent with the Supreme Court's observation "that the standard principles of statutory construction do not have their usual force in cases involving Indian law." *Blackfeet Tribe*, 471 U.S. at 766. Indeed, prior to the Supreme Court overruling the *Chevron* doctrine, courts routinely held that the Indian canon "trumped" that muscular and generally dispositive doctrine. *Cobell v. Salazar*, 573 F.3d 808, 812 (D.C. Cir. 2009) (internal quotation marks omitted). Thus, even if the Settlement Act contains ambiguity that triggers "varying and conflicting rules of statutory construction," the result is the same—the Settlement Act "*must* be construed in favor of the Indians, i.e., as" extending the Secretary's IRA fee-to-trust authority to the Tribe. *Muscogee (Creek) Nation*, 851 F.2d at 1445. The Second Circuit already reached this exact result in "find[ing] additional substantial support" in the Indian canon for its plain-text interpretation of the Settlement Act. *Blumenthal*, 228 F.3d at 92.

Finally, the State disingenuously claims that a ruling in the Tribe's and Defendants' favor would enable Interior "take into trust virtually all of southeastern Connecticut." ECF No. 35-1 at

27 (quoting *Blumenthal*, 228 F.3d at 94). But, as the Second Circuit emphasized in rejecting the State's prior claim that the sky would fall in this context, the State's "challenge is more appropriately presented as a challenge to the Secretary's exercise of discretion under the IRA" in connection with a given application, *Blumenthal*, 228 F.3d at 94, not to the Secretary's authorization to exercise that discretion. Even if such concerns were presented by the Tribe's attempts to restore 81.53 acres of its undeveloped homelands that it already owns and has no current plans to develop, the Supreme Court has admonished that those concerns "are irrelevant." *Ysleta Del Sur Pueblo v. Texas*, 596 U.S. 685, 706 (2022). "It is not our place to question whether Congress adopted the wisest or most workable policy, only to discern and apply the one it did adopt." *Id.* And "[i]f [the State] thinks good governance requires a different set of rules, its appeals are better directed to those who make the laws than those charged with following them." *Id.*

**3. Extension of the IRA to the Tribe Is Not "Inconsistent With" Other Provisions of the Settlement Act.**

The State contends that extending the IRA to the Tribe would be "inconsistent with" other provisions of the Settlement Act, thus triggering the exception to Section 9(a)'s general rule that all laws of general application to Indians and Indian nations shall be applicable to the Tribe. In support of its argument, the State cites Sections 2(f) and 5(b) of the Settlement Act, neither of which lends support to that argument.

*First,* Section 2(f) is part of the congressional findings and simply recognizes the United States' historical position that "[t]he United States has provided few, if any, special services to the" Tribe, and "has denied that it had jurisdiction over or responsibility for said Tribe." But Section 9(a)'s exception for "inconsistent" provisions applies only to "any *specific* provision" of the Settlement Act and thus does not, by its terms, encompass Section 2(f), which is nothing more than a recitation of congressional findings that lacks effect in this regard. *Cf. United States v.*

*Morrison*, 529 U.S. 598, 614 (2000) (explaining that "the existence of congressional findings is not sufficient … to sustain" the legality of legislation because "[s]imply because Congress may conclude" something in those findings "does not necessarily make it so" (citation and internal quotation marks omitted)). Section 2(f) stands in contradistinction to specific provisions such as Section 5(b)(8), which expressly precludes the Secretary from using settlement funds to acquire in trust land outside the settlement lands. If the Tribe used settlement funds to purchase a parcel outside the settlement lands, then taking such lands into trust would be "inconsistent with" a "specific" provision of the Settlement Act per Section 9(a): Section 5(b)(8). Moreover, Congress knows how to use a broader phrase when it so desires, as it did in Section 11, where it enacted broader language applying to "any provision" of the Settlement Act.[8] As the Supreme Court has admonished, Congress's "choice to use [a] narrower term," as in Section 9(a), "requires respect, not disregard." *Wis. Cent. Ltd v. United States*, 585 U.S. 274, 275 (2018).

*Second*, Section 5(b) provides that as settlement funds are disbursed, "the United States shall have no further trust responsibility to the Tribe or its members with respect to the sums paid, any subsequent expenditures of these sums, or any property other than private settlement lands or services purchased with these sums." But this provision plainly applies only to property purchased with settlement funds, that is, to the "disburse[ment]" of funds "by the Secretary in accordance with" Section 5 of the Settlement Act. Settlement Act § 5(b); *see also Yates v. United States*, 574 U.S. 528, 537 (2015) ("[I]t is a fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used." (internal quotation marks omitted)).

[8] Section 11 contains the Settlement Act's severability clause, which reflects "the intent of Congress that the entire [Act] be invalidated" if "any provision of [S]ection 4 of this Act is held invalid" and "the intent of Congress that the remaining sections of this Act shall continue in full force in effect" if "any other section or provision of this subchapter is held invalid."

Besides, the Second Circuit rejected the proposition that Section 5 prohibits the Secretary's IRA fee-to-trust authority in *Blumenthal.* There, the Second Circuit explained that Section 5, consistent with its title "Mashantucket Pequot Settlement Fund," "generally prescribes the use of the settlement fund." 228 F.3d at 88; *see also Yates*, 574 U.S. at 540 ("[T]he title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute." (alteration in original) (internal quotation marks omitted)). Because the Second Circuit concluded that Section 5(b)(8)'s "internal reference 'acquired under this subsection' is logically read to mean 'acquired with settlement funds," *Blumenthal*, 228 F.3d at 88, it thus naturally follows that Section 5(b)(5)'s internal reference to the "disburse[ment]" of settlement funds "in accordance with this section" similarly disclaims any further trust responsibility to the expended settlement funds themselves. *Id.* at 89 ("Section 5(b)(5) pertains to trust responsibilities *over the settlement funds.*" (emphasis added)). That conclusion not only "flows from [Section 5(b)(5)]'s express terms and context," *Me. Cmty. Health Options v. United States*, 590 U.S. 296, 310 (2020), but also "accords with common sense," *Paroline v. United States*, 572 U.S. 434, 448 (2014).

**4. The State Misrepresents the Scope of the Settlement Act.**

As part of its argument that the Settlement Act did not extend to the Tribe, the State argues that the Settlement Act was "limited" in scope and purpose. ECF No. 35-1 at 35. To the contrary, the Settlement Act did not merely rubber stamp a settlement agreement between the Tribe, private landowners, and the State. Rather, the Settlement Act, among other things, extended federal recognition to the Tribe and thereby institutionalized the trust relationship between the Tribe and the United States, allocated a settlement fund for the Tribe's acquisition of private settlement lands and obligated the federal government to administer that fund on a continual basis, declared the Tribe's reservation to constitute Indian country, restricted the Tribe's lands from alienation

consistent with the Trade and Intercourse Act, extended all federal Indian laws of general applicability to the Tribe, and made the Tribe eligible for the full panoply of federal benefits and services provided to other federally recognized tribes. *See* Settlement Act §§ 5(a)–(b), 6, 8, 9(a), (c). While the State attempts to miscast the Second Circuit decision in *Blumenthal*, the Second Circuit expressly concluded that "[n]othing in the Act indicates that Congress intended to establish the outermost boundaries of the Tribe's sovereign territory." 228 F.3d at 90.

**C. The State's Procedural Argument is Meritless.**

Apart from its arguments based on the Settlement Act, the State argues that it was denied the opportunity to meaningfully participate in the proceedings below in violation of the APA. ECF No. 35-1 at 36–39. The State asserts that it (1) never received notice of the Tribe's applications for the Secretary to take the parcels at issue into trust, and that it (2) otherwise rebutted the evidentiary presumption that it received notice, also known as the mailbox rule.

*First,* the State argues that it was not notified of the Tribe's application. But as the record conclusively establishes, each notice to the State indicates that it was sent by certified mail to the State, and separate proof-of-delivery notices establish that the State received and signed for each notice on November 7, 2023. AR 119-305; AR 159-430. The State now claims that its Legislative Office Building is not the same mailing address as that of its Governor, ECF No. 35-1 at 5, but the State's evidence before the agency established that "the legislative branch of Connecticut's government controls the operation of the building, including the receipt, sorting, and distribution of mail" such that "[w]hen mail arrives that is directed to the Governor's Office, the mail room delivers it to the Governor's Office." *E.g.*, AR 119-582. The State also never purported to explain why prior and subsequent mailings from Interior in the proceedings below were received by the Governor's office when mailed to the very same address and signed for by the very same signatory.

*See, e.g.*, AR 119-473; AR 159-414. At best, the State's arguments on this score represent an attempt to pass the buck to Interior for its own failure to properly sort its mail. But that failure is irrelevant to the question of whether Interior satisfied its obligation to notify the State, and the record conclusively establishes that Interior did so. *See* 25 C.F.R. § 151.10 (2023).

*Second*, the State argues that its evidence established that it never received the notices and thus sufficed to rebut the mailbox rule. But the State elides that its evidence consisted solely of a self-serving declaration of a State employee. Moreover, the mailbox rule is a "well settled" evidentiary presumption that requires "evidence to the contrary" to be overcome. *See* 29 Am. Jur. 2d *Evidence* § 269, Westlaw (database updated May 2025). A simple declaration by the recipient claiming non-receipt is insufficient to overcome the presumption as a matter of law. *See, e.g.*, *id.* n.1; *see also, e.g.*, *Lewin v. Comm'r*, 569 F.2d 444, 447 (7th Cir. 1978) (presumption not rebutted where "[p]ostal records" showed that forms at issue "were left at petitioners' residence"), *cert. denied*, 437 U.S. 904 (1978). The State's argument to the contrary again seeks to fault Interior for a mistake the State concedes was its own.

Additionally, the State has yet to identify impacts of the acquisitions on regulatory jurisdiction, real property taxes, and special assessments that it would have identified had the ERD allowed the State to submit untimely comments. *See* 25 C.F.R. § 151.10 (2023). Moreover, it is difficult to understand what tax and regulatory issues conceivably *could* arise. The ERD concluded that the 2022 real property taxes assessed for 119 Indiantown Road ($499.40 for 2022) and 159 Indiantown Road ($2,542.58 for 2022) were less than one thousandth of a percent (.001%) and six thousandths of a percent (.006%) of the Town of Ledyard's tax revenue, respectively. AR 119-509; AR 159-478. And it is undisputed that the Tribe has no plans to develop the properties at this time, which will remain open forest lands, and that the land surrounding these properties is either

owned by the Tribe or held in trust by the United States for the benefit of the Tribe. In view of the ERD's yet-uncontested conclusions that these impacts are minimal, remand to the agency would be unwarranted even if it somehow erred in this regard. *See Bechtel*, 710 F.3d at 449.

**IV. The Equities and Public Interest Favor the Tribe and Defendants.**

Finally, the balance of the equities and public interest favor the Tribe and Defendants. As the Tribe has explained in previous filings, the Tribe is already experiencing irreparable harm. The deprivation of the Tribe of its sovereign right to have these parcels taken into trust following Interior's grant of its applications infringes on the Tribe's sovereignty, and it is well-established that infringements on tribal sovereignty constitute irreparable harm. *See, e.g.*, *Ute Indian Tribe of the Uintah & Ouray Rsrv. v. Utah*, 790 F.3d 1000, 1005–06 (10th Cir. 2015) (Gorsuch, J.); *Ute Indian Tribe of the Uintah & Ouray Rsrv. v. Lawrence*, 22 F.4th 892, 909–10 (10th Cir. 2022); *Cayuga Nation v. Tanner*, 108 F. Supp. 3d 29, 34–35 (N.D.N.Y. 2015); *Seneca Nation of Indians v. Paterson*, No. 10-CV-687A, 2010 WL 4027795, at *2 (W.D.N.Y. Oct. 14, 2010).

As to Defendants, the Supreme Court has repeatedly affirmed that Congress has "plenary and exclusive" authority to "legislate with respect to Indian tribes." *Haaland*, 599 U.S. at 272 (internal quotation marks omitted). Congress acted pursuant to that authority in enacting the IRA in order to "rehabilitate the Indian's economic life and to give him a chance to develop the initiative destroyed by a century of oppression and paternalism." *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 152 (1973) (quoting H.R. Rep. No. 73-1804, at 6 (1934)). Consistent with the similar oppression and paternalism by the State against the Tribe throughout three centuries of land expropriation, Congress extended the Secretary's land-into-trust authority under the IRA to the Tribe by enacting the Settlement Act pursuant to that same plenary and exclusive authority. A stay in these circumstances would not only interfere with the Secretary's authority under the IRA

as extended by the Settlement Act, but it would also interfere with Congress' authority in the domain of federal Indian law.

It also bears reiteration that Interior has both (1) unlawfully withheld its acceptance of the parcels into trust status, and (2) otherwise unreasonably delayed in accepting the parcels into trust, each of which constitutes a violation of the APA. *See, e.g.*, *Adueva v. Mayorkas*, No. 17-CV-03350, 2021 WL 3492144, at *10 (E.D.N.Y. Aug. 9, 2021); *Giammarco*, 170 F. Supp. 3d at 330. But it is well-established that is well established that "[t]he public interest is served by compliance with the APA." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 678 (9th Cir. 2021) (quoting *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018)). For this reason, the public interest tips decisively against a stay.

## CONCLUSION

The Court should reject the State's arguments and deny its motion.

Dated: June 27, 2025

/s/ Keith M. Harper

Thomas J. Murphy (ct07959)
James J. Healy (ct28447)
COWDERY, MURPHY & HEALY, LLC
280 Trumbull Street
Hartford, CT 06103
(860) 278-5555 (phone)
(860) 249-0012 (fax)
tmurphy@cmandh.com
jhealy@cmandhj.com

Keith M. Harper (*pro hac vice*)
Andrew C. DeGuglielmo (*pro hac vice*)
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
(202) 639-6000 (phone)
(202) 639-6066 (fax)
kharper@jenner.com
adeguglielmo@jenner.com

*Attorneys for Interested Party Mashantucket Pequot Indian Tribe*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 27, 2025, I caused the foregoing document to be electronically filed with the Clerk of the Court for the United States District Court for the District of Connecticut by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Keith M. Harper
Keith M. Harper